Steven W. Fogg, WSBA No. 23528
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104-1001
Ph: (206) 625-8600

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| AMANDA BANTA, SHARP SHOOTING INDOOR RANGE & GUN SHOP, INC., THE RANGE, LLC, AERO PRECISION, LLC, and NATIONAL SHOOTING SPORTS FOUNDATION, INC. | No. |
| Plaintiffs, | COMPLAINT |
| v. | |
| ROBERT W. FERGUSON, ATTORNEY GENERAL OF THE STATE OF WASHINGTON; and JOHN R. BATISTE, CHIEF OF THE WASHINGTON STATE PATROL | |
| Defendants. | |

Amanda Banta, Sharp Shooting Indoor Range & Gun Shop, Inc., The Range, LLC, Aero Precision, LLC, and the National Shooting Sports Foundation, Inc. (collectively, "Plaintiffs") hereby bring this complaint against Robert W. Ferguson, Attorney General of Washington State, and John R. Batiste, Chief of the Washington State Patrol (collectively, "Defendants"). Plaintiffs bring this complaint based on

COMPLAINT - 1

1  personal knowledge as to all Plaintiff facts, and on information and belief as to all
2  other matters.

3                              **INTRODUCTION**

4        1.      "[T]he Second Amendment protects the possession and use of weapons
5  that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct.
6  2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627
7  (2008)).  "[A]ll instruments that constitute bearable arms, even those that were not
8  in existence at the time of the founding," come within the ambit of the Second
9  Amendment.  *Id.* at 2132 (quoting *Heller*, 554 U.S. at 582); *see Caetano v.*
10 *Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) (reversing state court decision
11 upholding blanket ban on stun guns).  And if an arm is "typically possessed by law-
12 abiding citizens for lawful purposes" today, then it may not be banned, full stop.
13 *Heller*, 554 U.S. at 625; *see Bruen*, 142 S. Ct. at 2143 (contrasting "weapons that
14 are unquestionably in common use today," which may not be banned, with "those
15 that 'are highly unusual in society at large'" (quoting *Heller*, 554 U.S. at 629)).  That
16 is the irreducible minimum of the fundamental "right of the people to keep and bear
17 Arms."  U.S. Const. amend. II.  A state may not "prohibit[] . . . an entire class of
18 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose."
19 *Heller*, 554 U.S. at 628.

20       2.      Yet that is precisely what Washington State has just done. On April 25,
21 Washington Governor Jay Inslee signed into law House Bill 1240 ("HB 1240").  HB
22 1240 takes the radical step of banning nearly every modern semiautomatic rifle—
23 the single most popular type of rifle in the country, possessed by Americans in the
24 tens of millions.   Indeed, Americans buy more of the most popular type of
25 semiautomatic rifle (the AR-15) each year than the most popular type of automobile

COMPLAINT - 2

1  (the Ford F-150), and there are more AR-15-style rifles in private hands in America
2  today than subscribers to all daily newspapers nationwide combined.

3      3.      Few states have ever tried to adopt such an extreme measure—and for
4  good reason, as no less an authority than the Supreme Court has already recognized
5  that semiautomatic rifles "traditionally have been widely accepted as lawful."
6  *Staples v. United States*, 511 U.S. 600, 612 (1994).

7      4.      All of that dooms any effort to claim that prohibiting these ubiquitous
8  arms is consistent with "the historical tradition that delimits the outer bounds of the
9  right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

10      5.      Not content with effectively banning the modern rifle, HB 1240 also
11  bans many semiautomatic *pistols*, even though "semiautomatic pistols" are "the
12  weapons most commonly used today for self-defense." *Caetano*, 577 U.S. at 417–
13  18 (Alito, J., concurring in the judgment).

14      6.      None of that is consistent with the Second Amendment, which protects
15  the right of law-abiding Americans to keep and bear arms that are "in 'common use'
16  for self-defense today." *Bruen*, 142 S. Ct. at 2143. Because the arms that
17  Washington has banned unquestionably are in common use today by law-abiding
18  Americans, its ban is unquestionably unconstitutional.

19      7.      Plaintiffs thus seek, among other things, declaratory and injunctive
20  relief to prevent Washington, including Defendants Ferguson and Batiste, and all of
21  their respective agents and assigns, from enforcing HB 1240 against Plaintiffs or any
22  of their members.

23                    **JURISDICTION AND VENUE**

24      8.      Plaintiffs' causes of action arise under 42 U.S.C. §1983 and the United
25  States Constitution, so this Court has jurisdiction pursuant to 28 U.S.C. §1331.

COMPLAINT - 3

9.      This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) because this action seeks to "redress the deprivation, under color of a[] State law," of "right[s], privilege[s] or immunit[ies] secured by . . . an[] Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

10.     Venue lies in this district pursuant to 28 U.S.C. §1391 because Defendants are located and perform their official duties in the Eastern District of Washington and are therefore considered to reside within this District as a matter of law.

## THE PARTIES

11.     Plaintiff Amanda Banta is a law-abiding, adult resident of Spokane, Washington.  A 2012 Olympian for Team USA in the 50-meter rifle three positions event and member of the U.S. Rifle Team for ten years, Banta won a bronze medal at the 2007 Pan American Games, and also competed on Ohio State University's NCAA Rifle Team.  She is legally eligible under federal and state law to possess and acquire firearms.  But for Washington's new ban, she would be in the market for one or more new firearms that fall within the scope of what is banned under HB 1240.

12.     Plaintiff Sharp Shooting Indoor Range & Gun Shop, Inc. ("Sharp Shooting") is a retail firearms business located in Spokane, Washington, and is authorized to sell firearms as a Federal Firearms Licensee (FFL 01) licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  Before HB 1240 was enacted, Sharp Shooting sold many of the semiautomatic firearms and magazines the state now prohibits.  But for HB 1240, Sharp Shooting would continue to sell these products in Washington.  Sharp Shooting also has entered into a contract with the Kitsap County Sheriff's Office to provide new firearms in exchange for partial payment of AR-platform rifles to Sharp Shooting from the Sheriff's Office.

COMPLAINT - 4

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1   Under HB 1240, Sharp Shooting can no longer take lawful possession of 25 rifles it
2   is still owed by the Sheriff's Office, nor can it lawfully sell in Washington the 100
3   rifles it has already received from the Sheriff's Office.

4      13.   Plaintiff The Range, LLC, is a retail firearms business located in
5   Yakima, Washington, and is authorized to sell firearms as a Federal Firearms
6   Licensee (FFL 01 & SOT 02) licensed by the ATF.  Before HB 1240's enactment,
7   The Range sold many of the firearms and magazines the state now prohibits.  But
8   for HB 1240, The Range would continue to sell these products in Washington.

9      14.   Plaintiff Aero Precision, LLC ("Aero") is a manufacturer of firearms,
10  firearm parts, and firearm accessories, based in Tacoma, Washington.  Aero is
11  authorized to manufacture firearms as a Federal Firearms Licensee (FFL 07)
12  licensed by the ATF.  Nearly all of the firearms Aero manufactures are now banned
13  under HB 1240, and nearly all of the related products Aero manufactures are
14  designed for firearms that are now banned under HB 1240 as well.

15     15.   Plaintiff National Shooting Sports Foundation, Inc. ("NSSF") is a
16  Connecticut nonprofit, tax-exempt, non-stock corporation with its principal place of
17  business in Connecticut.  It is the trade association for the firearm, ammunition, and
18  hunting and shooting sports industry.  It has a membership of more than 10,000
19  throughout the United States (including Washington), including manufacturers,
20  distributors, and retailers of firearms, ammunition, and related products, as well as
21  other industry members.  NSSF's mission is to promote, protect, and preserve
22  hunting and shooting sports by providing leadership in addressing industry
23  challenges, advancing participation in and understanding of hunting and shooting
24  sports, reaffirming and strengthening its members' commitment to the safe and
25  responsible sale and use of their products, and promoting a political environment

COMPLAINT - 5

supportive of America's traditional hunting and shooting heritage.   NSSF is authorized to bring this action on its members' behalf, in light of the injuries HB 1240 is causing and will cause NSSF members if allowed to take effect.

16.   Defendant Robert W. Ferguson is Washington's Attorney General. Attorney General Ferguson is "the legal adviser of the state officers," and he has the duty to "institute and prosecute all actions and proceedings for . . . the state," as well as to "defend all actions and proceedings against any state officer."  Wash. Const. art. III, §21; Wash. Rev. Code §43.10.030.  He is a resident of Washington, and his principal place of business is 1125 Washington Street SE, PO Box 401001, Olympia, WA 98504.  At all relevant times, Attorney General Ferguson, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law.

17.   Defendant John R. Batiste is the Chief of the Washington State Patrol. As Chief, Batiste has the duty to exercise the "powers and duties as are prescribed by law."  Wash. Rev. Code §43.43.030.  Chief Batiste is a resident of Washington, and his principal place of business is Helen Sommers Building, 106 11th Avenue SW, Olympia, WA 98501.  At all relevant times, he, as well as those subject to his supervision, direction, or control, are and will be acting under color of law.

## FACTS

**Semiautomatic Firearms Are The Modern Standard—And For Good Reason.**

18.   A "semiautomatic" firearm is a firearm that discharges a single projectile with each pull of the trigger, no matter how long the trigger is depressed. The "automatic" part of this term refers to the fact that the chamber will automatically reload and be ready for the next trigger pull; semiautomatic firearms remain only "semi-automatic" because the trigger must still be depressed each time

COMPLAINT - 6

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

the shooter wishes to fire.  By contrast, a fully automatic firearm, often known as a "machine gun," will discharge rounds for as long as the trigger is depressed.  *Staples*, 511 U.S. at 600.

19.    Semiautomatic rifles and pistols have been in safe and effective use by civilians in this country—including in Washington—for more than a century, and they "traditionally have been widely accepted as lawful." *Id.* at 603, 612.[1]

20.    That is hardly surprising.  The history of the advancement of firearms technology reflects a persistent trend of trying to increase firing capacity and speed—and thus utility for self-defense—without sacrificing accuracy or functionality, which is precisely what semiautomatic technology accomplishes.

21.    "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580," and several such handguns and long guns "pre-date[] the American Revolution." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *reh'g en banc granted*, *opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted*, *judgment vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).  "British soldiers were issued magazine-fed repeaters as early as 1658," while the Pepperbox-style pistol, with multiple

---

[1] Fully automatic firearms, by contrast, have long been heavily regulated, *see* National Firearms Act, ch. 757, 48 Stat. 1236 (1934); any commerce in fully automatic firearms manufactured after May 19, 1986, has been explicitly banned for nearly 40 years, *see* Pub. L. No. 99–308, 100 Stat. 449 (1986). Washington bans "machine guns," which is defined to include fully automatic firearms, a law that Plaintiffs do not challenge.  *See* Wash. Rev. Code §9.41.190(1)(a).

COMPLAINT - 7

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

barrels, was popular on both sides of the Atlantic for a century before the founding. *Id.*; *see also id.* ("As a predecessor to modern revolvers, the Pepperbox pistol design pre-dates the American Revolution by nearly one hundred years, with common variants carrying five to seven shots at the ready and with several European variants able to shoot 18 or 24 shots before reloading individual cylinders.").

22.     A major breakthrough in modern firearms came around the time of the Civil War, when a combination of new technologies produced rifles that could be fed self-contained metallic cartridges, which contained both powder and bullet, from a magazine. *See* David B. Kopel, *The History of Firearms Magazines and Magazine Prohibitions*, 78 Albany L. Rev. 849, 854 (2015). Using a lever action, arms such as the Spencer repeating rifle or the Henry rifle enabled users to fire as fast as their hands could work the lever and pull the trigger—a rate of 28 rounds per minute for the Henry, even accounting for the need to reload. Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403 (2d ed. 2018).

23.     By the end of the Civil War, "repeating, cartridge-fed firearms" were ubiquitous, and many of the most popular models had magazines that held more than 10 rounds. *Id.* at 1148. For example, the Winchester 66 had a 17-round magazine and could fire all 17 rounds, plus the one in the chamber, in under nine seconds. *Id.* Later Winchester repeater models, including the famed Winchester 73 ("the gun that won the West"), likewise had magazines that held more than 10 rounds, and they sold a combined "over 1.7 million total copies" between 1873 and 1941. *Id.*

24.     The flintlocks of the Revolutionary War era had taken 26 steps to reload; the lever action rifles of the Civil War reduced this to two (or four for the new bolt action). *Id.* at 463. In 1885, the invention of the semiautomatic action dropped this down to zero. *Id.* In a semiautomatic, the gas that is released by the gunpowder

COMPLAINT - 8

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

explosion when the arm is fired is harnessed "to eject the empty case, and then move a fresh cartridge from the magazine into the firing chamber." *Id.* Thus, while the user must still pull the trigger to fire each bullet—just as with bolt-action, lever-action, pump-action, or flintlock arms—the chamber reloads automatically, making the firearm "semiautomatic."

26. Semiautomatics were marketed as personal-defense and sport firearms for half a century before they were deployed in significant numbers by the United States military—or any military, for that matter, as the United States was the first nation to do so. *See id.* at 463, 519.

26. Hand-in-hand with the development of the semiautomatic firearm came the development of the detachable box magazine, a device that holds the ammunition in a stack typically underneath the firearm and can be replaced with a new magazine when needed. *See id.* at 520. The first such firearm was the Jarre harmonica pistol of 1862, but its horizontal-feeding magazine made it awkward to use. The modern detachable box magazine, which sits in the grip of the pistol, first enjoyed commercial success with the "broomhandle" Mauser in 1896. By 1911, the Colt M1911 semiautomatic pistol—which many still regard as one of the finest available handguns today—came with a detachable magazine. *Id.* at 518. And as the twentieth century wore on, many citizens purchased rifles and handguns with box magazines capable of holding more than 10 rounds, such as Auto Ordnance Company's semiautomatic rifle (1927, 30 rounds) and the Browning Hi-Power pistol (1935, 13 rounds). *Id.* Indeed, the U.S. government subsidized the spread of these popular arms: In 1963, it sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount, chiefly through the congressionally established Civilian Marksmanship Program. *Duncan*, 970 F.3d at 1148.

COMPLAINT - 9

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

27.    That same year, the first AR-15, Colt Sporter, rifle was released commercially.[2] *See id.* ("The ultimate successor to the M-1 was the M-16, with a civilian version dubbed the Armalite Model 15, or AR-15.").

28.    Made with modern materials such as plastic polymers rather than wood, the AR-15 was lighter and more durable than traditional rifles.  Moreover, the AR-15 is a "platform," not just a single model of semiautomatic rifle.  It has an "open source" design that can be modified with "countless variations and adaptations," with "ready-made retail parts" "made by numerous manufacturers under different product names," thus making it accessible to the needs of many different types of users.  *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1020 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022).

29.    These modern semiautomatic rifles quickly became—and have remained—extremely popular; indeed, the AR-15 is still the most popular type of rifle sold today.  "Over the last three decades, 19,797,000 modern rifles"—i.e., "rifle[s] built on the AR-15 platform"—have been manufactured or imported into the United States and the numbers have been steadily increasing."[3] *Miller*, 542 F.

---

[2] "AR" stands for ArmaLite Rifle; ArmaLite was the company that originally designed the platform.  AR does not stand for "assault rifle."  An "assault rifle" is a *fully* automatic firearm that has a selector switch enabling it to fire multiple rounds automatically.  *Johnson*, *supra*, at 1136.

[3] As "used in th[at] opinion," "the term 'modern rifle' . . . principally refers to a rifle built on the AR-15 platform."  *Miller*, 542 F. Supp. 3d at 1020. That term makes sense given the ubiquity of AR-15-types in modern America.

COMPLAINT - 10

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Supp. 3d at 1020, 1022; *accord Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) (similar), *rev'd*, 849 F.3d 114 (4th Cir. 2017) (en banc).

30.    The most recent sales and ATF data available indicate that, in 2020 alone, 2,798,000 AR-15-style rifles were produced or imported into the United States.  *See* National Shooting Sports Foundation, Inc., *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3CRHhQl (citing data). And AR-15-style rifles accounted for "one-half of all rifles (48%) produced in 2018."  *Miller*, 542 F. Supp. 3d at 1022.

31.    Recent data showed that approximately 24,446,000 AR-15-style rifles are currently owned nationwide.  NSSF, *Commonly Owned*, *supra*.  A recent survey of gun owners found the same: approximately 24,600,000 Americans have owned or continue to own one or more AR-15- style rifles.  See William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned at 2* (May 13, 2022), https://bit.ly/3HaqmKv.

32.    To put that in perspective, that dwarfs sales of the most popular automobile in the country, the Ford F-150:  In 2020, Ford sold 787,442 F-Series pickup trucks, including, but not limited to, the F-150, the most popular model. *Fourth-Quarter 2020 Sales* at 2, Ford (Dec. 2020), https://ford.to/3H87Y5T; s*ee Kolbe*, 813 F.3d at 174 (finding the difference between F-150 sales and AR-15 sales telling in the commonality inquiry); *Miller*, 542 F. Supp. 3d at 1022–23 (same). As opposed to the 24 million-plus AR-15-style rifles in circulation, there are approximately 16 million F-150s on the road.  Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Authority (Apr. 9, 2021), https://bit.ly/3GLUtaB. The number of AR-15- style rifles sold per year (more than 2 million) is also significantly more than the number of New York Times print

COMPLAINT - 11

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

subscribers (761,000). *See* Kate Robertson, *New York Times Reports a Gain of 180,000 Digital Subscribers*, N.Y. Times (Aug. 3, 2022), https://nyti.ms/3H8bz3T. And the total number of AR-15-style rifles in circulation is slightly more than the "total U.S. daily newspaper circulation (print and digital combined) in 2020 . . . 24.3 million for weekday[s]," and only slightly less than the "25.8 million for Sunday[s]." *Newspapers Fact Sheet, Pew Research Center* (June 29, 2021), *available at* https://pewrsr.ch/3CNXFS0 (last visited April 25, 2023).

33.    Purchasers consistently report that one of the most important reasons they purchase semiautomatic rifles is for self-defense. "In 2018, . . . 34% of buyers purchased a modern rifle [predominantly] for personal protection, while 36% purchased [predominantly] for target practice or informal shooting,[4] and 29% purchased [predominantly] for hunting." *Miller*, 542 F. Supp. 3d at 1022. Contrast that with non-semiautomatic rifles, "only 5% of [which] were bought for personal protection." *Id.*

34.    In addition to the benefits of the semiautomatic technology itself, semiautomatic rifles and pistols offer several features that make them popular for self-defense and other lawful uses.

35.    **Detachable magazines.** Most models accept detachable magazines, making it easier to reload the firearm, which can be critical in the stressful situation of being forced to defend self, family, or home. Many of the most popular models of rifles, including every AR-15-style rifle, come standard with magazines with a

---

[4] "During 2018, approximately 18,327,314 people participated nationally in target and sport shooting specifically with [AR-15-style] rifles." *Miller*, 542 F. Supp. 3d at 1022.

COMPLAINT - 12

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  capacity of 15, 20, or 30 rounds.  Many popular semiautomatic pistols likewise come

2  standard with capacities of 15 or more rounds.  To take just one of numerous

3  examples, the Beretta Model 92, a "popular handgun used for self-defense" "which

4  entered the market in 1976," "comes standard with a sixteen-round magazine."

5  *Duncan*, 970 F.3d at 1142.

6      36.    **Pistol grips.** Many semiautomatic rifles are fitted with pistol grips,

7  which improve accuracy and reduce the risk of stray shots by stabilizing the firearm

8  while firing from the shoulder.  David B. Kopel, *Rational Basis Analysis of "Assault*

9  *Weapon" Prohibition*, 20 J. Contemp. L. 381, 396 (1994).  "By holding the pistol

10  grip, the shooter keeps the barrel from rising after the first shot, and thereby stays on

11  target for a follow-up shot.  The defensive application is obvious, as is the public

12  safety advantage in preventing stray shots." *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th

13  Cir. 2017) (en banc) (Traxler, J., dissenting).

14      37.    **Thumbhole, folding, or telescoping stocks.** Many semiautomatic

15  rifles have the capacity to accept thumbhole, folding, and/or telescoping stocks.

16  Thumbhole stocks give the user a more comfortable and stable grip, which provides

17  for greater accuracy and decreases the risk of dropping the firearm or firing stray

18  shots.  Folding stocks make a rifle more maneuverable in confined spaces and

19  facilitate safe storage in easily accessible spaces.  And a telescoping stock allows a

20  firearm to be better fitted to an individual shooter's arm length, thereby enhancing

21  the ability to use the firearm safely and effectively, particularly if multiple people of

22  different sizes may need to use the same rifle.

23      38.    **Flash suppressors.** Many semiautomatic rifles and pistols can be fitted

24  with a flash suppressor, which is a device designed to reduce or redirect muzzle

25  flash—the sudden flash of light caused by the explosion of gunpowder when a rifle

COMPLAINT - 13

user fires a shot—from the shooter's field of vision.  Flash suppressors prevent users from being blinded in low lighting conditions, such as at dusk or dawn, or during the nighttime.  They also reduce recoil and muzzle movement, increasing accuracy and making the firearm less painful to use—crucial in self-defense situations.  Kopel, *supra*, 20 J. Contemp. L. at 397–99.

39.    **Threaded barrels.** Many pistol models come standard with a threaded barrel.  See Wm. Alan Bartley & Geoffrey Fain Williams, *What Is an Assault Weapon? Definitions, Attributes, and Implications Regarding Legislation*, 57 Gonz. L. Rev. 515, 534 (2022) (citing statistics showing that "threaded barrels/flash suppressors are . . . common features").  That is particularly true of so-called AR-type pistols, which, as the ATF recently noted, are "popular large handgun[s]" among law-abiding Americans.  86 Fed. Reg. 30,826, 30,831 (June 10, 2021).  A threaded barrel allows users to attach, e.g., a muzzle brake to a firearm, which "reduces the gun's recoil and makes it easier to control."  Kopel, *supra*, 20 J. Contemp. L. at 396.  Muzzle brakes are designed to redirect propellant gases to counter recoil and its resultant poor accuracy, and for that reason are often used in competitive shooting.

40.    **Arm braces.** Many popular semiautomatic pistols, including AR-type pistols, come standard with stabilizing braces.  A stabilizing brace (or "arm brace") "help[s] a shooter 'stabilize' his or her arm to support single-handed firing."  86 Fed. Reg. at 30,827.  In general, "the intent of the brace [is] to facilitate one-handed firing of the AR-15 pistol for those with limited strength or mobility due to a disability, and to reduce bruising to the forearm when firing with one hand."  *Id.*

41.    None of these features increases a firearm's rate of fire or capacity for firepower.  By making the firearm more comfortable and/or easier to operate, they

COMPLAINT - 14

simply "make rifles [and pistols] easier to control and more accurate—making them safer to use" for lawful purposes such as self-defense.  *Murphy v. Guerrero*, No. 1:14-CV-00026, 2016 WL 5508998, at *18 (N.D. Marian Isl. Sept. 28, 2016).

42.    It is little surprise, then, that there is no tradition in this country—historical or otherwise—of prohibiting firearms with these common features.  To the contrary, the vast majority of states place no special restrictions on semiautomatic, centerfire rifles with a detachable magazine and a pistol grip, thumbhole stock, flash suppressor, or adjustable stock.  Indeed, only eight states other than California (plus the District of Columbia) have singled out such arms for special restrictions, and all those restrictions are of recent vintage.[5]

**Washington Enacts A Ban On Ubiquitous Firearms.**

43.    On April 25, 2023, Governor Inslee signed HB 1240 into law, making Washington the tenth state to impose severe restrictions on some of the most commonly owned firearms in America.  Indeed, HB 1240 goes even farther than many of the handful of so-called "assault weapon" bans that have cropped up over the past few decades, as its ban encompasses nearly all semiautomatic rifles and prohibits many common semiautomatic pistols.

---

[5] California first enacted its restrictions in 1989, and D.C. enacted its restrictions in 2009. The other eight states that restrict such arms are New Jersey (first enacted in 1990), Hawaii (1992), Connecticut (1993), Massachusetts (1994), Maryland (2002), New York (2013), Delaware (2022), and Illinois (2023). Hawaii bans "assault pistols" only.

COMPLAINT - 15

**CORR CRONIN** LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

44.     Under HB 1240, "[n]o person in this state may manufacture, import, distribute, sell, or offer for sale any assault weapon, except" under certain narrow exceptions "as authorized in this section."  §3(1).

45.     The ban "takes effect immediately."  §6.

46.     Unlike the term "assault rifle," *see supra* n.2, "assault weapon" is not a term with any historical pedigree or fixed meaning.  Indeed, "the term 'assault weapon' did not exist in the lexicon of firearms" until the 1980s, when "anti-gun publicists" coined it to try "to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance."  *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

47.     HB 1240 defines "assault weapon" extremely broadly.

48.     First, HB 1240 includes any "semiautomatic, center fire rifle" that has both "the capacity to accept a detachable magazine" and a "grip that is independent or detached from the stock that protrudes conspicuously beneath the action of the weapon" (i.e., a pistol grip) in the definition of a prohibited "assault weapon." §2(a)(iv).

49.     That feature-based definition alone captures approximately 20% of all firearms sold in the U.S. in 2020, the most recent year for which data is available, as the most popular class of modern semiautomatic rifles—the AR platform—has both the capacity to accept a detachable magazine and a pistol grip.  See National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report* at 9, https://bit.ly/3CXJwC1 (last visited Apr. 24, 2023).

50.     Lest there be any doubt about the breadth of its prohibitions, HB 1240 also bans the AR15 "in all forms" and other AR variants explicitly.  §2(a)(i).  And

COMPLAINT - 16

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    HB 1240 lists more than 50 other semiautomatic rifles by name or type and deems

2    all of them banned "assault weapons." *Id.*

3        51.    Not content with wiping out the single most popular class of rifles in

4    America, HB 1240 also includes within its sweeping definition of prohibited "assault

5    weapons" any "semiautomatic, center fire rifle" that has both "the capacity to accept

6    a detachable magazine" and any "grip designed for use by the nonfiring hand to

7    improve control."  §2(a)(iv)(D).

8        52.    HB 1240 further includes within the definition any "semiautomatic,

9    center fire rifle" that has both "[t]he capacity to accept a detachable magazine" and

10   "one or more of" a "thumbhole stock," "a folding or telescoping stock," "a flash

11   suppressor, flash guard, flash eliminator, flash hider, sound suppressor, silencer, or

12   any item designed to reduce the visual or audio signature of the firearm," "a shroud

13   that encircles either all or part of the barrel," or "a grenade launcher."  §2(a)(iv)(B),

14   (C), (E), (I), (H).  That definition captures nearly any modern rifle, as most modern

15   rifles come standard with a "grip designed for use by the nonfiring hand" and/or a

16   forend "that encircles either all or part of the barrel," which the statute calls a

17   "shroud."  §2(a)(iv)(A), (I).[6] Washington has banned these features even though, as

18   explained,    most    (with    the    notable,    one-of-these-things-is-not-like-the-other

19   exception of "grenade launcher"[7]) increase the ability to use rifles safely and

20   effectively for lawful purposes like self-defense. *See supra.*

21

22   [6] The statute's definition of shroud exempts standard forends if they are "solid."

23   [7] "Grenade launchers" are very rare and already illegal as a general matter, as are

24   grenades themselves.  *See* Kopel, *supra*, 20 J. Contemp. L. at 399–400; *Staples*, 511

25   U.S. at 608.  Plaintiffs do not challenge this redundant prohibition.

COMPLAINT - 17

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

53.    HB 1240 then goes on to sweep in any "semiautomatic rifle that has an overall length of less than 30 inches" to the definition of a prohibited "assault weapon." §2(2)(a)(ii).

54.    HB 1240 further prohibits any semiautomatic rifle with a fixed (i.e., non-detachable) magazine that has "the capacity to accept more than 10 rounds." §2(a)(v).

55.    All in all, HB 1240 bans hundreds of models of rifle, including all of the most popular models in circulation.

56.    And Washington did not stop there.  In addition to effectively banning all modern semiautomatic rifles, HB 1240 deems prohibited "assault weapons" any semiautomatic pistol "that has the capacity to accept a detachable magazine" if it has "one or more of the following": "a threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer"; "a second hand grip"; a barrel shroud that "encircles either all or part of the barrel"; or "[t]he capacity to accept a detachable magazine at some location outside of the pistol grip." §2(a)(vi)(A)–(D).

57.    Again, some of these features, e.g., a threaded barrel, are common in modern semiautomatic pistols, including AR-type and other similar heavy pistols.

58.    In one final catchall, HB 1240 also bans any "conversion kit, part, or combination of parts, from which an assault weapon can be assembled or from which a firearm can be converted into an assault weapon." §2(2)(a)(iii).

59.    HB 1240 makes it a "gross misdemeanor" to "manufacture, import, distribute, sell, or offer for sale" any of these firearms.  §3(1), (4).  It does not contain any explicit ban on *possessing* these weapons, which effectively means that it implicitly grandfathers the possession (but *not* the re-sale) of firearms already lawfully possessed in the state..

COMPLAINT - 18

60.    The prohibition applies to "any person in [Washington]," with exceptions for licensed firearm manufacturers selling to the armed forces of the United States or the State of Washington, law enforcement agencies, or to a person not residing in the State of Washington; for licensed dealers selling to the armed forces of the United States or the State of Washington, and law enforcement agencies; and for the sale to a licensed dealer for the limited purpose of transferring the assault weapon to a person not residing in Washington.  §3(1), (2)(a)–(c).

61.    HB 1240 also provides for a limited 90-day grace period after the statute's effective date during which licensed dealers may transfer or sell their existing stock of "assault weapons," provided that it is an "out-of-state sale or transfer," and provided that the stock being transferred or sold was acquired before January 1, 2023.  §3(2)(d).

62.    HB 1240 does not prohibit the receipt of an assault weapon by operation of law upon the death of the former owner, but a person who receives an assault weapon through this method may not sell or transfer the assault weapon to any other person in the State other than a licensed dealer, a federally licensed gunsmith for the purpose of service or repair, or to a law enforcement agency.  §3(2)(e).

## CLAIM FOR RELIEF

63.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

64.    "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S. Ct. at 2125.

65.    The Supreme Court has made clear that when a court confronts a flat ban on a type of arm, the only question is whether the arm at issue is "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.  If

COMPLAINT - 19

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    the answer is "yes," then the ban is unconstitutional, because a state cannot prohibit

2    ordinary law-abiding Americans from possessing what the Constitution explicitly

3    entitles them to "keep." *See* U.S. Const. amend. II.

4        66.     The multitude of semiautomatic firearms that HB 1240 prohibits are

5    indisputably "arms" within the meaning of the Second Amendment. Indeed,

6    "[p]ractically all modern rifles, pistols, and shotguns are semiautomatics." James B.

7    Jacobs, *Why Ban "Assault Weapons"?*, 37 Cardozo L. Rev. 681, 686 (2015). And

8    a state cannot "prohibit[] . . . an entire class of 'arms' that is overwhelmingly chosen

9    by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628.

10        67.     The semiautomatic firearms that HB 1240 prohibits are also

11    indisputably in "common use." *See Heller*, 553 U.S. at 624–25 (the "arms"

12    protected by the Second Amendment are those "typically possessed by law-abiding

13    citizens for lawful purposes" today). That is not a close call. As noted, the

14    ownership of even one type of the thousands of firearms covered by this ban—those

15    on the AR-15 platform—dwarfs ownership of the most popular car on the road and

16    of all newspaper subscriptions in the United States. Indeed, if the 200,000 stun guns

17    in circulation in *Caetano* were sufficiently numerous to qualify as commonly

18    possessed, then the 24+ million AR-15-style rifles in circulation do a *fortiori*.

19    *Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment). Millions of

20    Americans own these arms for lawful purposes, including self-defense, sporting, and

21    hunting.

22        68.     Because modern semiautomatic rifles and the hundreds of other arms

23    banned under HB 1240 are arms in common use today, they are protected by the

24    Second Amendment, full stop, rendering Washington's effort to flatly ban them

25    flatly unconstitutional. *Bruen*, 142 S. Ct. at 2134. *Bruen* made clear what the

COMPLAINT - 20

"historical tradition" establishes when it comes to efforts to ban a type of arm
entirely: The government may not ban "weapons 'in common use' today for self-
defense." *Id.* Indeed, even before *Bruen*, the Supreme Court emphasized in *Caetano*,
a per curiam summary reversal, that it is irrelevant to the constitutional inquiry that
a certain type of arm was "not in common use at the time of the Second
Amendment's enactment" or is not "readily adaptable to use in the military."
*Caetano*, 577 U.S. at 411–12. If a "weapon belongs to a class of arms commonly
used for lawful purposes," then it cannot be banned, regardless of its "relative
dangerousness." *Id*. at 418 (Alito, J., concurring in the judgment); *accord Bruen*,
142 S. Ct. at 2143 ("[E]ven if [certain] colonial laws prohibited the carrying of
handguns because they were considered 'dangerous and unusual weapons' in the
1690s, they provide no justification for laws restricting the public carry of weapons
that are unquestionably in common use today.").

69.    At a minimum, these arms are "presumptively protect[ed]" by the
Second Amendment, so Washington would have to "affirmatively prove that its . . .
regulation is part of the historical tradition that delimits the outer bounds of the right
to keep and bear arms." *Bruen*, 142 S.Ct at 2126–27.

70.    Washington cannot make that showing. There were no restrictions on
firing capacity, reloading mechanisms, or the kinds of attachments the state has
singled out, when either the Second Amendment or the Fourteenth Amendment was
ratified. Although many states and the federal government began restricting fully
automatic firearms in the 1920s and 1930s, only a handful ever imposed restrictions
on semiautomatic firearms. Just three states and the District of Columbia outlawed
semiautomatic weapons that could fire more than a certain number of rounds
semiautomatically without reloading. *See* 1927 Mich. Pub. Acts 887, 888; 1927 R.I.

COMPLAINT - 21

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1   Acts & Resolves 256, 256-57; 1933 Minn. Laws ch. 190; Act of July 8, 1932, Pub.

2   L. No. 72-275, §§1, 14, 47 Stat. 650, 650, 652 (1932).  And each of those laws was

3   either repealed outright within a few decades or replaced with a law that restricted

4   only fully automatic weapons, i.e., machine guns—which, unlike semiautomatics,

5   were never widely adopted by law-abiding citizens for lawful purposes.  *See* 1959

6   Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 260, 263; 1963 Minn.

7   Sess. L. ch. 753, at 1229; 48 Stat. 1236 (1934).  Moreover, none of these early laws

8   took the extreme approach of banning semiautomatic firearms (whether rifles or

9   pistols) entirely.

10          71.    Even if the handful of less extreme variants of "assault weapon" bans

11   that mostly target only smaller subsets of rifles and pistols could serve as an analog

12   for Washington's draconian approach, the earliest of those laws dates back only to

13   1989, which is far too late to serve as an indicator of a "historical tradition."  *Bruen*,

14   142 S.Ct at 2126; *see id.* at 2138 (rejecting reliance on "late-19th-century [laws]").

15   As for the federal government, it did not restrict "assault weapons" until 1994—and

16   Congress allowed that (narrower) law to expire in 2004 after a study by the

17   Department of Justice revealed that the law had produced "no discernable reduction"

18   in gun violence.  Koper et al., *supra*, at 96.  In short:  "Prior to the 1990's, there was

19   no national history of banning weapons because they were equipped with furniture

20   like pistol grips, collapsible stocks, flash hiders, flare launchers, or barrel shrouds."

21   *Miller*, 542 F. Supp. 3d at 1024.  And even now, such laws remain exceedingly rare.

22          72.    That is not owing to some "dramatic technological change[]" that came

23   about in the past few decades or some "unprecedented societal concern[]" that did

24   not exist until 1989.  *Bruen*, 142 S. Ct. at 2132.  As detailed above, semiautomatic

25   firearms have been around for more than a century and were popular with civilians

COMPLAINT - 22

long before they were issued in serious numbers to any military. *See supra.* And soon after that, the federal government itself sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount just as the AR-15 and its standard 30-round magazine came on the market. *Duncan*, 970 F.3d at 1148. Small wonder that the Supreme Court has explicitly recognized that these arms are "civilian" in nature and "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612.

73.    In sum, there is no "enduring American tradition of state regulation" forbidding the purchase and/or sale of semiautomatic rifles and pistols by law-abiding citizens for lawful purposes. *Bruen*, 142 S. Ct. at 2155. To the contrary, the enduring American tradition is one of protecting the right of the people to own firearms that, like semiautomatic rifles and pistols, are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624–25. Because Washington cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2127, HB 1240 unconstitutionally infringes upon Second Amendment rights, *id.* at 2130.

## **PRAYER FOR RELIEF**

Plaintiffs pray for the following relief from the Court:

1.    A declaratory judgment under 28 U.S.C. §2201 that HB 1240 is unconstitutional;

2.    A temporary injunction enjoining Defendants and their officers, agents, and employees from enforcing HB 1240 against Plaintiffs and their members;

3.    A permanent injunction enjoining Defendants and their officers, agents, and employees from enforcing HB 1240 against Plaintiffs and their members;

COMPLAINT - 23

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

4.      Any attorneys' fees, costs, and expenses to which Plaintiffs may be entitled by law;

5.      Nominal damages; and

6.      Any further relief the Court deems just and proper.

DATED this 25th day of April, 2023.

CORR CRONIN LLP


s/ Steven W. Fogg
Steven W. Fogg, WSBA No. 23528
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington  98104-1001
Ph: (206) 625-8600 | Fax: (206) 625-0900
sfogg@corrcronin.com

Paul D. Clement *(pro hac vice forthcoming)*
Erin E. Murphy *(pro hac vice forthcoming)*
Matthew D. Rowen *(pro hac vice forthcoming)*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Ph: (202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com

*Attorneys for Plaintiff*

COMPLAINT - 24