1  Steven W. Fogg, WSBA No. 23528
2  CORR CRONIN LLP
   1015 Second Avenue, Floor 10
3  Seattle, WA 98104-1001
   Ph: (206) 625-8600
4

5

6

7

8              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF WASHINGTON
9

10 AMANDA BANTA, SHARP              No. 2:23-cv-00112-MKD
   SHOOTING INDOOR RANGE &
11 GUN SHOP, INC., THE RANGE, LLC,  PLAINTIFFS' MOTION FOR
   AERO PRECISION LLC, and          PRELIMINARY INJUNCTION
12 NATIONAL SHOOTING SPORTS
   FOUNDATION, INC.,                07/26/2023
13                                  With Oral Argument: TBD
               Plaintiff,           Spokane
14
   v.
15
   ROBERT W. FERGUSON, Attorney
16 General of the State of Washington, and
   JOHN R. BATISTE, Chief of the
17 Washington State Patrol,
18             Defendant.
19

20

21

22

23

24

25

MOTION FOR PRELIMINARY INJUNCTION

1

## TABLE OF CONTENTS

2   INTRODUCTION ........................................................................................... 1

3   BACKGROUND ............................................................................................ 2

4   ARGUMENT ................................................................................................. 6

5   I.      Plaintiffs Are Likely To Succeed On The Merits .............................. 7

6           A.      The Firearms that HB 1240 Prohibits Are "Arms" ............... 8

7           B.      The Arms that HB 1240 Ban Are in Common Use ............... 9

8           C.      Insofar as the Burden Shifts, the Government Cannot

9                   Shoulder It .......................................................................... 18

10  II.     The Remaining Factors All Favor Injunctive Relief ...................... 24

11  CONCLUSION ........................................................................................... 25

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MOTION FOR PRELIMINARY INJUNCTION - i

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

# TABLE OF AUTHORITIES

2

**Cases**

3
4
*AK Futures LLC v. Boyd St. Distro, LLC,*
  35 F.4th 682 (9th Cir. 2022) ...................................................................6

5
6
*Ashcroft v. Free Speech Coal.,*
  535 U.S. 234 (2002) ...............................................................................18

7
*Barnett v. Raoul,*
  2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ........................ 7, 8, 15, 23

8
9
*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) ..................................................... 8, 10, 13

10
11
*Cal. Pharmacists Ass'n v. Maxwell-Jolly,*
  563 F.3d 847 (9th Cir. 2009) ..............................................................25

12
*Craig v. Boren,*
  429 U.S. 190 (1976) ...............................................................................24

13
14
*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .................................................................. passim

15
16
*Douglas v. Indep. Living Ctr. of S. Cal., Inc.,*
  565 U.S. 606 (2012) ...............................................................................25

17
18
*Duncan v. Becerra,*
  970 F.3d 1133 (9th Cir. 2020) ..................................................... 19, 21

19
20
*Duncan v. Becerra,*
  988 F.3d 1209 (9th Cir. 2021) .............................................................19

21
*Duncan v. Bonta,*
  142 S. Ct. 2895 (2022) ...........................................................................19

22
23
*Duncan v. Bonta,*
  19 F.4th 1087 (9th Cir. 2021) ..............................................................19

24
*Duncan v. Bonta,* 49 F.4th 1228 (9th Cir. 2022) ...............................19

25

MOTION FOR PRELIMINARY INJUNCTION - ii

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ........................................................................18

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) .....................................................15

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ...........................................................6

*Jackson v. City & Cnty. of S.F.*,
    746 F.3d 953 (9th Cir. 2014) ..........................................................20

*Kolbe v. Hogan*,
    813 F.3d 160 (4th Cir. 2016) ..........................................................12

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) .................................................... 12, 15

*Md. Shall Issue, Inc. v. Hogan*,
    971 F.3d 199 (4th Cir. 2020) ..........................................................24

*Melendrew v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ..........................................................25

*Miller v. Bonta*,
    2022 WL 3095986 (9th Cir. Aug. 1, 2022) ....................................11

*Miller v. Bonta*,
    542 F.Supp.3d 1009 (S.D. Cal. 2021) ................................. 11, 14, 19

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S.Ct. 2111 (2022) ............................................................ passim

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................25

*Pimentel v. Dreyfus*,
    670 F.3d 1096 (9th Cir. 2012) ...........................................................6

*Renna v. Bonta*,
    2023 WL 2846937 (S.D. Cal. Apr. 3, 2023) ..................................24

MOTION FOR PRELIMINARY INJUNCTION - iii

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) ..............................................25

*Staples v. United States*,
511 U.S. 600 (1994) ......................................................... 1, 15

*Stenberg v. Carhart*,
530 U.S. 914 (2000) ..............................................................2

*United States v. Chovan*,
735 F.3d 1127 (9th Cir. 2013) ..............................................19

*Washington v. DeVos*,
466 F.Supp.3d 1151 (E.D. Wa. 2020) ....................................6

**Statutes**

1927 Mich. Pub. Acts 887.........................................................21

1927 R.I. Pub. Laws 256............................................................21

1933 Ohio Laws 189..................................................................21

1959 Mich. Pub. Acts 249.........................................................21

1959 R.I. Acts & Resolves 260..................................................21

1972 Ohio Laws 1866................................................................21

28 U.S.C. §1331 .........................................................................7

28 U.S.C. §1343 .........................................................................7

47 Stat. 650 (1932)....................................................................21

48 Stat. 1236 (1934)..................................................................21

H.R. 234, 2013-2014 Leg. (Ohio)............................................21

Haw. Rev. Stat. Ann. §134-1 ...................................................20

HB 1240 ............................................................................ passim

MOTION FOR PRELIMINARY INJUNCTION - iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Rules**

Fed. R. Civ. P. 65 ..................................................................................6

**Regulations**

86 Fed. Reg. 30,826 (2021) ...................................................................14

**Other Authorities**

Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB.................................12

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 96 (2004), available at https://bit.ly/3wUdGRE .....................................................................20

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381 (1994) ............................................................. 14, 15

Ex. A to Decl. of William E. Demuth II, *Barnett v. Raoul*, No. 3:23-cv-00209 (S.D. Ill. Mar. 2, 2023), Dkt.37-3 .....................................................21

Ford, *Fourth-Quarter 2020 Sales* (Dec. 2020), https://ford.to/3H87Y5T...............12

Gary Kleck, *Targeting Guns: Firearms and their Control* (1997).........................16

James B. Jacobs, *Why Ban "Assault Weapons"?*, 37 Cardozo L. Rev. 681 (2015)14

Kate Robertson, *New York Times Reports a Gain of 180,000 Digital Subscribers*, N.Y. Times (Aug. 3, 2022), https://nyti.ms/3H8bz3T ........................................13

*Newspapers Fact Sheet*, Pew Rsch. Ctr. (June 29, 2021), https://pewrsr.ch/3CNXFS0.................................................................13

Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* (2d ed. 2018)................................................................................. 20, 22

NSSF, *2021 Firearms Retailer Survey Report*, https://bit.ly/3CXJwC1 (last visited May 1, 2023) .......................................................................... 3, 12, 14

MOTION FOR PRELIMINARY INJUNCTION - v

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

NSSF, *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3CRHhQl ............................................................12

NSSF, *Firearm Production in the United States* (2020), https://bit.ly/3LwJvKh...11

Salem News Online (Jan. 31, 2023), bit.ly/42gPhEN ...........................................13

William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3HaqmKv .12, 14, 16

MOTION FOR PRELIMINARY INJUNCTION - vi

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**INTRODUCTION**

The Supreme Court made clear just last year that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). The firearms that Washington has banned in the recently enacted House Bill 1240 ("HB 1240") unquestionably fit that bill. Indeed, they are more common than the most popular truck in the United States. These are not newfangled innovations that demand novel government intervention. Semiautomatic rifles and pistols with the features Washington has singled out have been around for generations—and as recently as just a few decades ago, it was common ground that these common arms are "lawful." *Staples v. United States*, 511 U.S. 600, 612 (1994). Slapping the label "assault weapon" on arms that millions of Americans own for lawful purposes like self-defense does not take them outside the Second Amendment's protection. Under a straightforward application of the principles set forth in *Heller* and reiterated in *Bruen*, that puts HB 1240 profoundly out of step with our nation's historical tradition of firearms regulation. Plaintiffs are therefore likely to succeed on their claim that HB 1240 violates the Second Amendment, as the statute is profoundly out of step with our nation's history of *protecting* the right to possess firearms that are commonly owned for lawful purposes. The balance of equities and public interest support injunctive relief too, as the public interest is never served by enforcing an unconstitutional law, and a state

MOTION FOR PRELIMINARY INJUNCTION - 1

and its officers suffer no cognizable harm by being enjoined from enforcing one. The Court should enjoin enforcement of HB 1240 and ensure that law-abiding Washingtonians will not be precluded from exercising their Second Amendment rights on account of a law that is unlikely to survive in the final analysis.

## BACKGROUND

On April 25, 2023, Governor Inslee signed HB 1240 into law, making Washington the tenth state to impose severe restrictions on some of the most commonly owned firearms in America. Indeed, HB 1240 goes even further than several of the so-called "assault weapon" bans that have cropped up over the past few decades, as its ban encompasses nearly all semiautomatic rifles and prohibits many common semiautomatic pistols too. Under HB 1240, "[n]o person in this state may manufacture, import, distribute, sell, or offer for sale any assault weapon, except" under certain narrow exceptions "as authorized in this section." §3(1). The sweeping ban HB 1240 erects "takes effect immediately." §6.

Unlike "assault *rifle*," which refers to fully automatic arms with a selector switch enabling it to fire multiple rounds *automatically*, the term "assault weapon" has neither historical pedigree nor fixed meaning. Indeed, "the term 'assault weapon' did not exist in the lexicon of firearms" until the 1980s, when "anti-gun publicists" coined it to try "to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

MOTION FOR PRELIMINARY INJUNCTION - 2

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Consistent with that effort, HB 1240 defines "assault weapon" extremely broadly.

First, HB 1240 includes in the definition of "assault weapon" any "semiautomatic, center fire rifle" that has both "the capacity to accept a detachable magazine" and a "grip that is independent or detached from the stock that protrudes conspicuously beneath the action of the weapon" (i.e., a pistol grip) §2(a)(iv).  That features-based definition alone captures approximately 20% of all firearms sold in the U.S. in 2020; each model rifle built on the AR platform, the most popular class of semiautomatic rifles today, has both the capacity to accept a detachable magazine and a pistol grip.  *See* NSSF, *2021 Firearms Retailer Survey Report* at 9, https://bit.ly/3CXJwC1 (last visited May 1, 2023) ("NSSF Survey").  Lest there be any doubt about the breadth of its prohibitions, HB 1240 also bans the AR15 "in all forms" and other AR variants explicitly, and lists more than 50 *other* semiautomatic rifles by name or type and deems all of them banned "assault weapons."  §2(a)(i).

Not content with wiping out the single most popular class of rifles in America, HB 1240 also includes within its sweeping definition of prohibited "assault weapons" any "semiautomatic, center fire rifle" that has both "the capacity to accept a detachable magazine" and any "grip designed for use by the nonfiring hand to improve control."  §2(a)(iv)(D).  HB 1240 further includes within the definition any "semiautomatic, center fire rifle" that has both "[t]he capacity to accept a detachable magazine" and "one or more of" a "thumbhole stock," "a folding or telescoping stock," "a flash suppressor, flash guard, flash eliminator, flash hider, sound

MOTION FOR PRELIMINARY INJUNCTION - 3

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

suppressor, silencer, or any item designed to reduce the visual or audio signature of the firearm," or "a shroud that encircles either all or part of the barrel."[1]  §2(a)(iv)(B), (C), (E), (I).  That sweeping definition captures nearly any modern rifle, as most modern rifles come standard with a "grip designed for use by the nonfiring hand" and/or a forend "that encircles either all or part of the barrel," which the statute calls a "shroud."  §2(a)(iv)(A), (I).  Washington has banned these features even though, as explained below, most of them increase the ability to use rifles safely and effectively for lawful purposes like self-defense.

HB 1240 also sweeps into prohibited "assault weapon[s]" any "semiautomatic rifle that has an overall length of less than 30 inches," §2(2)(a)(ii), and any semiautomatic rifle with a fixed (i.e., non-detachable) magazine that has "the capacity to accept more than 10 rounds," §2(a)(v).  All in all, combining the features-based, magazine-capacity, and rifle length restrictions, HB 1240 bans hundreds of models of modern rifles, including all of the most popular models in circulation.

And Washington did not stop there.  In addition to effectively banning all modern semiautomatic rifles, HB 1240 deems prohibited "assault weapons" any semiautomatic *pistol* "that has the capacity to accept a detachable magazine" if it has "one or more of the following": "a threaded barrel, capable of accepting a flash

---

[1]  The statute also includes "grenade launcher" as a prohibited feature.  §2(a)(iv)(H).  "Grenade launchers" are very rare and already illegal, as are grenades themselves.  Plaintiffs do not challenge this redundant provision.

MOTION FOR PRELIMINARY INJUNCTION - 4

suppressor, forward handgrip, or silencer"; "a second hand grip"; a barrel shroud that "encircles either all or part of the barrel"; or "[t]he capacity to accept a detachable magazine at some location outside of the pistol grip."  §2(a)(vi)(A)–(D). Again, some of these features, e.g., a threaded barrel, are common in modern semiautomatic pistols, including AR-type and other similar heavy pistols.  Finally, in one last catchall that covers rifles and pistols, HB 1240 bans any "conversion kit, part, or combination of parts, from which an assault weapon can be assembled or from which a firearm can be converted into an assault weapon."  §2(2)(a)(iii).

HB 1240 makes it a "gross misdemeanor" to "manufacture, import, distribute, sell, or offer for sale" any of these firearms.  §3(1), (4).  The prohibition applies to "any person in [Washington]," with exceptions for licensed firearm manufacturers selling to the armed forces of the United States or the State of Washington, law enforcement agencies, or to a person not residing Washington; for licensed dealers selling to the armed forces of the United States or the State of Washington, and law enforcement agencies; and for the sale to a licensed dealer for the limited purpose of transferring the assault weapon to a person not residing in Washington. §3(1), (2)(a)– (c).  HB 1240 also provides a limited 90-day grace period during which licensed dealers may transfer or sell their existing stock of "assault weapons," as long as it is an "out-of-state sale or transfer" and the stock being transferred or sold was acquired before January 1, 2023.  §3(2)(d).  Finally, HB 1240 does not prohibit the receipt of an "assault weapon" by operation of law upon the death of the former owner, but a

MOTION FOR PRELIMINARY INJUNCTION - 5

person who receives one through this method may not sell or transfer it to any other person in Washington other than a licensed dealer, a federally licensed gunsmith for the purpose of service or repair, or to a law enforcement agency.  §3(2)(e).

## ARGUMENT

"Pursuant to Federal Rule of Civil Procedure 65, the Court may grant preliminary injunctive relief in order to prevent 'immediate and irreparable injury.'" *Washington v. DeVos*, 466 F.Supp.3d 1151, 1161 (E.D. Wa. 2020) (quoting Fed. R. Civ. P. 65(b)(1)(A)).  The party seeking the injunction must show a likelihood of success on the merits, irreparable harm absent preliminary relief, that the balance of the equities tips in its favor, and that the public interest favors an injunction.  *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 688 (9th Cir. 2022).  Courts in this circuit use a "sliding scale" approach in which the elements are "balanced, so that a stronger showing of one element may offset a weaker showing of another," with the likelihood of success on the merits being the most important factor. *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quoting *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (per curiam)).

Each of those factors is readily satisfied here.  The unconstitutionality of HB 1240 follows directly from the Supreme Court's holding in *Bruen* that the Second Amendment fully protects arms in "common use" today.  142 S.Ct. at 2134. The remaining factors follow as a matter of course.  Precluding law-abiding citizens from exercising constitutional rights inflicts irreparable injury per se for which there

MOTION FOR PRELIMINARY INJUNCTION - 6

is no adequate remedy at law, and the public interest does not favor enforcing unconstitutional laws.  The Court, which has jurisdiction over this case pursuant to 28 U.S.C. §§1331 & 1343(a)(3), should enjoin HB 1240.

## I.    Plaintiffs Are Likely To Succeed On The Merits.

The Second Amendment secures "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  Whether a firearm restriction is "well-intentioned, brilliant, or arrogant, no state may enact a law that denies its citizens rights" afforded by the Second Amendment.  *Barnett v. Raoul*, 2023 WL 3160285, at *1, *4 (S.D. Ill. Apr. 28, 2023) (enjoining enforcement of Illinois' materially indistinguishable "assault weapon[s]" ban).  That bedrock principle lights the way here, as the sweeping ban on common arms that Washington has just enacted unquestionably denies its citizens the rights afforded to them by the Second Amendment.

As the Supreme Court made clear last year, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Bruen*, 142 S.Ct. at 2126.  The first question this Court must ask in analyzing HB 1240 is whether the firearms the statute bans fit within "the Second Amendment's definition of 'arms.'"  *Id.* at 2132.  If the answer is yes, the Court must then ask whether the firearms HB 1240 bans are "in common use today" or are instead "highly unusual in society at large."  *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627).  If they are in common use, then the inquiry is over and the statute is invalid, as a state may not "prohibit[] … an entire class of 'arms' that is overwhelmingly

MOTION FOR PRELIMINARY INJUNCTION - 7

chosen by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628.

That makes this an easy case after *Bruen*, as firearms are unquestionably "arms," and wherever the line on "common" may be drawn, firearms lawfully possessed by millions of Americans for lawful purposes surely surpass it. This case thus begins and ends with the principle, thrice confirmed by the Supreme Court, that "[t]he Second Amendment protects … weapons that are unquestionably in common use today." *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627); *accord Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam); *see also Barnett*, 2023 WL 3160285, at *5 (a "plain reading" of the Amendment "lend[s] itself to the notion that [Illinois' identical ban] is in fact violative of the Second Amendment").

## A. The Firearms that HB 1240 Prohibits Are "Arms."

*Bruen* and *Heller* leave no doubt about the meaning of the term "Arms" in the Second Amendment: "The 18th-century meaning is no different from the meaning today…. '[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581. "[T]he Second Amendment's definition of 'arms'" thus presumptively covers all "modern instruments that facilitate armed self-defense." *Bruen*, 142 S.Ct. at 2132; *see also Heller*, 554 U.S. at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms[.]").

That obviously includes the rifles, pistols, and shotguns that HB 1240 bans, regardless of whether they possess the various features that HB 1240 singles out as

MOTION FOR PRELIMINARY INJUNCTION - 8

supposedly problematic.  *See* §2(a)(i–vii); *see also Barnett*, 2023 WL 3160285, at *9 ("items that aid in accuracy may be considered 'arms' and are presumptively protected by the Second Amendment").  Indeed, if the most ubiquitous arms in America do not even fall within the ambit of the Second Amendment, then *Bruen*, *Heller*, and the Amendment itself mean nothing.  Washington has prohibited "the people" whose rights the Second Amendment protects from obtaining wide swathes of rifles, pistols, and shotguns.  Rifles, pistols, and shotguns plainly "constitute bearable arms," *Heller*, 554 U.S. at 582—i.e., "instruments that facilitate armed self-defense," *Bruen*, 142 S.Ct. at 2132—no matter what kind of grip, stock, ammunition feeding device, or other features they may have.  The right to keep and bear them is thus "presumptively protect[ed]" by the Constitution.  *Id.* at 2126.

> **B.**     **The Arms that HB 1240 Ban Are in Common Use.**

Because the firearms that HB 1240 bans easily fit "the Second Amendment's definition of 'arms'" and thus are "presumptively protect[ed]" by the Constitution, Washington must "affirmatively prove that" HB 1240 "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.  The state cannot do so.  When it comes to efforts to ban particular arms, the Supreme Court has already identified what the nation's historical tradition is:  The Second Amendment protects arms that are "in common use today," and so permits the prohibition only of arms that are "highly unusual in society at large." *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 627 (noting "the

MOTION FOR PRELIMINARY INJUNCTION - 9

historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'"); *Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment) ("[T]he pertinent Second Amendment inquiry is whether [the arms that a state seeks to ban] are commonly possessed by law-abiding citizens for lawful purposes *today*."). That is the irreducible minimum of the Second Amendment: The government may not prohibit arms that are "overwhelmingly chosen by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628. In the context of a flat ban, then, the only question after *Bruen* is whether the arms that have been banned are "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Accordingly, HB 1240 can stand if—and only if—the state can prove that the various common arms it has banned are "highly unusual in society" today. *Bruen*, 142 S.Ct. at 2143. The state cannot come close to making that showing, as the arms that Washington has banned in HB 1240 are the furthest thing from "highly unusual."

1. Under HB 1240, "[n]o person in this state may manufacture, import, distribute, sell, or offer for sale any assault weapon, except" under certain narrow exceptions "as authorized in this section." §3(1). Such a sweeping prohibition might be defensible if, by "assault weapon," Washington meant some class of "dangerous and unusual weapons" that has long been restricted in the United States and that very few law-abiding Americans own for lawful purposes. But that is not what it has done. In fact, it has gone almost as far in the opposite direction as possible, defining "assault weapon" so broadly as to capture—and thus ban—nearly all modern

MOTION FOR PRELIMINARY INJUNCTION - 10

semiautomatic rifles, as well as many other common semiautomatic firearms.

HB 1240 defines "assault weapon" to include (among many other things) any "semiautomatic, center fire rifle" that has both "the capacity to accept a detachable magazine" and "one or more of the following": a "grip that is independent or detached from the stock that protrudes conspicuously beneath the action of the weapon" (i.e., a pistol grip), a "thumbhole stock," "a folding or telescoping stock," "a flash suppressor, flash guard, flash eliminator, flash hider, sound suppressor, silencer, or any item designed to reduce the visual or audio signature of the firearm," or "a shroud that encircles either all or part of the barrel." §2(a)(iv)(B), (C), (E), (I). That feature-based definition captures every model of rifle on the AR-15 platform—which means that every rifle on the AR-15 platform, even if not specifically called out by name in HB 1240, is now prohibited in Washington.

Yet rifles on the AR-15 platform are among the most commonly owned products in America. "Over the last three decades, 19,797,000 … rifle[s] built on the AR-15 platform have been manufactured or imported into the United States." *Miller v. Bonta*, 542 F.Supp.3d 1009, 1020 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). And "the numbers have been steadily increasing." *Id.* AR-platform rifles accounted for "one-half of all rifles (48%) produced in 2018." *Id.* at 1022; *accord* NSSF, *Firearm Production in the United States* 18 (2020), https://bit.ly/3LwJvKh. In 2020, another 2.8 million were produced in or imported into the U.S., accounting for nearly 20% of all firearms sold

MOTION FOR PRELIMINARY INJUNCTION - 11

that year.  *See* NSSF, *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3CRHhQl (citing data); NSSF Survey at 9. Altogether, recent estimates indicate that more than 24 million AR-platform rifles are currently owned nationwide.  NSSF, *Commonly Owned*, *supra*; William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, at 2 (May 13, 2022), https://bit.ly/3HaqmKv.

A product lawfully owned by millions of Americans is obviously not "highly unusual in society at large."  No one would call the Ford F-150 unusual in America, let alone highly so; it is the most popular automobile in the country.  Yet AR-platform rifle sales dwarf sales of the F-150, the most popular automobile in the country.  In 2020, Ford sold 787,442 F-Series pickup trucks (including, but not limited to, the F-150, the most popular model).  Ford, *Fourth-Quarter 2020 Sales* at 2 (Dec. 2020), https://ford.to/3H87Y5T.  That is less than a third of the number of AR-platform rifles sold that year.  And as compared to the 24 million-plus AR-platform rifles in circulation, there are approximately 16 million F-150s on the road. *See* Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB; *see also Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) (looking to the difference between F-150 sales and AR sales in commonality inquiry), *rev'd*, 849 F.3d 114 (4th Cir. 2017) (en banc).

To take another example, the number of AR-platform rifles sold per year (more than 2 million) is significantly more than the number of New York Times

MOTION FOR PRELIMINARY INJUNCTION - 12

print subscribers (761,000).  *See* Kate Robertson, *New York Times Reports a Gain of 180,000 Digital Subscribers*, N.Y. Times (Aug. 3, 2022), https://nyti.ms/3H8bz3T.  And the total number of these rifles in circulation is slightly more than the "*total* U.S. daily newspaper circulation (print and digital combined) in 2020 … 24.3 million for weekday[s]," and only slightly less than the "25.8 million for Sunday[s]."  *Newspapers Fact Sheet*, Pew Rsch. Ctr. (June 29, 2021), https://pewrsr.ch/3CNXFS0 (emphasis added).  Indeed, rifles built on the AR-15 platform are so common that courts, commentators, and industry members alike often refer to them simply as "modern rifles" (or "modern sporting rifles").  In short, to say that these rifles are in common use is to understate things by a considerable degree.  After all, if the fact that 200,000 Americans owned stun guns as of 2016 made those arms sufficiently numerous to qualify as commonly possessed, *see Caetano*, 577 U.S. at 420 (Alito, J., concurring in judgment), then the more than 24 million AR-platform rifles in circulation are common *a fortiori*.

Of course, HB 1240 does not stop with AR-platform rifles, or even with rifles.  *See supra* pp.2–4 (summarizing the statute's additional sweep).  And while the other firearms it bans may not be quite as ubiquitous as AR-platform rifles, they are unquestionably common in modern America.  *See* Ben Johnson, *ATF announces pistol brace ban affecting millions of gun owners*, Salem News Online (Jan. 31, 2023), bit.ly/42gPhEN (explaining that private ownership of "pistol braces," which are most commonly used for the types of pistols HB 1240 bans, is estimated to be

MOTION FOR PRELIMINARY INJUNCTION - 13

around 10 to 40 million); 86 Fed. Reg. 30,826, 30,845–46 (2021) (ATF estimate that 3 to 7 million stabilizing braces—designed for and commonly used with AR-style pistols—were sold between 2013 and 2020).  That should come as no surprise: "Practically all modern rifles, pistols, and shotguns are semiautomatics."  James B. Jacobs, *Why Ban "Assault Weapons"?*, 37 Cardozo L. Rev. 681, 685–87 (2015).

In short, the arms that HB 1240 bans are not just common; they are ubiquitous.

2. There is no question that the common firearms HB 1240 bans are "typically possessed by law-abiding citizens *for lawful purposes*."  *Heller*, 553 U.S. at 624–25 (emphasis added).  Sticking with AR-platform rifles for the moment, purchasers consistently report that one of the most important reasons they purchase these common firearms is for self-defense (and the other reasons are lawful purposes like hunting and sport shooting).  *See Miller*, 542 F.Supp.3d at 1022; English, *supra*, at 33–34; NSSF Survey at 7.  And despite being slapped with the demonizing "assault" moniker, the features that Washington has singled out as problematic are, in reality, beneficial for personal self-defense—the very raison d'être of the Amendment.

The capacity to accept detachable magazines makes it easier for a citizen to reload her firearm, which can be critical in the stressful circumstance of being forced to defend self, family, or home.  A pistol grip improves accuracy and reduces the risk of stray shots by stabilizing the firearm while firing from the shoulder.  David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 396 (1994).  "By holding the pistol grip, the shooter keeps the barrel from

MOTION FOR PRELIMINARY INJUNCTION - 14

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

rising after the first shot, and thereby stays on target for a follow-up shot.   The defensive application is obvious, as is the public safety advantage in preventing stray shots."   *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th Cir. 2017) (en banc) (Traxler, J., dissenting).   Thumbhole stocks likewise give the user a more comfortable and stable grip, which increases accuracy and decreases the risk of dropping the firearm or firing stray shots.   And flash suppressors not only prevent users from being blinded in low lighting conditions, such as at dusk or dawn, or during the nighttime, but also reduce recoil and muzzle movement, making the firearm less painful to use—crucial in self-defense situations.   Kopel, *supra*, 20 J. Contemp. L. at 397–99.   Indeed, even the State of Illinois, in trying to defend its nearly identical ban, "recognized that such items 'facilitate … sustained accuracy.'"   *Barnett*, 2023 WL 3160285, at *9 (ellipsis in original).   And, of course, "the 'meaningful exercise' of the right to armed self-defense is wholly dependent on the ability of citizens to utilize their arms and hit their intended target."   *Id.*   It is thus no small wonder that the Supreme Court has explicitly recognized that AR-platform rifles, which all share these features, "traditionally have been widely accepted as lawful possessions."   *Staples*, 511 U.S. at 612; *see Heller v. District of Columbia*, 670 F.3d 1244, 1269–70 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("There is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles.").

Of course, there are certainly people who use AR-platform rifles and the other arms HB 1240 prohibits for unlawful purposes.   But that was equally true—indeed,

MOTION FOR PRELIMINARY INJUNCTION - 15

arguably more so—of the handguns at issue in *Heller*. *See* Gary Kleck, *Targeting Guns: Firearms and their Control* 112 (1997) ("well under 1% [of crime guns] are 'assault rifles'"). The *Heller* dissenters protested that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting). The majority did not dispute that. It just found it irrelevant to the question of whether they are constitutionally protected, as that question does not turn on whether arms are misused by criminals; it turns on whether *law-abiding* citizens own and use them for *lawful* purposes. So it was enough that handguns—the overwhelming majority of which today are semiautomatic—are *typically* possessed for lawful purposes. *See id.* at 624–25 (majority op.). And what was true in *Heller* is no less true here, given the millions of law-abiding Americans who own, for lawful purposes, millions upon millions of the arms that HB 1240 bans.

Indeed, on the question that matters, the record is undisputed and indisputable: Purchasers consistently report that self-defense, hunting, and sport shooting are the most important reasons why they buy rifles on the AR-15 platform. *See* English, *2021 National Firearms Survey*, *supra*, at 33–34. Just as in *Heller*, then, Washington's flat ban on these common arms is flatly unconstitutional.[2]

3. It makes no difference whether the various common firearms that HB 1240

---

[2]    And it bears repeating that HB 1240 ban does not just ban modern sporting rifles like AR-15s; it bans a plethora of commonly owned pistols and shotguns as well.

MOTION FOR PRELIMINARY INJUNCTION - 16

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

dubs "assault weapons" are strictly "necessary" to self-defense.  The unstated theory underlying HB 1240 is that the state's interest in keeping such arms out of the hands of criminals outweighs the constitutional rights of law-abiding individuals because the state thinks that people can, in most cases, adequately defend themselves with less effective firearms.  But that sort of means-ends scrutiny is verboten under *Bruen*. "[T]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Bruen*, 142 S.Ct. at 2129 (quoting *Heller*, 554 U.S. at 634).  Means-ends scrutiny may not be smuggled into the analysis under the new label of "necessity." *See id.* at 2133 n.7 (courts may not "engage in independent means-end scrutiny under the guise of an analogical inquiry").  *Heller* itself (should have) made that clear.  It was "no answer" there to say that District of Columbia residents could possess rifles instead of handguns when "the American people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629.  While the Court identified many reasons handguns may be preferred, ultimately the "why" did not matter; "*whatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home," *id.* (emphasis added), and that was enough to entitle people to keep them.

Here too, that is the end of the inquiry.  As the Supreme Court made emphatic in *Bruen*, it is not twenty-first-century legislation, but "the traditions of the American people [] that demand[] our unqualified deference."  142 S.Ct. at 2131 (quoting

MOTION FOR PRELIMINARY INJUNCTION - 17

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

*Heller*, 554 U.S. at 635). And our nation's historical tradition is that the government may not ban arms that are "in 'common use' for self defense today." *Id.* at 2128. Because the wide swath of semiautomatic rifles, pistols, and other arms that Washington has banned are "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, HB 1240 violates the Second Amendment.

**C.    Insofar as the Burden Shifts, the Government Cannot Shoulder It.**

The Court can and should end its analysis there. "[T]he traditions of the American people … demand[] our unqualified deference," *Bruen*, 142 S.Ct. at 2131, and the tradition of the American people is that law-abiding citizens may keep and bear arms that are commonly possessed for self-defense. That *is* the historical test—i.e., the key inquiry under *Bruen*—and it forecloses the state's effort to ban these commonly possessed arms. After all, a state may not prohibit what the Constitution protects, even if what the Constitution protects is dangerous or capable of abuse. *See, e.g.*, *Edenfield v. Fane*, 507 U.S. 761, 770-71, 773 (1993) (state cannot "flat[ly] ban" solicitation by public accountants on the ground that solicitation "creates the dangers of fraud, overreaching, or compromised independence"); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002) (government cannot ban virtual child pornography on the ground that it might lead to child abuse because "[t]he prospect of crime" "does not justify laws suppressing protected speech"). In all events, even if this Court were to look beyond the problem that arms lawfully possessed in the tens of millions by millions of Americans are about the farthest thing from "highly

MOTION FOR PRELIMINARY INJUNCTION - 18

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

unusual in society at large," *Bruen*, 142 S.Ct. at 2143, the result would be the same, as there is no historical tradition whatsoever of treating the kinds of features the state has singled out as sufficiently "dangerous" to justify prohibiting arms that have them.

There were no restrictions on firing capacity, reloading mechanisms, or the kinds of attachments the state has singled out *at all* when either the Second or the Fourteenth Amendment was ratified, even though repeating firearms that were capable of firing nearly 20 rounds in under 10 seconds were widespread around the time of the latter. *See Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020) (discussing the Winchester Model 66), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and rev'd on reh'g en banc sub nom.*, *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022). Nevertheless, before "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds." *Miller*, 542 F.Supp.3d at 1024. The earliest laws treating such features as sufficient to convert an otherwise-lawful firearm into a so-called "assault weapon" date back to only 1989, which is far too late to serve as an indicator of a "historical tradition." *Bruen*, 142 S.Ct at 2126; *see id.* at 2138 (rejecting reliance on "late-19th-century [laws]"); *see also United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013) (deeming supposedly analogous "firearm restrictions" that did not come around "until 1938" insufficiently "longstanding" to provide a basis to find a

MOTION FOR PRELIMINARY INJUNCTION - 19

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

historical tradition of similar regulation); *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 962–63 (9th Cir. 2014) (looking only to supposed analogues in founding-era and Reconstruction-era fire safety laws in the context of a challenge to regulations on handgun storage and sales of certain ammunition).  And even today, such laws remain rare; the arms Washington has banned are legal in (at least) 40 states.[3]  As for the federal government, it did not restrict "assault weapons" until 1994—and Congress allowed that law to expire in 2004 after a DOJ study revealed that it had produced "no discernable reduction" in gun violence.  Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 96 (2004), available at https://bit.ly/3wUdGRE.

The lack of any historical tradition of prohibiting arms with the features Washington has singled out is not owing to some "dramatic technological change[]" that came about in the past few decades.  *See Bruen*, 142 S.Ct. at 2132. Semiautomatic firearms equipped with detachable magazines and features like a pistol grip have been around for more than a century.  *See* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 463, 519 (2d ed. 2018).  Indeed, one

---

[3]   Washington's ban is so aggressive that it reaches many arms that even some of the states that do have "assault weapon bans" do not prohibit.  *See, e.g.*, Haw. Rev. Stat. Ann. §134-1 (defining assault pistol as a semiautomatic firearm that "accepts a detachable magazine and has two or more" additional features).

MOTION FOR PRELIMINARY INJUNCTION - 20

of the firearms that Illinois identified as prohibited by its nearly identical "assault weapons" ban is the Broomhandle, which dates back *to 1896.  See* Ex. A to Decl. of William E. Demuth II, at 8, *Barnett v. Raoul*, No. 3:23-cv-00209 (S.D. Ill. Mar. 2, 2023), Dkt.37-3; *see also Duncan*, 970 F.3d at 1148.  Yet while many states and the federal government began restricting *fully automatic* firearms in the 1920s and 1930s, only a handful of states and D.C. imposed any restrictions on *semi*automatic arms— and each of those Prohibition Era laws was either repealed outright or replaced with a law regulating only fully automatic weapons.  *Id.* at 1150 & n.10.[4]  That divergent historical treatment is particularly notable because semiautomatic arms had been available on the civilian market for decades before anyone tried to market automatics

---

[4]    *See* 1927 Mich. Pub. Acts 887, §3 (prohibiting "any … firearm which can be fired sixteen times without reloading"), *repealed via* 1959 Mich. Pub. Acts 249, 250; 1927 R.I. Pub. Laws 256 §§1, 3 (prohibiting firearms "which shoot[] more than twelve shots semi-automatically without reloading"), r*epealed via* 1959 R.I. Acts & Resolves 260, 260, 263 (amended 1975); 1933 Ohio Laws 189, §§12819-3, -4 (prohibiting "any firearm which shoots more than eighteen shots semi-automatically without reloading"), *repealed via* 1972 Ohio Laws 1866, 1963 (setting 32-round limit); *see also* H.R. 234, 2013-2014 Leg. (Ohio) (fully repealing magazine ban) (codified at Ohio Rev. Code Ann. §2923.11); 47 Stat. 650 §§1, 14 (1932) (prohibiting "any firearm which shoots … semiautomatically more than twelve shots without reloading" in the District of Columbia), *repealed via* 48 Stat. 1236 (1934) (codified as amended at 26 U.S.C. §§5801-72).

MOTION FOR PRELIMINARY INJUNCTION - 21

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

to civilians.  Indeed, unlike automatics, semiautomatic arms were civilian arms from the start.  *See* Johnson, *supra*, at 463, 519.  Yet while more than a dozen states banned fully automatic arms within only a couple years of their entry onto the civilian market, very few ever restricted semiautomatic arms.

None of that is terribly surprising.  Centuries of history demonstrate that people have *always* gravitated toward firearms with features that enhance their ability to fire more rounds more quickly without compromising accuracy, safety, or functionality.  That explains why single-shot muskets gave way to multi-shot Pepperbox pistols, revolvers, and repeating rifles in the decades after the Founding, Compl. ¶¶20–22, why Winchester rifles capable of firing more than 10 rounds quickly became the weapon of choice for many in the late-nineteenth century, *id*. ¶23, why semiautomatic models largely displaced models with more cumbersome, less efficient feeding devices in the twentieth century, *id*. ¶¶24–26, and why pistols and AR-platform rifles soared in popularity precisely when detachable magazines capable of holding more rounds became more compact and reliable, *id*. ¶¶27–28.

To be sure, modern firearms are more accurate, more reliable, more portable, and capable of quickly firing more rounds than their Founding-era predecessors.  But that does not make them any less linear descendants of the "small-arms weapons used by militiamen … in defense of person and home" when the Amendment was ratified.  *Heller*, 554 U.S. at 624–25; *see also Caetano*, 577 U.S. at 416–17 (Alito, J., concurring in judgment) ("revolvers and semiautomatic pistols" are protected as

MOTION FOR PRELIMINARY INJUNCTION - 22

descendants of arms at the founding).  To the contrary, it makes them *better suited to self-defense*.  *See Barnett*, 2023 WL 3160285, at *9.  It would be particularly perverse to confine the people to arms that are less accurate, efficient, and reliable for self-defense—which likely explains why no such historical tradition exists.

Washington may try to justify its ban by reference to historical restrictions on individuals' ability to publicly carry arms in a concealed manner.  That maneuver does not work.  "[T]he relevant analysis of each historic firearm regulation must be centered around 'how and why' the regulation burdened Second Amendment rights." *Id.* at *11 (quoting *Bruen*, 142 S.Ct. at 2133).  And "[t]he 'how and why' of a concealed carry regulation is categorically different than the 'how and why' of a ban on possession." *Id.*  A prohibition on a class of arms precludes people from keeping or bearing the restricted arms; concealed carry bans, by contrast, do not even preclude people from carrying arms, let alone preclude them from keeping them.  Such restrictions thus "cannot pass 'constitutional muster' as a historical analogue to demonstrate this Nation's historical tradition regarding an 'arms' ban." *Id.*

\*    \*    \*

Simply put, there is no "enduring American tradition of state regulation" forbidding the purchase and/or possession of semiautomatic rifles and pistols by law-abiding citizens for lawful purposes. *Bruen*, 142 S.Ct. at 2135.  To the contrary, the enduring American tradition is one of protecting the right of the people to possess firearms that, like semiautomatic rifles and pistols equipped with common features

MOTION FOR PRELIMINARY INJUNCTION - 23

such as detachable magazines, pistol grips, and thumbhole stocks, are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624–25. Because Washington cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S.Ct. at 2127, HB 1240 violates the Second Amendment.

## II.    The Remaining Factors All Favor Injunctive Relief.

There is no question that the constitutional injuries HB 1240 will inflict on Plaintiffs and their members are imminent; the law has already taken effect.  And those injuries are irreparable by definition.  *See Renna v. Bonta*, 2023 WL 2846937, at *14 (S.D. Cal. Apr. 3, 2023).  Nor does it make a difference that Washington has not sought to dispossess Washingtonians of these arms, or that Washingtonians may bear these arms in other states that take a less dim view of the Second Amendment.

The constitutional injuries HB 1240 is already inflicting is enough in and of themselves to satisfy the second injunctive relief factor.  But they do not stand alone. Many plaintiffs (and many other Washington retailers among Plaintiff NSSF's 10,000+ members) will indisputably lose revenue if HB 1240 remains in effect.  *See* Decl. of Jeremy Ball ¶¶6-15; Decl. of Austin Harlan ¶¶6–11.  The statute has already resulted in "the constriction of [Plaintiffs'] buyers' market," which is a textbook economic "injury," and it will only get worse as time drags on.  *Craig v. Boren*, 429 U.S. 190, 194 (1976); *see Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 205 (4th Cir. 2020) (applying *Craig*'s logic to gun dealer's challenge to Maryland licensing law).

MOTION FOR PRELIMINARY INJUNCTION - 24

And while economic injuries typically are not irreparable because they can be remedied after the fact, they are irreparable when—as here—the defendants are cloaked in immunity. *See Cal. Pharmacists Ass'n v. Maxwell-Jolly,* 563 F.3d 847, 851–52 (9th Cir. 2009), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012). Every cent Plaintiffs lose as a result of HB 1240 is unrecoverable as a matter of law, thanks to the Eleventh Amendment.

The equities and the public interest favor an injunction as well. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (these factors "merge when the Government is the opposing party"). HB 1240 tramples on fundamental constitutional rights—and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendrew v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Defendants cannot make any serious argument that they (or the state) will suffer harm as a result of an injunction. Government defendants "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction. And because none of the material facts can be reasonably disputed—the arms Washington has banned are unquestionably in common use—and the issues are purely legal, there is no reason to delay entering judgment in Plaintiffs' favor.

MOTION FOR PRELIMINARY INJUNCTION - 25

1    DATED this 4th day of May, 2023.

2                                    CORR CRONIN LLP

3

4                                    *s/ Steven W. Fogg*_____
                                     Steven W. Fogg, WSBA No. 23528
5                                    CORR CRONIN LLP
                                     1015 Second Avenue, Floor 10
6                                    Seattle, Washington  98104-1001
                                     Ph: (206) 625-8600 | Fax: (206) 625-0900
7                                    sfogg@corrcronin.com

8
                                     Paul D. Clement *(pro hac vice pending)*
9                                    Erin E. Murphy *(pro hac vice pending)*
                                     Matthew D. Rowen *(pro hac vice pending)*
10                                   Mariel A. Brookins *(pro hac vice pending)*
                                     CLEMENT & MURPHY, PLLC
11                                   706 Duke Street
                                     Alexandria, VA 22314
12                                   Ph: (202) 742-8900
                                     paul.clement@clementmurphy.com
13                                   erin.murphy@clementmurphy.com
                                     matthew.rowen@clementmurphy.com
14                                   mariel.brookins@clementmurphy.com
15
                                     *Attorneys for Plaintiffs*
16

17

18

19

20

21

22

23

24

25

MOTION FOR PRELIMINARY INJUNCTION - 26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on (Date), I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

DATED at Seattle, Washington on 4th day of May, 2023.

<u>*s/ Megan Johnston*</u>
Megan Johnston, Legal Assistant
Corr Cronin LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Phone: (206) 625-8600
Email: mjohnston@corrcronin.com

MOTION FOR PRELIMINARY INJUNCTION - 27