1   Kristin Beneski, WSBA #45478
    *First Assistant Attorney General*
2   Andrew R.W. Hughes, WSBA #49515
    R. July Simpson, WSBA #45869
3   William McGinty, WSBA #41868
    *Assistant Attorneys General*
4   Washington Attorney General's Office
    800 Fifth Avenue, Suite 2000
5   Seattle, WA 98104
    (206) 464-7744
6

7

8                                          The Honorable Mary K. Dimke

9           **UNITED STATES DISTRICT COURT**
          **EASTERN DISTRICT OF WASHINGTON**
                   **AT SPOKANE**
10

11  AMANDA BANTA, et al.,              NO. 2:23-cv-00112-MKD

12                         ,           STATE DEFENDANTS'
                                       OPPOSITION TO MOTION
                                       FOR PRELIMINARY
13          v.                         INJUNCTION

14  ROBERT W. FERGUSON, Attorney
    General of the State of Washington,
15  et al.,

16                      .

17

18

19

20

21

22

23

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 2

    A.    SHB 1240 Prohibits the Manufacture and Sale of Assault Weapons ....................... 2

    B.    Assault Weapons Are Uniquely Deadly Military-Style Weapons ........................... 3

    C.    Assault Weapons Are Not Commonly Used in Self-Defense ................................. 5

    D.    Assault Weapons Are Often Used in Mass Shootings ........................................... 7

III.  ARGUMENT ...................................................................................................... 8

    A.    Legal Standard ................................................................................................. 8

    B.    Plaintiffs Are Unlikely to Succeed on the Merits ............................................... 9

        1.    The Second Amendment does not protect military-style assault weapons ........ 9

        2.    SHB 1240 fits well within the robust history and tradition of regulating
            weapons used in interpersonal violence .......................................................... 16

            a.    SHB 1240 responds to dramatic technological developments and
               unprecedented social change ......................................................... 17

            b.    States have long regulated weapons used for lawless violence ............... 18

               (1)    Regulations on trap guns and clubs .............................................. 19

               (2)    Regulations on Bowie knives and pistols ...................................... 19

               (3)    Early twentieth century regulations on automatic and semi-
                    automatic weapons .................................................................. 21

            c.    SHB 1240 is consistent with the historical tradition of weapons
              regulation ................................................................................... 21

    C.    Plaintiffs Face No Irreparable Harm .................................................................. 22

    D.    The Equities and Public Interest Weigh Heavily against an Injunction ................. 24

    E.    A Final Judgment Is Inappropriate at This Early Juncture .................................... 25

IV.   CONCLUSION .................................................................................................. 25

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## I.    INTRODUCTION

The Legislature enacted Substitute House Bill (SHB) 1240 to limit the manufacture and sale of firearms with a disproportionate and deadly role in mass shootings: assault weapons. Even though assault weapons make up less than five percent of all guns owned by Americans, they caused *over half* of mass shooting fatalities in the past decade. Plaintiffs' effort to enjoin this common-sense law lacks merit. As the Supreme Court reiterated in *Bruen*, the Second Amendment does not guarantee civilians the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128 (2022). Just like machine guns, assault weapons are not covered by the Second Amendment because they are not tools of self-defense; they are military-style weapons designed to kill as many people as possible as quickly as possible. Moreover, Washington's regulation of assault weapons fits comfortably within the long historical tradition of regulating dangerous and unusual weapons to promote public safety.

Accordingly, post-*Bruen*, courts have overwhelmingly rejected Second Amendment challenges to assault weapons restrictions (and the closely related restrictions on large capacity magazines). *See Bevis v. City of Naperville*, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023); *Herrera v. Raoul*, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 2023 WL 2655150 (D. Del. Mar. 27, 2023); *Hanson v. District of Columbia.*, 2023 WL 3019777 (D.D.C. Apr. 20, 2023); *Ocean State Tactical, LLC v. Rhode Island*, 2022 WL 17721175 (D.R.I. Dec. 14, 2022); *Ore. Firearms Fed'n v. Brown*,

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

2022 WL 17454829 (D. Or. Dec. 6, 2022); *see also Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (pre-*Bruen*); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) (same). Just as court after court has already done, this Court should reject Plaintiffs' dangerous misinterpretation of the Second Amendment and their effort to undermine the common-sense regulation of military-style weapons.

Nor can Plaintiffs satisfy the remaining preliminary injunction factors. There is no irreparable harm where Plaintiffs may continue to use their existing collections of assault weapons and purchase alternative firearms to defend themselves. And the public interest does not justify preliminarily enjoining a life-saving measure, limiting the sale of weapons disproportionately responsible for mass-shooting deaths, so that Plaintiffs may add to their assault-weapon collections during the pendency of this suit.

## II.    BACKGROUND

### A.    SHB 1240 Prohibits the Manufacture and Sale of Assault Weapons

The Legislature passed SHB 1240 to address the epidemic of gun violence that "threat[ens] . . . the public health and safety of Washingtonians." 2023 Wash. Sess. Laws, ch. 162, § 1. The Legislature found that assault weapons are not "well-suited for self-defense, hunting, or sporting purposes," but "are designed to kill humans quickly and efficiently." *Id.* Citing the use of assault weapons "in the deadliest mass shootings in the last decade," the Legislature found that "[a]n assailant with an assault weapon can hurt and kill twice the number of people [as] an assailant" without, and "during the period the federal assault weapon ban was in effect, mass shooting fatalities were 70 percent less likely to occur." *Id.*

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  Accordingly, the Legislature concluded that restricting the sale of assault weapons,

2  "while allowing existing legal owners to retain the assault weapons they currently

3  own," "is likely to have an impact on the number of mass shootings committed in

4  Washington" without interfering with lawful self-defense. *Id.*

5      SHB 1240 prohibits the "manufacture, importation, distribution, offer for

6  sale, or sale [of] any assault weapon," defined as weapons bearing enumerated

7  combat-specific features. *Id.* §§ 3; 2(2). SHB 1240 does not stop current owners

8  from keeping and using their existing assault weapons.

9  **B.    Assault Weapons Are Uniquely Deadly Military-Style Weapons**

10      Assault weapons' disproportionate role in our nation's deadliest mass

11  shootings stems directly from their unique capacity to kill. Assault weapons are

12  designed to be "more accurate, more portable, and more specifically tailored to

13  produce lethal outcomes." Busse Decl., ¶ 29. The AR-15—at its core an M-16

14  military rifle without fully-automatic capability—is a "near perfect weapon of

15  war" due to its light weight, maneuverability, and ability to accept lightweight,

16  high-velocity ammunition. Kyleanne Hunter, *An American Problem: Weapons of*

17  *War   in   Places   of   Peace*,   TEDxBend   (May   14,   2018),

18  https://www.ted.com/talks/kyleanne_hunter_an_american_problem_weapons_of

19  _war_in_places_of_peace. Bullets shot from an AR-15 can pierce both sides of a

20  standard-issue military helmet from 500 meters away, and are designed to ricochet

21  upon entering the body, causing far more damage than handgun ammunition. *Id.*

22      "The difference between the fully automatic and semiautomatic versions of

23  those firearms is slight." *Kolbe*, 849 F.3d at 125. An automatic M-16 can empty a

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

thirty-round magazine in "about two seconds, whereas a semiautomatic rifle can empty the same magazine in as little as five seconds." *Id.* The heart of both the M-16 and AR-15 rifles is an action and receiver capable of firing .223 caliber centerfire rounds. Busse Decl., ¶¶ 8–12. In this respect, the only difference between them is that the M-16 can fire automatically and in three round bursts. *Id.* ¶ 12. But the AR-15, as sold in America today, is a modular weapon capable of accepting a wide variety of accessories "all of which are designed and marketed to increase the effectiveness of the rifle in tactical battlefield situations." *Id.* ¶ 46. Semiautomatic assault weapons are easily converted into automatic weapons, virtually indistinguishable from those used by the military, using devices like trigger cranks or even a simple rubber band. *See Bevis*, 2023 WL 2077392, at *15; *see also* Busse Decl., ¶ 47. Indeed, "in many cases, U.S. civilians can now outfit rifles in a manner more lethal than the rifles carried by the military." Busse Decl., ¶ 47.

The features that define assault weapons in SHB 1240 (and that distinguish them from other semiautomatic firearms) are specifically designed to "increase the effectiveness of killing enemy combatants in offensive battlefield situations"—or, in the hands of a mass shooter, innocent civilians. *Id.* ¶ 32; 34–39. For example, pistol grips, forward grips, and thumbhole stocks all aid in controlling "the rifle during periods of rapid fire." Busse Decl., ¶ 34; *see also* ¶¶ 35–36. They are "useful during military operations because [they] help[] the shooter stabilize the weapon and reduce muzzle rise during rapid fire" but are "not necessary to operate a firearm safely in self-defense situations." *Id.* Barrel shrouds enable "the shooter to grasp the barrel during firing without burning the non-trigger hand and as the rifle

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

heats up in rapid-fire and continuous-fire situations." *Id.* ¶ 37. Again, useful in combat, but not for self-defense. *Id.* Similarly, flash suppressors, muzzle brakes, and compensators reduce recoil and muzzle rise in rapid-fire situations, prevent night blindness during nighttime firefights, and help misdirect enemy forces in nighttime battlefield scenarios, but lack self-defensive applications. *Id.* ¶ 38.

### C.    Assault Weapons Are Not Commonly Used in Self-Defense

While the AR-15 dates to the 1950s, assault weapon sales in the United States remained very low until the aftermath of the Sandy Hook Elementary massacre, when a shooter used an AR-15 to murder 20 children and six teachers. *Id.* at 5, ¶ 12; *Access to weapons made tragedy possible*, CT Post (Mar. 28, 2013), https://www.ctpost.com/news/article/Access-to-weapons-made-tragedy-possible-4392681.php. Before Sandy Hook, AR-15s were treated as military assault weapons, not suitable for sale or marketing to civilians. Busse Decl., ¶¶ 7–8, 18, 20–22. In the last decade, however, the gun industry has undertaken aggressive marketing to sell more assault weapons to civilians. Busse Decl., ¶¶ 17–31.

This aggressive marketing has led to an uptick in assault weapons sales, even though they are not "well-suited for self-defense, hunting, or sporting purposes" and "not commonly used in self-defense." 2023 Wash. Sess. Laws, ch. 162, § 1; *see also* Busse Decl., ¶¶ 23, 30–39. As discussed above, the combat features that define assault weapons are unhelpful for self-defense and, at worst, actively *increase* the danger to bystanders. For example, just as assault weapon ammunition pierces military helmets, it also pierces walls and can strike responding law enforcement and innocent bystanders. Hunter, *supra* § II.B.

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Unsurprisingly, then, data confirms assault weapons are not commonly used for self-defense. An analysis of The Heritage Foundation's "Defensive Gun Uses in the U.S." database—a database designed to *promote* a pro-gun agenda— shows that of the 1,241 recorded incidents of armed self-defense nationwide between 2019 and 2022 in which the type of gun used is known, only 4% involved some type of rifle (of which assault rifles are only a subset). Allen Decl., ¶¶ 23–28.

The gun industry understands assault weapons are offensive—not defensive—weapons, and they market them as such. Despite faddish claims that "assault weapon" is a misnomer made up by anti-gun activists, "[t]he firearms industry openly referred to these . . . weapons as 'assault weapons' and 'assault rifles' as late as 2008." Busse Decl., ¶ 27 (citing Gun Digest's "Buyer's Guide to Assault Weapons"). To this day, the ads for these guns stress their appropriateness for use in wartime, civil unrest, or vigilante scenarios. *Id.* ¶¶ 50–55. One typical advertisement by the weapons company Daniel Defense, whose gun was used in the Uvalde massacre, features a soldier and prominently encourages consumers to "use what they use." Busse Decl., ¶¶ 50–51. Smith & Wesson, whose assault weapons were used in the Parkland and Highland Park massacres, sells civilians an AR-15 variant called the "Military and Police AR-15." *Id.* ¶ 52. Bushmaster, whose rifle was used at Sandy Hook, "describes its Adaptive Combat Rifle as 'the ultimate military combat weapons system' that is '[b]uilt specifically for law enforcement and tactical markets.'" *Kolbe*, 849 F.3d at 125 (quoting record). "[S]maller AR-15 manufacturers now regularly seek to grow their market by advertising in ways that depict young men with AR-15s inciting or engaging in

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

armed urban warfare" and "armed offensive vigilante actions." *Id.* ¶¶ 53–54. Firearms manufacturers market assault weapons based on their offensive and military style characteristics because that is what separates them from other arms more suited for self-defense. Busse Decl., ¶¶ 13, 20, 38, 50, 56

**D.    Assault Weapons Are Often Used in Mass Shootings**

At least 31% of all public mass shootings in the last 25 years, and 50% in the last five years, involved an assault weapon. Klarevas Decl., ¶ 12. This is highly disproportionate given that assault weapons make up, at most, around 5% of all guns owned by Americans. *Id.* ¶ 13. And because assault weapons are so much deadlier than other weapons, their use in mass shootings leads to much higher casualty rates. Over the past decade, six people on average have been killed in each public mass shooting that did not involve an assault weapon, but that number *more than doubles* to almost 13 deaths in shootings involving an assault weapon. *Id.* ¶ 15. In fact, all seven of the deadliest acts of criminal violence since the September 11, 2001, attack were mass shootings, and six used assault weapons. *Id.* ¶ 14.

The Uvalde mass shooting provides a gut-wrenching case-in-point on the unique dangers of assault weapons. After a shooter entered the elementary school, ultimately killing 19 children and two teachers, the Uvalde Police Department was unwilling to enter the school for an hour because the destructive power of the shooter's AR-15 rendered police intervention *too dangerous*. Zach Despart, *"He has a battle rifle": Police feared Uvalde gunman's AR-15*, The Texas Tribune (March 20, 2023), https://www.texastribune.org/2023/03/20/uvalde-shooting-police-ar-15/. Police had to wait for more protective body armor, stronger shields,

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

and units with more tactical training. *Id*. Uvalde Police Department Sgt. Donald Page told investigators later: "You knew that it was definitely an AR . . . There was no way of going in . . . We had no choice but to wait and try to get something that had better coverage where we could actually stand up to him." *Id.*

Unfortunately, "the problem of mass shooting violence is on the rise." Klarevas Decl., ¶ 11. The first mass shooting incident that resulted in ten or more deaths in America's history happened in 1949, the next in 1966, then in 1975. *Id.* ¶¶ 17–18. When their frequency increased in the late 1980s, Congress responded with the 1994 federal Assault Weapons Ban. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-694, 108 Stat. 1796. But since that ban expired, the average rate of these incidents has increased "over six-fold." Klarevas Decl., ¶ 20.[1]

### III.    ARGUMENT

#### A.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs seeking a preliminary injunction must establish that: (1) their claims are likely to succeed on the merits; (2) they will likely suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. To carry the "heavy burden" of their facial challenge, Plaintiffs must "establish that no set of

---

[1] "Assault weapons are used disproportionately in . . . police killings" as well. *Bevis*, 2023 WL 2077392, at *15.

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    circumstances exists under which [SHB 1240] would be valid." *United States v.*
2    *Salerno*, 481 U.S. 739, 745 (1987). Where a statute has a "plainly legitimate
3    sweep," a facial challenge must fail. *Wash. State Grange v. Wash. State Republican*
4    *Party*, 552 U.S. 442, 449 (2008).

5    **B.    Plaintiffs Are Unlikely to Succeed on the Merits**

6    Under *Bruen*, Plaintiffs must first show that "the Second Amendment's plain
7    text covers" the right to obtain assault weapons. 142 S. Ct. at 2126 (2022). If they
8    can make this showing, the burden then shifts to Defendants to "justify [SHB 1240]
9    by demonstrating that it is consistent with the Nation's historical tradition of
10    firearm regulation." *Id.* at 2130. Plaintiffs are unlikely to succeed at either step.
11    *First*, the Second Amendment does not guarantee the right to obtain military-style
12    weapons that are not appropriate for self-defense. *Second*, Washington's law is
13    part of a robust historical tradition of limiting the manufacture and sale of the
14    weapons most destructively used for lawless interpersonal violence.

15    **1.    The Second Amendment does not protect military-style assault
       weapons**

16    Plaintiffs' Second Amendment claim fails at *Bruen*'s first step because the
17    Second Amendment does not afford a right to keep and bear military-style weapons
18    that are not commonly used for self-defense. Although Plaintiffs try to flip the
19    burden, ECF No. 16 (Mot.) at 7, the *Bruen* Court's analysis makes clear that
20    whether weapons are "in common use today for self-defense" goes to whether arms
21    are within the Second Amendment's ambit in the first instance. *Bruen,* 142 S. Ct.
22    at 2134. Thus, in *Bruen*, before turning to whether New York's restriction was
23    "consistent with the Nation's historical tradition of firearm regulation," *id.* at 2130,

1  the Court confirmed that "handguns are weapons in common use today for self-

2  defense." *Id.* at 2134 (cleaned up). Plaintiffs here fail to show, however, that assault

3  weapons are commonly used for self-defense. Rather, the evidence shows they are

4  military-style weapons unsuitable for self-defense.

5      The Second Amendment does not guarantee "a right to keep and carry any

6  weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*,

7  142 S. Ct. at 2128 (cleaned up). Textually, the *Heller* Court held, "self-defense" is

8  the "*central component* of" the Second Amendment right to "bear arms." *District*

9  *of Columbia v. Heller*, 554 U.S. 570, 599 (2008). As such, "the Second

10  Amendment right . . . extends only to certain types of weapons," namely those "in

11  common use at the time for lawful purposes like self-defense." *Id.* at 623, 624

12  (cleaned up). It was "these kinds of weapons (which have changed over the years)

13  [that] are protected by the Second Amendment in private hands, while military-

14  grade weapons (the sort that would be in a militia's armory), such as machine guns,

15  and weapons especially attractive to criminals . . . are not." *Friedman v. City of*

16  *Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) (citing *Heller*, 554 U.S. at 624–

17  25). Thus, as *Heller* made clear, "weapons that are most useful in military

18  service—M-16 rifles and the like—may be banned." 554 U.S. at 627; *see also*

19  *Kolbe*, 849 F.3d at 131 (same; upholding ban on assault weapons). This

20  textual-historical limitation is fatal to Plaintiffs' argument. *Kolbe*, 849 F.3d at 135;

21  *Friedman*, 784 F.3d at 412; *see also Bevis*, 2023 WL 2077392, at *9 ("The text of

22  the Second Amendment is limited to only certain arms, and history and tradition

23  demonstrate that particularly 'dangerous' weapons are unprotected.").

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Assault weapons are not merely "like" M-16s: they are fundamentally the same gun. Indeed, the most popular assault weapon, the AR-15, *is* an M-16, just without the ability to fire automatically or in three-round bursts. Busse Decl., ¶ 12. AR-15s preserve the features that make M-16s such devastating combat weapons, and can easily be converted to near-automatic rates of fire. *Supra* at II.B. Thus, assault weapons regulated by SHB 1240, and especially the AR-15, are the types of weapons the Supreme Court has specifically identified as outside the scope of the Second Amendment.

Beyond their functional equivalence to M-16s, assault weapons are not covered by the Second Amendment because they are not "in common use . . . for lawful purposes like self-defense." *Heller*, 554 U.S. at 624; *see also Bruen*, 142 S. Ct. at 2134. As combat weapons designed to kill as many enemies as possible, assault weapons have limited—if any—utility for self-defense. 2023 Wash. Sess. Laws, ch. 162, § 1; Hunter, *supra* § II.B.; Busse Decl., ¶¶ 32–41. Indeed, data show they are almost *never* used in self-defense. Allen Decl., ¶¶ 23–28. A study of active shooter incidents using FBI data shows that, of the 456 active shooter situations between 2000 and 2022, only 18 involved defensive gun uses by a private citizen, and only *one*—0.2%—is known to have involved an assault weapon. Klarevas Decl., ¶ 24. This makes sense: as one court found, in the type of close-range encounters in which one is likely to need to defend oneself, "handguns are most useful." *Bevis*, 2023 WL 2077392, at *16; *see also id.* ("[S]hotguns and 9mm pistols are generally recognized as the most suitable and effective choices for armed defense.'"). Recent increases in the sales of assault weapons stem not from

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

their utility in self-defense, but from aggressive marketing by gun makers touting their combat capabilities. Busse Decl., ¶¶ 49–55; 2023 Wash. Sess. Laws, ch. 162, § 1.[2] By contrast, assault weapons *are* disproportionately used in mass shootings and other high-profile criminal activity, and they make those shootings vastly more lethal. *Supra* § II.D.; *see also* Klarevas Decl., Table 2, at 19.

Assault weapons are combat weapons designed to kill as many enemies on the battlefield as quickly as possible. It is "[t]he very features that qualify a firearm as a[n] . . . assault weapon—such as flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips, grenade launchers, night sights, and the ability to accept bayonets and large-capacity magazines"—that give them a "capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms[.]" *Kolbe*, 849 F.3d at 137 (cleaned up). Accordingly, following *Bruen*, federal courts considering assault weapons restrictions have had no difficulty concluding that assault weapons are especially dangerous weapons that fall outside the text of the Second Amendment, as informed by history. *Herrera*, 2023 WL 3074799, at *4; *Bevis*, 2023 WL 2077392, at *16; *see also Hanson v. D.C.*, 2023 WL 3019777, at *12 (D.D.C. Apr. 20, 2023) (large-capacity magazines);

---

[2] To the extent Plaintiffs claim that assault weapons are used for lawful purposes *besides* self-defense, this is irrelevant to the constitutional inquiry: "self-defense is the *central component*' of the Second Amendment right." *Bruen*, 142 S. Ct. at 2133 (cleaned up) (emphasis in original); *see also* Mot. at 14 ("personal self-defense" is the Amendment's "raison d'être").

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   *Ocean State Tactical*, 2022 WL 17721175, at \*15 (same); *Ore. Firearms Fed'n v.*

2   *Brown*, 2022 WL 17454829, at \*11 (D. Or. Dec. 6, 2022) (same).

3   Plaintiffs ignore these cases, but rely heavily on *Barnett v. Raoul*, 2023 WL

4   3160284 (S.D. Ill. Apr. 28, 2023), the *only* post-*Bruen* district court opinion to

5   conclude that restrictions on assault weapons likely violate the Second

6   Amendment. Mot. at 7, 8, 9, 15, 21, 23. But *Barnett* was promptly stayed by the

7   Seventh Circuit. *Barnett v. Raoul*, No. 23-1825 (7th Cir. May 4, 2023)) (ECF

8   No. #9). It merits no deference in the face of overwhelmingly contrary authority.

9   Plaintiffs respond with the same handful of arguments that every prior,

10   unsuccessful plaintiff has raised. They assert that assault weapons should be

11   protected by the Second Amendment simply because there are a lot of them. Mot.

12   at 11–12. But Plaintiffs' claims of assault weapons' ubiquity are vastly overstated;

13   the sources they cite are methodologically unsound and ignore that assault weapon

14   ownership is highly concentrated in the hands of collectors and super-collectors.

15   Klarevas Decl., ¶ 27. Even if Plaintiffs' sources were reliable, those sources reflect

16   that "only 5 percent of firearms" in the U.S. "are assault weapons" and that "less

17   than 2 percent of all Americans own assault weapons." *Bevis*, 2023 WL 2077392,

18   at \*16; Mot. at 9 (citing the same source); *see also* Klarevas Decl., ¶ 26. And they

19   show that, at minimum, nearly *half* of all assault weapons are owned by just 1.6

20   percent of all assault weapon owners—around .03% of Americans. Klarevas Decl.,

21   ¶ 26. Further, as Plaintiffs admit, of the tiny percentage of Americans who own

22   assault weapons, only a fraction cite self-defense as a reason. Mot. at 14.

23   Meanwhile, almost a third of Americans live in states that restrict them. Klarevas

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Decl., ¶ 39. Regardless, whether assault weapons are commonly *possessed* is irrelevant. The question under *Heller* and *Bruen* is whether assault weapons are "in common *use* . . . for self-defense today." *Bruen*, 142 S. Ct. at 2143 (emphasis added). Here, the evidence shows they are not. Allen Decl., ¶¶ 23–28.

Plaintiffs' popularity-contest argument also fails as a legal matter. As the Seventh Circuit pointed out in *Friedman*, Tommy guns were "all too common" during Prohibition, but this "popularity d[oes]n't give" dangerous military weapons "constitutional immunity." 784 F.3d at 408. Rather, *Heller* makes clear "[t]here is no Second Amendment protection for . . . 'weapons that are most useful in military service'"; it does not "make[] an exception for such weapons if they are sufficiently popular." *Kolbe*, 849 F.3d at 142 (quoting *Heller*, 554 U.S. at 627). Plaintiffs' argument leads to the absurd conclusion that a firearm's constitutional status turns on whether the gun industry chooses to engage in mass campaigns to flood the market. *See* Busse Decl., ¶¶ 31 (quoting a Palmetto Armory advertisement: "we want to sell as many AR-15 and AK-47 rifles as we can and put them into common use in America today"). Moreover, "relying on how common a weapon is at the time of litigation would be circular" because a weapon's popularity (or not) often depends on whether it is banned or not. *Friedman*, 784 F.3d at 409; *see also Kolbe*, 849 F.3d at 141.

Additionally, like the unsuccessful plaintiffs in *Kolbe* and other cases, Plaintiffs attempt to read *Caetano v. Massachusetts*, 577 U.S. 411 (2016)—a five-paragraph, *per curiam* opinion about non-lethal stun guns—to conclusively establish an unbounded right to acquire as many assault weapons as they want.

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Mot. at 13. *Caetano* is irrelevant: it is a narrow opinion that rejects three arguments no one makes here. Plaintiffs rely on the concurring opinion of Justice Alito, joined by only one other Justice, in which he concluded that "the relative dangerousness of a weapon is irrelevant" so long as 200,000 or so people own one. *See Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring). "Of course, that reading of *Heller* failed to garner a Court majority in *Caetano*." *Kolbe*, 849 F.3d at 142.[3]

Adopting Plaintiffs' standard whereby any weapon would be immune from regulation as long as enough people bought one would also "upend settled law" because the number of stun guns owned by Americans is roughly equal to the number of "legal civilian-owned machine guns in the United States." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *5 (D. Del. Mar. 27, 2023). Thus, under Plaintiffs' reasoning, "the National Firearms Act's restrictions on machineguns" would be unconstitutional, a suggestion the Supreme Court itself called "startling." *Heller*, 554 U.S. at 624.

Plaintiffs next rely on *Heller* to argue that if handguns cannot be banned despite their use in violence, so too must assault weapons be available to anyone

---

[3] Plaintiffs' reliance on dissents in *Kolbe* (Mot. at 14–15) and *Heller* ( *II* (*id.* at 15), and their heavy reliance on overruled and vacated decisions (e.g., *Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021); *Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016), *rev'd*, 849 F.3d 114 (4th Cir. 2017) (en banc); and *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020)) are similarly unavailing—those opinions are not good law. *See* Mot. at 11, 12, 14, 19.

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    who wants them. Mot. at 16. But *Heller* undermines Plaintiffs here. It held that

2    even though handguns are often used in crime, they may not be banned because

3    they are "overwhelmingly chosen by American society" for self-defense. *Heller*,

4    554 U.S. at 628. By contrast, only a small fraction of gun owners own assault

5    weapons at all, and they almost never use them for self-defense. *Supra* §§ II.C.,

6    III.B.1. at 13–14.

7        Finally, Plaintiffs suggest that SHB 1240 sweeps too broadly, banning not

8    only AR-15s and the like but also "commonly owned pistols and shotguns as well."

9    Mot. at 16 n.2. Plaintiffs have not identified any such "commonly owned"

10   weapons, nor has any Plaintiff alleged an intent to obtain such weapons to satisfy

11   standing. But it ultimately does not matter: Plaintiffs' facial challenge requires

12   them to prove "the law is unconstitutional in all of its applications." *Wash. State*

13   *Grange*, 552 U.S. at 449. Plaintiffs unsubstantiated complaint about the law's

14   scope comes nowhere near meeting this burden.

15       None of Plaintiffs' arguments prove assault weapons are the type of self-

16   defense weapons covered by the Second Amendment. Rather, like M-16s, assault

17   weapons are the type of "weapons that are most useful in military service" that

18   "may be banned" consistent with the Second Amendment. *Heller*, 554 U.S. at 627.

19    **2. SHB 1240 fits well within the robust history and tradition of regulating weapons used in interpersonal violence**

20       Even if the Second Amendment covered assault weapons, Plaintiffs'

21   challenge would fail at *Bruen* step two because SHB 1240 "is consistent with the

22   Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. Where, as

23   here, government regulation responds to technological change and unprecedented

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112
16
ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

social concerns, this analysis requires a "nuanced approach," focusing on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132–33. The "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

SHB 1240 responds to the recent proliferation of assault weapons, which has been primarily driven by aggressive marketing. The increasing numbers of assault weapons has increased the rate of mass shootings and, even more dramatically, increased mass shooting fatalities. Even on a preliminary record, the history and tradition of the United States is replete with examples of government regulation responding to new social harms by restricting the use of weapons disproportionately used in criminal violence. Thus, courts around the country have repeatedly concluded that even if assault weapons were the type of arms that fall within the text of the Second Amendment, prohibiting their manufacture, import, and sale is well within the historical tradition of the United States.

### a. SHB 1240 responds to dramatic technological developments and unprecedented social change

Obviously, the weapons regulated by SHB 1240 did not exist in 1791 when the Second Amendment was ratified, nor in 1868 when the Fourteenth Amendment was. Semi-automatic weapons, of which assault weapons are a sub-group, first became technologically feasible in the early twentieth century, and were sold primarily to the military. Spitzer Decl., at 25. The AR-15 was invented in the late 1950s, but it was not until the late 2000s, and after the Sandy Hook massacre, that assault weapons gained significant market share. Busse Decl., ¶¶ 8, 15. Increased

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   sales resulted directly from efforts by the gun industry to sell firearms previously

2   considered too dangerous for civilian use. *Id.* ¶¶ 17–23. These developments,

3   which enabled civilians to wield weaponry capable of killing more people more

4   quickly than ever before, directly contributed to unprecedented increases in the

5   frequency and lethality of mass shootings. Klarevas Decl., ¶¶ 13–18.

6       The creation of assault weapons in the second half of the 20th century, their

7   proliferation in the civilian market, and the consequent prevalence of mass

8   shooting deaths are the kind of technological and social changes that warrant a

9   "nuanced approach" under *Bruen.* 142 S. Ct. at 2132; *see Herrera*, 2023 WL

10  3074799 at *7; *Del. State Sportsmen's Ass'n*, 2023 WL 2655150 at *10.

### b.    States have long regulated weapons used for lawless violence

12  SHB 1240 follows a long American tradition of regulating weapons

13  associated with interpersonal violence. Since the Founding, the same basic pattern

14  has repeated itself. First, someone invents a weapon which initially has no

15  significant impact on society. Spitzer Decl., at 2–3. If the technology can be readily

16  manufactured and works as intended, the military will often adopt it. *Id.* Afterward,

17  military-style weapons often pass into the civilian market. *Id.* If so, they sometimes

18  contribute to criminal violence that terrorizes the public. *Id.* Here is where, time

19  and again, states decide to regulate the weapons. *Id.* at 33–47 (firearms capable of

20  automatic and semi-automatic fire), 7–14 (Bowie knives), 14–17 (clubs and other

21  blunt weapons), 18–19 (pistols), 19–20 (trap guns).

22      This pattern shows how weapons have typically been regulated when their

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

proliferation leads to widespread societal problems. Weapons regulations that follow this pattern are useful analogues because they are "comparably justified" as a response to changing technology and new threats of violence and terror, and they "impose a comparable burden on the right of armed self-defense" by regulating especially dangerous weapons while leaving law-abiding citizens free to possess other weapons that are appropriate for self-defense. *Bruen*, 142 S. Ct. at 2133.

### (1)    Regulations on trap guns and clubs

Some of America's earliest weapons regulations concerned "trap guns," devices "rigged . . . to fire when the owner need not be present." Spitzer Decl., at 19. New Jersey prohibited trap guns in 1771, and 15 states followed between then and 1925. *Id.*, Ex. B. New Jersey enacted its early law because the "most dangerous Method of setting Guns has too much prevailed in this Province," and penalized violators with a fine of six pounds or six months' incarceration. *Id.* at 19.

Even older are laws regulating bludgeons such as billy clubs (a heavy hand-held rigid club), slungshots (a strap with rock or piece of metal at one end), and sandbags (a bag filled with sand or rocks). *Id.* at 15–17. Restrictions on these sorts of weapons go back at least as far as 1664, when the Colony of New York prohibited their public carry. *Id.* at 16; Ex. C. In the following centuries, "every state in the nation had laws restricting one or more types of clubs," owing to their widespread use in criminality and interpersonal violence. *Id.* at 14; Ex. C.

### (2)    Regulations on Bowie knives and pistols

The history and tradition of regulating weapons associated with interpersonal violence continued into the 19th and 20th centuries with regulations

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    of Bowie knives and pistols, among others.

2        Knives have been used throughout human history. But in the 1830s, the

3    "Bowie knife" became popular after Jim Bowie used one to kill a man and injure

4    another in a duel. Spitzer Decl., at 7; Rivas Decl., ¶ 13. The knives exploded in

5    popularity, and "were widely used in fights and duels." Spitzer Decl., at 7; *see also*

6    Rivas Decl., ¶ 14. Like assault weapons today, the demand for Bowie knives was

7    partly fueled by their notorious reputation. Spitzer Decl., at 8. The knives'

8    proliferation, and their widespread criminal usage, prompted states to restrict them.

9    *Id*. Starting in the 1830s and ending around the start of the twentieth century,

10    "every state" except New Hampshire "restricted Bowie knives." *Id.* at 9. Fifteen

11    states "all but banned the possession of Bowie knives outright (by banning both

12    concealed and open carry)," while others taxed them, often prohibitively. *Id.*; *see*

13    *also id.,* Exs. C, E, H. "[T]hese taxes were clearly designed to discourage trade in

14    and public carry of" Bowie knives. Rivas Decl., ¶ 26.

15        The regulatory pattern repeated when multi-shot revolvers appeared. While

16    Colt's revolver achieved the technological capability of firing multiple shots

17    without reloading as early as the 1830s, the gun did not become popular until after

18    the Civil War, once it reached the civilian market. Spitzer Decl., at 26–27; Rivas

19    Decl., ¶ 16. When that happened, and Colt revolvers became associated with

20    increasing rates of interpersonal violence and crime, states passed laws regulating

21    them. Spitzer Decl., at 27; Rivas Decl., ¶ 29. Tennessee and Arkansas completely

22    prohibited the sale of easily concealed pistols in the late 1800s, complementing the

23    public-carry restrictions that were common throughout the United States. Rivas

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Decl., ¶ 29–30; *see also* Spitzer Decl. Ex. B.

**(3)    Early twentieth century regulations on automatic and semi-automatic weapons**

Automatic and semi-automatic weapons were introduced into the civilian marketplace after being adopted by the military during World War I, and quickly became the subject of a nationwide effort to restrict them. Spitzer Decl., at 33–47. The Thompson submachine gun was first marketed to civilians in the United States starting in the 1920s, and advertised as the "ideal weapon for the protection of large estates, ranches, plantations, etc." *Id.* at 34–36. Despite its marketing, the "Tommy Gun" became known primarily for its role in gang violence, most infamously in the St. Valentine's Day massacre of 1929. *Id.* at 34, 37. Reacting to these new, dangerous, and suddenly widely available weapons, 32 states enacted anti-machine gun laws between 1925 and 1934. *Id.* at 40–41. Many of these laws regulated semi-automatic weapons in addition to automatics. *Id.* at 43–45. Ten jurisdictions had laws of this kind. *Id.* This flurry of legislative activity culminated in the 1934 National Firearms Act, which imposed strict requirements on automatic firearms nationwide. *Id.* at 42. "Machine guns" (i.e., automatic weapons) remain strictly regulated in the United States to this day. *See, e.g.*, 18 U.S.C. § 922(o).

**c.    SHB 1240 is consistent with the historical tradition of weapons regulation**

SHB 1240 was enacted for similar reasons as historical weapons regulations, and any burden on the right to bear arms in self-defense is similarly minimal.

The machine-gun bans of the 1920s and 1930s are particularly apt comparators. While *Bruen* stated that "not all history is created equal," 142 S. Ct.

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

at 2136, it did not hold that more modern history was irrelevant, especially when it is consistent with earlier American traditions. *See Hanson*, 2023 WL 3019777 at *16 ("*Bruen* left open the possibility that in an appropriate case, 20th century history that is not contradicted by earlier evidence can illuminate a modern-day regulation's constitutional vitality."). Prohibition-era machine-gun bans were a natural outgrowth of earlier laws restricting trap guns, clubs, Bowie knives, and pistols—just as modern assault-weapon restrictions are. And SHB 1240, just like its historical analogues, was specifically enacted to reduce incidents of high-fatality violence. *See, e.g.*, *Hanson*, 2023 WL 3019777 at *15. Like its historical forebears, SHB 1240 does not burden the right to self-defense. Just as the Tommy Gun is a weapon of war, unsuited for self-defense, Spitzer Decl., at 34–35, so too are assault weapons. *See supra* §§ II.B–D. Just as machine-gun bans and other historical restrictions are consistent with the history and tradition of the United States—as *Heller* confirmed, 554 U.S. at 624—so too are modern assault weapon restrictions, as courts have consistently found. *See Del. State Sportsmen's Ass'n*, 2023 WL 2655150 at *11; *Bevis*, 2023 WL 2077392 at *10–11; *Herrera*, 2023 WL 3074799, at *4; *see also Ore. Firearms Fed'n*, 2022 WL 17454829 at *13; *Hanson*, 2023 WL 3019777 at *15–16 (upholding regulation on large-capacity magazines as relevantly similar to Prohibition-era machine-gun regulations).

## C.    Plaintiffs Face No Irreparable Harm

Plaintiffs' request for a preliminary injunction also fails because they will not suffer any irreparable harm while this litigation is pending. Individual Plaintiffs' sole asserted claim of harm is a constitutional violation (Mot. at 24), but

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  they cannot show a likelihood of success on their facial challenge to SHB 1240.

2  Plaintiffs are also incorrect that a constitutional violation, standing alone,

3  automatically establishes irreparable harm. That rule is specifically limited to the

4  First Amendment context. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In other

5  contexts, courts "require[] more than a constitutional claim to find irreparable

6  harm." *Great N. Res. v. Coba*, 3:20-CV-01866-IM, 2020 WL 6820793, at *2 (D.

7  Or. Nov. 20, 2020) (discussing *Melendres v. Arpaio*, 695 F.3d 990, 997 (9th Cir.

8  2012); *Hernandez v. Sessions*, 872 F.3d 976, 986 (9th Cir. 2017); *Ariz. Dream Act

9  Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); and *Am. Trucking Assn's v.

10  City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009)); *see also Allen v. County

11  of Lake*, No. 14-CV-03934-TEH, 2014 WL 4380297, at *2 (N.D. Cal.

12  Sept. 4, 2014); *Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962 (D. Ariz.

13  2020); *Mendoza v. Garrett*, 358 F. Supp. 3d 1145, 1180–81 (D. Or. 2018).

14  Nothing in SHB 1240 materially restricts Plaintiffs' ability to bear arms in

15  self-defense. Even taking at face value any claim that Plaintiffs own assault

16  weapons for self-defense (despite their unsuitability for this purpose), SHB 1240

17  does not affect the individual Plaintiffs' ability to use the assault weapons they

18  *already own*. *See* ECF No. 1, ¶¶ 11–13. Furthermore, plenty of firearms are

19  lawfully for sale in Washington that Plaintiffs can use for self-defense. Though

20  Plaintiffs may not sell their existing assault weapons within the State or add to their

21  collections, those inconveniences pose no constitutional emergency warranting the

22  "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 24.

23  Nor can Plaintiffs bootstrap their irreparable harm argument by alleging lost

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

sales by the gun-industry Plaintiffs, because "the Second Amendment does not independently protect a proprietor's right to sell firearms." *Teixeira v. County of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017). The gun-industry Plaintiffs have no Second Amendment right to sell weapons, so they suffer no irreparable harm. Plaintiffs have also failed to show that, even if the prohibition on the sale of assault weapons will result in some monetary losses, those losses will not be made up by the sale of other weapons that are unaffected by SHB 1240. To the extent that Plaintiffs allege they have inventory they can no longer sell in Washington, nothing in SHB 1240 stops them from transporting that inventory out of the state and selling it for profit. SHB 1240 § 3(a).

## D.    The Equities and Public Interest Weigh Heavily against an Injunction

Finally, the Court should deny Plaintiffs' Motion because the equities and public interest are resoundingly in the State's favor. Plaintiffs' only interest is in being able to buy *more* assault weapons than they already have, or to sell them to a broader market than SHB 1240 permits, while this litigation is pending. By contrast, the Legislature found, and the evidence confirms, that SHB 1240 will likely save lives. Klarevas Decl., ¶¶ 33–44. This is no contest.

Assault weapons are military-style firearms that act as force multipliers in mass shootings, and are disproportionately used in horrific crimes. A literal arms race by the gun industry, and the wide availability of accessories that increase lethality, have given civilians weapons that can be even *more* deadly than what is carried by the military. Busse Decl., ¶¶ 44, 47; *Bevis*, 2023 WL 2077392, at *15. Washington's Legislature concluded that "gun violence is a threat to the public

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    health and safety of Washingtonians" and that restricting the sale of assault

2    weapons would likely reduce that violence. 2023 Wash. Sess. Laws, ch. 162 § 1.

3    It would be a mistake for this Court to overturn the judgment of the People's

4    representatives on a preliminary basis without a fully developed factual record.

5    **E.    A Final Judgment Is Inappropriate at This Early Juncture**

6          In a single sentence, Plaintiffs request this Court enter final judgment in their

7    favor. Mot. at 25. But "it is generally inappropriate for a federal court at the

8    preliminary-injunction stage to give a final judgment on the merits." *Univ. of Tex.*

9    *v. Camenisch*, 451 U.S. 390, 395 (1981). If this Court reaches the second step of

10   the *Bruen* analysis, the parties will need to engage in discovery to uncover and

11   illuminate the relevant historical tradition of weapons regulation, including laws

12   and regulatory practices throughout our history and the historical contexts in which

13   they arose. *See* Mot. at 9 (agreeing that historical tradition must be factually

14   "prove[d]"); *see also Sullivan v. Ferguson*, Case No. 3:22-cv-5403-DGE (ECF No.

15   67) (Sep. 23, 2022) (ruling that "discovery is appropriate" in Second Amendment

16   challenge to Washington's large-capacity magazine law). Summary adjudication

17   on an undeveloped record would be highly inappropriate.

18                    **IV.    CONCLUSION**

19         Plaintiffs' Motion for Preliminary Injunction should be denied.

20

21

22

23

1      RESPECTFULLY SUBMITTED this 1st day of June, 2023.

2                                    ROBERT W. FERGUSON
                                     Attorney General

3

4                                    *s/Andrew Hughes*
                                     KRISTIN BENESKI, WSBA #45478

5                                    First Assistant Attorney General
                                     ANDREW R.W. HUGHES, WSBA #49515

6                                    R. JULY SIMPSON, WSBA #45869
                                     WILLIAM MCGINTY, WSBA #41868

7                                    Assistant Attorneys General

8                                    *Attorneys for State Defendants*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

## **DECLARATION OF SERVICE**

2

I hereby declare that on this day I caused the foregoing document to be

3

electronically filed with the Clerk of the Court using the Court's CM/ECF System

4

which will serve a copy of this document upon all counsel of record.

5

6

DATED this 1st day of June, 2023, at Seattle, Washington.

7

8

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES, WSBA #49515
Assistant Attorney General

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

STATE DEFS. OPPOSITION TO MOT.
PRELIM. INJUNCTION
NO. 2:23-CV-00112

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744