1   Andrew R.W. Hughes, WSBA #49515
    R. July Simpson, WSBA #45869
2   William McGinty, WSBA #41868
    *Assistant Attorneys General*
3   Kristin Beneski, WSBA #45478
    *First Assistant Attorney General*
4   Washington Attorney General's Office
    800 Fifth Avenue, Suite 2000
5   Seattle, WA 98104
    (206) 464-7744

6

7                    **UNITED STATES DISTRICT COURT**
8                    **EASTERN DISTRICT OF WASHINGTON**
                              **AT SPOKANE**

9   AMANDA BANTA, et al.,              NO. 2:23-cv-00112-MKD

10              Plaintiffs,            DECLARATION OF LOUIS
                                       KLAREVAS, PHD, IN SUPPORT
11      v.                             OF STATE DEFENDANTS'
                                       OPPOSITION TO MOTION FOR
12  ROBERT W. FERGUSON, Attorney       PRELIMINARY INJUNCTION
    General of the State of Washington,
13  et al.,

14              Defendants.

15

16                  **I.     PROFESSIONAL QUALIFICATIONS**

17          1.      I am a security policy analyst and, currently, Research Professor at

18  Teachers College, Columbia University, in New York. I am also the author of the

19

1    book *Rampage Nation*, one of the most comprehensive studies on gun massacres

2    in the United States.[1]

3        2.    I am a political scientist by training, with a B.A. from the University

4    of Pennsylvania and a Ph.D. from American University. During the course of my

5    nearly 25-year career as an academic, I have served on the faculties of George

6    Washington University, the City University of New York, New York University,

7    and the University of Massachusetts. I have also served as Defense Analysis

8    Research Fellow at the London School of Economics and Political Science and as

9    United States Senior Fulbright Scholar in Security Studies at the University of

10    Macedonia.

11        3.    My current research examines the nexus between American public

12    safety and gun violence, including serving as an investigator in a study funded by

13    the National Institutes of Health that focuses on reducing intentional shootings at

14    elementary and secondary schools.

15        4.    In addition to having made over 100 media and public-speaking

16    appearances, I am the author or co-author of more than 20 scholarly articles and

17    

18        [1] Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings*

19    (2016).

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    over 70 commentary pieces. In 2019, my peer-reviewed article on the effectiveness

2    of restrictions on LCMs in reducing high-fatality mass shootings that result in six

3    or more victims killed was published in the *American Journal of Public Health*.[2]

4    This study found that jurisdictions with LCM bans experienced substantially lower

5    gun massacre incidence and fatality rates when compared to jurisdictions not

6    subject to similar bans. Despite being over 3 years old now, this study continues to

7    be one of the highest-impact studies in academia. It was recently referred to as "the

8    perfect gun policy study," in part due to the study's "robustness and quality."[3]

9

10    [2] Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on*

11    *High-Fatality Mass Shootings*, 109 American Journal of Public Health 1754

12    (2019), *available at* https://ajph.aphapublications.org/doi/full/

13    10.2105/AJPH.2019.305311 (last accessed February 11, 2023).

14    [3] Lori Ann Post and Maryann Mason, *The Perfect Gun Policy Study in a Not*

15    *So Perfect Storm*, 112 American Journal of Public Health 1707 (2022), *available*

16    *at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2022.307120    (last

17    accessed February 11, 2023). According to Post and Mason, "Klarevas et al.

18    employed a sophisticated modeling and research design that was more rigorous

19    than designs used in observational studies. Also, they illustrated the analytic steps

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112                           3                ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1          5.       Since January 1, 2019, I have been deposed, testified in court, or

2     testified by declaration in the following cases (all in federal court), listed

3     alphabetically by state:

4     **California – Central District**
      *Rupp v. Bonta*                                    8:17-cv-00746-JLS-JDE
5     **California – Eastern District**
      *Wiese v. Bonta*                                   2:17-cv-00903-WBS-KJN
6     **California – Southern District**
      *Duncan v. Bonta*                                  17-cv-1017-BEN-JLB
7     *Jones v. Bonta*                                   19-cv-01226-L-AHG
      *Miller v. Bonta*                                  3:19-cv-1537-BEN-JBS
8     *Nguyen v. Bonta*                                  3:20-cv-02470-WQH-
                                                         MDD
9     **Colorado**
      *Gates v. Polis*                                   1:22-cv-01866-NYW-SKC
10    **Connecticut**
      *National Association for Gun Rights v. Lamont*    3:22-cv-01118-JBA
11    **Hawaii**
      *National Association for Gun Rights v. Lopez*     1:22-cv-404-DKW-RT
12    **Illinois – Northern District**
      *Viramontes v. Cook County*                        1:21-cv-04595
13    *National Association for Gun Rights v. Highland*  22-cv-04774
      *Park*
14    *Herrera v. Raoul*                                 1:23-cv-00532
      **Illinois – Southern District**
15    *Harrel v. Raoul*[*]                               23-cv-141-SPM

16    they took to rule out alternative interpretations and triangulate their findings, for

17    example examining both state bans and federal bans. They helped build the

18    foundation for future studies while overcoming the limitations of previous

19    research." *Id.*

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112                                    4                    ATTORNEY GENERAL OF WASHINGTON
                                                                              Complex Litigation Division
                                                                              800 Fifth Avenue, Suite 2000
                                                                              Seattle, WA 98104-3188
                                                                                 (206) 464-7744

| | |
|---|---|
| *Langley v. Kelly*[*] | 23-cv-192-SPM |
| *Barnett v. Raoul*[*] | 23-cv-209-SPM |
| *Federal Firearms Licensees of Illinois v. Pritzker*[*] | 23-cv-215-SPM |
| *Kenneally v. Raoul* | 3:23-cv-50039 |
| **Massachusetts** | |
| *National Association for Gun Rights v. Campbell* | 1:22-cv-11431-FDS |
| **Oregon** | |
| *Oregon Firearms Federation v. Kotek*[†] | 2:22-cv-01815-IM |
| *Fitz v. Rosenblum*[†] | 3:22-cv-01859-IM |
| *Eyre v. Rosenblum*[†] | 3:22-cv-01862-IM |
| *Azzopardi v. Rosenblum*[†] | 3:22-cv-01869-IM |
| **Washington – Eastern District** | |
| *Brumback v. Ferguson* | 1:22-cv-03093-MKD |
| **Washington – Western District** | |
| *Sullivan v. Ferguson* | 3:22-cv-5403-DGE |
| *Hartford v. Ferguson* (Present Case) | 3:23-cv-05364-RJB |

[*]Non-Consolidated Cases on the Same Briefing Schedule / [†]Consolidated Cases

6.    In 2021, I was retained by the Government of Canada in the following cases which involved challenges to Canada's regulation of certain categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-735-20; and *Eichenberg, et al. v. Attorney General of Canada*, Federal

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Court, Court File No.: T-905-20. I testified under oath in a consolidated court

2    proceeding involving all six cases in the Federal Court of Canada.

3         7.    I have also submitted declarations in the following state court cases:

4    *People of Colorado v. Sgaggio*, District Court, El Paso County, Colorado,

5    2022M005894 (Criminal); and *Guardian Arms v. Inslee*, Superior Court, Grant

6    County, Washington, 23-2-00377-13 (Civil).

7         8.    A true and correct copy of my current curriculum vitae is attached as

8    **Exhibit A** to this Declaration.

9         9.    I have been retained by the State Defendants to render expert opinions

10   in this case. I am being compensated at a rate of $480/hour for my work on this

11   Declaration, $600/hour for any testimony (including deposition testimony) in

12   connection with this matter, and $120/hour for travel required to provide

13   testimony.

14                          **II.    OPINIONS**

15        10.   It is my professional opinion, based upon my analysis of the data

16   reviewed herein, that (1) in terms of individual acts of intentional criminal

17   violence, mass shootings presently pose the deadliest threat to the safety of

18   American society in the post-9/11 era, and the problem is growing nationwide;

19   (2) mass shootings involving assault weapons, on average, have resulted in a

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    substantially larger loss of life than similar incidents that did not involve assault

2    weapons; (3) mass shootings resulting in double-digit fatalities are relatively

3    modern phenomena in American history, often related to the use of large-capacity

4    magazines and assault weapons; (4) assault weapons are used by private citizens

5    with a far greater frequency to perpetrate mass shootings than to stop mass

6    shootings; (5) handguns, as opposed to rifles (let alone rifles that qualify as assault

7    weapons), are the most commonly owned firearms in the United States; and (6)

8    jurisdictions that restrict assault weapons experience fewer mass shooting

9    incidents and fatalities, per capita, than jurisdictions that do not restrict assault

10    weapons. Based on these findings, it is my opinion that restrictions on assault

11    weapons have the potential to save lives by reducing the frequency and lethality of

12    mass shootings.[4]

13

14    [4] For purposes of this Declaration, I employ two prominent definitions of

15    mass shootings from the field of firearm violence research. "High-fatality mass

16    shootings" (also referred to as "gun massacres") are shootings resulting in 6 or

17    more fatalities, not including the perpetrator(s), regardless of location or

18    underlying motive. "Mass public shootings" are shootings resulting in 4 or more

19    fatalities, not including the perpetrator(s), occurring largely in a public setting and

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

2

_____

3    not undertaken in pursuit of an underlying criminal objective (e.g., robbery, illicit

4    trafficking, organized crime, gang violence, or domestic violence). Unfortunately,

5    long-term, publicly-available, exhaustive data on all mass shootings resulting in 4

6    or more fatalities, not including the perpetrator(s), regardless of location or

7    underlying motive, are presently not available. This limits comprehensive

8    scholarly analyses over a long period of time to the above two types of mass

9    shooting violence: high-fatality mass shootings and mass public shootings. The

10   data on high-fatality mass shootings is from a data set that I maintain and

11   continuously update. This data set is reproduced in **Exhibit B**. The data set of mass

12   public shootings that I analyzed is publicly available from The Violence Project.

13   The creation of this data set was funded by the National Institute of Justice, which

14   is part of the U.S. Department of Justice. In addition to basic variables, such as

15   incident dates and locations, casualty counts, and information on offenders, The

16   Violence Project data set also identifies whether an assault weapon was used to

17   perpetrate a mass public shooting. The Violence Project data set is available at

18   https://www.theviolenceproject.org/mass-shooter-database        (last    accessed

19   December 27, 2022). The Violence Project data set is reproduced in **Exhibit C**.

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    **A.      Mass Shootings Are a Growing Threat to Public Safety**

2          11.      Examining mass-casualty acts of violence in the United States points

3    to two disturbing patterns. First, as demonstrated in Table 1, the deadliest

4    individual acts of intentional criminal violence in the United States since the

5    terrorist attack of September 11, 2001, have all been mass shootings. Second, as

6    displayed in Figures 1–4, the problem of mass shooting violence is on the rise. To

7    put the increase over the last 50 years into perspective, between the ten-year-period

8    of 1973–1982 and the ten-year-period of 2013–2022, the average population of the

9    United States increased approximately 47%. However, the number of people killed

10   in high-fatality mass shootings and mass public shootings between these two ten-

11   year-periods, respectively, reflect 178% and 523% increases. In other words, the

12   rise in mass shooting violence has far outpaced the rise in national population. The

13   obvious takeaway from these patterns and trends is that mass shootings pose a

14   significant—and growing—threat to American public safety.

15

16

17

_____

18   Unless stated otherwise, all of the data used to perform original analyses and to

19   construct tables and figures in this Declaration are drawn from **Exhibits B and C**.

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

**Table 1. The Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

2

| | Deaths | Date | Location | Type of Violence |
|---|---|---|---|---|
| 1 | 60 | October 1, 2017 | Las Vegas, NV | Mass Shooting |
| 2 | 49 | June 12, 2016 | Orlando, FL | Mass Shooting |
| 3 | 32 | April 16, 2007 | Blacksburg, VA | Mass Shooting |
| 4 | 27 | December 14, 2012 | Newtown, CT | Mass Shooting |
| 5 | 25 | November 5, 2017 | Sutherland Springs, TX | Mass Shooting |
| 6 | 23 | August 3, 2019 | El Paso, TX | Mass Shooting |
| 7 | 21 | May 24, 2022 | Uvalde, TX | Mass Shooting |

3

4

5

6

7

**Figure 1. Annual Trends in High-Fatality Mass Shooting Incidents, 1973–2022**

8

9

10



11

12

13

14

15

Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

16

17

18

19

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Figure 2. Annual Trends in High-Fatality Mass Shooting Fatalities, 1973–2022**



Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

**Figure 3. Annual Trends in Mass Public Shooting Incidents, 1973–2022**



Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

**Figure 4. Annual Trends in Mass Public Shooting Fatalities, 1973–2022**



Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

**B.    The Use of Assault Weapons Is a Major Factor in the Rise of Mass Shooting Violence**

12.    In addition to showing that the frequency and lethality of mass shootings are on the rise nationally, the data point to another striking pattern: the use of assault weapons in the commission of mass shootings has grown in vast proportions. In both high-fatality mass shootings and mass public shootings, assault weapons have been used with increased frequency. As shown in Figures 5 and 6, the pattern is particularly marked of late, with at least half of high-fatality mass shooting incidents and mass public shooting incidents in the last five years

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  involving assault weapons. A similar, albeit more pronounced, pattern is found

2  when examining fatalities in the last five years, with approximately 6-in-10 high-

3  fatality mass shooting deaths and mass public shooting deaths resulting from

4  incidents involving assault weapons, as shown in Figures 7 and 8. These trends

5  clearly demonstrate that, among mass shooters, there is a growing preference for

6  using assault weapons to perpetrate their attacks.

7  **Figure 5. Share of High-Fatality Mass Shootings Involving Assault Weapons**



Note: The calculations in Fig. 5 exclude two high-fatality mass shootings (3/15/2020, Moncure, NC, 6 deaths; and 9/7/2020, Aguanga, CA, 7 deaths) in which the firearms used are unknown.

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1



**Figure 6. Share of Mass Public Shootings Involving Assault Weapons**

Note: The calculations in Fig. 6 exclude one mass public shooting (2/6/17, Yazoo City, MS, 4 deaths) in which the firearms used are unknown.



**Figure 7. Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving Assault Weapons**

Note: The calculations in Fig. 7 exclude two high-fatality mass shootings (3/15/2020, Moncure, NC, 6 deaths; and 9/7/2020, Aguanga, CA, 7 deaths) in which the firearms used are unknown.

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

**Figure 8. Share of Mass Public Shooting Deaths Resulting from Incidents Involving Assault Weapons**

2



10

Note: The calculations in Fig. 8 exclude one mass public shooting (2/6/17, Yazoo City, MS, 4 deaths) in which the firearms used are unknown.

11    13.    The growing use of assault weapons to carry out mass shootings is an

12  obvious theme reflected in the data. The *disproportionate* resort to assault weapons

13  by perpetrators of mass shootings is another clear theme. The National Sport

14  Shooting Foundation (NSSF) estimates that there are approximately 24.4 million

15  "modern sporting rifles"—which is a firearm industry term for AR-15-platform

16  and AK-47-platform firearms— in civilian hands as of the end of 2020.[5] Based on

17

18    [5] NSSF, *Commonly Owned: NSSF Announces over 24 Million MSRs in*

19  *Circulation*, July 20, 2022, *available at* https://www.nssf.org/articles/commonly-

1   federal government data, it appears that modern sporting rifles make up

2   approximately 5.3% of all firearms in circulation in American society (24.4 million

3   out of an estimated 461.9 million firearms).[6] And, in all likelihood, the NSSF's

4

5   owned-nssf-announces-over-24-million-msrs-in-circulation    (last    accessed

6   January 3, 2023).

7          [6] The 5.3% ownership rate for modern sporting rifles was calculated using

8   NSSF and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) data. The

9   NSSF estimates that there are approximately 24.4 million modern sporting rifles

10  in civilian hands as of the end of 2020 (when the most recent data is available). In

11  a 2020 report that captured data through the end of 2018, the NSSF estimated that

12  there were 433.9 million total firearms in civilian circulation. NSSF, *Industry*

13  *Intelligence Reports: Firearm Production in the United States with Firearm Import*

14  *and Export Data, 2020*, at 18, *available at* https://www.nssf.org/wp-

15  content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf    (last    accessed

16  January 3, 2023). According to ATF data, in 2019 and 2020, an additional 28.0

17  million firearms entered the civilian stock nationwide. ATF, *National Firearms*

18  *Commerce and Trafficking Assessment: Firearms in Commerce, 2022*, at 181, 188,

19  193, *available at* https://www.atf.gov/firearms/docs/report/national-firearms-

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    estimate of 24.4 million modern sporting rifles is an over-estimation because it

2    appears to include firearms in the possession of domestic law enforcement agencies

3    and firearm retailers (as well as possibly prohibited owners).[7] But, even using this

4    estimate, if assault weapons were used in proportion to the percentage of modern

5    sporting rifles in circulation, approximately 5% of all mass shootings would

6    involve assault weapons. However, as seen in Figures 5–6 above, civilian

7    ownership rates and mass-shooter use rates are not similar. Indeed, the current

8    difference is approximately ten-fold, with the rate at which assault weapons are

9    now used to commit mass murder far outpacing the rate at which modern sporting

10    rifles circulate amongst civilians in the United States.

11

12

13    commerce-and-trafficking-assessment-firearms-commerce-volume/download

14    (last accessed January 3, 2023). Assuming these figures reported by the NSSF and

15    the ATF are accurate, this brings the estimated number of firearms in civilian

16    circulation through the end of 2020 to approximately 461.9 million. The ownership

17    rate is calculated as follows: 24.4 million modern sporting rifles divided by 461.9

18    million total firearms equals 5.3%.

19        [7] ATF, 2022, *supra* note 6, at 12; NSSF, 2020, *supra* note 6, at 2–3.

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112                    17                    ATTORNEY GENERAL OF WASHINGTON
                                                          Complex Litigation Division
                                                          800 Fifth Avenue, Suite 2000
                                                          Seattle, WA 98104-3188
                                                          (206) 464-7744

1      14.    Another pattern that stands out when examining the relationship

2    between assault weapons use and mass shooting violence reflects the

3    disproportionately greater lethality associated with the use of assault weapons. For

4    instance, returning to the aforementioned list of the seven deadliest individual acts

5    of intentional criminal violence in the United States since the coordinated terrorist

6    attack of September 11, 2001, besides all seven of the incidents being mass

7    shootings, six of the seven incidents (86%) involved assault weapons, as shown in

8    Table 2. When mass shooting fatalities are examined on a rising scale, the

9    relationship between assault weapons use and higher death tolls is striking. In the

10    past 50 years, assault weapons have been used in 28% of all high-fatality mass

11    shootings and mass public shootings. However, as the fatality threshold of such

12    incidents increase, so too does the share of incidents involving assault weapons.

13    For instance, assault weapons were used in 80% of all mass public shootings

14    resulting in more than 24 deaths and 100% of all high-fatality mass shootings

15    resulting in more than 40 deaths (Figures 9–10). As the data show, there is an

16    association between assault weapons use and mass shooting lethality.

17

18

19

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Table 2. The Use of Assault Weapons in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

| Deaths | Date | Location | Involved Assault Weapon(s) |
|--------|------|----------|---------------------------|
| 60 | October 1, 2017 | Las Vegas, NV | ✓ (AR-15) |
| 49 | June 12, 2016 | Orlando, FL | ✓ (AR-15) |
| 32 | April 16, 2007 | Blacksburg, VA | |
| 27 | December 14, 2012 | Newtown, CT | ✓ (AR-15) |
| 25 | November 5, 2017 | Sutherland Springs, TX | ✓ (AR-15) |
| 23 | August 3, 2019 | El Paso, TX | ✓ (AK-47) |
| 21 | May 24, 2022 | Uvalde, TX | ✓ (AR-15) |

**Figure 9. Percentage of High-Fatality Mass Shootings Involving Assault Weapons by Fatality Threshold, 1973–2022**



Note: The calculations in Fig. 9 exclude two high-fatality mass shootings (3/15/2020, Moncure, NC, 6 deaths; and 9/7/2020, Aguanga, CA, 7 deaths) in which the firearms used are unknown.

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

**Figure 10. Percentage of Mass Public Shootings Involving Assault Weapons by Fatality Threshold, 1973–2022**



Note: The calculations in Fig. 10 exclude one mass public shooting (2/6/17, Yazoo City, MS, 4 deaths) in which the firearms used are unknown.

15.    Of the 134 high-fatality mass shootings in that last 50 years in which the type of firearm used is known, 38 involved assault weapons, resulting in 491 deaths. The average death toll for these 38 incidents is 12.9 fatalities per shooting. By contrast, the average death toll for the 96 incidents in which it is known assault weapons were not used (which resulted in 749 fatalities) is 7.8 fatalities per shooting (Table 3). Of the 174 mass public shootings in that last 50 years in which the type of firearm used is known, 48 involved assault weapons, resulting in 496 deaths. The average death toll for these 48 incidents is 10.3 fatalities per shooting. By contrast, the average death toll for the 126 incidents in which it is known assault

DECLARATION OF LOUIS KLAREVAS, PHD.

NO. 2:23-CV-00112

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    weapons were not used (which resulted in 759 fatalities) is 6.0 fatalities per

2    shooting (Table 4). In other words, in the last 50 years, the use of assault weapons

3    in high-fatality mass shootings and mass public shootings has resulted,

4    respectively, in 65% and 72% increases in average fatalities per incident (Tables 3

5    and 4). In the last 10 years, the differences in average fatality rates per incident are

6    even more pronounced—more than double: 8.0 versus 16.7 deaths per high-fatality

7    mass shooting and 6.2 versus 12.8 deaths per mass public shooting. These amount,

8    respectively, to 109% and 106% increases in the average death tolls, associated

9    with the use of assault weapons (Tables 3 and 4).

10       16.    This review of the data suggests that assault weapons are force

11   multipliers when used to perpetrate mass shootings.

12   ///

13

14

15

16

17

18

19

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

21

**Table 3. The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1973–2022**

| | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| **Last 50 Years** | 7.8 Deaths | 12.9 Deaths | 65% |
| **Last 10 Years** | 8.0 Deaths | 16.7 Deaths | 109% |

Note: The calculations in Table 3 exclude two high-fatality mass shootings (3/15/2020, Moncure, NC, 6 deaths; and 9/7/2020, Aguanga, CA, 7 deaths) in which the types of firearms used are unknown.

**Table 4. The Average Death Tolls Associated with the Use of Assault Weapons in Mass Public Shootings in the U.S., 1973–2022**

| | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| **Last 50 Years** | 6.0 Deaths | 10.3 Deaths | 72% |
| **Last 10 Years** | 6.2 Deaths | 12.8 Deaths | 106% |

Note: The calculations in Table 4 exclude one mass public shooting (2/6/17, Yazoo City, MS, 4 deaths) in which the types of firearms used are unknown.

DECLARATION OF LOUIS KLAREVAS, PHD.

NO. 2:23-CV-00112

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**C.    Double-Digit-Fatality Mass Shootings Are a Post-World War II Phenomenon in American History And They Often Involve Assault Weapons**

17.    I have also examined the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed since 1776 (Table 5 and Figure 11).[8] In terms of the origins of this form of extreme gun violence, there is no known occurrence of a mass shooting resulting in double-digit fatalities during the 173-year period between the nation's founding in 1776 and 1948. The first known mass shooting resulting in 10 or more deaths occurred in 1949. In other words, for 70% of its 247-year existence as a nation, the United States did not

---

[8] I searched for firearm-related "murders," using variations of the term, setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, *available at* www.newspaperarchive.com (last accessed October 2, 2022). The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607. Consistent with other analyses on mass murder, incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

DECLARATION OF LOUIS KLAREVAS, PHD.

NO. 2:23-CV-00112

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    experience a mass shooting resulting in double-digit fatalities, making them

2    relatively modern phenomena in American history.[9]

3        18.    After the first such incident in 1949, 17 years passed until a similar

4    mass shooting occurred in 1966. The third such mass shooting then occurred nine

5    years later, in 1975. And the fourth such incident occurred seven years after, in

6    1982. Basically, the first few mass shootings resulting in 10 or more deaths did not

7    occur until the post-World War II era. Furthermore, these first few double-digit-

8    fatality incidents occurred with relative infrequency, although the temporal gap

9    between these first four incidents shrank with each event (Table 5 and Figure 12).[10]

10

11

12

13

14

---

15        [9] Using the Constitution's effective date of 1789 as the starting point would

16    lead to the conclusion that, for 68% of its 234-year existence as a nation, the United

17    States did not experience a mass shooting resulting in double-digit fatalities.

18        [10] Figures 11–12 are reproduced in larger form as **Exhibit D** of this

19    Declaration.

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

24

**Table 5. Mass Shootings Resulting in Double-Digit Fatalities in American History (1776–2022)**

|   | Date | Location | Deaths | Involved Assault Weapon(s) | Involved Large-Capacity Magazine(s) |
|---|------|----------|--------|---------------------------|-------------------------------------|
| 1 | 9/6/1949 | Camden, NE | 13 | N | N |
| 2 | 8/1/1966 | Austin, TX | 14 | N | Y |
| 3 | 3/30/1975 | Hamilton, OH | 11 | N | N |
| 4 | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y |
| 5 | 2/18/1983 | Seattle, WA | 13 | N | N |
| 6 | 4/15/1984 | Brooklyn, NY | 10 | N | N |
| 7 | 7/18/1984 | San Ysidro, CA | 21 | Y | Y |
| 8 | 8/20/1986 | Edmond, OK | 14 | N | N |
| 9 | 10/16/1991 | Killeen, TX | 23 | N | Y |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | Y |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | Y |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | Y |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y |
| 23 | 5/18/2018 | Santa Fe | 10 | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | Y |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | Y |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y |

Note: Death tolls do not include perpetrators. An incident was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban; (2) the statutes of the state where the gun massacre occurred; or (3) a legal or judicial declaration

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   issued by a state official. An incident was coded as involving a large-capacity
    magazine if at least one of the firearms discharged was armed with a detachable
2   ammunition-feeding device holding more than 10 bullets.

3   ### Figure 11. Mass Shootings Resulting in Double-Digit Fatalities in American
    History (1776–2022)



### Figure 12. Mass Shootings Resulting in Double-Digit Fatalities in American
History (1949–2022)



DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1      19.     The distribution of double-digit-fatality mass shootings changes in the

2    early 1980s, when five such events took place in a span of just five years (Table 5

3    and Figure 12). This timeframe also reflects the first time that assault weapons

4    were used to perpetrate mass shootings resulting in 10 or more deaths: the 1982

5    Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths)

6    and the 1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in

7    21 deaths). But this cluster of incidents was followed by a 20-year period in which

8    only two double-digit-fatality mass shootings occurred (Figure 12). This period of

9    time from 1987–2007 correlates with three important federal firearms measures:

10    the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use"

11    importation restrictions, and the 1994 Federal Assault Weapons Ban.

12      20.     It is well-documented in the academic literature that, after the Federal

13    Assault Weapons Ban expired in 2004, mass shooting violence increased

14    substantially.[11] Mass shootings that resulted in 10 or more deaths were no

15

16    [11] *See*, for example, Louis Klarevas, Rampage Nation, *supra* note 1

17    (Relevant Excerpt Attached as **Exhibit E**); Louis Klarevas, et al., *The Effect of*

18    *Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, *supra* note 2

19    (Attached as **Exhibit F**); Charles DiMaggio, et al., *Changes in US Mass Shooting*

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    exception, following the same pattern. In the 56 years from 1949 through 2004,

2    there were a total of 10 mass shootings resulting in double-digit fatalities (a

3    frequency rate of one incident every 5.6 years). In the 18 years since 2004, there

4    have been 20 double-digit-fatality mass shootings (a frequency rate of one incident

5    every 0.9 years). In other words, the frequency rate has increased over six-fold

6    since the Federal Assault Weapons Ban expired (Table 5 and Figure 12). (The 1994

7    Federal Assault Weapons Ban and its impact on mass shooting violence is

8    discussed in further detail in Section F of this Declaration.)

9        21.    Over three-quarters of mass shootings resulting in 10 or more deaths

10   involved assault weapons and/or LCMs. As also shown in the analyses of mass

11   shootings in Section B, death tolls in double-digit-fatality mass shootings are

12

_____

13   *Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of*

14   *Open-Source Data*, 86 Journal of Trauma and Acute Care Surgery 11 (2019)

15   (Attached as **Exhibit G**); Lori Post, et al., *Impact of Firearm Surveillance on Gun*

16   *Control Policy: Regression Discontinuity Analysis*, 7 JMIR Public Health and

17   Surveillance (2021) (Attached as **Exhibit H**); and Philip J. Cook and John J.

18   Donohue, *Regulating Assault Weapons and Large-Capacity Magazines for*

19   *Ammunition*, 328 JAMA, September 27, 2022 (Attached as **Exhibit I**).

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  related to the use of firearms technologies like assault weapons that, in terms of

2  mass shootings, serve as force multipliers.

3  **D.    Assault Weapons Are Almost Never Used by Private Citizens in Self-Defense during Active Shootings**

4

5  22.    An important question that, until now, has gone unanswered is: Are

assault weapons used as frequently to stop mass shootings as they are to perpetrate

6

them? As shown above in Section B, assault weapons have been used in

7

approximately one-third of mass shootings in the past 25 years (Figures 5–6). And

8

in the past five years, the share of mass shootings that have involved assault

9

weapons has risen to approximately half (Figures 5–6).

10

23.    The Federal Bureau of Investigation (FBI) has been documenting

11

active shooter incidents since 2000.[12] According to the FBI, active shootings are

12

violent attacks that involve "one or more individuals actively engaged in killing or

13

14

15

16  [12] All of the information in this section, including definitions and data, are

17  publicly available from the FBI. *See* FBI, *Active Shooter Safety Resources*,

18  *available at* https://www.fbi.gov/how-we-can-help-you/safety-resources/active-

19  shooter-safety-resources (last accessed May 4, 2023).

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    attempting to kill people in a populated area."[13] A simple way to conceptualize

2    active shooter incidents is to think of them as attempted mass shootings. As part of

3    its analysis of attempted mass shootings, the FBI identifies incidents that involved

4    armed civilians using their personal firearms to intervene, regardless of whether

5    the interventions were successful in stopping the attacks and/or neutralizing the

6    perpetrator(s).

7

8

_____

9    [13] FBI, *Active Shooter Incidents in the United States in 2022*, April 2023,

10    at 1, *available at* https://www.fbi.gov/file-repository/active-shooter-incidents-in-

11    the-us-2022-042623.pdf/view (last accessed May 4, 2023). The FBI adds,

12    "Implicit in this definition is the shooter's use of one or more firearms. The *active*

13    aspect of the definition inherently implies the ongoing nature of the incidents, and

14    thus the potential for the response to affect the outcome." *Id.* (emphasis in original).

15    In addition to the report on incidents in 2022, the FBI has published seven other

16    reports on active shooter incidents covering the following seven time-periods:

17    2000–2013, 2014–2015, 2016–2017, 2018, 2019, 2020, and 2021. All of these

18    reports are available at the FBI's "Active Shooter Safety Resources" website,

19    *supra* note 12.

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

30

1    24.    In the 23 years between January 1, 2000, and December 31, 2022, the

2    FBI has identified 456 active shootings occurring in the United States. Out of these

3    456 active shooter incidents, 18 incidents (3.9%) involved defensive gun uses

4    (DGUs) by civilians, excluding law enforcement or armed security.[14] Of these 18

5    DGUs, the firearm used by an armed private citizen intervening was identifiable in

6    17 incidents; 14 involved handguns and the remaining three involved long guns

7    (one shotgun, one bolt-action rifle, and one assault rifle).[15] In other words, out of

8

9

---

10    [14] In 17 of the 18 DGU-involved active shooter incidents, there was an

11    exchange of gunfire. For the one incident that did not involve an exchange of

12    gunfire, the gun (a handgun) was used to detain the active shooter after the shooting

13    had ceased. FBI, *supra* notes 12 and 13.

14    [15] All 14 DGU incidents that involved handguns also involved armed

15    civilians who held valid concealed-carry permits or were legally carrying their

16    handguns. *Id.* In 12 of these 14 incidents, details about the types of handguns used

17    in self-defense were available in news media accounts or in news media

18    photographs from the crime scene. In two of the 14 incidents, the use of concealed

19    handguns was inferred based on details about the shooting reported in news media

---

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

31

1   the 17 incidents where an armed civilian intervened and it was possible to identify

2   the DGU firearm, only one incident (5.9%) involved an assault weapon.[16] Within

3   the broader context of all active shooter incidents, only one incident out of 456 in

4

5

6

_____

7   accounts. There is no evidence that either of these two DGU incidents involved an

8   assault pistol.

9       [16] The FBI also identifies an incident in which an armed individual (a local

10  firefighter) subdued and detained a school shooter, but there is no evidence that the

11  armed firefighter drew his handgun during the incident. *Id.* Moreover, local

12  authorities have refused to comment on whether the firefighter ever drew his

13  handgun. *See* Carla Field, *Firefighter Was Armed During Takedown of Shooting*

14  *Suspect, Sheriff Says*, WYFF, October 3, 2016, *available at*

15  https://www.wyff4.com/article/firefighter-was-armed-during-takedown-of-

16  shooting-suspect-sheriff-says/7147424 (last accessed January 3, 2023). Adding

17  this incident to the 17 DGU-involved incidents where the type of firearm was

18  identifiable would mean that 5.6% (as opposed to 5.9%) of the active shooter

19  incidents, where an armed civilian intervened, involved an assault weapon.

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  the past 23 years (0.2%) is known to have involved an armed civilian intervening

2  with an assault weapon.[17]

3      25.    The bottom line is that assault weapons are used by civilians with a

4  far greater frequency to perpetrate mass shootings than to stop mass shootings.

5  **E.**    **Ownership Rates of "Modern Sporting Rifles" in the U.S.**

6      26.    As noted above in Para. 13, based on the most recent, publicly-

7  available NSSF and federal government data, modern sporting rifles—such as AR-

8  and AK-platform firearms—appear to make up approximately 5.3% of all firearms

9

---

10      [17] FBI, *supra* notes 12 and 13. The one DGU that involved an assault weapon

11  was the 2017 church massacre in Sutherland Springs, Texas. In that incident, an

12  armed private citizen used an AR-15-style assault rifle to wound the perpetrator as

13  he was attempting to flee the scene. While the perpetrator was still able to flee the

14  scene despite being shot, minutes later, he crashed his vehicle trying to escape and

15  then took his life with his own firearm before law enforcement could apprehend

16  him. *See* Adam Roberts, *Man Who Shot Texas Gunman Shares His Story*,

17  KHBS/KHOG,    November    7,    2017,    *available*    *at*

18  https://www.4029tv.com/article/man-who-shot-texas-church-gunman-shares-his-

19  story/13437943 (last accessed January 3, 2023).

DECLARATION OF LOUIS KLAREVAS, PHD.

NO. 2:23-CV-00112

33

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    in circulation in American society (24.4 million out of an estimated 461.9 million

2    firearms), although this likely includes modern sporting rifles possessed by law

3    enforcement agencies, firearm retailers, and possibly prohibited possessors (e.g.,

4    criminals). Based on this data, only 6.4 million gun owners—out of an estimated

5    81 million Americans who own at least one personal firearm—own modern

6    sporting rifles.[18] In other words, less than 8% of all civilian gun owners in the

7

8        [18] In its most recent survey data (2022), the NSSF found that civilian owners

9    of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these

10    owners possessing only one such rifle.  NSSF, *Modern Sporting Rifle: Ownership,*

11    *Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles*,

12    Comprehensive    Consumer    Report,    2022,    at    12,    *available    at*

13    https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-

14    Report.pdf (last accessed January 16, 2023).  The estimate that approximately 6.4

15    million gun owners possess what the NSSF considers to be modern sporting rifles

16    is calculated by dividing the 3.8 average number of such rifles that each modern

17    sporting rifle owner possesses into the 24.4 million such rifles estimated to be in

18    civilian circulation.  This calculation (24.4 million divided by 3.8) equals 6.4

19    million.  Based on survey data, 81 million American adults are estimated to own

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

34

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  United States own modern sporting rifles.[19] In terms of the total population of the

2  United States, estimated by the Census Bureau to be approximately 333 million

3  people in 2022, less than 2% of all Americans own a modern sporting rifle.[20]

4

5  guns.  Andy Nguyen, "Proposed Assault Weapons Ban Won't Turn Gun Owners

6  into Felons Overnight," PolitiFact, The Poynter Institute, August 3, 2022,

7  *available    at*    https://www.politifact.com/factchecks/2022/aug/03/instagram-

8  posts/proposed-assault-weapons-ban-wont-turn-gun-owners-    (last    accessed

9  January 16, 2023).

10    [19] The finding that less than 8% of all gun owners possess modern sporting

11  rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the

12  81 million American adults estimated to be gun owners. Taking 6.4 million and

13  dividing it by 81 million equals 7.9%.

14    [20] The Census Bureau's total population estimate for 2022 is 333,287,557

15  persons. U.S. Census Bureau, *Growth in U.S. Population Shows Early Indication*

16  *of Recovery Amid COVID-19 Pandemic*, December 22, 2022, *available at*

17  https://www.census.gov/newsroom/press-releases/2022/2022-population-

18  estimates.html#:~:text=DEC.,components%20of%20change%20released%20tod

19  ay (last accessed January 16, 2023). The finding that less than 2% of all Americans

DECLARATION OF LOUIS KLAREVAS, PHD.

NO. 2:23-CV-00112

35

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

27.     In addition to the NSSF's estimate that there are 24.4 million modern sporting rifles in civilian circulation in the United States as of the end of 2020, the Plaintiffs draw on a survey conducted by William English to support their estimates about the number of AR-15-style rifles in American society.[21] According to English, "about 24.6 million people" have owned "an AR-15 or similar styled rifle."[22] In surveying ownership rates, English also found that 0.3% of respondents "indicate owning over 100" AR-15 styled rifles.[23] Assuming English correctly estimates that 24.6 million people have owned an AR-15 or similarly styled rifle,

---

possess modern sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 333 million persons in United States. Taking 6.4 million and dividing it by 333 million equals 1.9%.

[21] ECF No. 16 at 12 (Mot. Prelim. Inj.) (*citing* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Unpublished Paper (Sept. 22, 2022), *available at* https://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=4283305 (last accessed March 7, 2023)).

[22] English, *supra* note 21.

[23] *Id.*

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

36

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    his survey results indicate that approximately 74,000 people own over 100 such

2    rifles. Moreover, English also reports that 1.3% of all AR-15 style rifle owners

3    (approximately 320,000 people) own between 11 and 100 such rifles.[24] Even if, for

4    the sake of argument, these 74,000 people all owned only 101 AR-15s and these

5    additional 320,000 people all owned 11 AR-15s—the lowest possible number in

6    the range that they identified as best capturing the number of AR-15 styled rifles

7    they own—that would mean that, ***at the very least, approximately 11 million AR-***

8    ***15 styled rifles are concentrated in the hands of 1.6% of AR-15 owners***.[25] As a

9

10    [24] *Id.*

11    [25] As a reminder, the NSSF found that civilian owners of modern sporting

12    rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only

13    one such rifle.  NSSF, *supra* note 18.  While the NSSF, unlike the English survey,

14    does not report whether respondents in its surveys of modern sporting rifle owners

15    happen to own more than 10, let alone more than 100, modern sporting rifles, NSSF

16    has detected a growing trend toward increased ownership of multiple modern

17    sporting rifles.  For instance, in its 2010 survey, it found that 40% of modern

18    sporting rifle owners owned only 1 modern sporting rifle and 60% owned multiple

19    modern sporting rifles, with the average number of modern sporting rifles owned

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

37

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    reminder, 11 million AR-15 style rifles is a conservative estimate calculated using

2    the absolute minimum numbers in the reported ranges of 11-to-100 and 101-or-

3    more.[26]

4

5    being 2.6.  In its 2013 survey, it found that 35% of modern sporting rifle owners

6    owned only 1 modern sporting rifle and 65% owned multiple modern sporting

7    rifles, with the average number of modern sporting rifles owned increasing to 3.1.

8    In its most recent, 2021 survey, the NSSF found that 24% of modern sporting rifle

9    owners owned only 1 modern sporting rifle and 76% owned multiple modern

10   sporting rifles, with the average number of modern sporting rifles owned

11   increasing yet again to 3.8.  This speaks to a growing trend in which modern

12   sporting rifles are being purchased by gun owners who already own a modern

13   sporting rifle, resulting in modern sporting rifles being concentrated, relatively

14   speaking, in the hands of those who already own modern sporting rifles.  *Ibid*.

15        [26] While the English survey is discussed in an unpublished academic paper

16   that is publicly available online, there are significant concerns with the study,

17   which call into question the findings reported in the paper. Arguably, the biggest

18   problem with the English survey (as reported in the unpublished paper) is that it

19   appears to be in serious violation of the Code of Professional Ethics and Practices

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

38

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1     28.     Drawing on the NSSF and English estimates, the Plaintiffs proclaim

2     that, "as compared to the 24 million-plus AR platform rifles in circulation, there

3     are approximately 16 million F-150s on the road."[27] If there were true parallels

4     between AR-15 style rifles and F-series style pickup trucks, then at least one-

5     _____

6     of the American Association for Public Opinion Research (AAPOR). *See* "AAPOR

7     Code of Professional Ethics and Practices," April 2021 (Attached as **Exhibit J**).

8     Among the ways that the English survey seemingly runs afoul of AAPOR canons,

9     it fails to identify the source of sponsorship funding and it fails to fully disclose

10    the measurement tools (Rules III.A.2–3). The former is vital to assuring that the

11    survey was not designed and conducted to further the political or economic

12    interests of particular people or organizations. The latter allows independent

13    observers and researchers to assess if, among other factors, question order,

14    question wording, or answer options biased responses. The latter is also crucial to

15    assuring that select findings were not suppressed because they would, if publicized,

16    undermine the agenda of the survey's sponsor(s). Without release of the entire

17    questionnaire and the full results, it cannot be confirmed that questions and

18    corresponding responses were not suppressed.

19           [27] ECF No. 16 at 12.

DECLARATION OF LOUIS KLAREVAS, PHD.

NO. 2:23-CV-00112

39

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    quarter of all F-series pickup trucks would be owned by less than 2% of all F-series

2    pickup truck owners. Are there any individual Americans who personally own

3    more than 100 F-150 pickup trucks? What about Americans who personally own

4    more than 10 F-150 pickup trucks? The answer is unknown. But, according to the

5    English survey, apparently there are hundreds of thousands of Americans who

6    personally own more than 10 AR-15 style rifles.[28]

7        29.    In deriving its estimates, the NSSF often relies on United States

8    government data, particularly ATF data.[29] According to the ATF, from 1986

9    through 2020 (which reflects the most currently-available data), the civilian stock

10    of firearms in the United States has been made up predominantly of handguns.[30]

11

---

12    [28] English, *supra* note 21.

13    [29] NSSF, 2020, *supra* note 6.

14    [30] For data on the number of firearms manufactured, imported, and exported,

15    by category of firearm, from 2000–2020, *see* ATF, *supra* note 6. For similar data

16    covering 1986–1999, *see* ATF, *Firearms Commerce in the United States: Annual*

17    *Statistical                 Update,            2021,             available             at*

18    https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-

19    report/download (last accessed January 16, 2023).

DECLARATION OF LOUIS KLAREVAS,                    40
PHD.
NO. 2:23-CV-00112

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    As Figure 13 shows, handguns account for 50% of the civilian stock of firearms,

2    rifles account for 33%, and shotguns account for 17%.

3        30.    According to ATF data, handguns are the most common firearms in

4    civilian circulation; not rifles, and most certainly not modern sporting rifles that

5    qualify as assault weapons.

6

7    **Figure 13. Share of Firearms in Civilian Circulation in the United States,**

8    **1986–2020**

9



**F.    Restrictions on Assault Weapons and LCMs Reduce the Incidence of Gun Massacres, Resulting in Lives Saved**

**F.1.    Bans in Theory**

31.    As conceptualized in the Trinity of Violence model that I developed in my book on mass shootings, every act of violence involves three elements: a perpetrator, a weapon, and a target (Figure 14).[31] The key to mitigating violence is to "break the trinity" by hindering at least one of the three elements. This is accomplished by dissuading the potential offender(s), denying the potential instrument(s) of violence, or defending the potential victim(s).[32]

**Figure 14. The Trinity of Violence**



_____

[31] Klarevas, _supra_ note 1, at 27–29, 229–238.

[32] _Id._

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

42

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

32.    Bans are law-based concepts that prohibit certain behaviors by criminalizing them.[33] Bans on assault weapons generally make it illegal to manufacture, import, transfer, own, or possess certain firearms. Bans work in relation to two of the three elements of the Trinity of Violence: dissuasion and denial. With regard to perpetrators, bans use the threat of criminal penalty to *deter potential offenders* from engaging in the prohibited behavior. In the case of bans on assault weapons, they threaten conviction, imprisonment, and/or fines should an individual manufacture, import, transfer, or possess a prohibited assault weapon. One mechanism at work here centers around dissuading potential shooters from trying to build or otherwise acquire banned firearm technologies. But another mechanism at work focuses on the assault weapon itself: *deprive potential instruments of violence*. Knowing that someone who is willing to commit murder might not be deterred from violating another criminal law, like possessing a prohibited item, bans on assault weapons also threaten punishment against anyone who tries to transfer (through sale, gift, or loan) a restricted item to someone who

---

[33] Philip J. Cook, *Research in Criminal Deterrence: Laying the Groundwork for the Second Decad*e, 2 Crime and Justice 211 (1980); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime and Justice 199 (2013).

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

43

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

is prohibited from acquiring it. In essence, the former strategy seeks to dissuade the offenders and the latter strategy seeks to deny the instruments of violence.

33.    Ideally, someone intent on committing a mass shooting with an assault weapon would be dissuaded from going on a rampage by the fact that their means of choice are not available. In such a scenario, the attack would be quashed. This *suppression effect* is akin to what economists and psychologists refer to as a positive spillover effect, where one desirable outcome produces a second, loosely-related desirable outcome.[34] A real-world example of this is the so-called "Matrix Killings," where a 19-year-old Virginia man blamed *The Matrix* film for driving him to murder his parents with a shotgun. At the time of the crime in 2003, the Federal Assault Weapons Ban was in effect, preventing him from obtaining an assault rifle. In a 2013 jailhouse interview, he told CNN, "If I had an assault weapon, things would have been much worse." He added that had he had an AR-15

---

[34] Paul Dolan and Mateo M. Galizzi, *Like Ripples on a Pond: Behavioral Spillovers and Their Implications for Research and Policy*, 47 Journal of Economic Psychology 1 (2015); K. Jane Muir and Jessica Keim-Malpass, *Analyzing the Concept of Spillover Effects for Expanded Inclusion in Health Economics Research*, 9 Journal of Comparative Effectiveness Research 755 (2020).

DECLARATION OF LOUIS KLAREVAS, PHD.

NO. 2:23-CV-00112

44

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  instead of a shotgun, he is positive that, after killing his parents, he would have

2  gone on a rampage and "killed as many people as I possibly could." As he noted,

3  "because I didn't have an assault weapon, that didn't happen."[35] In this case, the

4  unavailability of an assault weapon due to the federal ban appears to have

5  suppressed the perpetrator's impulse to commit a mass shooting.

6      34.    Of course, some potential mass shooters will not be discouraged from

7  going on a killing spree just because their means of choice are unavailable. They

8  will instead replace their desired instruments of violence with available

9  alternatives. This is commonly referred to as the *substitution effect*, wherein an act

10  of violence is still perpetrated, but with a different, less lethal instrument of

11  violence.[36] A real-world example of the substitution effect at work is the 2019

12

13      [35] *Inside the Mind of a Killer*, CNN (Transcripts), August 23, 2013, *available*

14  *at*   https://transcripts.cnn.com/show/pmt/date/2013-08-23/segment/01   (last

15  accessed January 24, 2023).

16      [36] Philip J. Cook, *The Effect of Gun Availability on Violent Crime Patterns*,

17  455 Annals of the American Academy of Political and Social Science 63 (1981);

18  Anthony A. Braga, et al., *Firearm Instrumentality: Do Guns Make Violent*

19  *Situations More Lethal?*, 4 Annual Review of Criminology 147 (2021), available

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

45

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    synagogue rampage in Poway, California. In that attack, the gunman appears to

2    have been unable to acquire an assault rifle and LCMs due to California's ban on

3    both. Instead, he acquired what is known as a California-compliant semiautomatic

4    rifle (which lacked features such as a pistol grip and a forward hand grip) and 10-

5    round magazines. As a result, the gunman quickly ran out of bullets, and while

6    pausing to reload—which appears to have been extremely difficult given that he

7    did not have assault weapon features on his rifle that facilitated fast reloading—a

8    congregant chased him away, preventing him from continuing his attack.[37] In this

9    incident, which resulted in one death, California's ban on assault weapons and

10   LCMs worked exactly as intended. It deprived the active shooter of the

11   mechanisms that might have allowed him to kill enough people to surpass the

12   fatality threshold of a mass shooting. Stated differently, if you examine data sets

13

14   at    https://www.annualreviews.org/doi/abs/10.1146/annurev-criminol-061020-

15   021528.

16        [37] Elliot Spagat and Julie Watson, *Synagogue Shooter Struggled with Gun,*

17   *Fled with 50 Bullets*, Associated Press, April 30, 2019, *available at*

18   https://apnews.com/article/shootings-north-america-us-news-ap-top-news-ca-

19   state-wire-8417378d6b934a8f94e1ea63fd7c0aea (last accessed January 24, 2023).

1    that identify shootings resulting in mass murder, you will not find the Poway

2    synagogue attack on their lists.

3        35.    It might seem perverse to think that restrictions on certain instruments

4    of violence operate on the premise that, if an act of violence cannot be averted,

5    then it will proceed with an alternative instrument. Nevertheless, this is exactly

6    how bans on assault weapons work in theory. They suppress the inclinations of

7    potential mass shooters to go on killing rampages in the first place because their

8    means of choice are unavailable. And, should deterrence fail, bans force

9    perpetrators to substitute less lethal instruments for more dangerous, prohibited

10    ones, reducing the casualty tolls of attacks when they do occur.

11   **F.2.**    **Bans in Practice**

12        36.    In light of the growing threat posed by mass shootings, legislatures

13    have enacted restrictions on assault weapons in an effort to reduce the occurrence

14    and lethality of such acts of firearm violence. Prominent among these measures

15    was the 1994 Federal Assault Weapons Ban. In September 1994, moved to action

16    by high-profile shooting rampages that occurred the previous year at a San

17    Francisco law firm and on a Long Island Rail Road commuter train, the U.S.

18    Congress enacted a ban on assault weapons (as well as LCMs) that applied to all

19

DECLARATION OF LOUIS KLAREVAS, PHD.

NO. 2:23-CV-00112

47

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1 50 states plus the District of Columbia, bringing the entire country under the ban.[38]

2   37. Like the state bans on assault weapons that were implemented before

3 it, the federal ban was aimed primarily at reducing mass shooting violence—an

4 objective the ban sought to achieve by prohibiting the manufacture, importation,

5 possession, and transfer of assault weapons and LCMs not legally owned by

6 civilians prior to the date of the law's effect (September 13, 1994).[39] Congress,

7 however, inserted a sunset provision in the law which allowed the federal ban to

8 expire in exactly 10 years, if it was not renewed beforehand. As Congress

9 ultimately chose not to renew the law, the federal ban expired on September 13,

10

11

12

13   [38] Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996–2010

14 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).

15   [39] Christopher Ingraham, *The Real Reason Congress Banned Assault*

16 *Weapons in 1994—and Why It Worked*, Washington Post, February 22, 2018,

17 *available at* https://www.washingtonpost.com/news/wonk/wp/2018/02/22/the-

18 real-reason-congress-banned-assault-weapons-in-1994-and-why-it-worked (last

19 accessed January 2, 2023).

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

48

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    2004. In the aftermath of the federal ban's expiration, mass shooting violence in

2    the United States increased substantially.[40]

3        38. The legislative intent of the State of Washington in enacting the laws

4    being challenged in the present case is similar to that of other legislative bodies

5    that have restricted assault weapons: reducing gun violence, especially the

6    frequency and lethality of mass shootings. Because, on average, the use of assault

7    weapons results in higher death tolls in mass shootings, the rationale for imposing

8    restrictions on assault weapons is to reduce the loss of life associated with the

9    increased kill potential of such firearm technologies.

10       39.    Currently, 32% of the U.S. population is subject to a ban on both

11   assault weapons. The following is a list of the 11 state-level jurisdictions that

12   presently restrict both assault weapons and LCMs: California (January 1, 1990);

13   New Jersey (September 1, 1990); Hawaii (July 1, 1992, assault pistols only);

14   Connecticut (October 1, 1993); Maryland (June 1, 1994, initially assault pistols but

15   expanded to long guns October 1, 2013); Massachusetts (July 23, 1998); New York

16   (November 1, 2000); the District of Columbia (March 31, 2009); Delaware

17

18

19       [40] *See* sources cited *supra* note 11.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  (June 20, 2022); Illinois (January 10, 2023); and Washington (April 25, 2023).[41]

2  As a reminder, from September 13, 1994 through September 12, 2004, the entire

3  country was also subject to federal ban on assault weapons.

4      40.    In the field of epidemiology, a common method for assessing the

5  impact of laws and policies is to measure the rate of onset of new cases of an event,

6  comparing the rate when and where the laws and policies were in effect against the

7  rate when and where the laws and policies were not in effect. This measure, known

8  as the incidence rate, allows public health experts to identify discernable

9  differences, while accounting for variations in the population, over a set period of

10  time. Relevant to the present case, calculating incidence rates across states, in a

11  manner that captures whether or not bans on assault weapons were in effect during

12  the period of observation, allows for the assessment of the effectiveness of such

13  bans. In addition, fatality rates—the number of deaths, per population, that result

14  from particular events across different jurisdictions—also provide insights into the

15

16

17

---

18      [41] The dates in parentheses mark the effective dates on which the listed states

19  became subject to bans on assault weapons.

DECLARATION OF LOUIS KLAREVAS, PHD.

NO. 2:23-CV-00112

50

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    impact bans on assault weapons have on mass shooting violence.[42]

2        41.    Since January 1, 1990, when the first state ban on assault weapons

3    took effect, through December 31, 2022, there have been 94 high-fatality mass

4    shootings and 145 mass public shootings in the United States (**Exhibits B and**

5    **C**).[43] Calculating incidence and fatality rates for this time-period, across

6    jurisdictions with and without bans on assault weapons, reveals that states that

7    prohibited assault weapons experienced 46% and 16% decreases, respectively, in

8    the high-fatality mass shooting and mass public shooting incidence rates. They also

9    experienced 54% and 37% decreases, respectively, in the high-fatality mass

10

---

11        [42] For purposes of this Declaration, incidence and fatality rates are calculated

12    using methods and principles endorsed by the Centers for Disease Control. *See*

13    Centers for Disease Control and Prevention, *Principles of Epidemiology in Public*

14    *Health Practice: An Introduction to Applied Epidemiology and Biostatistics*

15    (2012), *available at* https://stacks.cdc.gov/view/cdc/13178 (last accessed January

16    3, 2023).

17        [43] There were no state bans on assault weapons in effect prior to January 1,

18    1990. Therefore, January 1, 1990, is the logical starting point for an analysis of the

19    impact of assault weapons bans.

shooting and mass public shooting fatality rates, regardless of the weaponry used by the mass murderers (Tables 6–7).[44]

42. When calculations go a step further and are limited to mass shootings involving assault weapons, the difference between the two jurisdictional categories (non-ban states and ban states) is even more pronounced. In the time-period between January 1, 1990, and December 31, 2022, accounting for population, states with assault weapons bans in place experienced 59% fewer high-fatality mass shootings involving the use of assault weapons and 35% fewer mass public shootings involving the use of assault weapons. Similarly, jurisdictions with bans in effect experienced 68% fewer deaths resulting from high-fatality mass shootings perpetrated with assault weapons and 58% fewer deaths resulting from mass public shootings perpetrated with assault weapons (Tables 6–7).

---

[44] For purposes of coding, between September 13, 1994, and September 12, 2004, the federal assault weapons ban was in effect. During that 10-year period, all 50 states and the District of Columbia were under legal conditions that prohibited assault weapons. As such, the entire country is coded as being under an assault weapons ban during the timeframe that the federal assault weapons ban was in effect.

DECLARATION OF LOUIS KLAREVAS, PHD.
NO. 2:23-CV-00112

52

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

43.    All of the above epidemiological calculations lead to the same conclusion: when bans on assault weapons are in effect, per capita, fewer high-fatality mass shootings occur and fewer people die in such shootings—especially incidents involving assault weapons, where the impact is most striking.

44.    The main purpose of bans on assault weapons is to restrict the availability of assault weapons. The rationale is that, if there are fewer assault weapons in circulation, then potential mass shooters will either be dissuaded from attacking or they will be forced to use less-lethal firearm technologies, resulting in fewer lives lost. The epidemiological data lend support to the policy choices of the State of Washington that seek to enhance public safety through restrictions on civilian access to certain firearms. While imposing constraints on assault weapons will not prevent every mass shooting, the data suggest that legislative efforts to restrict such instruments of violence should result in lives being saved.

///

DECLARATION OF LOUIS KLAREVAS, PHD.

NO. 2:23-CV-00112

53

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Table 6. Incidence and Fatality Rates for High-Fatality Mass Shootings, by Whether or Not Assault Weapons Bans Were in Effect, 1990–2022**

| | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| All High-Fatality Mass Shootings | | | | | |
| Non-AW Ban States | 159.2 | 64 | 1.22 | 673 | 12.81 |
| AW Ban States | 137.1 | 30 | 0.66 | 264 | 5.84 |
| Percentage Decrease in Rate for AW Ban States | | | 46% | | 54% |
| High-Fatality Mass Shootings Involving Assault Weapons | | | | | |
| Non-AW Ban States | 159.2 | 23 | 0.44 | 333 | 6.34 |
| AW Ban States | 137.1 | 8 | 0.18 | 92 | 2.03 |
| Percentage Decrease in Rate for AW Ban States | | | 59% | | 68% |

Note: Population data are from U.S. Census Bureau, "Population and Housing Unit Estimates Datasets," *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed January 3, 2023).

DECLARATION OF LOUIS KLAREVAS, PHD.

NO. 2:23-CV-00112

54

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

**Table 7. Incidence and Fatality Rates for Mass Public Shootings, by Whether or Not Assault Weapons Bans Were in Effect, 1990–2022**

2

3

4

| | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| All Mass Public Shootings | | | | | |
| Non-AW Ban States | 159.2 | 84 | 1.60 | 694 | 13.21 |
| AW Ban States | 137.1 | 61 | 1.35 | 375 | 8.29 |
| Percentage Decrease in Rate for AW Ban States | | | 16% | | 37% |
| Mass Public Shootings Involving Assault Weapons | | | | | |
| Non-AW Ban States | 159.2 | 27 | 0.51 | 325 | 6.19 |
| AW Ban States | 137.1 | 15 | 0.33 | 119 | 2.63 |
| Percentage Decrease in Rate for AW Ban States | | | 35% | | 58% |

Note: Population data are from U.S. Census Bureau, "Population and Housing Unit Estimates Datasets," *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed January 3, 2023).

DATED this 30ᵗʰ day of May , 2023, at Nassau County    NY                    .

_____

LOUIS KLAREVAS, PHD

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

## **DECLARATION OF SERVICE**

2      I hereby declare that on this day I caused the foregoing document to be

3  electronically filed with the Clerk of the Court using the Court's CM/ECF System

   which will serve a copy of this document upon all counsel of record.

4      DATED this 1st day of June, 2023, at Seattle, Washington.

5

6      _/s/ Andrew R.W. Hughes_
       ANDREW R.W. HUGHES, WSBA #49515
7      Assistant Attorney General

8

9

10

11

12

13

14

15

16

17

18

19

DECLARATION OF LOUIS KLAREVAS,
PHD.
NO. 2:23-CV-00112

56

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744