1   Andrew R.W. Hughes, WSBA #49515
    R. July Simpson, WSBA #45869
2   William McGinty, WSBA #41868
    *Assistant Attorneys General*
3   Kristin Beneski, WSBA #45478
    *First Assistant Attorney General*
4   Washington Attorney General's Office
    800 Fifth Avenue, Suite 2000
5   Seattle, WA 98104
    (206) 464-7744

6              **UNITED STATES DISTRICT COURT**
            **EASTERN DISTRICT OF WASHINGTON**
7                      **AT SPOKANE**

8   AMANDA BANTA, et al.,          NO. 2:23-cv-00112-MKD

9                  Plaintiffs,     DECLARATION OF
                                   BRENNAN RIVAS
10          v.

11  ROBERT W. FERGUSON, Attorney
    General of the State of Washington,
12  et al.,

                   Defendants.
13

14          I, Brennan Rivas, declare as follows:

15          1.    I am over the age of 18, competent to testify as to the matters herein,

16  and make this declaration based on my personal knowledge.

17          2.    I have been asked by State of Washington defendants in this matter

18  to render an opinion on the history of firearms restrictions enacted in the

19  nineteenth century, especially as it relates to weapons deemed especially

1    dangerous. For my work in this case, I am being compensated at a rate of $175

2    per hour for research, $225 per hour for writing, and $325 per hour for testimony.

3        3.    I am an Historian and Independent Scholar. During the 2021-2022

4    academic year, I was the Lloyd Lewis Fellow in American History at The

5    Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for

6    the Study of Southwestern America within the Clements Center for Southwest

7    Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer

8    in American History at Texas Christian University.

9        4.    My educational background includes a Ph.D. in History from TCU,

10    where my dissertation was on the development, evolution, and enforcement of

11    gun and weapon policy in Texas from the era of Mexican independence to the

12    1930s.

13        5.    My expertise includes historical weapon regulations in the United

14    States. I have authored multiple publications on this topic, including peer-

15    reviewed articles in the Southwestern Historical Quarterly, and a chapter in an

16    edited collection forthcoming by Oxford University Press; in 2022, my article,

17    "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022),

18    was published in the UC Davis Law Review. I am currently completing a book

19    manuscript based upon my dissertation research.

6. I have provided expert witness testimony in *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C); *Duncan v. Bonta*, 3:17-cv-01017-BEN-JLB (S.D. Cal.); *Brumback v. Ferguson*, No. 1:22-cv-03093-MKD (E.D. Wash.); *Christian v. Nigrelli*, No. 22-cv-00695 (JLS) (W.D.N.Y.); *Hanson v. District of Columbia*, No. 22-cv-2256 (D.D.C.); *National Association for Gun Rights v. Campbell*, No. 22-cv-11431 (D. Mass.); *Oregon Firearms Federation, Inc. v. Kotek, Oregon*, No. 2:22-cv-01815-IM (D. Ore.); *National Shooting Sports Foundation v. Jennings*, No. 22-cv-01499-RGA (D. Del.); and *Jones v. Bonta*, No. 3:19-cv-01226-L-AHG, (S.D. Cal. 2022). I am currently working on potential expert witness testimony that may be provided in other jurisdictions.

7. A true and correct copy of my current curriculum vitae is attached as Exhibit A.

## I.    SUMMARY OF OPINIONS

8. My exploration of historical weapon regulations for this case, in conjunction with my ongoing research dating back to 2015, shows that Americans have a long tradition of regulating weapons considered especially dangerous to the peace and safety of their communities. The weapons which nineteenth-century Americans focused on were not semiautomatic firearms with

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   large-capacity, detachable magazines, as we are familiar with today, but newly

2   developed or newly popular weapons that reached American consumers and were

3   associated with unnecessary violence. Often grouped together as deadly

4   weapons, these instruments were mainly large fighting knives and pocket-sized

5   revolvers, but could include others like sword-canes, slung shots, and metal

6   knuckles. Public outcry at the social cost of deadly weapons was common, and

7   governments targeted them for regulation through taxation, public carry laws,

8   and point-of-sale restrictions that sometimes prohibited their sale altogether. This

9   report identifies and explains this history, focusing specifically on state laws that

10  restricted the sale or manufacture of deadly weapons through sales bans or

11  prohibitive taxation.

## II.   DEFINING DEADLY WEAPONS

13      9.      Americans living in the nineteenth century generally distinguished

14  between two types of weapons: arms suitable for militia service or hunting, and

15  concealable weapons associated with interpersonal violence and known as deadly

16  weapons.[1] In the decentralized, agricultural environments that characterized early

17  

18      [1] There are some exceptions to this tendency, such as sales restrictions that

19  applied to all firearms rather than just pistols, or certain sensitive place laws that

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112                                    4                    ATTORNEY GENERAL OF WASHINGTON
                                                                              Complex Litigation Division
                                                                              800 Fifth Avenue, Suite 2000
                                                                               Seattle, WA 98104-3188
                                                                                  (206) 464-7744

1   American life, hunting knives, rifles, muskets, and shotguns were important tools

2   present in most rural homes. Men used these firearms for militia service and for

3   the occasions when they were required to participate in local policing efforts

4   through the *posse comitatus*; they would have much more frequently used such

5   weapons for hunting—be it killing predatory animals, driving birds away from

6   their crops, or hunting for meat. Rifles, muskets, and shotguns were not likely to

7   be used in the commission of crimes, especially crimes of passion that resulted

8   in murder or manslaughter. Those offenses were much more likely to be

9   committed with bare hands, blunt instruments, or other types of weapons such as

10  _____

11  prohibited all firearms in addition to deadly weapons. *See* S.B. 80, 1st Sess., at

12  79 (Ohio 1880), establishing a minimum age for the sale of "any air-gun, musket,

13  rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description

14  whatever, or ammunition for the same." *See also* John A. Hockaday, *et al.*,

15  *Revised Statutes of the State of Missouri* 224, §1274 (1879) (prohibiting the

16  carrying of "any firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly

17  weapon" at "public assemblages,"). Nonetheless, this distinction between deadly

18  weapons and militia or hunting weapons was foundational to nineteenth-century

19  regulatory policies.

1    concealable knives and pistols.[2]

2        10.    As rates of homicide, violence, and crime rose in tandem with

3    developments in weapon technology during the nineteenth century, American

4    people across the country turned to weapon regulations as a solution. These

5    regulations tended to focus upon readily concealable "deadly weapons" like

6    knives and pistols, because those were the weapons associated with lawless

7    interpersonal violence, rather than the firearms used for militia and hunting

8    purposes. Deadly weapons were associated with crime and needless bloodshed,

9    and the people habitually carrying them were presumed to be ruffians, burglars,

10    and assassins—those ready to settle personal difficulties with blood rather than

11    by reason and law. Some states listed and defined deadly weapons by code or

12    statute. For example, an 1892 edition of the Mississippi Penal Code carried

13    forward a public carry law from 1888 as Sec. 1026, entitled "Deadly weapons;

14

15

16    _____

17        [2] Guns were used in less than half of the murders of unrelated adults, and

18    less than ten percent of marital murders during the seventeenth and eighteenth

19    centuries. *See* Randolph Roth, *American Homicide* 115 (2009).

1   carrying of concealed."[3] Other states defined deadly weapons by their suitability

2   for concealment; in fact, deadly weapons were often referred to as "concealed

3   weapons" for the straightforward reason that they were designed to be carried

4   concealed.[4] Article 47, Chapter 25 of the Oklahoma Territory Penal Code, for

5   instance, was titled "Concealed Weapons" and its first two sections enumerated

6   "prohibited weapons" that were not to be carried upon the person or concealed.[5]

7       11.    Some of these weapons, and the regulations governing them, are

8   _____

9       [3] R. H. Thompson, et al, *Annotated Code of the General Statute Laws of

10  the State of Mississippi* 326, § 1026 (1892).

11      [4] For example, *see What They Think of It: The State Press on the Carrying

12  of Concealed Weapons*, Daily Constitution (Atlanta, Georgia), April 11, 1879, at

13  4; and *Concealed Weapons: What Is Thought of the Practice by the Press of the

14  State*, Daily Constitution (Atlanta, Georgia), March 27, 1879, at 1. The articles

15  quote numerous other newspapers from Georgia which condemn carrying deadly

16  weapons in terms that associate going armed and carrying deadly weapons with

17  the habit of carrying concealed weapons.

18      [5] Concealed Weapons, 1890 Okla. Sess. Laws, ch. 25, art. 47, §§ 1–2, at

19  412.

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    discussed below.

2                    ### III.    LARGE KNIVES

3    　　12.    Prior to the widespread availability of revolvers near the mid-

4    nineteenth century, large knives were considered the most dangerous weapon

5    around. There were so many different styles and names of knives that Americans

6    sometimes struggled to define them and distinguish them from one another. The

7    "dirk knife" originated in Scotland as a knife carried into battle or for martial

8    ornamentation by soldiers. It has come to be identified as having a straight blade.[6]

9    "Dagger" is an older word, and generally connotes a double-edged blade. Bowie

10   knives were often associated with long blades that curved and became double-

11   edged near the tip. An "Arkansas toothpick," on the other hand, was more likely

12   to be a knife that was as long as a bowie, double-edged, and sharply tapered. The

13   narvaja was of Spanish origin and tended to refer to a large folding blade. To

14   make matters even more complicated, these definitions might vary

15   geographically, change over time, and were not set in stone during the nineteenth

16   

17   　　[6] William B. Worthen, *Arkansas Made: A Survey of the Decorative,*

18   *Mechanical, and Fine Arts Produced in Arkansas through 1950* at 267–268,

19   Vol. I (University of Arkansas Press, 2nd ed. 2021).

DECLARATION OF BRENNAN RIVAS                    8
NO. 2:23-CV-00112

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  century.

2      13.    By far the Bowie knife became the style most widely known, used,

3  and discussed by Americans in the nineteenth century. The blade took its name

4  from a man named Jim Bowie who was born in Kentucky in 1796 and died at the

5  Alamo during the Texas Revolution in 1836.[7] He began carrying a large hunting

6  knife in a leather scabbard in 1826, after an enemy tried to assassinate him in the

7  street.[8] The following year, Bowie used it to great effect in a duel that turned into

8  a melee and became the subject of nationwide news coverage.[9] His death at the

9

10      [7]    William R. Williamson, *Bowie, James*, Handbook of

11  Texas Online, Texas State Historical Association,

12  https://www.tshaonline.org/handbook/entries/bowie-james (last accessed

13  February 25, 2023).

14      [8] Clifford Hopewell, *James Bowie, Texas Fighting Man: A Biography*

15  25–30 (1994).

16      [9] *Terrible Rencontre*, Niles' Register (Baltimore, Maryland), Nov. 17,

17  1827, at 182. https://archive.org/details/sim_niles-national-register_1827-11-

18  17_33_844/page/182/mode/1up, *reprinted at* https://chroniclingamerica.loc.gov

19  /lccn/sn83045110/1827-10-31/ed-1/seq-2/

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  Alamo cemented the legend of his namesake knife. As the legend spread, the

2  Bowie knife became one of the most widely denounced deadly weapons of the

3  antebellum nineteenth century.

4       14.    Fighting knives were certainly not new in the 1830s, and the exact

5  styling of the original Bowie knife remains unknown, but Bowie's life story

6  became a vehicle for Americans to discuss and address the growing problem of

7  knife violence. As rates of violence rose during the nineteenth century, people

8  were more likely to carry and use large knives; the increased presence of

9  knives—even if ostensibly carried for personal defense—had the regrettable

10  consequence of exacerbating the problem.[10] This was especially notable in

11  southern areas, where "so certain, indeed, is the bowie-knife to appear in a

12  quarrel, that the great anxiety of a disputant in the South seems to be always to

13  strike the first blow."[11]

14

15      [10] *See Another Victim of the Bowie Knife*, Cheraw Gazette

16  (South Carolina), September 6, 1837, at 3, *available at*

17  https://chroniclingamerica.loc.gov/lccn/sn88084121/1837-09-06/ed-1/seq-3/.

18      [11] *The Bowie-Knife In the South*, San Francisco Evening Bulletin,

19  October 18, 1861.

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    15.    The response on the part of Americans confronting knife-violence

2    was the regulation of such weapons. Going back to 1801, nineteenth-century

3    weapon restrictions regulated the presence of knives larger than a regular pocket

4    knife in public places.[12] As homicide rates increased and the popularity of bowie

5

6    [12] 1801 Tenn. Laws, ch. 22, § 6 (prohibiting "privately" carrying "any dirk,

7    large knife, pistol or any other dangerous weapon."). Similar laws existed in

8    numerous states during the antebellum nineteenth century, including: Florida,

9    which clearly distinguished between fighting knives and pocket knives, *see* 1846

10    Fla. Laws, ch. 75 ("any dirk, pistol or other arm or weapon, except a common

11    pocket knife . . . ." *See also* 1838 Va. Acts, ch. 101 ("any pistol, dirk, bowie

12    knife, or any other weapon of the like kind, from the use of which the death of

13    any person might probably ensue . . ."; 1840 Ala. Laws, ch. 7 ("a bowie knife, or

14    knife or instrument of the like kind or description, by whatever name called, dirk

15    or any other deadly weapon, pistol or any species of fire arms, or air gun . . .";

16    1819 Ind. Acts, ch. 23 ("any dirk pistol, sword in cane, or any other unlawful

17    weapon . . ."); 1821 Miss. Laws, ch. 49 ("any pistols, dirk or other such offensive

18    weapons . . ."); 1812 Ky. Acts, ch. 89 ("a pocket pistol, dirk, large knife, or sword

19    in a cane "; 1813 La. Acts, ch. 5 ("any concealed weapon, such as a dirk, dagger,

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112                    11                    ATTORNEY GENERAL OF WASHINGTON
                                                          Complex Litigation Division
                                                          800 Fifth Avenue, Suite 2000
                                                          Seattle, WA 98104-3188
                                                          (206) 464-7744

1    knives grew, so did laws restricting bowie knives, as discussed more fully

2    below.[13]

3    ### IV.    POCKET PISTOLS

4    16.    Another weapon that came to be associated with lawless violence

5    was the "pocket pistol." Prior to the mid-nineteenth century, most of the pistols

6    available on the American consumer market were single-shot, muzzle-loading

7    pistols modeled after designs that appeared in the eighteenth century.[14] After

8    _____

9    knife, pistol, or any other deadly weapon,"; *Of Proceedings to Prevent the*

10    *Commission of Crime,* in The Revised Statutes of the State of Wisconsin,

11    Title XXXI, ch. 144, § 18, 719 (1849), ("a dirk, dagger, sword, pistol or pistols,

12    or other offensive and dangerous weapon . . ."); *Of Proceedings to Prevent the*

13    *Commission of Crime,* in The Revised Statutes of the State of Michigan, Title II,

14    Ch. 1, § 16 (1846) ("a dirk, dagger, sword, pistol, or other offensive and

15    dangerous weapon . . ."). This is not an exhaustive list.

16    [13] As a general rule, public carry laws included knives within their purview,

17    and some jurisdictions prohibited the sale of bowie knives as well. *See infra*, at

18    17–24, 29, 36–39.

19    [14] *Pollard's History of Firearms* 114–16 (Claude Blair, ed. 1983).

1   being fired, they were useful only as clubs until they could be reloaded through

2   a process that took upwards of fifteen seconds.[15] In 1836, Samuel Colt patented

3   the design for a revolver, which ultimately became more widely used than single-

4   shot devices or other types of repeating pistols. Still, it took until the Civil War

5   Era for the revolver to become a commercial success and widely available to

6   Americans. In 1857, Colt's patent expired, which opened the door for other

7   manufacturers to produce revolvers. The rising number of pistols available for

8   sale contributed to their growing presence in American homes and communities.

9       17.   Pistols both before and after the advent of the revolver tended to be

10   produced in three sizes. The largest were called "horse," "holster," and later

11   "army" pistols, and they descended from large handguns conducive to mounted

12   warfare that were kept in saddle holsters. By about the 1870s, these firearms were

13   called "army" pistols and had been scaled down somewhat in such a way that

14   they were more conducive to being carried on the person. But in the early

15

16

17       [15] For example, see the websites: https://timothyrjeveland.com/how-to-load-and-fire-a-musket-or-flintlock-pistol-explained-briefly-with-appropriate-jargon/; and https://www.quora.com/How-long-did-it-take-to-load-a-flintlock-pistol.

18

19

DECLARATION OF BRENNAN RIVAS       13       ATTORNEY GENERAL OF WASHINGTON
NO. 2:23-CV-00112                                Complex Litigation Division
                                               800 Fifth Avenue, Suite 2000
                                               Seattle, WA 98104-3188
                                                 (206) 464-7744

nineteenth century, "horse" or "holster" pistols were decidedly large and not designed to be carried on the person.[16]

18.    The second size was the "belt" or "navy" pistol, which was somewhat smaller and carried a lower caliber. These firearms were designed to be carried either on the belt (sometimes attached by a ring on the firearm), in the pocket of a greatcoat, or in a portable case. One of the main uses of these seven-to-ten-inch pistols prior to the nineteenth century was for defensive purposes while traveling.[17] The mid-sized navy revolvers produced by Colt's were one of the more successful models produced and may have been the most common type of revolver among American consumers at the start of the Civil War.

19.    The smallest size, measuring approximately five or six inches in length, was the pocket pistol. As the name suggests, these firearms were purposefully designed to be carried within the pockets of everyday attire.[18] The most famous of these was the Deringer pistol, named for its designer, Henry

---

[16] *Pollard's History*, *supra* note 14 at 104, 119.

[17] *Id.* at 117–18.

[18] *Id.* at 116–18 ("These [pocket pistols] were intended to be carried in the pocket of a person wearing normal civilian attire,").

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112                                      14                  ATTORNEY GENERAL OF WASHINGTON
                                                                          Complex Litigation Division
                                                                          800 Fifth Avenue, Suite 2000
                                                                          Seattle, WA 98104-3188
                                                                          (206) 464-7744

Deringer, and notorious as the gun used to assassinate Abraham Lincoln. Deringers (often misspelled as "Derringers") were capable of firing large calibers, which made them exceedingly lethal at close range—often more lethal than mid-sized navy revolvers.[19] Other pocket revolvers, on the other hand, carried smaller calibers and might only hold four or five shots. As the United States military demobilized after the Civil War and ceased purchasing large numbers of revolvers, the manufacturers in the business turned toward civilian sales to continue their profitability. Pocket revolvers, which could be had for a few dollars or less, were marketed heavily.[20]

20.    Even though pocket pistols were less frequently the targets of popular outrage in the early nineteenth century than were large knives, they were still regulated alongside them. Small, concealable pistols lent themselves to the

---

[19] Lee A. Silva, *Henry Deringer's Popular 'Pocket Cannons' Packed a Wallop from California to Washington, D.C.*, Wild West, April 2002, at 12–13.

[20] On size, variability, and manufacture of Colt pistols, *see* Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (2021); Martin Rywell, *Colt Guns* 66–67, 84-93 (1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (1979).

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    same violent ends as fighting knives, and it was a single-shot, muzzle-loading

2    pocket pistol used in the assassination of Abraham Lincoln in 1865. Public carry

3    laws generally included "pistols" within their purview, and other regulatory

4    strategies attempted to discourage their presence in public spaces. The

5    proliferation of pocket revolvers after the Civil War catapulted them to

6    centerstage for regulation during the postbellum era.

7    **V.    SLUNG SHOTS & OTHER DEADLY WEAPONS**

8        21.    There were other deadly weapons which Americans tended to

9    regulate in the nineteenth century. These included sword-canes and loaded canes,

10    as well as metal knuckles (often referred to as "knucks") and slung shots. A slung

11    shot was a makeshift weapon associated with organized crime and street gangs.

12    Unlike a sling shot that we might think of today, a slung shot was "a shot, piece

13    of metal, stone, etc., fastened to a strap or thong, and used as a weapon."[21] Like

14    large knives and pocket pistols, slung shots, sword-canes, and metal knuckles

15    were weapons associated with crime and interpersonal violence rather than

16    militia service or communal policing.

17

18        [21] This is the definition of the nineteenth-century American phrase from

19    the *Oxford English Dictionary*.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## VI.    VIOLENCE & USE OF DEADLY WEAPONS IN THE 19TH CENTURY

22.    Rates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors. Where Americans failed to unite together based upon common interests and principles, and where they viewed governing institutions with skepticism, violence tended to rise. The southern society predicated upon racial slavery made slaveholding states more violent places than northern counterparts. Areas that were isolated from governing officials or on the fringe of Anglo-American settlement also experienced more violence than the more established parts of the country closer to the Atlantic seaboard.[22] After the Civil War, pervasive racism, rural poverty, and unrepresentative state and local governments meant that violence remained a staple of southern life. Northern cities and states were not immune from high levels of homicide and crime, either. They saw a sharp uptick in violence and homicide from about 1840 through the end of the Civil War, and then again in

---

[22] Historian Randolph Roth has shown that four correlates contribute to rates of homicide: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy. *See* Roth, *supra* note 2, at 17–26.

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    the closing decades of the century. Ethnic tension, political conflict, and the

2    effects of industrialization (urbanization, poverty, lack of resources, etc.)—all of

3    which eroded the cohesion of communities and citizens—fueled this trend.[23]

4        23.    Americans North and South criticized the everyday carrying of

5    deadly weapons, particularly the concealment of them beneath one's clothes.

6    Such behavior belonged to "ruffians"—bullies who imposed their will on others

7    through force or intimidation, and who engaged in unforgivably brutal behavior

8    in order to do so. Ruffians carried bowie knives and used them to stab someone

9    who insulted them, and ruffians turned a minor conflict into a melee by drawing

10   a pocket revolver and shooting their opponents.[24] To carry weapons was also

11

_____

12       [23] On homicide in American history, particularly as broken down into

13   northern and southern regions, *see id.* at 297–326, 386–88 (for trends in northern

14   areas); at 185 (for data-supported charts showing trends in homicide for large

15   cities across the entire nineteenth century); at 184 (complicating data from pp.

16   185 by showing that some rural northern areas experienced sharp rise in crime

17   after 1865 and therefore emulated what took place in the American South during

     that time).

18       [24] For example, *see The 'Science of Defence,'* Public Ledger (Philadelphia,

19   PA), August 5, 1840 (carrying swords as "refined ruffianism"); *The Ruffian*

described as a relic of barbarism—"that most barbarous of all customs, the habit of wearing concealed weapons."[25] Commentators later in the century described pistol-toting as a "relic of barbarism"[26] and rallied to the cry, "The revolver must go!"[27]

_____

*Foote*, Barre Patriot (Boston, MA) April 26, 1846 (Sen. Henry S. Foote of Mississippi as a "ruffian" for being armed in the Senate chamber, bullying an enemy, and pulling a knife on him in the presence of the full Senate); *Shocking Outrage*, The Miners' Express (Dubuque, Iowa) September 24, 1851, at 2 ("some ruffian or ruffians unknown" stabbed a pair of stabled horses, killing one). *See* https://chroniclingamerica.loc.gov/lccn/sn86083363/1851-09-24/ed-1/seq-2/

[25] *Concealed Weapons*, Daily Picayune (New Orleans, Louisiana) February 28, 1845, at 2.

[26] *The Cattlemen*, Fort Worth Daily Democrat, March 5, 1883. *See also* *Brenham Daily Banner* (Texas), March 7, 1883.

[27] *See The Revolver Must Go*, Clarksville Weekly Chronicle (Tennessee) May 24, 1884, at 1 (reprinted from *Gainesville Register* (Texas)): https://chroniclingamerica.loc. gov/lccn/sn88061082/1884-05-24/ed-1/seq-1/ ; *Personals*, Chicago Daily Tribune, March 29, 1879, at 5 (mocking the movement developing in the South by saying, "Southern papers say the revolver must go— go off?") https://chroniclingamerica.loc.gov/lccn/sn84031492/1879-03-29/ed-

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112                                19                ATTORNEY GENERAL OF WASHINGTON
                                                                      Complex Litigation Division
                                                                      800 Fifth Avenue, Suite 2000
                                                                      Seattle, WA 98104-3188
                                                                      (206) 464-7744

24. Widespread criticism of deadly weapons and the bloody toll which they exacted upon American society prompted state and local governments to enact regulations. Some of the earlier statutes and ordinances originated in southern and southwestern[28] areas and spread across much of the country by the Civil War Era. Regulations carried on unabated in the postbellum era, often turning to the same strategies of public carry, taxation, and sales restriction laws.

## VII.   WEAPON REGULATIONS

25. There were several different regulatory strategies which nineteenth-century Americans pursued in order to stem the tide of violence associated with deadly weapons. These ranged from public carry laws to taxes and sales restrictions. Sales restrictions grew in number and importance as the century wore on, but they dated back to the antebellum nineteenth century.

26. Sometimes taxes were straightforward attempts to prohibit the

---

1/seq-5; *Current Opinion*, Rocky Mountain News (Colorado) March 26, 1879 ("If the west and south would rally around the sentiment, 'The revolver must go,' it would be one more step in the interests of civilization.").

[28] In the antebellum era, the Old Southwest stretched from Louisiana to Missouri, Kentucky, and Alabama.

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112                                                    20
ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    carrying of weapons without saying so explicitly. This approach was practiced in

2    Florida during its territorial phase and remained a policy option for much of the

3    nineteenth century.[29] In 1835, the territorial government enacted a public carry

4    law with a steep fine of $50 to $500 for violations and an exemption for "carrying

5    arms openly, outside of all their clothes."[30] Unsatisfied with the public carry law,

6    leaders established a new series of prohibitive taxes designed to further reduce

7

8    _____

9        [29] In some ways, possession taxes came close to being carry taxes or even

10   proto-licensing policies. 1866 Ga. Laws §§ 3–4, 27–28 (assessing a tax of $1 for

11   each "gun or pistol, musket or rifle over the number of three kept or owned on

12   any plantation" in select counties.). Taxation as a form of public carry regulation

13   was considered in Texas in 1866 as well as in Tennessee in 1893. *See* Brennan

14   Gardner Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White

15   Supremacy in Texas, 1836-1900*, 121 Southwestern Historical Quarterly 290

16   (Jan. 2018); Tennessee State News, *Bolivar Bulletin* (Bolivar, Tennessee)

17   Feb. 10, 1893, at 1, https://chroniclingamerica.loc.gov/lccn/sn89058007/1893-

18   02-10/ed-1/seq-1/.

19       [30] John P. Duval, *Compilation of the Public Acts of the Legislative Council

20   of the Territory of Florida* 423 (1839) *available at* The Making of Modern Law:

21   Primary Sources (*Source entitled* Passed Prior to 1840, Image 425).

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

21

the presence of deadly weapons in public. This 1838 enactment held that anyone who chose "to vend dirks, pocket pistols, sword canes, or bowie knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay . . . a tax of ten dollars annually."[31] In 2023 dollars, the annual occupation tax would amount to approximately $6,300, and the annual open carry tax would amount to approximately $320.[32] In a sparsely populated, rural environment, these taxes were clearly designed to discourage trade in and public carry of deadly weapons. The architects of the statute saw it as intrinsically connected to the previously enacted concealed carry restriction—as a way of more effectively reducing the number of weapons carried in public spaces.[33]

27.    Antebellum lawmakers also restricted the sale of certain problematic weapons. As bowie knives, pocket pistols, and other deadly weapons were becoming more popular and more prevalent, Tennessee and Georgia prohibited

---

[31] 1838 Fla. Laws, ch. 24.

[32] The amounts reach $319.14 and $6,382.73. *See* https://www.in2013dollars.com/us/inflation/1838?amount=200.

[33] The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly."

their sale. In 1837, Georgia passed a statute combining a public carry law with a sales restriction. It was unlawful "for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence."[34] The statute further held that "pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols."[35] The following year (1838), Tennessee lawmakers did much the same with an updated public carry law that included a section prohibiting "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or

---

[34] 1837 Ga. Laws, ch. 90; https://dlg.usg.edu/record/dlg_zlgl_16741934#text.

[35] *Id.*

23

knives, or Arkansas tooth pick."[36] In 1849, Vermont lawmakers prohibited the manufacture and sale of slung shots, which were makeshift weapons associated with organized crime and street gangs.[37] New York did the same.[38] Kentucky lawmakers enacted a law that prohibited "vending, buying, selling, or dealing in the weapons popularly known as colts, brass knuckles, slung-shots, or any imitation or substitute therefor,"—essentially adopting the policies all these states into one catch-all statute.[39]

28.    These sales restrictions were not challenged in the antebellum era

---

[36] 1838 Tenn. Laws, ch. 137. This law was temporarily suspended during part of the Civil War. *See* 1862 Tenn. Laws, ch. 23.

[37] 1849 Vt. Acts & Resolves, ch. 36, § 1, 26. Slung shots were not like slingshots as we understand the term today. The *Oxford English Dictionary* identifies this as a nineteenth-century American phrase referring to "a shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon."

[38] Hiram Denio, et al, *Revised Statutes of the State of New York* § 52, 880 (1852) (*see* Part IV, Title 6, *Misdemeanors*; the code section cites 1849 NY Laws ch. 278.)

[39] 1855 Ky. Acts, ch. 636, § 1, 96.

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

the way that public carry laws sometimes were.[40] The public carry portion of the Georgia statute was challenged in 1844, when a man named Hawkins Nunn appealed his conviction. Nunn had been seen carrying a pistol (not a horseman's pistol) openly in his hand, and a grand jury issued a presentment against him. The Georgia Supreme Court ultimately struck down the portions of the law in question that prohibited keeping and openly carrying certain kinds of weapons and criticized the poor construction of the statute. But the decision in the case did

---

[40] Some southern appellate courts weighed the constitutionality of public carry laws in light of their view of the Second Amendment and particularly in light of their state analogues. The regional understanding that emerged was that legislatures could prohibit the concealed carrying of deadly weapons, but not the open carrying of them. This understanding coexisted with a general disdain for the habitual carrying of weapons in public spaces, and was likely a way of protecting the open carrying of deadly weapons at times of emergency rather than carte blanche to carry openly at all times. Eric Ruben and Saul A. Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, in Yale Law Journal Forum 121–135 (Summer 2015). For more on the distinction between open and concealed carry, *see id.* at 21–24.

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112                                      25                  ATTORNEY GENERAL OF WASHINGTON
                                                                          Complex Litigation Division
                                                                          800 Fifth Avenue, Suite 2000
                                                                          Seattle, WA 98104-3188
                                                                          (206) 464-7744

not actually address the constitutionality of the sales restriction.[41] The *Nunn* decision, far from a full-throated defense of limitless gun rights, in fact reiterated states' authority to prohibit the concealed carrying of deadly weapons in the name of public safety and set no precedent regarding weapon-specific sales bans.

29.    Sales restrictions continued to be placed upon certain deadly weapons even in the post-Civil War period. By the 1870s, Tennessee had long prohibited the sale of bowie knives and Arkansas toothpicks,[42] but in 1879 lawmakers strengthened their sales restriction by placing pistols within its purview.[43] The statute in question criminalized the sale of "belt or pocket pistols,

---

[41] *Nunn v. State*, 1 Ga. 243 (1846).

[42] An Act to suppress the sale and use of Bowie Knives and Arkansas Toothpicks in this State, 1838 Tenn. Laws, ch. 137, 200–201. There was a brief period in which the law was not enforced during the Civil War. Tennessee was the first Confederate state to be reconquered and begin the process of political reconstruction (in 1863), so it is likely that this wartime hiatus of enforcement lasted less than two years. 1862 Tenn. Laws, ch. 23.

[43] Between 1871 and 1879, Tennessee lawmakers made substantial changes to their state weapons policy, of which the 1879 sales restriction forms

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

or revolvers, or any other kind of pistols, except army or navy pistol."[44] When a

Tennessee merchant named Burgoyne challenged the law, the state supreme court

_____

only a part. An 1870 statute prohibited "publicly or privately" carrying "a dirk,

sword cane, Spanish stiletto, belt or pocket pistol or revolver." When the state

supreme court struck the measure down as unconstitutional for prohibiting the

open carrying of militia arms known as "repeaters" (referring to army-sized

revolvers), lawmakers quickly added an exception for army/navy pistols carried

"openly in his hands." In 1879, lawmakers prohibited the sale of "belt or pocket

pistols, or revolvers, or any other kind f pistols, except army or navy pistols." *See*

1870 Tenn. Laws ch. 13, 28–29; 1871 Tenn. Laws ch. 90, 81–82; *Andrews v.*

*State*, 50 Tenn. 165 (1871); 1879 Tenn. Laws, ch. 96, 135–36.

[44] 1879 Tenn. Laws, ch. 96 § 1 ("That it shall be a misdemeanor for any

person to sell, or offer to sell, or to bring into the State for the purpose of selling,

giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any

other kind of pistols, except army or navy pistol; *Provided*, that this Act shall not

be enforced against any person now having license to sell such articles until the

expiration of such present license,"). The associated fine was $25 to $100 and

imprisonment at the court's discretion.

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    decided that it was well within the police powers of the legislature to "put down

2    the pernicious habit of going armed"[45] by declining to issue licenses to firearm

3    dealers. When the justices considered whether the law deprived Burgoyne of his

4    property rights, they determined that the state's allowance for licensed dealers to

5    dispose of their stock prior to the expiration of their licenses was sufficient

6    protection. In explaining that the harm posed by the traffic in pistols justified the

7    sales restriction, the court quoted Thomas Cooley, one of the more influential

8    legal scholars of the time. Cooley wrote that sometimes a tax "has not for its

9    object the raising of revenue, but looks rather to the regulation of relative rights,

10   privileges and duties, as between individuals, to the conservation of order in the

11   political society, to the encouragement of industry, and the discouragement of

12   pernicious employments."[46] The legislation was "being made in the exercise of

13   that authority which is inherent in every sovereignty, to make all such rules and

14   regulations as are needful to secure and preserve the public order, and to protect

15

16       [45] *State v. Burgoyne*, 75 Tenn. 173 (1881).

17       [46] Thomas M. Cooley, *A Treatise on the Law of Taxation:*

18   *Including the Law of Local Assessments* 396 (1876). *See*

19   https://archive.org/details/atreatiseonlawt01coolgoog/page/896/mode/1up.

1   each individual in the enjoyment of his own rights and privileges by requiring the

2   observance of rules of order, fairness and good neighborhood, by all around

3   him."[47] The Tennessee justices summed up the concept by saying that "the private

4   interests of the few must yield to the welfare of the many and good order in

5   society."[48]

6       30.    Arkansas lawmakers followed the pattern set by their peers in

7   Tennessee by enacting a statute in 1881 that combined an updated public carry

8   law with a similar sales restriction.[49] Not only did it prohibit carrying pistols,

9   knives, swords, spears, metal knuckles, and razors, but also provided that anyone

10  "who shall sell, barter or exchange, or otherwise dispose of, or in any manner

11  furnish to any person" said weapons also faced prosecution.[50] When the Arkansas

12

13      [47] *Id.*

14      [48] *Burgoyne*, 75 Tenn. 173.

15      [49] 1881 Ark. Acts. ch. 96.

16      [50] *Id.* §§ 2–3. It is worth noting that the Arkansas policy was almost

17  identical to that of Tennessee in that the public carrying of deadly weapons was

18  strictly illegal with the exception of army/navy pistols carried "uncovered" and

19  in the hand.

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    law faced a constitutional challenge, it was also upheld by an appellate court.[51]31.

2        Vermont had prohibited the sale of slung shots in 1849, and continued to

3    do so throughout the rest of the century.[52] Several other states followed suit, and

4    some also banned the sale of metal knuckles, which were similarly associated

5    with gang activity. By 1868, the sale and manufacture of them was punishable by

6    fine or jail time in Florida.[53] Illinois did the same in 1881,[54] and so did

7

8

9

10

---

11        [51] *Dabbs v. State*, 39 Ark. 353 (1882).

12        [52] *Offenses against the person*, in *Vermont Statutes, 1894: Including the*

13    *Public Acts of 1894* at 879, ch. 212, § 4920 (1894)..

14        [53] Of Offenses against the Public Peace, 1868 Fla. Sess. Laws, ch. 7, § 11,

15    95. The law was reiterated in the subsequent penal code revision. *See* Allen H.

16    Bush, *Digest of the Statute Law of Florida of General and Public Character, in*

17    *Force up to the First Day of January, 1872* at 253, ch. 49, § 12 (1872).

18        [54] Criminal Code – Deadly Weapons: Regulates Traffic and Prevents Sale

19    to Minors, 1881 Ill. Laws, 73, § 1.

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Massachusetts in 1882,[55] Oklahoma Territory in 1890,[56] and Florida in 1893.[57]

2    Manufacturing and selling a slung shot was a misdemeanor in the Dakota

3    Territory, and using or attempting to use one was a felony.[58] That particular law

4    remained in force in the state of North Dakota.[59]

5    32.    These regulations did not prohibit the sale of all firearms, or even

6    all revolvers. They targeted weapons which people at the time overwhelmingly

7

8    [55] *Offenses against the Public Peace*, in *Public Statutes of the*

9    *Commonwealth of Massachusetts, Enacted November 19, 1881, to Take Effect*

10    *February 1, 1882* at 1164, § 11 (1886). (This appears to be a reiteration of a

11    previously existing law in Massachusetts; citation is G. S. 164, § 11).

12    [56] Of Crimes against the Public Health and Safety, 1890 Okla. Sess. Laws,

13    ch. 25, art. 38, § 18 at 475–476 (1890).

14    [57]1893 Fla. Sess. Laws, § 1 at 4124.

15    [58] *Of Crimes against the Public Health and Safety*, in *Revised Codes of the*

16    *Territory of Dakota, Comprising the Codes and General Statutes Passed at the*

17    *Twelfth Session of the Legislative Assembly* 684, §§ 455–56 (1883).

18    [59] *Crimes against the Public Health and Safety*, in *Revised Codes of the*

19    *State of North Dakota* 1461, § 7311 (Bismarck: Tribune Co., 1899).

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

associated with reckless and criminal behavior. Persons wishing to defend themselves, their property, and their homes still had access to rifles, shotguns, and army pistols in order to do so. Reserving access to these weapons, which were also associated with communal policing and militia service, meant that Second Amendment and state analogue rights were not implicated by prohibitions or restrictions placed upon the sale of certain deadly weapons. In upholding a prohibitive sales tax placed upon pistols in Texas, an appellate court asserted that the business of selling pistols was one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society." As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein."[60] This history of prohibiting the sale of especially dangerous weapons paved the way for state-level bans on automatic firearms and the adoption of the National Firearms Act of 1934.

## VIII. CONCLUSION

33.    During the nineteenth century, Americans confronted rising levels

---

[60] *Caswell & Smith v. State*, 148 S.W. 1159 (Tex. Civ. App. 1912).

DECLARATION OF BRENNAN RIVAS
NO. 2:23-CV-00112

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  of violence and homicide that resulted from socio-economic conflict occurring in

2  conjunction with rapid developments in weapon technology. Report after report

3  of needless death as a result of a culture armed to the teeth prompted Americans

4  and their leaders to embrace gun regulation as a life saving policy. These

5  regulations took many forms, such as public carry and taxation laws, and also

6  embraced sales prohibitions against certain weapons deemed especially

7  dangerous. Americans of the time did not see these regulations as violations of

8  the Second Amendment or state analogues. It is my opinion that the State of

9  Washington's restrictions against the sale of firearms classified as "assault

10  weapons" aligns with this historical tradition.

11      I declare under penalty of perjury under the laws of the State of

12  Washington that the foregoing is true and correct.

13      DATED this _18_ day of May, 2023, at _Ft Worth_ , _TX_ .

14

15  _____

16  BRENNAN RIVAS
    Historian and Independent Scholar

17

18

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

## DECLARATION OF SERVICE

2        I hereby declare that on this day I caused the foregoing document to be

3   electronically filed with the Clerk of the Court using the Court's CM/ECF System

4   which will serve a copy of this document upon all counsel of record.

5        DATED this 1st day of June, 2023, at Seattle, Washington.

6

7
                        _/s/ Andrew R.W. Hughes_
8                       ANDREW R.W. HUGHES, WSBA #49515
                        Assistant Attorney General

9

10

11

12

13

14

15

16

17

18

19