Andrew R.W. Hughes, WSBA #49515
R. July Simpson, WSBA #45869
William McGinty, WSBA #41868
*Assistant Attorneys General*
Kristin Beneski, WSBA # 45478
*First Assistant Attorney General*
Washington Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
### AT SPOKANE

| | |
|---|---|
| AMANDA BANTA, et al.,<br><br>    Plaintiffs,<br><br> v.<br><br>ROBERT W. FERGUSON, Attorney General of the State of Washington, et al.,<br><br>    Defendants. | NO. 2:23-cv-00112<br><br>DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION |

I, Robert J. Spitzer, Ph.D., declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

## I. INTRODUCTION

2. I have been asked by the Washington State Attorney General's Office to render an opinion on the history of firearms restrictions, including those

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

1

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    pertaining to fully automatic and semiautomatic firearms, ammunition feeding

2    devices, the origins of multi-shot firearms, and the historical regulation of other

3    dangerous weapons.

4    **II.    BACKGROUND AND QUALIFICATIONS**

5    3.    I am a Distinguished Service Professor of Political Science Emeritus at the

6    State University of New York at Cortland. I am currently an adjunct professor at

7    the College of William and Mary School of Law. I was also a visiting professor

8    at Cornell University for thirty years. I earned my Ph.D. in Government from

9    Cornell University. I have been studying, teaching, and writing about gun policy

10    for over thirty years. My first publication on the subject appeared in 1985.[1] Since

11    then, I have published six books and over one hundred articles, papers, and essays

12    on gun policy. My expertise includes the history of gun laws, gun policy in

13    American politics, and related historical, legal, political, and criminological

14    issues. My book, *The Politics of Gun Control,* has been in print since its initial

15    publication in 1995. It examines firearms policy in the United States through the

16    lenses of history, law, politics, and criminology. The eighth edition of the book

17    was published in 2021 by Routledge Publishers. My two most recent books on

18

19    ───────────

    [1] Robert J. Spitzer, *Shooting Down Gun Myths*, *America* 468–69 (June 8, 1985). *reprinted in* Gun Control (Robert E. Long ed., H.W. Wilson 1989).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

2

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    gun policy, *Guns across America* (Oxford University Press, 2015) and *The Gun*

2    *Dilemma* (Oxford University Press, 2023), both deal extensively with the study

3    of historical gun laws. I am frequently interviewed and quoted in the national and

4    international media on gun-related matters. For over twenty years, I have been a

5    member of both the National Rifle Association and of Brady (formerly, the Brady

6    Campaign to Prevent Gun Violence). I am being compensated at a rate of

7    $500/hour for my work on any written materials, and $750/hour for any

8    testimony in connection with this matter. A copy of my curriculum vitae is

9    attached as Exhibit A.

10                          **III.    SUMMARY OF OPINIONS**

11           Gun ownership is as old as America, but so are gun laws. From the 1600s

12    through the early twentieth century, the colonies, states, and localities enacted

13    literally thousands of gun laws of every imaginable variety. In this document, I

14    demonstrate that a specific relationship existed between the development of new

15    weapons technologies, their spread into society, and subsequent regulation by the

16    government as part of a centuries-long effort to protect the public from harm and

17    to dampen weapons-related criminality and violence. This pattern, including as

18    seen in contemporary restrictions on assault weapons and large capacity

19

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

3

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   magazines, is not new; in fact, it is a tradition that can be traced back throughout

2   the Nation's history.

3       I examine a number of specific examples of weapons that illustrate a

4   pattern seen repeatedly throughout United States history. First, a new weapon or

5   weapon technology is invented. Second, it may then be patented, though the

6   patenting of a design or idea by no means assures that it will proceed beyond this

7   point. Third, it is often developed with a focus on military applications and

8   supplying military needs, not directly for civilian acquisition or use. Fourth, some

9   military-designed weapons may then spread to, or be adapted to, civilian markets

10  and use. Finally, if such weapons then circulate sufficiently in society to pose a

11  safety, violence, or criminological problem or threat, calls for government

12  regulation or restriction then may lead to weapon policy/law changes. New

13  weapon laws are not enacted when technologies are invented or conceived. They

14  are enacted when those technologies circulate sufficiently in society to spill over

15  into criminal or other harmful use, presenting public safety concerns that

16  governments attempt to address through their police and policy-making powers.

17      These examples include: (1) weapons that were subject to government

18  restrictions in the eighteenth and nineteenth centuries, such as Bowie and similar

19  long-bladed fighting knives, clubs and other blunt weapons, and "trap guns";

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

4

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1  (2) multi-shot firearms in the nineteenth century, including Colt revolvers and

2  Winchester rifles, that proved more successful than the experimental multi-shot

3  firearms that preceded them; and (3) restrictions on fully automatic (most

4  famously the Tommy gun) and semi-automatic firearms, and detachable

5  ammunition feeding devices, both from the early twentieth century.

6      Firearms and other dangerous weapons were subject to remarkably strict,

7  consistent, and wide-ranging regulation throughout our history when they entered

8  society, proliferated, and resulted in violence, harm, or contributed to criminality.

9  This historical record is even more remarkable given that the United States was

10  an evolving and developing nation-state that could not claim to have reached

11  maturity until the twentieth century. The historical record summarized here

12  makes clear that contemporary restrictions among the states pertaining to large

13  capacity ammunition magazines are merely the latest iteration of a centuries-long

14  tradition of weapons regulations and restrictions.

15      **IV.   CONTEXT**

16      The current controversy surrounding legislative efforts to restrict large

17  capacity magazines would seem to be a purely contemporary matter, responding

18  to the modern phenomenon of mass shootings. The effort to restrict these

19  accessories was sparked in part by a shooting at an elementary school in Stockton,

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

5

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    California, in 1989, when a man armed with an AK-47 and a handgun killed five

2    children and wounded thirty-three others. The assailant fired a total of 105 rounds

3    in about three minutes from a 75-round magazine and then a 30-round magazine,

4    both of which he emptied before killing himself.[2] California's 1989 law, amended

5    in 1999, restricted assault weapons in part by whether they could accept a

6    detachable ammunition magazine, or if the weapon had a fixed magazine that

7    could hold more than ten rounds.[3] In 1994, Congress enacted a limited ten year

8    ban on assault weapons and large capacity magazines (those holding more than

9    ten rounds).[4] As of this writing, ten states plus the District of Columbia have

10   enacted similar bans, as have various localities around the country.[5] These

11

12        [2] Nelson Kempsky, *A Report to Attorney General John K. Van de Kamp*

13   *on Patrick Edward Purdy and the Cleveland School Killings* 7–8 (1989),

14   https://schoolshooters.info/sites/default/files/Purdy&-&official&report.pdf

15        [3] https://giffords.org/lawcenter/state-laws/assault-weapons-in-california/

16        [4] Robert J. Spitzer, *The Politics of Gun Control* 25–26, 205–11(8th ed. NY:

17   Routledge 2020) (1995)

18        [5]    *Assault    Weapons*,    Giffords    Law    Center,

19   https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

6

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    jurisdictions represent approximately 109 million people, or approximately

2    32.7% of the U.S. population.[6] Fourteen states plus the District of Columbia

3

_____

4    ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* 14–15

5    (2023). The ten American states or entities with assault weapons bans are:

6    California, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois,

7    Maryland, Massachusetts, New Jersey, and New York. Illinois enacted its law,

8    including an LCM limit, in early 2023. C. Mandler, *Illinois governor signs ban*

9    *on assault weapons and high-capacity magazines*, CBS News*,*

10   Jan. 10, 2023, https://www.cbsnews.com/news/illinois-governor-signs-ban-on-

11   assault-weapons-and-high-capacity-magazines/.       The    U.S.    House    of

12   Representatives passed a renewed federal assault weapons ban with magazine

13   limitations in 2022 (H.R. 1808, 117th Cong. (2022)). Delaware enacted its assault

14   weapons and large-capacity magazine restrictions in June 2022. *See* Press

15   Release, DE Office of the Governor, *Governor Carney Signs Package of Gun*

16   *Safety        Legislation        (June        30,        2022),*

17   https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-

18   safety-legislation/.

19        [6] *See* U.S. Census, *National Population Totals and Components of*

1    restrict large capacity magazines (LCMs).[7] These jurisdictions represent more

2

3

_____

4    *Change:        2020–2022,*        https://www.census.gov/data/tables/time-

5    series/demo/popest/2020s-national-total.html#par_textimage_2011805803

6    (2022 state population estimates). The total population in these jurisdictions is

7    estimated to be 101,000,000 out of a U.S. total of about 333,000,000.

8          [7]    *Large    Capacity    Magazines,*    Giffords    Law    Center,

9    https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-

10    ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma, supra* note

11    5, at 30. The fifteen jurisdictions are California, Colorado, Connecticut,

12    Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts,

13    New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington. With

14    four exceptions (Colorado, Delaware, Illinois, and Vermont), all of these

15    restrictions impose a ten-round limit on magazines, as did the 1994 federal law.

16    The Illinois and Vermont laws limit magazines for long guns to ten rounds, and

17    handguns to fifteen. Colorado law limits all magazines to fifteen rounds.

18    Delaware law limits all magazines to seventeen rounds. Litigation challenging

19    most of these assault weapon and LCM restrictions is currently pending.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

8

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    than 115 million individuals, or approximately 34.5% of the U.S. population.[8]

2        As of this writing, fourteen states plus the District of Columbia have

3    enacted laws to restrict LCMs.[9] These jurisdictions represent more than 115

4

5        [8] U.S. Census, *supra* note 6. The total population in these jurisdictions is

6    estimated to be over 115,000,000 out of a U.S. total of about 333,000,000. In

7    2022, the U.S. House of Representatives passed a renewed nationwide assault

8    weapons ban with LCM restrictions. H.R. 1808, 117th Cong. (2022).

9        [9] Giffords Law Center, *supra* note 7; Spitzer, *The Gun Dilemma*, *supra*

10   note 5 at 30. The fifteen states are California, Colorado, Connecticut, Delaware,

11   the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey,

12   New York, Oregon, Rhode Island, Vermont, and Washington. With three

13   exceptions (Colorado, Delaware, and Vermont), all of these restrictions impose

14   a ten-round limit on magazines, as did the 1994 federal law. Hawaii's restrictions

15   apply to only handguns. The Illinois law limits magazines for long guns to ten

16   rounds, and handguns to fifteen. Oregon voters approved by referendum a ten-

17   round LCM limit in November 2022, but that law is under court challenge:

18   Jonathan Levinson, *Oregon's new gun laws remain blocked, won't go into effect*

19   *early Thursday*, Oregon Public Broadcasting, December 7, 2022,

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

9

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1  million individuals, or approximately 34.5% of the U.S. population.[10]

2  The pattern of criminal violence and concerns for public safety leading to

3  weapons restrictions is not new; in fact, it can be traced back to the Nation's

4  beginnings. While the particular weapons technologies and public safety threats

5  have changed over time, governmental responses to the dangers posed by certain

6  weapons have remained constant. Current restrictions on detachable ammunition

7  magazines are historically grounded. They are part of a pattern in America's

8  history of legislative restrictions on particular weapons stretching back centuries.

9

10

11

12

13

14  https://www.opb.org/article/2022/12/07/oregon-measure-114-new-gun-laws-

15  remain-blocked-court-challenges/.

16  [10] U.S. Census, *supra* note 6. The total population in these jurisdictions is

17  estimated to be over 115,000,000 out of a U.S. total of about 333,000,000. In

18  2022, the U.S. House of Representatives passed a renewed nationwide assault

19  weapons ban with LCM restrictions. H.R. 1808, 117th Cong. (2022).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

10

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1

## V.    HISTORICAL RESTRICTIONS ON KNIVES, BLUNT WEAPONS, PISTOLS, AND TRAP GUNS

2

The pattern in America's history of legislative restrictions related to

3

dangerous weapons dates to the country's earliest history.[11] More focused

4

restrictions pertaining to particular weapons began to appear in the late 1700s and

5

early 1800s. These enactments appeared as violent crimes involving dangerous

6

weapons became more widespread in the early 1800s. For example, from 1780-

7

1809, at least four states (Connecticut, Ohio, New Jersey, Maryland) enacted

8

measures that increased the penalties for burglaries or other crimes if the

9

perpetrators were armed.[12] At least three states (New York, Ohio, Maryland)

10

11

[11] Robert J. Spitzer, *Gun Law History in the United States and Second*

12

*Amendment Rights*, 80 *Law and Contemporary Problems* 57–62 (2017).

13

[12] An Act For The Punishment of Burglary And Robbery, 1783 Conn. Acts

14

633; An Act for Suppressing and Prohibiting Every Species of Gaming for

15

Money or Other Property, and for Making Void All Contracts and Payments

16

Made in Furtherance Thereof, 1788-1801 Ohio Laws 42, ch. 13, § 4; Charles

17

Nettleton, *Laws of the State of New-Jersey* 474, Image 501 (1821), *available at*

18

The Making of Modern Law: Primary Sources, Part II, 1763–1970; 1799 [*An Act*

19

*to Describe, Apprehend and Punish Disorderly Persons (1799)*], The Laws Of

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

11

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    enacted laws to punish the discharge of firearms near populated areas.[13] At least

2    four states (Virginia, Massachusetts, North Carolina, Tennessee) criminalized

3

4

5

6

_____

7    Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State,

8    And Its Alterations, The Declaration Of Independence, And The Constitution Of

9    The United States, And Its Amendments at § 2, 465, Image 466 (1811), *available*

10    *at* The Making of Modern Law: Primary Sources, Part II, 1763–1970, 1809.

11        [13]James Kent, 1 *Laws of the State of New-York 1802–1812* at 41-42, Image

12    44-45, *available at* The Making of Modern Law: Primary Sources, 1785; An Act

13    to Prevent the Firing of Guns and Other Fire-Arms within this State, on certain

14    days therein mentioned, 1785 N.Y. Laws, ch. 81; An Act for Suppressing and

15    Prohibiting Every Species of Gaming for Money or Other Property, and for

16    Making Void All Contracts and Payments Made in Furtherance Thereof, 1788

17    Ohio Laws, ch. 13, § 4, 42; A Supplement To An Act Entitled, An Act to Improve

18    and Repair the Streets in Elizabethtown, in Washington County, and For Other

19    Purposes Therein Mentioned, 1792 Md. Laws, chap. 52, § 4, 22.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

12

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   public arms carrying.[14] In addition, specific weapons that were restricted,

2   following the pattern I outlined above, are discussed in subsequent sections.

3   **A.      Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives**

4         The Bowie knife is generally credited with having been invented by the

5   brother of adventurer Jim Bowie, Rezin Bowie. The knife was named after Jim

6   Bowie, who reputedly killed one man and wounded another using a "big knife"

7

8

9

10

―――――――――――

11         [14] An Act forbidding and punishing Affrays, 1786 Va. Laws 33, ch. 21; An

12   Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil

13   Consequences Thereof, 1786 Mass. Sess. Laws, ch. 38; Francois Xavier Martin,

14   *A Collection of Statutes of the Parliament of England in Force in the State of*

15   *North Carolina* 60–61 (1792); Judge Edward Scott, 1 *Laws of the State of*

16   *Tennessee: Including Those of North Carolina Now in Force in this State: From*

17   *the Year 1715 to the Year 1820*, at 710, Image 714 (1821) The Making of Modern

18   Law: Primary Sources. 1801, An Act for the Restraint of Idle and Disorderly

19   Persons § 6.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

13

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    given to him by his brother in the alternately notorious or celebrated "Sandbar

2    Duel" in 1827.[15]

3            The "Bowie knife" rapidly became known beginning in the 1830s for the

4    distinctive type of long-bladed and usually single-edged knife with a hand guard

5    identified with Bowie, the man after whom the knife was named. While Bowie

6    knives initially "came in a variety of forms—with or without guards, with

7    differently shaped blades," they eventually became more standardized as "a large

8

9    _____

10            [15]    Bowie    Knife,    *Encyclopedia    of    Arkansas*,    n.d.,

11    https://encyclopediaofarkansas.net/entries/bowie-knife-2738/; William C. Davis,

12    *Three Roads to the Alamo* 207–8 (1998). Davis persuasively dismisses the claim

13    of a blacksmith, James Black, that he invented or styled the distinctive knife for

14    Rezin Bowie (*id.* at 676–77). David Kopel says, erroneously, that "Jim Bowie

15    used a traditional knife at a famous 'sandbar fight' on the lower Mississippi River

16    in 1827." Rezin Bowie had just developed the distinctive knife his brother used

17    in the fight, so it could not have been "traditional." David Kopel, *Bowie knife*

18    *statutes    1837-1899*,    The    Volokh    Conspiracy,    Nov.    20,    2022,

19    https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

14

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    knife with a cross guard and a blade with a clipped point."[16] The distinctive traits

2    of the Bowie knife are revealed in Robert Abels' book, *Bowie Knives*, which

3    includes pictures of nearly one hundred Bowie knives made between 1835 and

4    1890.[17] The Bowie legend, the explosive growth and spread of Bowie-related

5    mythology (only magnified by his death at the Alamo in 1836), and the knife's

6    distinctive features encouraged its proliferation,[18] referred to by one historian as

7    "the craze for the knives."[19] As was true of other knives with long, thin blades,[20]

8    they were widely used in fights and duels, especially at a time when single-shot

9

10

11

12    [16]    Bowie    Knife,    *Encyclopedia    of    Arkansas*,    n.d.,

13    https://encyclopediaofarkansas.net/entries/bowie-knife-2738/.

14    [17] Robert Abels, *Bowie Knives* (1979).

15    [18] Virgil E. Baugh, *Rendezvous at the Alamo* 39–63 (1985).

16    [19] Davis, *supra* note 15, at 583.

17    [20] Other such long-bladed, thin knives of varying configurations typically

18    named in laws barring their carrying included the Arkansas toothpick, the

19    Spanish stiletto, dirks, daggers, and the like.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

15

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    pistols were often unreliable and inaccurate.[21] Indeed, such knives were known

2    as "fighting knives"[22] that were "intended for combat."[23] In the early nineteenth

3    century, "guns and knives accounted for a growing share of the known weapons

4    that whites used to kill whites."[24] In 1834, for example, a grand jury in Jasper

5    County, Georgia deplored

6        the practice which is common amongst us with the young the middle
         aged and the aged to arm themselves with Pistols, dirks knives sticks
7        & spears under the specious pretence of protecting themselves
         against insult, when in fact being so armed they frequently insult
8        others with impunity, or if resistance is made the pistol dirk or club

9

10

_____

11    [21] Davis, *supra* note 15, at 164, 208; Baugh, *supra* note 19, at 42; Karen

12    Harris, *Bowie Knives: The Old West's Most Famous Blade*, Oldwest, n.d.,

13    https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie*

14    *Knife* 485 (2004).

15    [22] Randolph Roth, *American Homicide* 218 (2012).

16    [23] Flayderman, *The Bowie Knife, supra* note 21, at 59.

17    [24] Roth, *supra* note 22, at 218. White on white violence is more relevant

18    from a social science perspective in order to better understand the dynamics of

19    homicide, which is typically intra-racial.

DECLARATION OF ROBERT J.                    16            ATTORNEY GENERAL OF WASHINGTON
SPITZER IN SUPPORT OF OPPOSITION                              1125 Washington Street SE
TO MOTION FOR PRELIMINARY                                          PO Box 40100
INJUNCTION                                                    Olympia, WA 98504-0100
NO. 2:23-CV-00112                                                 (360) 753-6200

is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[25]

As early as 1836, "most of the American public was well aware of the Bowie knife."[26] (Very much like the allure of contemporary assault weapons to some,[27] the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[28])

As homicide rates increased in the South in the early nineteenth century, so did laws restricting the use and carrying of weapons. Some of the earliest such laws focused specifically on dueling. Dueling persisted during this time, even as the practice was widely deplored by religious and other groups, in newspapers,

---

[25] *Quoted in* Roth, *supra* note 22, at 218–19.

[26] Flayderman, *The Bowie Knife, supra* note 21, at 43.

[27] Ryan Busse, *Gunfight* 12–15, 65 (2021); David Altheide, *The cycle of fear that drives assault weapon sales*, The Guardian, March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, *Guns, Lies, and Fear*, American Progress, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.

[28] Flayderman, *The Bowie Knife, supra* note 21, at 46.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

17

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

by anti-dueling societies and political leaders.[29] Arms expert Norm Flayderman provides abundant and prolific evidence of the early criminal use of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper and other accounts, and providing references to literally hundreds of additional articles and accounts attesting to the widespread use of Bowie knives in duels, as well as fights, robberies, and other criminal activities.[30] Pistols were likewise prominently used in such affairs.[31] All this contributed to widespread enactment of laws prohibiting dueling in the states.[32] In 1839, Congress passed a measure barring dueling in the District of Columbia.[33]

---

[29] Baugh, *supra* note 18, at 51.

[30] Flayderman, *The Bowie Knife, supra* note 21, at 25–64; 495–502.

[31] Roth, *supra* note 22, at 180–83, 210–17.

[32] A search under the term "dueling" in the Duke Center for Firearms Law database of old gun laws yields 38 results. *See* https://firearmslaw.duke.edu/repository/search-the-repository/.

[33] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.

DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 2:23-CV-00112

18

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    The ubiquity of the concern about the criminal and violent consequences

2   of carrying Bowie knives and other, similar long-bladed knives also gave rise to

3   the widespread adoption of laws barring or restricting these weapons.[34] In the

4   1830s, at least six states enacted laws barring the carrying of Bowie knives by

5   name.[35] From then to the start of the twentieth century, every state[36] plus the

6   District of Columbia (with the sole exception of New Hampshire) restricted

7   Bowie knives: a total of at least 42 states (including the District of Columbia)

8   restricted Bowie knives by name; and another 8 states enacted laws restricting

9

10   [34] The near-immediate effort in the states to restrict Bowie knives was

11   noted. *See*, for example, in Davis, *supra* note 15, at 582, and in Flayderman, *The*

12   *Bowie Knife, supra* note 21, at 53–54.

13   [35] A seventh state, Massachusetts, criminalized the carrying of fighting

14   knives using labels that would have included the Bowie knife in an 1836 law. *See*

15   Exhibit E.

16   [36] For these purposes, the word "state" includes territories which

17   eventually became states, such as the Washington Territory, which became a state

18   in 1889, and which first enacted a law restricting Bowie knives in 1854 during

19   its territorial period. *See* Exhibits C and E.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

19

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    the category or type of knife embodied by the Bowie knife but without

2    mentioning them by name (*see* Exhibits C and E) totaling 49 states plus the

3    District of Columbia.[37] For example, 15 states all but banned the possession of

4    Bowie knives outright (by banning both concealed carry and open carry), while

5    others imposed taxes on the ability for individuals to acquire or possess them (*see*

6    Exhibit H). The desirability and utility of such restrictions were precisely that

7    they pushed dangerous weapons out of public spaces and places, improving

8    public safety through the deterrent and punishment effects of such laws, and also

9    discouraging the settlement of private grievances and disputes in public through

10   weapons-fueled violence.

11       States relied on a variety of regulatory techniques to suppress Bowie knife

12   carrying: 29 states enacted laws to bar their concealed carry; 15 states barred their

13   carry whether concealed or openly; 7 states enacted enhanced criminal penalties

14   for those who used the knives to commit a crime; 4 states enacted regulatory taxes

15   attached to their commercial sale; 3 states imposed a tax for those who owned the

16

17       [37] Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s:

18   11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states;

19   1900s: 13 states. *See* Exhibits C and E.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

20

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    knives; 10 states barred their sale to specified groups of people; and 4 states

2    enacted penalties for brandishing the knives (*see* Exhibit H).

3        The extensive and ubiquitous nature of these Bowie knife prohibitions

4    raises a further question: given the universal agreement that these knives were

5    dangerous, why didn't more states ban their possession outright? The answer is

6    two-fold. First, America was a developing nation-state in the nineteenth century.

7    The federal and state governments did not yet possess the maturity, powers, tools,

8    or resources to implement and effectively enforce any measure as sweeping as a

9    knife ban, especially since knives are technologically very simple to produce.

10    After all, the front-line administrative entity on which we today rely for law

11    enforcement, the police, barely existed (in the way we think of policing today) in

12    the early nineteenth century (up to this time policing fell to a haphazard mix of

13    the watch system, constables, militias, and vigilantes). Modern police forces only

14    came into being in a handful of large cities before the Civil War.[38] Second, the

15

16        [38] Chris McNab, *Deadly Force: Firearms and American Law Enforcement*

17    13–24 (2009). Boston created a police force in 1838, New York City created a

18    standing police force in 1845, followed by Chicago in 1851, Philadelphia in 1854,

19    and Baltimore in 1857 (23). Jill Lepore, *The Invention of the Police*, The New

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112                           21                    ATTORNEY GENERAL OF WASHINGTON
                                                                  1125 Washington Street SE
                                                                  PO Box 40100
                                                                  Olympia, WA 98504-0100
                                                                  (360) 753-6200

1    chief remedy enacted by the states to address the problem of knife fighting was

2    far more focused and feasible: to bar the carrying of knives, along with the other

3    two categories of weapons that also threatened public safety, clubs and pistols.

4    The fact that all three types of weapons were consistently treated together shows

5    that all were considered so dangerous and inimical to public safety that they were

6    subjected to anti-carry laws and bundled together in legislative enactments.

7        At least four state court cases dealt in some manner with fighting knives

8    like the Bowie knife. In the 1840 case of *Aymette v. State*,[39] the Supreme Court

9    of Tennessee upheld the conviction of William Aymette for wearing a Bowie

10   knife concealed under his clothes under a state law of 1837–1838, ch. 137, sec.

11   2, providing "that, if any person shall wear any bowie-knife, or Arkansas

12   toothpick, or other knife or weapon that shall in form, shape, or size resemble a

13   bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed

14   _____

15   *Yorker*, July 13, 2020, https://www.newyorker.com/magazine/2020/07/20/the-

16   invention-of-the-police. Both McNab and Lepore emphasize the role of slavery

17   and slave suppression as key to the development of policing.

18       [39] *Aymette v. State*, 21 Tenn. 152 (1840). This decision was cited in *District

19   of Columbia v. Heller*, 554 U.S. 570 (2008).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

22

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1  about his person such person shall be guilty of a misdemeanor, and, upon

2  conviction thereof, shall be fined in a sum not less than two hundred dollars, and

3  shall be imprisoned in the county jail not less than three months and not more

4  than six months."[40] In its decision, the court concluded that the prohibition

5  against wearing the named weapons was well justified in that they "are usually

6  employed in private broils, and which are efficient only in the hands of the robber

7  and the assassin."[41] The court continued, "The Legislature, therefore, have a right

8  to prohibit the wearing or keeping weapons dangerous to the peace and safety of

9  the citizens. . . ."[42] Further, the court added that the state law existed "to preserve

10  the public peace, and protect our citizens from the terror which a wanton and

11  unusual exhibition of arms might produce, or their lives from being endangered

12  by desperadoes with concealed arms. . . ."[43]

13

14

15

---

16  [40] *Aymette*, 21 Tenn. at 153.

17  [41] *Id.* at 156.

18  [42] *Id.* at 157.

19  [43] *Id.*

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

23

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1        Four years later, the Tennessee Supreme Court again dealt with a Bowie

2   knife law violation and challenge. In the case of *Haynes v. Tennessee* (1844),[44]

3   Stephen Haynes was indicted for carrying a concealed Bowie knife. He was

4   convicted of wearing a knife that resembled a Bowie knife but appealed his

5   conviction on the grounds that he was actually carrying a "Mexican pirate knife,"

6   which reputedly had a shorter, narrower blade. (At the trial, witnesses disagreed

7   as to the proper name for the knife in question.) He also argued that the state law,

8   in listing various types of knives including those "similar" to Bowie knives, was

9   "too indefinite" and could therefore lead to "absurd consequences" that "must

10  follow its enforcement. . . ."[45] On appeal, the court upheld his conviction and

11  commended the Tennessee state legislature's enactment: "The design of the

12  statute was to prohibit the wearing of bowie knives and others of a similar

13  description, which the experience of the country had proven to be extremely

14  dangerous and destructive to human life; the carrying of which by truculent and

15  evil disposed persons but too often ended in assassination."[46]  The court

16

17        [44] *Haynes v. State*, 24 Tenn. 120 (1844).

18        [45] *Id.* at 122.

19        [46] *Id.*

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

24

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    continued: "The design, meaning, and intent was to guard against the destruction

2    of human life, by prohibiting the wearing [of] heavy, dangerous, destructive

3    knives, the only use of which is to kill. . . ."[47] The court noted that the state law

4    "wisely provides against bowie knives, Arkansas tooth picks, or any other

5    weapon in form, shape or size, resembling them."[48] Noting the similarity among

6    knives and the possibility of an unjust outcome where, say, a person might be

7    convicted of carrying a mere pocket knife, the court posed this question: "what

8    is to protect against conviction, when the words of the statute cover the charge,

9    and its true spirit and meaning does not?" Their answer: "the judge and jury who

10   try the case."[49] As the author of a book on Bowie knives noted, "the fact that the

11   term 'bowie knife' had never been precisely defined did not help his [Haynes's]

12   case."[50]

13

14

_____

15       [47] *Id.* at 123.

16       [48] *Id.* at 122.

17       [49] *Id.* at 123.

18       [50] Paul Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques*

19   43 (2010).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

25

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1          Two other state court cases are relevant to the legal status of Bowie knives,

2     *Nunn v. State* (1846)[51] and *Cockrum v. State* (1859).[52] *Nunn* involved a man who

3     was prosecuted for carrying a pistol (openly, not concealed), not a knife. A state

4     law criminalized concealed carry of various named weapons, including pistols

5     and Bowie knives, whereas a different provision allowed for open carrying of

6     named weapons, including Bowie knives, but failed to include pistols on that list.

7     Noting the "great vagueness" in the statute's wording, the court reversed the

8     man's conviction and wrote that there was a constitutional right to open carry

9     "for the important end to be attained: the rearing up and qualifying a well-

10    regulated militia, so vitally necessary to the security of a free State." By contrast,

11    the court upheld the constitutionality of the concealed carry restrictions, and

12    noted that those restrictions were enacted "to guard and protect the citizens of the

13    State against the unwarrantable and too prevalent use of *deadly weapons*."[53]

14

15

16

17         [51] *Nunn v. State*, 1 Ga. 243 (1846).

18         [52] *Cockrum v. State,* 24 Tex. 394 (1859).

19         [53] *Nunn*, 1 Ga. at 246.

DECLARATION OF ROBERT J.                              26                ATTORNEY GENERAL OF WASHINGTON
SPITZER IN SUPPORT OF OPPOSITION                                              1125 Washington Street SE
TO MOTION FOR PRELIMINARY                                                            PO Box 40100
INJUNCTION                                                                      Olympia, WA 98504-0100
NO. 2:23-CV-00112                                                                   (360) 753-6200

1          1.    The *Cockrum* case involved John Cockrum, who was charged with

2    the murder of his brother-in-law, William Self, with a Bowie knife.[54] Under

3    Texas law, "a homicide, which would otherwise be a case of manslaughter, if

4    committed with a bowie-knife or dagger, shall be deemed murder and punished

5    as such. . . ."[55] The court upheld the added penalty provision of the law relating

6    to use of a Bowie knife, despite the court's very expansive interpretation of the

7    right to bear arms, (though it reversed and remanded the man's conviction

8    because of an error related to statutory changes and jury instructions). It

9    described Bowie knives as "an exceeding destructive weapon," an "instrument

10    of almost certain death," and "the most deadly of all weapons in common use."[56]

11    Further, the court said: "He who carries such a weapon . . . makes himself more

12

13

14

15

---

16    [54]   https://www.genealogy.com/ftm/p/i/l/Karen-Pilgrim-TX/WEBSITE-

17  0001/UHP-0254.html

18    [55] *Cockrum*, 24 Tex. at 394.

19    [56] *Id.* at 403–04.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

27

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    dangerous to the rights of others, considering the frailties of human nature, than

2    if he carried a less dangerous weapon."[57]

3    All of these cases underscore the courts' recognition of the dangerous

4    nature and nefarious use of Bowie knives not only by their characterizations of

5    them, but by the fact that they are permissibly treated in the same restrictive and

6    prohibitory manner in law as other dangerous, deadly weapons including pistols

7    and various named clubs.[58]

8

_____

9    [57] *Id.* at 403.

10    [58] Among the notorious incidents attached to the Bowie knife was its use

11    by two of the conspirators in the Lincoln assassination in 1865. The plan was to

12    assassinate President Lincoln, Vice President Andrew Johnson, and Secretary of

13    State William Seward. The man assigned to attack Seward, Lewis Powell, entered

14    the Seward home armed with a pistol and a Bowie knife. When one of Seward's

15    sons tried to stop him, Powell tried to shoot him, but his gun misfired, so he used

16    it as a club against the son. When he encountered another son, Powell slashed

17    him with his Bowie knife, the weapon he then used to attack Seward who, thanks

18    to a neck collar, survived. David Morgan, *Lincoln assassination: The other*

19    *murder        attempt*,        CBS        News,        May        10,        2015,

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

28

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    **B.    Historical Restrictions on Clubs and Other Blunt Weapons**

2              Among the most widely and ubiquitously regulated harmful implements in

3    U.S. history were various types of clubs and other blunt weapons. (*See* Exhibits

4    C and E.) As discussed above, these weapons were primarily regulated by anti-

5    carry laws, which lumped them together with pistols and specific types of knives.

6    Although some states extended prohibitions to these weapons' manufacture,

7    possession, sale, or use in crime.[59] These laws follow the same pattern mentioned

8

9

10   https://www.cbsnews.com/news/lincoln-assassination-the-other-murder-

11   attempt/;    https://www.history.com/topics/american-civil-war/william-seward.

12   John Wilkes Booth also carried what was later identified as a Bowie knife which

13   he used to slash the man who accompanied Lincoln to the theater and who tried

14   to stop Booth after he shot the president. Booth slashed the man in the arm with

15   his knife to make his escape. Dave Taylor, *Cloak and Daggers: Cutting Through*

16   *the Confusion of the Assassination Knives, LincolnConspirators.com*, Dec. 31,

17   2018,    https://lincolnconspirators.com/2018/12/31/cloak-and-daggers-cutting-

18   through-the-confusion-of-the-assassination-knives/

19           [59] *See, e.g.* 1917 Cal. Sess. Laws 221–225; 1923 Cal. Stat. 695.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

29

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    above with regulations not coming about until the weapons become associated

2    with interpersonal violence.

3         The table in Exhibit C shows the various types of clubs and blunt objects

4    that were regulated in the United States. Notably, every state in the nation had

5    laws restricting one or more types of clubs. According to a detailed reference

6    book on the subject of these blunt instruments by Robert Escobar, they were

7    considered "objectionable objects, once feared but now forgotten."[60] Escobar

8    provides what he calls "a family history" of these blunt weapons, but adding that

9    "[i]t's a disreputable family to say the least, black sheep even within the study of

10   weaponry."[61] They have been described as "wicked, cowardly, 'Soaked in blood

11   and cured in whiskey.'"[62] Those who carried them (excluding police) "were

12   called vicious, devils and lurking highwaymen."[63] These club-type blunt objects

13

14

15   [60] Robert Escobar, *Saps, Blackjacks and Slungshots: A History of*

16   *Forgotten Weapons* 1 (2018).

17   [61] *Id.* at 2.

18   [62] *Id.*

19   [63] *Id.*

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

30

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    compose a family of objects used for striking others, and while they vary in name

2    and construction, the categories are "somewhat fluid."[64]

3        Among the states with laws regulating these types of clubs, 15 states barred

4    bludgeon carrying. A bludgeon is a short stick with a thickened or weighted end

5    used as a weapon.[65] The earliest state anti-bludgeon law was in 1799; 11 other

6    such state laws were enacted in the 1800s, and 4 in the early 1900s (as with each

7    of these chronological categories, the state law total exceeds the total number of

8    states because some states enacted the same or similar laws in multiple centuries).

9        A billy (sometimes spelled "billie") club is a heavy, hand-held rigid club,[66]

10    usually made of wood, plastic, or metal,[67] that is traditionally carried by police,

11

12        [64] *Id.* at 1.

13        [65] https://www.merriam-webster.com/dictionary/bludgeon.

14        [66] Some versions were made to have some flexibility to increase their

15    striking power. *See* Escobar, *supra* note 60, at 118–19.

16        [67] https://www.merriam-webster.com/dictionary/billy&club.    Escobar

17    discusses a Civil War veteran and later police officer, Edward D. Bean, who

18    experimented with various types of billy clubs to improve their striking power

19    and durability by utilizing leather, often adhered to wood, to reduce the likelihood

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

31

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

often called a nightstick or baton.[68] Escobar cites an early reference to the billy club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police armed with batons,"[69] a synonym for a billy club. As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry. At least 16 states had anti-billy club laws, totaling 46 laws; the earliest law appears to have been enacted in

that the club would break on use. Escobar, *supra* note 60, at 118. One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c." *Local Intelligence*, Delaware Weekly Republican, June 15, 1857, *available at* https://bit.ly/3V9nVO7.

[68] Escobar, *supra* note 60, at 2, 69–70, 105, 113–30.

[69] *Id.* at 105.

DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 2:23-CV-00112

32

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

Kansas in 1862,[70] followed by a New York law in 1866.[71] Fourteen states enacted such laws in the 1800s; 11 states did so in the early 1900s.

At least 14 states barred the carrying of "clubs" more generically, without specifying the type. The oldest known anti-club law was 1664; 6 states enacted these laws between 1750 and 1799, 7 states in the 1800s, and 2 in the early 1900s. (*See* Exhibit C.)

Another weapon long regulated for its use in interpersonal violence is the

---

[70] C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863), *available at* The Making of Modern Law: Primary Sources, 1862.

[71] Montgomery Hunt Throop, *The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index* at 2512, Image 677 (Vol. 3, 1882), *available at* The Making of Modern Law: Primary Sources, 1866.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

33

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    slungshot (or slung shot), also referred to as "a type of blackjack,"[72] is a hand-

2    held weapon for striking that has a piece of metal or stone at one end attached to

3    a flexible strap or handle that was developed roughly in the 1840s (the first

4    "known use" of a slungshot was 1842[73]). These weapons were viewed as

5    especially dangerous or harmful when they emerged in society, given the ubiquity

6    of state laws against carrying them enacted after their invention and their

7    spreading use by criminals and as fighting implements. These devices were

8    invented and appeared in society during an identifiable period of time in the mid-

9    nineteenth century, sparking subsequent wide-ranging prohibitions. The earliest

10   anti-Slungshot law was enacted in 1850; 43 states legislated against them in the

11   1800s (including the District of Columbia), and 11 states in the early 1900s (note

12   this incorporates multiple laws enacted in more than one century by a few states).

13        By one account, "[s]lungshots were widely used by criminals and street

14   gang members in the 19th Century. They had the advantage of being easy to

15   make, silent, and very effective, particularly against an unsuspecting opponent.

16

17        [72] Escobar, *supra* note 60, at 228.

18        [73] *See* https://www.merriam-webster.com/dictionary/slungshot. Escobar

19   agrees with this rough date. *See* Escobar, *supra* note 60, at 67.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

34

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   This gave them a dubious reputation, similar to that carried by switchblade knives

2   in the 1950s, and they were outlawed in many jurisdictions. The use as a criminal

3   weapon continued at least up until the early 1920s."[74] Escobar concurs that

4   slungshots and blackjacks "were a regular part of criminal weaponry . . . and

5   gangsters could be merciless in their use."[75]

6       Sandbags, also known as sand clubs, were also a specific focus in anti-

7   carry laws as well. Consisting of nothing more than sand poured into a bag, sack,

8

9   [74] "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

10  [75] Escobar, *supra* note 60, at 86. In a criminal case considered the most

11  famous of those involving lawyer Abraham Lincoln, the future president

12  defended a man charged with murdering another using a slung shot. In the 1858

13  trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's

14  acquittal. Lincoln was able to discredit the testimony of a witness who claimed

15  to see Armstrong strike the victim with a slung shot at night because of the full

16  moon. Lincoln used as evidence an Almanac to prove that on the night in

17  question, there was no full moon. Judson Hale, *When Lincoln Famously Used the*

18  *Almanac*, Almanac*,* May 4, 2022, https://www.almanac.com/abraham-lincoln-

19  almanac-and-murder-trial.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

35

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    sock, or similar tube-shaped fabric (although the weight could also be something

2    dense and heavy, like a lock in the end of a sock),[76] their particular appeal was

3    that they could be dispensed with by simply pouring the sand out, leaving nothing

4    more than an empty cloth bag. (Alternately, they could be made heavier by

5    adding water to the sand.) The first anti-sandbag law was 1866, with 10 states

6    enacting such laws—seven in the 1800s and seven in the early 1900s.

7    Thus, as shown above, laws regulating these weapons were ubiquitous and

8    only four states did not have any prohibitions in any of these categories. But three

9    of those four (Louisiana, Ohio, and Washington State) had blanket legislative

10    provisions against the carrying of any concealed/dangerous/deadly weapons. (*See*

11    Exhibit C.) The fourth state, New Hampshire, may not have enacted such a law

12    during this time but did at some point.[77]

13

14    [76]    Ferris Law, *Dangerous Weapons in Nevada*,

15    https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-

16    weapons/; Escobar, *supra* note 60, at 20–22 (Escobar dates the earliest reference

17    to sandbags as weapons to the 1600s).

18    [77] Up to 2010, New Hampshire had this law on the books: "159:16

19    Carrying or Selling Weapons. Whoever, except as provided by the laws of this

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

36

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    **C.    Historical Restrictions on Pistols and Gun Carrying**

2          Carry restriction laws were widely enacted from the 1600s through the start

3    of the twentieth century, spanning over three centuries. As early as 1686, New

4    Jersey enacted a law against wearing weapons because they induced "great Fear

5    and Quarrels." Massachusetts followed in 1751. North Carolina and Virginia

6    passed similar laws in the 1790s. (*See* Exhibit C.) In the 1800s, as interpersonal

7    violence and gun carrying spread, forty-three states joined the list; three more did

8    so in the early 1900s. (*See* Exhibit B).[78] The enactment of laws restricting

9    concealed weapons carrying followed the rise of homicides and interpersonal

10   _____

11   state, sells, has in his possession with intent to sell, or carries on his person any

12   stiletto, switch knife, blackjack, dagger, dirk-knife, slung shot, or metallic

13   knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried

14   by him shall be confiscated to the use of the state." In 2010, the law was amended

15   when it enacted HB 1665 to exclude stilettos, switch knives, daggers, and dirk-

16   knives. *Compare* N.H. Rev. Stat. § 159:16 *with* 2010 N.H. Laws, ch. 67 (H.B.

17   1665).

18          [78] Spitzer, *Gun Law History in the United States and Second Amendment*

19   *Rights*, *supra* note 11, at 63–67.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

37

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    violence described by historian Randolph Roth, who noted that restrictions on

2    firearms from the colonial period to the start of the Revolution were few because

3    homicide rates were low. When homicides did occur, guns were seldom used, in

4    large part because of the time involved loading them, their unreliability, and

5    (especially for pistols) their inaccuracy. After the Revolutionary period the

6    spread of violence tied to concealable percussion cap pistols and fighting knives

7    led to the enactment of anti-concealed carry weapons laws.[79] Concealed carry

8    laws normally targeted pistols as well as the types of fighting knives and various

9    types of clubs discussed here (*See* Exhibit E for text of such laws). In addition, at

10    least three-fourths of the states enacted laws that penalized public weapons

11    brandishing or display. At least four states did so in the 1600s, two in the 1700s,

12    twenty-eight states in the 1800s, and two more in the early 1900s.[80] As of 1938,

13

14          [79] Roth, *supra* note 22, at 61–144, 216–21; Randolph Roth, *Why Guns Are*

15    *and Are Not the Problem: The Relationship between Guns and Homicide in*

16    *American History*, in *A Right to Bear Arms?* 116–17 (Jennifer Tucker, Barton C.

17    Hacker, and Margaret Vining, eds, Washington, D.C.: Smithsonian Institution

18    Scholarly Press, 2019); Roger Lane, *Murder in America* 344–45 (1997).

19          [80] Spitzer, *The Gun Dilemma*, *supra* note 5, at 77–80.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

38

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    "the carrying of concealed pistols is either prohibited absolutely or permitted only

2    with a license in every state but two."[81] Thus, the widespread enactment of

3    concealed carry laws was the public policy remedy to the emergent crime

4    problem described here. In addition, and consonant with a maturing society, at

5    least 30 states broadened their laws to restrict open weapons carrying as well.

6    Most of these laws were enacted in the post-Civil War period (*see* Exhibit B).

7         Firearm technologies and the regulations concerning firearms are

8    discussed in greater detail in Sections VI and VII below.

9    **D.    Historical Restrictions on Trap Guns**

10        Not to be confused with firearms used in trapshooting, trap guns were

11   devices or contraptions rigged in such a way as to fire when the owner need not

12   be present. Typically, trap guns could be set to fire remotely (without the user

13   being present to operate the firearm) by rigging the firearm to be fired with a

14

15

16

17

18

19

---

[81] Sam B. Warner, *The Uniform Pistol Act*, 29 *Journal of Criminal Law and Criminology* 530 (Winter 1938).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

39

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

string or wire which then discharged when tripped.[82] This early law from New

Jersey in 1771 both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[83]

Also sometimes referred to as "infernal machines,"[84] the term trap gun came to

encompass other kinds of traps designed to harm or kill those who might

encounter them, including for purposes of defending property from intruders. At

---

[82] *See* Spitzer, *Gun Law History in the United States and Second Amendment Rights*, *supra* note 11, at 67.

[83] An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, 1763–1775 N.J. Laws, ch. 539, § 10, 346.

[84] *See e.g.* An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , 1901 Utah Laws, ch. 96, §§ 1–3, at 97–98.

DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 2:23-CV-00112

40

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

the time, some argued that thieves or criminals hurt or killed by the devices had it coming,[85] though the weight of opinion seemed mostly against such devices because of the likelihood that innocent persons could be injured or killed, and also because such devices represented an improper, arbitrary, and excessive meting out of "justice."[86] Those who set gun traps typically did so to defend their places of business, properties, or possessions. This 1870 newspaper account from an incident in New York City provides an example where a burglar was killed by a gun-trap set by a shopkeeper, who was then prosecuted: "As there is a statute

_____

[85] For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27, 1870: "A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window. A few such 'accidents' are needed to teach the thieves who have lately been operating in this city, a lesson."

[86] This is my observation based on my reading of historic newspaper accounts from the late 1800s, and from the number of anti-trap gun laws enacted. As policing became more consistent, professional, and reliable, support for vigilante-type actions like setting trap guns seems to have declined.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

41

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    against the use of such infernal machines, which might cause loss of life to some

2    innocent person, the jury censured Agostino." After the verdict the man

3    continued to be held under $2,000 bail.[87]

4        Inevitably, however, the traps sometimes wound up hurting or killing

5    innocents, even including the person who set the trap. For example, this 1891

6    newspaper account from Chillicothe, Missouri illustrated the problem: "George

7    Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun.

8    Dowell set the gun in his corn-crib to catch a thief, but his wife was the first

9    person to visit the crib and on opening the door was shot dead."[88] In all, at least

10   16 states had anti-trap gun laws (*see* Exhibits B and F). The earliest such law

11   encountered was the 1771 New Jersey law (above). Eight such laws were enacted

12   in the 1800s, and nine in the early 1900s (counting states that enacted multiple

13   laws across the centuries). (*See* Exhibit F.)

14

15

16        [87] *The Man Trap*, The Buffalo Commercial, November 1, 1870; from the

17   *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF. *See* Exhibit G.

18        [88] *Shot by a Trap-Gun*, South Bend Tribune, February 11, 1891,

19   https://bit.ly/3CtZsfk. *See* Exhibit G.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

42

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

## VI.    THE HISTORY OF PRE-TWENTIETH CENTURY FIREARMS TECHNOLOGIES AND THEIR REGULATIONS

**A.    Early Multi-Shot Weapons Did Not Achieve Any Kind of Commercial Success or Popularity**

As researchers and experts of gun history have noted, experimental multi-shot guns existed in the eighteenth century (with multi-shot experimental designs dating back as much as two centuries earlier). For example, a firearm from the late 1500s that could fire up to sixteen rounds is described in a book titled, *Firearms Curiosa*. But this book's very title indicates why this narrative is irrelevant to the modern gun debate. The definition of "curiosa" is something that is rare or unusual. As the book's author, Lewis Winant says, his book is about "oddity guns" and "peculiar guns."[89] That is, they were anything but common, ordinary, or found in general circulation. Winant's description of the sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[90] A "Roman candle charge" was defined by Winant as one where "the operator had

---

[89] Lewis Winant, *Firearms Curiosa* 8, 9 (1955).

[90] *Id.* at 168.

no control of the interval between shots; he could not stop the firing once he had started it."[91] In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that cannot be controlled by the operator once the initial charge is ignited.

Roman candle firing was one type of "superposed" or "superimposed" firing. The other type was controlled, where the gun "was charged with one load on top of another, but the operator had control of the interval between shots. It might have one movable lock or several fixed locks. Each shot would be fired by trigger pull, presumably when the operator felt he had the proper aim."[92] Winant concludes: "Of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[93] Several "multi-shot" guns invented prior to the perfection of the revolver and repeating rifle relied on this strategy, which had a number of defects all stemming from the

---

[91] *Id.* at 166.

[92] *Id.*

[93] *Id.*

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

44

1    difficulty of loading multiple charges in one barrel, with potentially catastrophic

2    results should a charge go off before it was supposed to.

3         An early multi-shot gun, the "Puckle Gun," patented in 1718 in London by

4    James Puckle, could fire nine rounds per minute (hardly comparable to the firing

5    capabilities of semi- and fully automatic weapons of the twentieth and twenty-

6    first centuries). The patent drawing of this weapon shows it sitting on a tripod on

7    the ground.[94] It was not a hand-held weapon. In the patent, Puckle described it as

8    "a portable Gun or Machine (by me lately invented) called a DEFENCE."[95] It

9    was indeed a military weapon, as Winant says: "Of the oddities among military

10   weapons none has received more publicity than the Puckle gun. . . . The Puckle

11   invention was probably the first crank-operated machine gun. It embodied several

12   elements that closely resemble construction features of Gatling, Hotchkiss and

13   other manually-operated machine guns." Winant continued, "It is doubtful that

14   any of the Puckle guns that may have been actually produced ever saw service."[96]

15   A different account of this weapon says: "There is in fact no record of such a gun

16

17         [94] *Id.* at 220.

18         [95] *Id.* at 219.

19         [96] *Id.* at 219–20.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

45

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    ever having been built,"[97] although there are claims to the contrary. A

2    contemporaneous poet, commenting on 'Puckle's Machine Company', wrote

3    'Fear not, my friends, this terrible machine. They're only wounded who have

4    shares therein.'"[98] This weapon "never advanced beyond the prototype stage."[99]

5    In short, it was an experimental weapon designed for military use, and the

6    patent's reference to "DEFENCE" was clearly a reference to military defense,

7    not personal defense. As this account confirms, it was likely never even

8    manufactured beyond perhaps a prototype. It was a failed effort, even though

9    later gun inventors learned from its failure.

10        The Belton flintlock is another example of a purportedly multi-shot rifle

11    that never gained popularity. Joseph Belton was an inventor who corresponded

12    with Congress in 1777, claiming that he could produce and provide a flintlock

13

14        [97] John Ellis, *The Social History of the Machine Gun* 13 (1975).

15        [98] Winant, *Firearms Curiosa*, *supra* note 89, at 219–21; *see also* Forgotten

16    Weapons, *The Puckle Gun: Repeating Firepower in 1718*, YouTube (Dec. 25,

17    2016), https://www.youtube.com/watch?v=GPC7KiYDshw.

18        [99] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed*

19    *America* 3 (2021).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

46

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   that could fire as many as sixteen to twenty consecutive rounds without reloading.

2   After deliberation, Congress "dismissed Belton's petition altogether"[100] even

3   though Belton offered to provide a demonstration of his invention. The problems

4   with Belton's scheme were evident. It relied on "superposed loads" as a firing

5   method, a "discredited" and dead-end technology (see discussion above). Despite

6   Belton's offer to demonstrate the gun, not only are there "no known surviving

7   examples of Belton's gun," but "the only evidence" of the gun's existence is "the

8   correspondence between Belton and Congress."[101] Obviously, this anecdote bears

9   no relationship to actual firearms in circulation in the U.S. during this time.

10

11

12

13

14   [100] Logan Metesh, *As a Matter of Fact, the Founding Fathers Did Know*

15   *About         Repeating         Rifles*,         Nov.         24,

16   2019.https://www.thetruthaboutguns.com/founding-fathers-knew-repeating-

17   rifles-bill-rights-drafted/.

18   [101]              "Belton         Flintlock,"         https://military-

19   history.fandom.com/wiki/Belton_flintlock.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

47

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

Isaiah Jennings' multi-shot flintlock rifle from 1821, capable of firing up to twelve "superposed" shots before reloading,[102] is also cited as an early multi-shot gun. Yet according to *Flayderman's Guide to Antique American Firearms,* its production quantity was so small as to be "unknown" and therefore is "extremely rare," unsurprising since it utilized fatally defective "superposed" firing (discussed earlier) relying on twelve individual touchholes.[103] By one account, "probably not more than 100 rifles of this type [were] manufactured."[104] Similar problems plagued or doomed multi-shot flintlock pistols of the early nineteenth century. According to Carl P. Russell: "Flintlock revolving pistols had been given trials and some practical use very early in the nineteenth century, but

---

[102] David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Albany Law Review 853 (2014–2015).

[103] Norm Flayderman, *Flayderman's Guide to Antique American Firearms* 683 (Gun Digest Books, 9th ed. 2007).

[104] "Isaiah Jennings," LittleGun.info, https://www.littlegun.info/arme%20americaine/artisan%20i%20j%20k%20l/a%20jennings%20gb.htm

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

48

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    the loose priming powder in the pan of each cylinder constituted a hazard that

2    was never eliminated."[105]

3        Another example often cited is the Girandoni (or Girardoni) air rifle, a

4    military weapon developed in Europe for crack shots—highly skilled target

5    shooters—in the Austrian army that was capable of firing up to 20 rounds. One

6    of these made its way to the U.S. where it was taken along on the Lewis and Clark

7    expedition of 1804-1806.[106] But these guns were a rarity, as they were extremely

8

9        [105] Carl P. Russell, *Guns on the Early Frontier* 91 (1957).

10        [106] David Kopel, *The history of magazines holding 11 or more rounds:*

11    *Amicus brief in 9th Circuit*, Washington Post, May 29, 2014,

12    https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-

13    history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/.

14    The Girandoni air gun taken by Lewis and Clark was never used in combat or

15    battle, but to impress the Native Americans they encountered. Whenever they

16    planned to fire the gun, they were careful to prepare it before encountering Native

17    Americans so that they were not aware of the extensive pre-fire preparations

18    needed. *See* Stephen E. Ambrose, *Undaunted Courage* 158, 160, and *passim*

19    (1996).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

49

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    expensive, fragile, and complex, and few were made—no more than about 1,500.

2    As one writer noted: "The Girandoni air rifle is a might-have been; a footnote to

3    military history."[107] Indeed, the rifles never caught on as they proved to be

4    impractical on the battlefield, and even more so for civilian use. To wit: "Leather

5    gaskets needed to be constantly maintained and swelled with water to sustain

6    pressure. Once empty the reservoirs required a significant effort and 1500 strokes

7    to restore full power. A supply wagon was subsequently outfitted with a mounted

8    pump to readily supply soldiers but this negated one of the key features—

9    mobility. The rudimentary fabrication methods of the day engineered weak

10    threading on the reservoir neck and this was the ultimate downfall of the weapon.

11    The reservoirs were delicate in the field and if the riveted brazed welds parted the

12    weapon was rendered into an awkward club as a last resort."[108] First introduced

13

14    [107] Mike Markowitz, *The Girandoni Air Rifle*, DefenseMediaNetwork,

15    May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-

16    rifle/.

17    [108] John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*,

18    GUNS.com, March 15, 2011, https://www.guns.com/news/2011/03/15/the-

19    girandoni-air-rifle-deadly-under-pressure.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

50

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    to the Austrian army in the late 1700s, the gun was pulled from military service

2    by 1815.[109] One American manufacturer, Isaiah Lukens of Pennsylvania,

3    apparently produced perhaps four such weapons.[110] The rest were made and used

4    in Europe.

5        To take another example, the Volcanic repeating pistol, patented in 1854,

6    was said to have the ability to fire up to "ten or greater rounds."[111] The Volcanic

7    Repeating Arms Company was founded in 1855, and it experimented with a

8    number of design innovations. But the company was "short-lived" and went

9    "defunct" in 1866, even though its partners included Horace Smith, Daniel B.

10

11        [109]    Markowitz, *supra* note 107; *Girardoni Air Rifle*,

12    ForgottenWeapons.com, https://www.forgottenweapons.com/rifles/girardoni-

13    air-rifle/

14        [110] Nancy McClure, *Treasures from Our West: Lukens air rifle*,

15    Buffalo    Bill    Center    of    the    West,    Aug.    3,    2014,

16    https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/

17        [111] Declaration of Ashley Hlebinsky (Hlebinsky Decl.) at 6, *Miller v.*

18    *Becerra*, No. 3:19-cv-01537-BEN-JLB (ECF No. 24-3) (S.D. Cal., Dec. 13,

19    2019) (Plaintiffs' Trial Exhibit 2).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

51

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Wesson, and Courtlandt Palmer.[112] Its patent and technological work were

2    important for subsequent developments, especially for Smith and Wesson's later

3    work, but the actual weapons produced by Volcanic were few, flawed, and

4    experimental,[113] dubbed "radical defects" by Winchester himself.[114] In 1857 and

5    1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust

6    for many decades" until the company finally sold them for fifty cents each to

7    employees.[115]

8        Another account laboring to establish early gun firing provenance asserts

9    that "[s]emi-automatic technology was developed in the 1880s" with the

10

11

12        [112] These are the three men who came together to form what became the

13    Smith & Wesson gun company. Pamela Haag, *The Gunning of America* 51–52

14    (2016).

15        [113]    Volcanic    Repeating    Arms,    https://military-

16    history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Guide*

17    *to Antique American Firearms, supra* note 103, at 303–5.

18        [114] *Quoted in* Haag, *supra* note 112, at 56.

19        [115] Haag, *supra* note 112, at 60.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

52

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    "Mannlicher rifle. . . generally attributed to be the first semi-automatic rifle."[116]

2    Yet this "development" was initially a failure: "Ferdinand von Mannlicher's

3    Model 1885 self-loading rifle design" was "a failure, never seeing anything even

4    resembling mass production."[117] The true semi-automatic weapon did not

5    become feasible and available until the beginning of the twentieth century, and

6    the primary market was the military.[118]

7            The more well-known "pepperbox," a multi-shot firearm where the

8    number of shots capable of being fired repeatedly coincided with the number of

9    barrels bundled together, found some civilian market popularity in the early

10

11    [116] Hlebinsky Decl. at 8, *Miller,* No. 3:19-cv-01537-BEN-JLB

12    (ECF No. 24-3).

13    [117] Ian McCollum, *Mannlicher 1885 Semiauto Rifle*, Forgotten Weapons,

14    May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-

15    rifle/.

16    [118] Philip Schreier, *A Short History of the Semi-Automatic Firearm*,

17    America's 1st Freedom, June 28, 2022,

18    https://www.americas1stfreedom.org/content/a-short-history-of-the-semi-

19    automatic-firearm/.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

53

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    1800s, but was ultimately unsuccessful. The reason: pepperboxes were "heavy,

2    lumpy, and impractical."[119] By another account, "because of its small bore, short

3    range, and lack of accuracy, the pepperbox was by no means as satisfactory as a

4    revolver for military use."[120] Further, "[t]hey also had a nasty habit of discharging

5    all their barrels at once. No shooter could be certain he would not get two or three

6    innocent bystanders, as well as his intended victim."[121]

7        Thus, single shot guns were the ubiquitous firearm until after the Civil

8    War, although some long gun repeaters appeared late in the Civil War.[122] Even

9    so, the "standard infantry weapon [in the Civil War] remained the single-shot,

10

11

12

---

13    [119] Rasenberger, *supra* note 99, at 54.

14    [120] Lewis Winant, *Pepperbox Firearms* 30 (1952).

15    [121] Larry Koller, *The Fireside Book of Guns* 154 (1959). By another

16    account, "it was a disconcerting but not uncommon experience to have all six

17    barrels go off in unison." Winant, *Pepperbox Firearms*, *supra* note 120, at 32.

18    [122] Kopel, *The history of magazines holding 11 or more rounds, supra* note

19    106; Lee Kennett and James L. Anderson, *The Gun in America* 112–13 (1975).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

54

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    muzzle-loaded weapon."[123] Historian James M. McPherson concurred that, even

2    though some repeating rifles appeared in the Civil War as early as 1863, single-

3    shot muzzle-loaders "remained the principal infantry weapons throughout the

4    war."[124]

5    **B.    The Colt Revolver Did Not Achieve Popularity Until Decades After its Invention**

6           The Colt revolver was "the first widely used multishot weapon,"[125]

7    although it took decades after its invention for this and similar revolvers to catch

8    on. The idea of an available, affordable, reliable multi-shot firearm did not arise

9    until the development of Colt's multi-shot revolver in the 1830s. Indeed, Colt

10   biographer Jim Rasenberger says that Colt's pistol was the first practical firearm

11   that could shoot more than one bullet without reloading.[126] Even then, Colt could

12   not readily manufacture multi-shot weapons for many years because he could

13   find no market for them, either from the government or the public. The

14

15         [123] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert*

16   *Storm: War and Politics in the American Experience* 90 (1994).

17         [124] James M. McPherson, *Battle Cry of Freedom* 475 (1988).

18         [125] Rasenberger, *supra* note 99, at 401.

19         [126] *Id.* at 3–5, 401.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

55

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   government, in fact, dismissed such firearms as mere "novelties."[127] After an

2   1837 test of Colt's gun and others the government concluded that it was "entirely

3   unsuited to the general purposes of the service."[128] The government also rejected

4   the weapon after tests in 1836, 1840, and 1850. Colt's early failure to cultivate

5   either a military or a civilian market in the U.S. drove him to bankruptcy and then

6   to market his guns to European governments in the 1840s. The gun made

7   appearances in the pre-Civil War West, yet even during the Civil War, "Colt's

8   revolver was a sideshow through most of the war. . . ."[129] And though the Colt-

9   type revolver "had proved itself, the official sidearm of the United States Army

10   [in the Civil War] remained a single shot pistol."[130] It took the Colt's limited use

11   during the Civil War to finally spur the post-Civil War proliferation of the Colt-

12   type revolver and similar firearms into society.[131] And as detailed below, once

13

14   [127] Haag, *supra* note 112, at 24.

15   [128] Rasenberger, *supra* note 99, at 136.

16   [129] *Id.* at 390.

17   [130] Kennett and Anderson, *supra* note 122, at 91.

18   [131] Haag, *supra* note 112, at 34–7, 46–64. As Haag said, "the Civil War

19   saved" the gun industrialists. *Id.* at 65.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

56

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    revolvers began to spread from the military to the civilian market following the

2    Civil War, and became associated with lawless violence, they were swiftly met

3    by laws and regulations aimed at curbing their possession and use.

4    **C.    The Winchester Repeating Rifle did Not "Win the West"**

5        Even the famous Winchester repeating rifle did not obtain popularity until

6    the onset of the twentieth century, despite the fanciful claim that it won the

7    American West. Inventor Benjamin Henry claims credit for developing the first

8    practical, lever action repeating rifle (patented in 1860), however his competitor

9    Winchester "deftly gutted" the Henry Arms Company, coopting it to form the

10   Winchester Arms Company in 1866, paving the way for Winchester's

11   dominance.[132] The Winchester rifle could fire up to fifteen rounds without

12   reloading. Yet the widely known Winchester 1873, "was designed for sale to the

13   Government as a military arm."[133] A gun whose legendary status wildly

14   outdistanced its actual production and impact, it was nevertheless an important

15   firearm in the late nineteenth century, although this "quintessential frontier rifle

16   flourished later, in the 'post-frontier' early 1900s. Its celebrity biography

17

18       [132] *Id.* at 96.

19       [133] Koller, *supra* note 121, at 112.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

57

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

backdated its diffusion and even its popularity."[134] In fact, the slogan stating that the Winchester "won the West" was invented by a Winchester executive as a marketing ploy in 1919.[135]

As historian Michael Vorenberg concluded: "Rifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction."[136] An analysis of production runs of Henrys and Winchesters from 1861-1871 concluded that they produced a total of 74,000 guns. Most of them—about 64,000—were sold to foreign militaries, leaving about 9,200 for domestic American sales. Of those, 8,500 were acquired by Union soldiers, leaving a very small supply of guns for domestic civilian acquisition.[137] By

---

[134] Haag, *supra* note 112, at 179.

[135] *Id.* at 353.

[136] Declaration of Michael Vorenberg ¶42, *Ocean State Tactical v. Rhode Island*, No. 1:22-cv-00246-JJM-PAS, Dkt. 19-2 (D. R.I. Oct. 14, 2022).

[137] Herbert G. Houze, *Winchester Repeating Arms Company: Its History & Development from 1865 to 1981* at 21, 36–41, 51, 59, 65–66, 71, 73, 75 (2004); Tom Hall to D. C. Cronin, New Haven, May 18, 1951; Box 8, folder 16,

DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 2:23-CV-00112

58

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    comparison, 845,713 Springfield "trap-door" single shot rifles were

2    manufactured during this same time period.[138]

3        Additionally, the Winchester was not a semi-automatic firearm; it was a

4    lever-action rifle that required the shooter to manipulate a lever in a forward-and-

5    back motion before each shot. And when the gun was emptied, it had to be

6    manually reloaded, one round at a time.[139] Winchester did not produce a true

7    semi-automatic rifle—then called a "self-loading" rifle—until the Winchester

8    Model 1903 was released in 1903, and did not produce a semi-automatic rifle

9    with a detachable magazine until the Winchester Model 1905, two years later.

10   The Model 1905 could receive a five or ten round box magazine, although from

11   _____

12   Winchester Repeating Arms Company, Office files (MS:20), McCracken

13   Research Library, Cody, WY.

14       [138] According to an account of the Springfield, "The end of the Trapdoor

15   series came in 1892, when the government adopted a bolt-action repeating rifle

16   known as the Krag-Jorgensen." *The Trap Door Rifle*, National Park Service, July

17   22, 2020, https://www.nps.gov/spar/learn/historyculture/trapdoor-rifle.htm

18       [139] Normally, a Remington-type rifle is loaded from a feed ramp on the

19   side of the rifle.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

59

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    1905 to 1920 only about 30,000 of the guns were made. Even in World War I,

2    soldiers primarily used bolt-action one shot rifles that could fire about twelve

3    rounds per minute.[140]

4         With all this, the Winchester was by no means universally embraced by

5    long gun users. Indeed, "a good many westerners would have nothing to do with

6    the early Winchesters or other repeaters, for reasons they considered very sound,

7    and not until the 1880s did the repeating rifle assert its dominance over the single-

8    shot breechloader."[141] According to A.C. Gould, writing in 1892, single-shot

9

10

―――――――――――

11    [140] Robert Johnson and Geoffrey Ingersoll, *It's Incredible How Much Guns*

12    *Have Advanced Since The Second Amendment*, Military & Defense, Dec. 17,

13    2012,    https://finance.yahoo.com/news/incredible-much-guns-improved-since-

14    174927324.html; Phil Bourjaily, *Blast From the Past: Winchester Model 1905*,

15    Field & Stream, Jan. 11, 2019, https://www.fieldandstream.com/blast-from-past-

16    winchester-model-1905/.

17    [141] Louis A. Garavaglia and Charles G. Worman, *Firearms of the American*

18    *West, 1866-1894* at 129 (1985). Historian Michael Vorenberg says that "Henrys

19    and Winchesters were . . . repeating rifles, but because they were in a class of

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

60

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    rifles were: "less complicated, and less liable to get out of order; will shoot a

2    greater variety of ammunition; will shoot uncrimped ammunition, patched or

3    unpatched bullets; will permit the use of a longer barrel; an explosive bullet can

4    be used; a greater range of rear sights on tang can be used."[142] Historian

5    Vorenberg confirms this analysis: "There were civilians during Reconstruction

6    who owned high-capacity rifles, to be sure. Yet almost all such civilians were

7    'frontiersmen' of the Western Territories, and the population of the Western

8    Territories was tiny compared to the population of the United States as a whole.

9    Furthermore, Henrys and Winchesters, the only high-capacity firearms of the era,

10   were not the preferred firearms of the 'frontiersmen' of the region."[143]

11   **D.    The Rise of Post-Civil War Multi-Shot Handguns Was Accompanied by Escalating Firearm Violence and then Firearm Regulations**

12          Following the Civil War, revolvers were marketed to the civilian

13   population in newspaper advertisements extolling their virtues. For example,

14   when Smith & Wesson's near-monopoly over the manufacture of cartridge

15   _____

16   their own, due to their high capacity, they were generally known only as Henrys

17   or as Winchesters." Declaration of Michael Vorenberg. *supra* note 136, ¶ 15.

18          [142] *Quoted in* Garavaglia and Worman, *supra* note 141, at 131.

19          [143] Declaration of Michael Vorenberg, *supra* note 136, ¶ 97.

DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 2:23-CV-00112

61

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    revolvers ended with the expiration of its Rollin White patent in 1870, "dozens

2    of other [gun] makers"[144] entered the market. Soon these other manufacturers

3    were producing abundant cheap revolvers at low cost to the consumer. As

4    Kennett and Anderson noted, Colt's initial revolvers sold for $35, but by 1900

5    the "'two dollar pistol' was a fixture in American life."[145] Further, as the mail

6    order business boomed from the 1870s on, companies like Montgomery Ward

7    and Sears began selling revolvers through their catalogs—especially small,

8    cheaper, lighter-weight models that cost less to mail. Cheap handguns were

9    advertised not only through catalogs, but also through newspaper and magazine

10   advertisements.[146]

11       The rise in the circulation of multi-shot handguns in society following the

12   Civil War was accompanied by escalating interpersonal violence associated with

13   the weapons and, soon thereafter, the rapid spread of concealed carry restrictions

14

15

16

---

17   [144] Kennett and Anderson, *supra* note 122, at 98.

18   [145] *Id.* at 99.

19   [146] *Id.* at 99–100; *see also* Haag, *supra* note 115, at 251–55.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

62

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    (*see* Exhibits B–E).[147] By the end of the nineteenth century, virtually every state

2    in the country prohibited or severely restricted concealed gun and other weapons

3    carrying.[148] In addition, in the late 1800s and early 1900s several states and

4    localities barred possession of such weapons outright, regardless of other

5    circumstances.[149]

6

7    [147] Dickson D. Bruce, *Violence and Culture in the Antebellum South*

8    (1979); Roth, *American Homicide*, *supra* note 22, at 218–19.

9    [148] Spitzer, *Gun Law History in the United States and Second Amendment*

10    *Rights*, *supra* note 11, at 63–67.

11    [149] Illinois Act of Apr. 16, 1881, 1885 Ill. Stat. Ann., Crim. Code, ch. 38,

12    88; George R. Donnan, *Annotated Code of Criminal Procedure and Penal Code*

13    *of the State of New York as Amended 1882-5* § 410, 172, Image 699 (1885);

14    Geoffrey Andrew Holmes, *Compiled Ordinances of the City of Council Bluffs,*

15    *and Containing the Statutes Applicable to Cities of the First-Class, Organized*

16    *under the Laws of Iowa* § 105, 206–207, Images 209–210 (1887); William H.

17    Baily, *The Revised Ordinances of Nineteen Hundred of the City of Des Moines,*

18    *Iowa* § 209, 89–90, Images 89–90 (1900); An Act to Amend the Penal Law, in

19    Relation to the Sale and Carrying of Dangerous Weapons, 1911 N.Y. Laws

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

63

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    It was only in the post-World War I era when multi-shot semi-automatic

2    and fully automatic long guns began to circulate appreciably in society and came

3    to be associated with criminal use that they became a regulatory and public policy

4    concern, leading to the enactment of anti-machine gun laws in at least 32 states,

5    between eight and eleven state laws restricting semi-automatic firearms, and the

6    first significant national gun regulatory law in 1934.[150]

7    As noted earlier, the problems with arguments claiming that historical

8    multi-shot weapons were both viable and commonly possessed before the late

9    nineteenth century are two-fold: they misrepresent the actual past of the weapons

10   cited, and even more importantly fail to understand the connection between gun

11

12

13   ch. 195 § 1, 442–43; 1913 N.Y. Laws ch. 608, § 1, 1627–30; 1915 N.D. Laws 96,

14   ch. 83, §§ 1–3, 5; 1917 Cal. Sess. Law 221–225; 1923 Cal. Stat. 695; 1931 N.Y.

15   Laws 1033, ch. 435, § 1. Not included in this list are other state laws that barred

16   weapons possession to specific groups (enslaved persons, minors) or that

17   criminalized weapons possession by individuals if they committed a crime with

18   the listed weapons.

19   [150] *See infra* § VII.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

64

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

technology developments and the steps leading up to changes in weapons-related public policy to regulate threats posed by those developments.

As discussed previously, that process has occurred, both historically and in the modern era, through a series of sequential steps. First, a new gun or gun technology must be invented. Second, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution and dissemination. As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[151] And as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[152] Third, in many cases, weapons development is historically tied to military need and military acquisition, not directly for civilian use or self-defense applications. Military weaponry is developed without consideration of potential civilian use and the consequences of dissemination in the civilian market.[153] Fourth, some weapons may then spill

[151] Winant, *Firearms Curiosa*, *supra* note 89, at 36.

[152] Jack O'Connor, *Complete Book of Rifles and Shotguns* 42 (1961).

[153] Note that the third step, and perhaps the second, do not apply to non-firearms weapons discussed here—in particular the Bowie knife and various

DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 2:23-CV-00112

65

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

over into, or be adapted to, civilian markets and use. Fifth, if such weapons then circulate sufficiently to pose a public safety or criminal problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes. This general sequence is echoed in works like the Buyer's Guide to Assault Weapons, a standard reference work on assault weapons.[154]

Again, to simply assert or assume that past firearms design/development, invention, or patenting equals commonality, viability, or a measurable presence or impact on society, is a leap in logic without historical foundation. It would be as logical to reject modern governmental regulation of electric power through such government agencies as state power commissions and the Federal Energy

---

clubs. These weapons were mostly not developed for military use, though Bowie knives, for example, were carried by some soldiers during the Civil War. Knives and clubs are far simpler technologically compared to firearms (and of course do not rely on ammunition) and thus were much more easily made, reproduced, and circulated.

[154] Phillip Peterson, *Gun Digest Buyer's Guide to Assault Weapons* 4–7 (2008). Peterson's Foreword summarizes a similar relationship between weapons development and subsequent calls for regulation.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

66

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Regulatory Commission (founded in 1977) because no such regulation was

2    enacted around the time of Benjamin Franklin's experiments with electricity in

3    the mid-eighteenth century. The fact that inventors worked on new firearm

4    designs and modifications tells us nothing about the consequences of such

5    designs for society and public policy. And the existence of such designs does not

6    equal technological viability or reliability, much less general availability, much

7    less societal circulation and use of these weapons. Other weapons subject to

8    government restriction in our history further illustrate these principles.

9    **VII.  HISTORY AND REGULATION OF FULLY AUTOMATIC AND SEMIAUTOMATIC FIREARMS**

10   **A.    The History**

11       A clear example of this historical pattern is provided by early twentieth-

12   century restrictions related to fully automatic firearms. While weapons capable

13   of firing rounds in rapid succession can be traced to guns of the late nineteenth

14   and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun

15   which could fire up to 200 rounds per minute,[155] it and its successors were

16

17       [155] The Gatling gun, a manually operated, hand-cranked machine gun, was

18   adopted by the U.S. Army in 1866, and was utilized in warfare against Native

19   Americans and in the Spanish-American War of 1898. Richard W. Stewart,

1    military weapons designed to be used in combat and fired from a tripod or similar

2    supporting apparatus, owing to the Gatling gun's size and weight. Strictly

3    speaking, guns like the Gatling gun were not fully automatic as they did not fire

4    a continuous stream of bullets while depressing a gun trigger. The development

5    of a fully automatic machine gun for battlefield use, capable of firing all of its

6    rounds from a single barrel and with a single trigger pull, came to fruition during

7    World War I. These tripod-mounted military guns, like the Maxim, operated to

8    devastating effect on the battlefield. They initially fired 200-400 rounds per

9    minute but later 400-600 rounds per minute from a gun weighing roughly 100

10   pounds.[156]

11

12

13   *American Military History, Vol. I: The U.S. Army and the Forging of a Nation,*

14   *1775-1917* at 367–68 (2008); *Gatling Gun*, History.com, September 9, 2021,

15   https://www.history.com/topics/american-civil-war/gatling-gun.

16        [156] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert*

17   *Storm: War and Politics in the American Experience* 127 (Armonk, NY: M.E.

18   Sharpe, 1994); "How the Machine Gun Changed Combat During World War I,"

19   Norwich        University        Online,        October        15,        2020,

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

68

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Out of World War I came a practical, lighter-weight, reliable, hand-held,

2    fully automatic weapon: the Thompson submachine gun, widely known as the

3    Tommy gun. Though it was developed for use in World War I as "purely a

4    military weapon,"[157] it came too late in the war to have much effect. Its inventor,

5    John Thompson, patented his .45 caliber gun in 1920.[158] It typically fired with

6    either a 20–30 round stick magazine or a 100-round drum magazine. The Tommy

7    gun was initially unregulated after World War I. In an effort to boost anemic post-

8    war sales, the manufacturer marketed the gun for civilian purchase. (The U.S.

13    https://online.norwich.edu/academic-programs/resources/how-machine-gun-

14    changed-combat-during-world-war-i.

15    [157] William J. Helmer, *The Gun That Made the Twenties Roar* 75 (1969).

16    [158] Matthew Moss, *From Gangland to the Battlefield — 15 Amazing Facts*

17    *About the Thompson Submachine Gun*, Military History Now, January 16, 2015,

18    https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-

19    15-amazing-facts-about-the-thompson-submachine-gun/.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

69

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    military showed little interest in acquiring the weapon, as the military largely

2    demobilized and contracted sharply in size after the war.[159])

3        It was only at this point—in the early 1920s—that reliable hand-held

4    automatic weapons were made available to civilians and began to circulate in

5    society,[160] though sales in the early 1920s were sluggish. By 1925, Thompson's

6    marketing company, Auto Ordnance, had sold only about 3,000 of the 15,000 it

7    had manufactured up to this point, including to police forces and individuals.[161]

8    This pattern of anemic sales typified the gun's commercial trajectory: "Despite

9    its initial publicity and later notoriety, the Thompson submachine gun was a

10

11    [159] Ellis, *The Social History of the Machine Gun*, 149–52; Helmer, *supra*

12    note 157, at 161–64.

13    [160] Peter Suciu, *The Thompson Submachine Gun: Made for the U.S. Postal*

14    *Service?*,    The    National    Interest,    July    3,    2020,

15    https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-

16    postal-service-164096.

17    [161] Kennett and Anderson, *supra* note 122, at 203. Helmer confirms the

18    number of 3000 guns sold by 1925. Helmer, *supra* note 157, at 74. Helmer says

19    that "sales declined steadily" after 1921; *see id.* at 130.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112                    70                    ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    failure from the start."[162] This was especially true for sales to police forces, to

2    whom Thompson and his company marketed the gun aggressively, even as

3    criminals began adopting the gun. "As a criminal's weapon, the Tommygun was

4    an unqualified success. As a police weapon, it was such a flop that many law-

5    enforcement officials wished sincerely that it had never come off the drawing

6    board."[163] For example, after the St. Valentine's Day massacre, a representative

7    of Auto-Ordnance visited Chicago police captain John Stege to offer assistance.

8    Captain Stege "practically ran him out of the office. . . .It was Stege's opinion

9    that not even the police should be armed with machine guns," an opinion shared

10   "by many other lawmen in the country."[164] Another police chief explained why:

11   "It is not possible for a police officer to open a machine gun up on a crowded

12   street . . . because you are going to kill possibly ten innocent people to one

13

14

15

16        [162] Helmer, *supra* note 157, at 129.

17        [163] *Id.* at 126. Helmer quotes numerous police officials denouncing the

18   weapon as useless for the police; *see id.* at 126–28.

19        [164] *Id.*

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112                    71                    ATTORNEY GENERAL OF WASHINGTON
                                                          1125 Washington Street SE
                                                          PO Box 40100
                                                          Olympia, WA 98504-0100
                                                          (360) 753-6200

1    criminal."[165] Poor military and law enforcement sales forced the company to

2    "peddle the new gun in peacetime" by trying "to think up something else it might

3    be good for." Their conclusion was to market the gun as "good for anything"[166]

4    as seen by this 1922 advertisement from Auto-Ordnance (*see infra* page 73):

5

6

7

8

9

10

11

12

13

14

15

---

16        [165] *Id.* The gun's rare actual use by police confirmed this fear. In an attack

17    on John Dillinger, for example, FBI agents "mistakenly shot three innocent

18    customers." (*Id.* at 128).

19        [166] *Id.* at 75.

DECLARATION OF ROBERT J.                                72
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



# The Thompson Submachine Gun
## *The Most Effective Portable Fire Arm In Existence*

THE ideal weapon for the protection of large estates, ranches, plantations, etc. A combination machine gun and semi-automatic shoulder rifle in the form of a pistol. A compact, tremendously powerful, yet simply operated machine gun weighing only *seven* pounds and having only *thirty* parts. Full automatic, fired from the hip, 1,500 shots per minute. Semi-automatic, fitted with a stock and fired from the shoulder, 50 shots per minute. Magazines hold 50 and 100 cartridges.

THE Thompson Submachine Gun incorporates the simplicity and infallibility of a hand loaded weapon with the effectiveness of a machine gun. It is simple, safe, sturdy, and sure in action. In addition to its increasingly wide use for protection purposes by banks, industrial plants, railroads, mines, ranches, plantations, etc., it has been adopted by leading Police and Constabulary Forces, throughout the world and is unsurpassed for military purposes.

*Information and prices promptly supplied on request*

## AUTO-ORDNANCE CORPORATION
302 Broadway   *Cable address: Autordco*   New York City

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

73

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

Another automatic weapon developed for World War I was the Browning Automatic Rifle (BAR). It fired a .30-06 caliber round, could receive a 20-round box magazine, and could fire up to 650 rounds per minute. The BAR first appeared on the battlefield in 1918.[167] It was "a heavy machine rifle weighing nearly twenty pounds with bipod and loaded magazine. . . ."[168] It, too, made its way into civilian life and found favor among criminals and gangsters in the 1920s and early 1930s.[169]

---

[167] Paul Richard Huard, *Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?*, The National Interest, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; *Browning automatic rifle*, Britannica, September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.

[168] Helmer, *supra* note 57, at 37.

[169] Derek Avery, *Firearms* 12 (Wordsworth eds., 1995). The BAR was a favorite of the notorious outlaws Bonnie and Clyde, for example. Christian Oord, *The Weapons of Bonnie & Clyde & the Guns That Stopped Them*, War History

DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 2:23-CV-00112

74

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Before the early 1920s, these fully automatic weapons were unregulated for

2    the obvious reason that they did not exist or were not circulating widely in

3    society. When they did begin to circulate, however, their uniquely destructive

4    capabilities rapidly became apparent, especially to the emergent Prohibition-

5    fueled gangster organizations of the 1920s. Guns like the Tommy gun and the

6    BAR were actually used relatively infrequently by criminals generally, but when

7    they were used, they exacted a devastating toll and garnered extensive national

8    attention, such as their use in the infamous St. Valentine's Day massacre in

9    Chicago in 1929.[170]

10    I conducted a search of Newspapers.com from 1920-1930 using the search

11    terms "Tommy Gun," "Thompson submachine" and "machine gun." The term

12    "Tommy Gun" turned up essentially no hits until 1928, a clear indication that this

13    particular term did not come into wide use until fairly late in the decade. The

14    search for "machine gun" turned up more, but many of them referenced the

15    weapons owned or used by the military (including many stories about World

16

17    Online, April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-

18    bonnie-and-clyde.html?A1c=1.

19    [170] Chris McNab, *supra* note 38, at 97–98.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

75

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    War I). The search for "Thompson submachine," by contrast, yielded many

2    articles from across the country. Starting in the fall of 1920, a few newspaper

3    articles described regular reports of demonstrations of the gun for police and

4    other government officials and agencies, and reports of local police forces

5    sometimes purchasing a few of the guns. Reports of demonstrations of the gun to

6    police forces and other state and local officials and also of some purchases

7    appeared regularly starting in 1921, and continued throughout the 1920s, as did

8    numerous articles describing the gun's development and capabilities by inventor

9    John Thompson. These articles also reprinted standard accounts of the Tommy

10    gun's weight, size, firing capabilities and possible uses by law enforcement.

11        To cite a few examples of early news coverage, an account in the Western

12    Sentinel from December 3, 1920,[171] reported on a demonstration of the Tommy

13    gun, saying that it weighed about seven pounds, fired .45 caliber rounds, could

14    fire up to 1500 rounds per minute, and could receive a box magazine holding 20

15    _____

16    [171] *New    Type    of    Gun    is    Demonstrated    Here*,

17    Winston-Salem,    North    Carolina,    December    3,    1920;

18    https://www.newspapers.com/image/89498556/?terms=%22Thompson%20sub

19    machine%22&match=1

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

76

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    rounds, or a drum magazine with either 50 or 100 rounds. It went on to say that

2    the gun was "without equal for riot use and for the police chasing thieves and

3    other lawbreakers who attempt to escape in automobiles, for with this little

4    weapon it is a very easy thing to rip the tires off of an escaping car, and the gun

5    is so light and simple that an inexperienced man can fire with the effect of an

6    expert marksman and moving targets can be hit with the ease that a fireman

7    sprays a hose on a flame." Other articles touted the gun's usefulness in controlling

8    riots and mobs. An account from the Jamestown Weekly Alert reported that state

9    and county officials were provided with ten of the guns for "hunting down

10    whiskey runners in the northern part of the state."[172]

11          Starting in roughly late 1921 and early 1922, a handful of small news items

12    reported thefts of Tommy guns from armories or police stations. The one notable

13    crime-related case to receive enormous press attention was a major seizure of

14    about 600 Tommy guns with ammunition and magazines, first reported about

15    June 16, 1921, from a ship docked at the port of Hoboken, New Jersey, bound for

16

17          [172] *New Submachine Guns Received*, Jamestown, North Dakota, May 12,

18    1921;    https://www.newspapers.com/image/465633429/?terms=%22

19    Thompson%20submachine%22&match=1

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

77

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   Ireland for use by the IRA in the ongoing Irish rebellion (Ireland won its

2   independence from Britain in 1922).[173]

3         Newspaper reports of criminal use of Tommy guns were few, small, and

4   spare until 1926, when a few very sensational news reports of their criminal use

5   received widespread and extensive attention in newspapers across the country.

6   Most of these initial stories were reports of Chicago gangster use (notably one

7   "Al Caponi" in an early account) along with stories from the New York City-

8   New Jersey area. For example, an AP story from October 16, 1926, with the

9   dateline Somerville, N.J. reported on "the advance of 500 city, state and volunteer

10  police on the mountain stronghold of New Jersey's machine gun mail bandits."[174]

11  According to the account, eight men robbed a truck of over $100,000 and were

12  holed up at the stronghold. The authorities were also armed with weapons that

13  included machine guns, and were contemplating the expansion of the search party

14  with 2000 militiamen.

15

16         [173] Helmer, *supra* note 157, at 53–64.

17         [174] *Use Expert Riflemen to Hunt Robbers*, Ithaca Journal, N.Y., Oct. 16,

18  1926,         https://www.newspapers.com/image/254505945/?terms=%22

19  Thompson%20submachine%22&match=1

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

78

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Coinciding with these extensive stories were articles, editorials, and exposés

2    calling for changes in the law to address this growing gun crime problem. For

3    example, an article from the Boston Herald began by quoting a magazine story

4    from Collier's Weekly that observed: "The police authorities are powerless to

5    interfere with the sale and distribution of the highest powered instrument of

6    destruction that has yet been placed at the convenience of the criminal element

7    in this country." The Herald sent out a man to see if an average person could buy

8    a machine gun "without trouble." The buyer's conclusion: "He had no trouble"

9    purchasing the gun, which the article labeled "a diabolical engine of death." The

10    article detailed that for the prospective gun purchaser, "Pistols would not be

11    shown unless the customer exhibited a permit, but machine guns could be had

12    over the counter with no such formalities." The article concluded this way: "Here

13    is a case where it seems that 'there ought to be a law.' This weapon . . . was

14    designed for war. . . . a machine gun is the greatest aid to crime that yet has been

15    placed within the reach of criminals."[175]

16

17    [175] *Machine Guns for All*, Kennebec Journal, Augusta, Maine, Dec. 4,

18    1926,    https://www.newspapers.com/image/857617757/?terms=%22

19    Thompson%20submachine%22&match=1

1      Reports and exposés, juxtaposed with lurid and sensational accounts of

2    Tommy gun criminality, built pressure on the states to enact anti-machine gun

3    laws and also put pressure on Congress to act. A long-stalled bill in Congress to

4    restrict the interstate shipment of guns received renewed interest and support in

5    1926, eventually leading to congressional enactment of the Mailing of Firearms

6    Act of 1927, a limited measure that failed to restrict interstate handgun shipment

7    because it did not affect non-Postal Service shipments. From 1926 on, news

8    stories were filled with the kind of sensational gangster-related stories that led to

9    the Tommy gun being labeled the weapon that "made the Twenties roar," and

10   that also led to many anti-machine gun laws. For example, an article dated

11   November 27, 1928, reported that "Chicago's war on gangsters and racketeers

12   was reopened tonight with the drafting of a law to prohibit the sale of machine

13   guns. 'Tommy guns,' the bullet spitting little Thompson submachine guns which

14   are inseparable from gang fights, bank robberies, assassinations and other major

15   crimes . . . could be purchased as easily and legally in Chicago as a pound of

16   meat. . . . practically every sporting goods establishment in Chicago carried the

17

18

19

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

80

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1  firearms and sold them readily."[176] (Illinois adopted an anti-machine gun law in

2  1931.[177])

3  **B.    State-Level and Nationwide Attempts to Regulate Automatic and
       Semi-Automatic Firearms and Ammunition Feeding Devices**

4          In response to the wider availability of firearms like the Tommy gun and

5  the BAR, between 1925 and 1934, at least 32 states enacted anti-machine gun

6  laws (*see* Exhibits B and D). These state (and eventually federal) enactments

7  were anticipated, justified, and promoted by the National Conference of

8  Commissioners on Uniform State Laws, a national organization formed in 1892

9  to provide "non-partisan, well-conceived and well-drafted legislation that brings

10  clarity and stability to critical areas of state statutory law."[178] (Today, the

11

12

13          [176] *Machine Gun Ban Plan of Chicago*, The Salt Lake Tribune, Nov. 27,

14  1928          https://www.newspapers.com/image/542285510/?terms=%22

15  Thompson%20submachine%22&match=1

16          [177] An Act to regulate the sale, possession and transportation of machine

17  guns, Ill. Rev. Stat. ch. 38, ¶¶ 414(a) to 414(g), approved July 2, 1931.

18          [178]    Uniform    Law    Commission,    *About    Us*,

19  https://www.uniformlaws.org/aboutulc/overview.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

81

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   organization is known as the Uniform Law Commission.) In 1923, the

2   Commission organized a special committee to draft a "Uniform Act to Regulate

3   the Sale and Possession of Firearms." In 1928, it issued a model law calling for

4   the prohibition of the possession of "any firearm which shoots more than twelve

5   shots semi-automatically without reloading."[179] In 1930, it issued a model

6   firearms act focusing on "guns of the pistol type." In 1932, it issued a model act

7   "intended not only to curb the use of the machine gun, but to make it unwise for

8   any civilian to possess one of the objectionable type." The Commission explained

9   that, between 1923 and 1930, "the infant industry of racketeering grew to

10  monstrous size, and with it the automatic pistol replaced the revolver, to be in

11  turn displaced by a partly concealable type of machine gun—the Thompson .45

12  inch caliber submachine gun becoming most popular. . . ."[180]

13

14

15   [179] Report of Firearms Committee, 38th Conference Handbook of the

16  National Conference on Uniform State Laws and Proceedings of the Annual

17  Meeting 422–23 (1928).

18   [180] Uniform Machine Gun Act, National Conference of Commissioners on

19  Uniform State Laws, Forty-Second Annual Conference, Washington, D.C.,

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

82

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Congress enacted a machine gun ban for the District of Columbia in 1932

2    which defined a machine gun as "any firearm which shoots automatically or

3    semiautomatically more than twelve shots without reloading."[181] The National

4    Rifle Association endorsed D.C.'s ban, stating "it is our desire [that] this

5    legislation be enacted for the District of Columbia, in which case it can then be

6    used as a guide throughout the states of the Union."[182] In his testimony before

7    Congress in 1934 on the bill that became the National Firearms Act, NRA vice

8    president Milton A. Reckord extolled his organization's role in passing the 1932

9    D.C. law, saying, ". . . the association I represent is absolutely favorable to

10

11

12

13    _____

14    October 4–10, 1932,

15    http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

16    [181] National Firearms Act, Hearings Before the H. Comm. on Ways and

17    Means, H.R. 9066, April 16, 18, May 14, 15, and 16, 1934, at 45 (Washington,

18    D.C.: GPO, 1934); Act of July 8. 1932, 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

19    [182] S. Rep. No. 72-575, at 5–6 (1932).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

83

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    reasonable legislation. We are responsible for the uniform firearms act. . . . in the

2    District of Columbia. It is on the books now."[183]

3        In 1934, Congress enacted the National Firearms Act, which imposed a

4    series of strict requirements on the civilian acquisition and general circulation of

5    fully automatic weapons, like the Tommy gun. The National Firearms Act

6    imposed a tax on the manufacture, sale, and transfer of listed weapons, including

7    machine guns, sawed-off shotguns and rifles, silencers, and "any other weapons"

8    with certain firing capabilities. Such weapons had to be registered with the

9    Treasury Department, and the owners fingerprinted and subject to a background

10   check, with the payment of a $200 tax.[184] The early models of the Tommy gun

11   could fire "an astounding 1,500 rounds per minute. A Tommy gun could go

12   through a 100-round drum magazine in four seconds. Later versions fired 600 to

13   700 rounds per minute."[185]

14

15

16        [183] *Hearings Before the Committee on Ways and Means*, *supra* note 181,

17   at 36.

18        [184] National Firearms Act, Pub. L. No. 73-474, 48 Stat. 1236 (1934).

19        [185] Moss, *supra* note 158.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

84

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    In his opening statement to the Ways and Means Committee of the U.S.

2    House of Representatives, Attorney General Homer Cummings made clear that

3    the bill under consideration was designed to fight the epidemic of gun crime

4    where criminals could evade capture by crossing state lines:

5    The development of late years of the predatory criminal who passes
     rapidly from State to State, has created a situation which is giving

6    concern to all who are interested in law and order. . . . there are more
     people in the underworld today armed with deadly weapons, in fact,

7    twice as many, as there are in the Army and the Navy of the United
     States combined. . . . In other words, roughly speaking, there are at

8    least 500,000 of these people who are warring against society and
     who are carrying about with them or have available at hand, weapons

9    of the most deadly character.[186]

10

11

12    [186] *Hearings Before the Committee on Ways and Means*, *supra* note 181,

13    at 4. The version of the bill that appears on page 1 of the Hearings had this

14    definition of machine gun: "The term 'machine gun' means any weapon designed

15    to shoot automatically or semiautomatically twelve or more shots without

16    reloading." Congress eventually settled on strict regulation of fully automatic

17    weapons, sawed-off shotguns, and silencers. This political compromise was the

18    result of the Congressional focus on weapons used by organized criminals of the

19    era.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

85

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

In addition to the National Firearms Act's restrictions on fully automatic weapons, during this same time period at least seven states plus the District of Columbia, and as many as ten states plus D.C., enacted laws restricting semi-automatic weapons (*see* Exhibit B).[187] The reason for restricting semi-automatic firearms is not hard to discern. These restrictions all appeared in the same statutes as those restricting fully automatic weapons, which utilize the same fundamental firearms technology: an action that automatically loads a new round into the chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[188] During the time that Thompson and his

---

[187] *See also* Spitzer, *Gun Law History in the United States and Second Amendment Rights*, *supra* note 11, at 68–71. The language of the restrictions in Illinois, Maine, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

[188] Spitzer, *The Gun Dilemma*, *supra* note 5, at 32–33. In 1913, Florida enacted this measure: "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns." While an automatic weapon fires

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

86

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    company were developing and marketing the Tommy gun (which could fire in

2    semi- or full-auto modes[189]), they were also developing the Thompson Autorifle,

3    a "strictly semiautomatic rifle" for which the military showed greater interest

4    than it did for the Tommy gun.[190] The Autorifle was also promoted to police and

5    military organizations, though it was overshadowed in the public mind by the

6    Tommy gun.[191]

7        As the prior discussion reveals, the regulation of automatic and semi-

8    automatic weapons in the 1920s and 1930s was closely tied to the enhanced firing

9    capacity of these weapons and the attractiveness (and use) of these weapons by

10   criminals at that time, and the related understanding that these weapons had no

11   justifiable civilian use. By that time, gun technology was available that made it

12   possible for ammunition to be reliably fired in rapid succession and guns to be

13

14   a continuous stream of bullets when the trigger is depressed, a semi-automatic

15   weapon fires a single shot with each pull of the trigger.

16       [189] Helmer, *supra* note 157, at 48–49, 255–56.

17       [190] *Id.* at 37, 50.

18       [191] Ultimately, the military opted for the semiautomatic M1 Garand over

19   the Autorifle. *Id.* at 161.

1    reloaded through interchangeable ammunition magazines or similar devices.

2    Again, the lesson is the same: once these technologies began to spread in civil

3    society and be used for criminal or other dangerous purposes, and because of the

4    belief that it was "unwise for any civilian to possess" such weapons,[192] regulatory

5    efforts ensued.

6         Restrictions on fully automatic and semi-automatic firearms were closely

7    tied to restrictions on ammunition magazines or their equivalent, as both

8    automatic and semi-automatic weapons are predicated on some kind of

9    mechanical loading function or device that automatically feeds new rounds into

10   the firing chamber after the previous round is fired. As is the case with

11   contemporary state limitations on ammunition magazine capacity, state laws

12   enacted early in the twentieth century imposed restrictions based on the number

13   of rounds that could be fired without reloading, ranging from more than one

14   (Massachusetts and Minnesota) up to a high of eighteen (Ohio).

15

16

17

18

19

---

[192] Uniform Machine Gun Act, *supra* note 180.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

88

1        In fact, magazine capacity/firing limits were imposed in at least 23 states,

2   representing approximately 58% of the American population at that time.[193]

3   These state laws fell into three categories (*see* Table 1 below): ten states plus the

4   District of Columbia regulated semi-automatic and fully automatic weapons

5   (California, District of Columbia, Massachusetts, Michigan, Minnesota, New

6   Jersey, North Carolina, Ohio, Rhode Island, South Dakota, and Virginia[194]);

7

---

8        [193] U.S. Census, *Historical Population Change Data (1910-1920)* (using

9   1920        census        data),        https://www.census.gov/data/tables/time-

10  series/dec/popchange-data-text.html.

11        [194] 1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8; 47 Stat. 650,

12  650, 652 (District of Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452;

13  1927 Mass. Acts 413, 413–14; Act of June 2, 1927, no. 372, 1927 Mich. Pub.

14  Acts 887, 888; Act No. 206, 1929 Mich. Pub. Acts, Sec. 3, Comp. Laws 1929;

15  Act of Apr. 10, 1933, , 1933 Minn. Laws, ch. 190, at 231–232; Act of Apr. 8,

16  1933, no. 64, 1933 Ohio Laws 189; 1927 R.I. Pub. Laws 256; Uniform Machine

17  Gun Act, 1933 S.D. Sess. Laws 245, ch. 206, 245; Act of Mar. 7, 1934, 1934 Va.

18  Acts, ch. 96, 137. Two of these states enacted early laws focused on such

19  weapons' use in hunting. New Jersey had a 1920 law making it "unlawful to use

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

89

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

eleven states regulated fully automatic weapons only, where the regulation was defined by the number of rounds that could be fired without reloading or by the ability to receive ammunition feeding devices (Illinois, Louisiana, Minnesota, New Jersey, North Dakota, Oregon, Pennsylvania, South Carolina, Texas, Vermont, and Wisconsin[195]); and four states restricted all guns that could receive

_____

in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading." 1920 N.J. Laws 67, ch. 31, § 9. North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917. 1917 N.C. Sess. Laws 309, ch. 209, § 1.

[195] An Act to Regulate the Sale, Possession and Transportation of Machine Guns, 1931 Ill. Laws, §§ 1–2, 452–53; Act of July 7, 1932, no. 80, A Supplement to an Act Entitled "An Act for the Punishment of Crimes,"1932 La. Acts 336; 1927 N.J. Laws, ch. 95, §§ 1–2, 180–81,; An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , 1931 N.D. Laws ch. 178, §§ 1-2, 305–6; An Act to Amend Sections 72-201, 72-202, 72-207, 1933 Or. Laws 488; 1929 Pa. Laws 777, § 1; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; An Act Defining "Machine Gun" and

DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 2:23-CV-00112

90

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    any type of ammo feeding mechanism or round feeding device and fire them

2    continuously in a fully automatic manner (California, Hawaii, Missouri, and

3    Washington State).[196]

**TABLE 1**

AMMUNITION MAGAZINE RESTRICTIONS IN 23 STATES, 1917–1934[197]

| Semi-automatic and Fully Automatic Firearms (barred firearms holding more than the listed | Fully Automatic Firearms (barred firearms capable of firing the listed number of rounds or more without reloading | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|

9    "Person"; Making It an Offense to Possess or Use Machine Guns. . . , 1933 Tex.

10    Gen. Laws 219–20, ch. 82, §§ 1–4, 6; An Act to Prohibit the Use of Machine

11    Guns and Automatic Rifles in Hunting, 1923 Vt. Acts and Resolves, § 1, 127;

12    1933 Wis. Sess. Laws 245, 164.01.

13    [196] 1927 Cal. Stat. 938; 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170;

14    1933 Wash. Sess. Laws 335.

15    [197] Including the District of Columbia. Note that California, Minnesota,

16    and New Jersey appear twice in this table. The dataset from which this

17    information is drawn ended in 1934, so it does not include any states that might

18    have enacted similar restrictions after 1934. *See* Duke Law Center for Firearms

19    Law, *Repository of Historical Gun Laws*, https://law.duke.edu/gunlaws/.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

91

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

| number of rounds or more without reloading) | or that could receive ammunition feeding devices) | |
|---|---|---|
| -California (10 rounds; 1933)<br>-District of Columbia (12 rounds; 1932)<br>-Massachusetts (1 round; 1927)<br>-Michigan (16 rounds; 1927)<br>-Minnesota (1 round; 1933)<br>-New Jersey (2 rounds; hunting only; 1920)<br>-North Carolina (2 rounds; hunting only; 1917)<br>-Ohio (18 rounds; 1933)<br>-Rhode Island (12 rounds; 1927)<br>-South Dakota (5 rounds; 1933)<br>-Virginia (7 rounds; 1934) | -Illinois (8 rounds; 1931)<br>-Louisiana (8 rounds; 1932)<br>-Minnesota (12 rounds; 1933)<br>-New Jersey (any removable device holding rounds; 1927)<br>-North Dakota (loadable bullet reservoir; 1931)<br>-Oregon (2 rounds; 1933)<br>-Pennsylvania (2 rounds; 1929)<br>-South Carolina (8 rounds; 1934)<br>-Texas (5 rounds; 1933)<br>-Vermont (6 rounds; 1923)<br>-Wisconsin (2 rounds; 1933) | -California (1927)<br>-Hawaii (1933)<br>-Missouri (1929)<br>-Washington State (1933) |

*See* Exhibit D for statutory text.

A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

> all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.[198]

---

[198] 1927 Cal. Stat. 938.

DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 2:23-CV-00112

92

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

The other three states in this category (Hawaii, Missouri, Washington[199]) utilized this same description. In all, at least twenty-three states enacted 26 gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (*see* Table 1). Of the states appearing in Table 1, fifteen of them restricted weapons or ammunition feeding devices of more than ten rounds. Another five states barred any weapons that could receive removable ammunition feeding devices (i.e., no rounds), totaling twenty states. The original version of the legislation that became the National Firearms Act of 1934, as noted earlier, included this definition of machine gun that encompassed both semi-automatic and fully automatic firearms: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[200] (This text was derived from the law enacted by Congress for the District of Columbia in 1932, which also stipulated a 12 round limit, as

---

[199] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; 1933 Wash. Sess. Laws 335.

[200] Hearings before the H. Comm. on Ways and Means, *supra* note 181, at 52.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

93

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    noted previously.[201] The final version of the 1934 bill was limited to fully

2    automatic firearms only and did not include any limitation by number of rounds

3    fired.) Regulations concerning removable magazines and magazine capacity

4    were thus common as early as the 1920s—the period of time when these weapons

5    and devices began to make their way into civilian life and also contributed to

6    violence and criminality, as illustrated by the Tommy gun narrative and other

7    weapons discussed here—as these regulations were adopted by nearly half of all

8    states.

9    **C.    Lessons From The Regulations of Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices**

10       The lesson from this sequence of events early in the twentieth century

11    demonstrates that changes in gun policy followed the series of steps described in

12    this Report that respond to developments in firearms technologies and their use

13    in crime, each dependent on the previous step. This lesson is significant because

14    some argue that the absence of government gun regulations in history—at the

15    time of the invention of various weapons or weapons developments—means that

16    regulations now are unjustifiable, or have no historical basis.

17

18    _____

19       [201] *Id.* at 45.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

94

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1          For example, David Kopel argues that "[m]agazines of more than ten

2     rounds are older than the United States."[202] Drawing on examples like a firearm

3     "created around 1580" capable of firing 16 "'superposed' loads" (with each

4     round stacked on top of the other); the Puckle gun said to fire eleven shots and

5     patented in 1718; the Girandoni air rifle, invented in the late 1700s; and the

6     Pepperbox pistol of the early 1800s,[203] Kopel suggests that "magazines of more

7     than ten rounds are older than the Second Amendment."[204] Therefore, by Kopel's

8     reckoning, since these weapons existed early in (or even before) the country's

9     existence, and were not specifically regulated, ipso facto, today's governments

10    are unable to regulate assault weapons, like AR-platform rifles, or magazines

11    exceeding certain capacities (typically, a ten-round limit).[205]

12

13         [202] Kopel, *The History of Firearm Magazines and Magazine Prohibitions*,

14    *supra* note 102, at 851.

15         [203] *Id.* at 852–54.

16         [204] *Id.* at 849.

17         [205] *Id.* at 871–72 ("a court which today ruled that [10-round] magazines are

18    'dangerous and unusual' would seem to have some burden of explaining how

19    such magazines, after a century and a half of being 'in common use' and

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

95

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1       Kopel's and similar arguments[206] fail for two sets of reasons. First, as

2    explained in the preceding sections, this sort of narrative misrepresents the

3    availability, viability, and capabilities of these early weapons. Kopel's claim that

4    ammunition magazines holding "more than ten rounds" were "very commonly

5    possessed in the United States since 1862" and were "owned by many millions

6    of law-abiding Americans" dating back to the "mid-nineteenth century"[207] is

7    simply false, as this narrative demonstrates. Second, the account fails to

8    understand the relationship between firearms' technological development, their

9    spread into civil society, and government gun policy. As one gun history expert

10    noted, "the guns of 1830 were essentially what they had been in 1430: single

11

12    'typically possessed by law-abiding citizens for lawful purposes,' became

13    'dangerous and unusual' in the twenty-first century.").

14       [206] Hlebinsky Decl., *Miller,* No. 3:19-cv-01537-BEN-JLB (Dkt. # 24-3).

15       [207] Kopel, *The History of Firearm Magazines and Magazine Prohibitions*,

16    *supra* note 102, at 871. Kopel insists "that [10-round] magazines" have been "'in

17    common use' and 'typically possessed by law-abiding citizens for lawful

18    purposes'" for "a century and a half" (*id.* at 871–72). This claim is both false and

19    unverified by his article.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

96

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

metal tubes or barrels stuffed with combustible powder and projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile. . .; then ignite the gunpowder and send the projectile on its way."[208] The firearms and firearm feeding devices regulated in the early twentieth century in the previous account represented a dramatically different type of firearm, capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices.

---

[208] Rasenberger, *supra* note 99, at 3–4. Indeed, as the United States evolved from an agrarian to an urban/industrial society, the resultant industrial revolution that took hold by the latter part of the nineteenth century resulted in the "acceleration in the processes of technical innovation . . . ." Freddie Wilkinson, *Industrial Revolution and Technology*, National Geographic (June 2, 2022), https://education.nationalgeographic.org/resource/industrial-revolution-and-technology/. This was no less true for the development of firearms, which witnessed a similar acceleration in developments by the start of the twentieth century.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

97

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1

## VIII.  CLARIFYING TERMS AND CONCEPTS ABOUT ASSAULT WEAPONS AND LCMS

2

According to the Plaintiffs' Motion in this case, "the term 'assault weapon'

3

has neither historical pedigree nor fixed meaning. Indeed, 'the term "assault

4

weapon" did not exist in the lexicon of firearms' until the 1980s, when 'anti-gun

5

publicists' coined it to try 'to expand the category of "assault rifles" so as to allow

6

an attack on as many additional firearms as possible on the basis of undefined

7

"evil" appearance.'"[209] Similarly, the Motion for Preliminary Injunction in this

8

case asserts that the "term 'assault weapons' is a misnomer. 'Prior to 1989, the

9

term "assault weapon" did not exist in the lexicon of firearms. It is a political

10

term, developed by anti-gun publicists.'"[210] Assertions like this are incorrect. The

11

terms "assault weapon" and "assault rifle" were the very terms used by the gun

12

companies that first produced, marketed, and sold such weapons to the public.

13

Gun industry use of the terms "assault weapons" and "assault rifles"

14

appeared in the early 1980s (and even earlier), before efforts to regulate them

15

16

[209] Motion for Preliminary Injunction, ECF No. 16 at 2 (quoting *Stenberg*

17

*v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissent)) (though Justice

18

Thomas specified "prior to 1989," not "until the 1980s.").

19

[210] *Id.*

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

98

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   emerged in the late 1980s and early 1990s.[211] A study of the marketing strategies

2   employed by gun manufacturers and gun publications from the time that such

3   weapons emerged in the American civilian market in a significant way in the

4   early 1980s verifies this.[212] It reports on and quotes directly from gun company

5   advertisements and gun magazines. Examples include: Heckler and Koch selling

6   its "HK 91 Semi-Automatic Assault Rifle"; ads for the "Bushmaster assault

7   rifle"; the AKM "imported assault rifle"; the Beretta M-70 that "resembles many

8   other assault rifles"; the AR10/XM-10 (made by Paragon S&S Inc.) advertised

9   as a "Famous Assault Rifle [that] is Now Available in a Semi Auto Civilian Legal

10  Form!" (*see* Exhibit J); the "AMT 25/.22 Lightning Carbine" that was advertised

11  as an "assault-type semi-auto"; Intratec extolling its TEC-9 as one that "clearly

12  stands out among high capacity assault-type pistols" (*see* Exhibit I); and the after-

13

14  [211] Violence Policy Center, *The Militarization of the U.S. Civilian Arms*

15  *Market*, June 2011, http://www.vpc.org/studies/militarization.pdf#page=33; *see*

16  *also* Violence Policy Center, *Assault Weapons and Accessories in America*, 1988,

17  http://www.vpc.org/studies/awacont.htm;

18  http://www.vpc.org/studies/thatintr.htm.

19  [212] Tom Diaz, *Making a Killing* (1999).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

99

1     market supplier Assault Systems that appealed to civilian owners of "assault

2     weapons," among many other examples. The use of military terminology, and the

3     weapons' military character and appearance, were key to marketing the guns to

4     the public.[213] *Guns & Ammo* magazine described the "success of military assault

5     rifles in the civilian market" in its July 1982 issue.[214] In 1984, *Guns & Ammo*

6     advertised a book called *Assault Firearms* that the magazine extolled as "full of

7     the hottest hardware available today."[215]

8         As a standard buyer's guide on assault weapons noted, the "popularly-held

9     idea that the term 'assault weapon' originated with anti-gun activists, media or

10    politicians is wrong. The term was first adopted by the manufacturers,

11

12

13    [213] Diaz, *Making a Killing*, *supra* note 212, at 124–128, 230–231;

14    Tom Diaz, *The Last Gun* 142–43 (2013); Ryan Busse, *Gunfight* 8 (2021).

15    [214] *Wooters Chooses the 10 Best Gun Designs*, Guns & Ammo (July 1982),

16    at 58, 68; Diaz, *Making a Killing, supra* note 212, at 126.

17    [215] Erica Goode, *Even Defining 'Assault Rifles' Is Complicated*, New York

18    Times, Jan. 17, 2013, https://www.nytimes.com/2013/01/17/us/even-defining-

19    assault-weapons-is-complicated.html

DECLARATION OF ROBERT J.                         100                  ATTORNEY GENERAL OF WASHINGTON
SPITZER IN SUPPORT OF OPPOSITION                                            1125 Washington Street SE
TO MOTION FOR PRELIMINARY                                                        PO Box 40100
INJUNCTION                                                                  Olympia, WA 98504-0100
NO. 2:23-CV-00112                                                               (360) 753-6200

1  wholesalers, importers and dealers in the American firearms industry . . . ."[216]

2  The more expansive phrase "assault weapon" is generally used over "assault

3  rifle" because "weapon" also includes not only rifles but some shotguns and

4  handguns that were also subject to regulation in the federal 1994 assault weapons

5  ban and subsequent laws.

6       An article in *Outdoor Life* belied the claim that assault weapons are limited

7  only to firearms that fire fully automatically. That article urged its readers to share

8  its information with non-shooting friends to dispel "myths" about "assault

9  weapons." In its account, it correctly noted that "the term 'assault weapon' . . .

10  generally referred to a type of light infantry firearm initially developed in World

11  War II; a magazine-fed rifle and carbine suitable for combat, such as the AK-47

12  and the M16/M4. These are selective-fire weapons that can shoot semi-auto, full-

13  auto, or in three-round bursts."[217]

14

15

---

16       [216] Phillip Peterson, *Gun Digest Buyer's Guide to Assault Weapons, supra*

17  note 155, at 11.

18       [217] John Haughey, *Five Things You Need to Know About 'Assault*

19  *Weapons'*,          Outdoor          Life,          March          19,          2013,

1    The effort to rebrand "assault weapons" as something more benign and

2    severed from its military origins was seen in the publication struggles of Phillip

3    Peterson, whose book, titled as recently as 2008, *Gun Digest Buyer's Guide to*

4    *Assault Weapons*,[218] is a well-known reference work on the subject. As Peterson

5    explained, the gun industry "moved to shame or ridicule" those who used the

6    phrase "assault weapons," insisting that the term should now only apply to fully

7    automatic weapons. Peterson noted that the origin of the term "assault weapon"

8    was the industry itself.[219] He found that the NRA refused to sell his book until he

9    changed the title, which in 2010 he renamed *Gun Digest Buyer's Guide to*

10   *Tactical Rifles*.[220] The very same pattern played out in Canada, where gun

11   companies also used the term "assault rifle" in the 1970s and 1980s until political

12   pressure began to build to restrict such weapons in the aftermath of a mass

13

14   http://www.outdoorlife.com/blogs/gun-shots/2013/03/five-things-you-need-

15   know-about-assault-weapons/

16   [218] Peterson, *Gun Digest Buyer's Guide to Assault Weapons*, *supra* note

17   154.

18   [219] Goode, *supra* note 215.

19   [220] Phillip Peterson, *Gun Digest Buyer's Guide to Tactical Rifles* (2010).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

102

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    shooting in Montreal in 1989. By the 1990s, gun companies marketing guns in

2    Canada and their allies also adopted terms like "modern sporting rifles."[221]

3        Critics of statutory limits on large capacity magazines (LCMs), usually

4    defined as those holding more than ten rounds, similarly complain that such terms

5    are "often purposely and wrongly applied by anti-gun groups during

6    conversations on gun politics to mislabel standard capacity magazines."[222] Yet

7

8

---

9    [221] According to Blake Brown, Canadian newspapers ran ads from gun

10   companies selling weapons like the "AR-15 semi-automatic assault rifle," the

11   "Colt AR-15 Semi Auto Assault Rifle," and the "SKS Assault Rifle" among

12   others, in 1976, 1982, 1983, 1985, and 1986 from dealers and companies

13   including MilArm, Colt, and Ruger. Blake Brown, *Gun Advocates' Changing*

14   *Definition of 'Assault Rifles' is Meant to Sow Confusion*, The Globe and Mail,

15   May 21, 2020, https://www.theglobeandmail.com/opinion/article-gun-

16   advocates-changing-definition-of-assault-rifles-is-meant-to-sow/

17   [222] Chris Eger, *Magazines: Standard Capacity v Large Capacity*,

18   Guns.com, Nov. 18, 2020, https://www.guns.com/news/2020/11/18/magazines-

19   standard-capacity-v-large-capacity

DECLARATION OF ROBERT J.                    103              ATTORNEY GENERAL OF WASHINGTON
SPITZER IN SUPPORT OF OPPOSITION                                1125 Washington Street SE
TO MOTION FOR PRELIMINARY                                            PO Box 40100
INJUNCTION                                                     Olympia, WA 98504-0100
NO. 2:23-CV-00112                                                   (360) 753-6200

the LCM term is neither "wrongly applied" nor a political "mislabel," and for three reasons.

First, the LCM definition of one holding ten or more rounds dates back to at least 1991,[223] in an early version of the law Congress eventually passed in 1994 that said the term "large capacity ammunition feeding device" was defined in the law as "a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. . . ."[224] Since that time, ten states plus the District of Columbia have adopted the LCM ten round limit (see earlier discussion).

Second, the definition of LCMs based on a ten-round limit has been and is widely accepted and used in the scholarly literature in criminology and other fields examining such devices.[225]

---

[223] Violent Crime Control and Law Enforcement Act of 1994, H.R. Rep. 103-489, H.R. Rep. No. 489, 103rd Cong., 2nd Sess. 1994, at 36.

[224] *Id.* at 6.

[225] *For example, see*, 3 *Guns in American Society* § III, 777–78, (Gregg Lee Carter, ed. Santa Barbara, CA: ABC-CLIO, 2012),; Jaclyn Schildkraut and Tiffany Cox Hernandez, *Laws That Bit The Bullet: A Review of Legislative*

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

104

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1          Third, as Table 1 and the accompanying discussion in this document

2     shows, from 1917 to 1934 roughly half of the states in the U.S. enacted laws that

3     restricted various ammunition feeding devices, or guns that could accommodate

4     them, based on a set number of rounds, though the numerical cap for gun firing

5     without reloading varied at that time from more than a single round up to

6     _____

7     *Responses to School Shootings*, 39 American Journal of Criminal Justice, 358-74

8     (2014); Luke Dillon, *Mass Shootings in the United States: An Exploratory Study*

9     *of the Trends from 1982-2012*, Mason Archival Repository Service (May 22,

10    2014)        (M.A.        Thesis,        George        Mason        University),

11    http://mars.gmu.edu/xmlui/handle/1920/8694;        Jaclyn        Schildkraut,        *Assault*

12    *Weapons, Mass Shootings, and Options for Lawmakers, Rockefeller Institute of*

13    *Government*,  March  22,  2019,  https://rockinst.org/issue-area/assault-weapons-

14    mass-shootings-and-options-for-lawmakers/;        Christopher        Koper,        et        al.,

15    *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings*

16    *Through  Restrictions  on  Assault  Weapons  and  Other  High-Capacity*

17    *Semiautomatic Firearms*, 19 *Criminology & Public Policy* 157, (Feb. 2020);

18    Philip J. Cook and Kristin A. Goss, *The Gun Debate* 201, (2nd ed. NY: Oxford

19    University Press, 2020).

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

105

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1     eighteen. Thus, the idea of restricting removable magazines by capping the

2     number of rounds dates back at least a century.

3                   **IX.    CONCLUSION**

4         As I describe in this Report, and as the series of examples examined here

5     illustrate, gun policy changes occur in and through a sequential process. *First*, a

6     new gun or gun technology is invented. *Second*, it may then be patented, though

7     the patenting of a design or idea by no means assures that it will proceed beyond

8     this point. *Third*, it is often developed with a focus on military applications and

9     supplying military needs, not directly for civilian acquisition or use. *Fourth*, some

10     weapons may then spread to, or be adapted to, civilian markets and use. *Finally*,

11     if such weapons then circulate sufficiently in society to pose a safety, violence,

12     or criminological problem or threat, calls for government regulation or restriction

13     then may lead to gun policy/law changes. New gun laws are not enacted when

14     firearm technologies are invented or conceived. They are enacted when those

15     technologies circulate sufficiently in society to spill over into criminal or other

16     harmful use, presenting public safety concerns that governments attempt to

17     address through their police and policy-making powers.

18         Contemporary restrictions among the States pertaining to large capacity

19     ammunition magazines are merely the latest iteration of a centuries-long tradition

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

106

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

of weapons regulations and restrictions. Gun ownership is as old as the country. But so are gun and other dangerous weapons laws, which have adapted to changes in threats to public safety. Given the importance of history to considerations of contemporary gun laws, the lesson is abundantly clear: Firearms and other dangerous weapons were subject to remarkably strict, consistent, and wide-ranging regulation throughout our history when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality. The historical record from the 1600s through the early twentieth century, as seen in the examples examined here, is even more remarkable given that the United States was an evolving and developing nation-state that could not claim to have reached maturity until the twentieth century. Contemporary restrictions among the states pertaining to assault weapons and large capacity ammunition magazines are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions.

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

107

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1        I declare under penalty of perjury under the laws of the State of

2    Washington that the foregoing is true and correct to the best of my knowledge.

3        EXECUTED this _18th_ day of _May_, 2023 at _Williamsburg, Virginia_ .

4

5    _____

6        ROBERT J. SPITZER, Ph.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

DECLARATION OF ROBERT J.
SPITZER IN SUPPORT OF OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 2:23-CV-00112

108

1

## <u>DECLARATION OF SERVICE</u>

2      I hereby declare that on this day I caused the foregoing document to be

3   electronically filed with the Clerk of the Court using the Court's CM/ECF System

which will serve a copy of this document upon all counsel of record.

4      DATED this 1st day of June, 2023, at Seattle, Washington.

5

6                              */s/ Andrew R.W. Hughes*
                              ANDREW R.W. HUGHES, WSBA #49515
7                              Assistant Attorney General

8

9

10

11

12

13

14

15

16

17

18

19