ZACHARY J. PEKELIS, WSBA #44557
KAI A. SMITH, WSBA #54749
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
(206) 245-1700

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| AMANDA BANTA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT W. FERGUSON, *et al.*,<br><br>Defendants,<br><br>and<br><br>ALLIANCE FOR GUN RESPONSIBILITY,<br><br>Intervenor-Defendant. | No. 2:23-cv-00112-MKD<br><br>INTERVENOR-DEFENDANT ALLIANCE FOR GUN RESPONSIBILITY'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br><br>**NOTED ON MOTION CALENDAR:**<br>July 26, 2023 |

INTERVENOR-DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:23-cv-00112-MKD - 1

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

TABLE OF CONTENTS

I. INTRODUCTION ................................................................................... 1

II. FACTUAL BACKGROUND ................................................................. 2

III. AUTHORITY AND ARGUMENT ........................................................ 3
    A. Legal Standard and Burdens Under *Bruen* .................................. 3
    B. SHB 1240 is constitutional under each prong of the *Bruen* test .. 4
        1. Plaintiffs misconstrue the "common use" question ........... 5
        2. Assault weapons involve dramatic technological changes 7

IV. CONCLUSION ..................................................................................... 13

ALLIANCE'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:23-cv-00112-MKD - i

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

TABLE OF AUTHORITIES

Federal Cases

*Bevis v. City of Naperville*, No. 22 C,
   4775, 2023 WL 2077392 ..................................................................................8

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ............................................................................... 2, 3, 4, 8

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ...........................................................................17

*Gould v. Morgan*,
   907 F.3d 659 (1st Cir. 2018) ...........................................................................17

*Hanson v. District of Columbia*,
   No. CV 22-2256 (RC), 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ...................9

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ..........................................................................................3

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*,
   618 F. Supp.3d 901 (N.D. Cal. 2022) ...............................................................6

*Nat'l Rifle Ass'n v. Bondi*,
   61 F.4th 1317 (11th Cir. 2023) ........................................................................17

*New York State Rifle and Pistol Association, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ............................................................................. passim

*Oregon Firearms Fed'n, Inc. v. Brown* (*OFF I*), No. 2:22-CV-01815-IM,
   2022 WL 17454829, at *12 (D. Or. Dec. 6, 2022),
   2022 WL 17454829, at *12 (D. Or. Dec. 6, 2022) ........................................5, 9

*Or. Firearms Fed'n v. Kotek* (*OFF II*), No. 2:22-CV-01815-IM, 2023 WL
   3687404, at *2 (D. Or. May 26, 2023),
   2023 WL 3687404, at *2 (D. Or. May 26, 2023) .................................. 8, 11, 12

ALLIANCE'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:23-cv-00112-MKD - ii

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

*Ocean State Tactical, LLC v. Rhode Island*,
　No. 22-CV-246 JJM-PAS, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) ............. 10

*State Sportsmen's Ass'n v. Del. Dep't of Safety and Homeland Sec.*,
　No. 22-951-RGA, 2023 WL 2655150 ............................................................ 10, 11

*United States v. Tilotta*,
　No. 3:19-cr-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) .............. 9

Other Authorities

*Gun Accessories and the Second Amendment*,
　83 Law & Contemp. Probs. 231 (2020) .......................................... 19, 21, 22, 23

*On Analogical Reasoning*,
　106 Harv. L. Rev. 741 (1993) ..................................................................... passim

ALLIANCE'S RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:23-cv-00112-MKD - iii

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

## I. INTRODUCTION

Assault weapons are semiautomatic firearms created for deadly battlefield purposes and designed to kill people quickly and in large numbers. Giffords L. Ctr., *Assault Weapons*, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Jonathan Franklin, *How AR-15-Style Rifles Write the Tragic History of America's Mass Shootings*, https://www.npr.org/2023/05/10/1175065043/mass-shootings-america-ar-15-rifle. The availability of unusually dangerous weaponry like assault weapons and large-capacity magazines to the public has fueled an alarming increase in high capacity mass shootings across the nation. Giffords L. Ctr., *supra*. Perpetrators of many of the deadliest mass shootings in modern American history—including in Las Vegas, Orlando, Newtown, Sutherland Springs, El Paso, Robb Elementary, Parkland, Aurora, and Dayton—used assault weapons equipped with large-capacity magazines. *Id*. In response to this gun violence crisis, on April 25, 2023, Governor Jay Inslee signed into law Substitute House Bill 1240 ("SHB 1240" or the "Law") to improve public safety and reduce mass shootings by limiting the manufacture, import, and sale of assault weapons. Contrary to Plaintiffs' contentions, SHB 1240 is constitutional.

In *New York State Rifle and Pistol Association, Inc. v. Bruen*, the Supreme Court announced a new standard for Second Amendment claims based on constitutional text and history. 142 S. Ct. 2111, 2125–26 (2022). At the same time, the Justices in the majority emphasized that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id*. at 2162 (Kavanaugh, J.,

INTERVENOR-DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 2:23-cv-00112-MKD - 1

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

joined by Roberts, C.J., concurring) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008)). For the reasons explained by Defendants Robert Ferguson, et al. ("State Defendants"), Washington State's SHB 1240 meets the new *Bruen* standard. Intervenor-Defendant Alliance for Gun Responsibility (the "Alliance") joins State Defendants' Response, ECF No. 30, in full. Having recently been permitted to intervene, the Alliance submits this brief to complement State Defendants' submissions. Contrary to Plaintiffs' argument, the *Bruen* analysis does not ask whether assault weapons are widely *owned*, and it certainly does not *end* with that question. If a regulated weapon is "presumptively protected" as an "Arm" that is "in common use today for self-defense" (which assault weapons are not), *Bruen* leaves no doubt what the next step is: the Court must then determine whether the regulation comports with this Nation's "historical tradition of firearm regulation." 142 S. Ct. at 2134, 2130 (cleaned up). Furthermore, assault weapons involve "dramatic technological changes" from the firearms available when the Second and Fourteenth Amendments were ratified, and SHB 1240 is consistent with this country's history of increasingly regulating firearms as they contribute to interpersonal violence.

## II. FACTUAL BACKGROUND

The Alliance incorporates by reference the factual background and procedural history set forth in State Defendants' Response. ECF No. 30 at 2-8.

INTERVENOR-DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 2:23-cv-00112-MKD - 2

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### III.    AUTHORITY AND ARGUMENT

**A. Legal Standard and Burdens Under *Bruen***

The Supreme Court has clarified that "individual self-defense is the *central component* of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (citing *Heller*, 554 U.S. at 599) (cleaned up). For that reason, the Second Amendment "guarantee[s] the individual the right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.

In *Bruen*, the Supreme Court reaffirmed *Heller* and established a new method for resolving Second Amendment challenges. *Bruen*, 142 S. Ct. at 2125-26. It divided the analysis into two parts: (1) a textual inquiry to determine if "the Second Amendment's plain text covers an individual's conduct" regulated by the challenged law, *id*. at 2129–30; and (2) a historical inquiry into whether the statute "is consistent with this Nation's historical tradition of firearm regulation," *id*. at 2130. The Law is valid if Plaintiffs do not carry their burden of demonstrating that the Second Amendment's text applies to the statute. *Id*. at 2129–30. And even if Plaintiffs succeed at the first stage, the Law is still valid if it is "consistent with the Nation's historical tradition of firearm regulation." *Id*.; *see also Oregon Firearms Fed'n, Inc. v. Brown* (*OFF I*), No. 2:22-CV-01815-IM, 2022 WL 17454829, at *12 (D. Or. Dec. 6, 2022) ("At trial, if Plaintiffs demonstrate that their conduct is covered by the text of the Second Amendment, the Constitution presumptively protects that conduct and the burden shifts to the government to demonstrate that the regulation is part of the historical tradition delimiting the outer bounds of the right to keep and bear arms."); *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 618 F. Supp.3d 901, 914 (N.D.

INTERVENOR-DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:23-cv-00112-MKD - 3

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Cal. 2022) ("If the conduct at issue is covered by the text of the Second Amendment, the burden then shifts to the government to show why the regulation is consistent with the Nation's historical tradition of firearms regulation . . . .").

For the reasons explained in State Defendants' Response, Plaintiffs have failed to meet their burden and SHB 1240 is constitutional. Specifically, the Second Amendment's plain text does not apply to military-style assault weapons that are not commonly *used* for self-defense—no matter how many such weapons of war have been *sold*. And even if the Second Amendment did cover such firearms, SHB 1240 fits well within the nation's history of firearm regulation. The Alliance provides this separate brief to explain that (1) Plaintiffs are wrong that the *Bruen* analysis here involves nothing more than determining whether or not assault weapons are widely owned; and (2) assault weapons involve dramatic technological changes and warrant regulation, consistent with the Nation's tradition of regulating firearms.

**B. SHB 1240 is constitutional under each prong of the *Bruen* test**

As the State Defendants explain, SHB 1240 does not regulate conduct falling within the plain text of the Second Amendment. ECF No. 30 at 9-16. But even if Plaintiffs could meet that burden, the Law would still be constitutional. As *Bruen* explained, while conduct falling within the Second Amendment's plain text is presumptively protected, regulations of such conduct are nevertheless constitutional if "consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. SHB 1240 is consistent with this tradition.

INTERVENOR-DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 2:23-cv-00112-MKD - 4

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

### 1. Plaintiffs misconstrue the "common use" question

As an initial matter, the Court should reject Plaintiffs' unfounded argument that the Court should ignore the history prong of the *Bruen* analysis. ECF 16 at 18. Misreading *Bruen*, Plaintiffs contend that the historical test is the "traditions of the American people" and that "the tradition of the American people is that law-abiding citizens may keep and bear arms that are commonly possessed for self-defense." ECF 16 at 18. This attempt to short-circuit the historical analysis distorts *Bruen* in two separate respects. First, *Bruen* makes clear that the "common use" question goes to the *textual* analysis of whether conduct is constitutionally protected at all, not the *history* prong. *See Bruen*, 142 S. Ct. at 2128 (*Heller* found it "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that the Second Amendment protects the possession and use of weapons that are "'in common use at the time.'") (quoting *Heller*, 554 U.S. at 627); *Or. Firearms Fed'n v. Kotek* (*OFF II*), No. 2:22-CV-01815-IM, 2023 WL 3687404, at *2 (D. Or. May 26, 2023) (whether "conduct at issue is covered by the plain text of the Second Amendment . . . includes finding that the weapon in question is "'in common use today for self-defense'"); *Bevis v. City of Naperville*, No. 22 C 4775, 2023 WL 2077392, at *9 n. 7 ("[B]ans on weapons not in common use fall outside the Second Amendment's text only protecting certain 'arms.'"). Second, Plaintiffs incorrectly frame the "common use" question as asking simply whether assault weapons are "highly unusual." ECF No. 16 at 17. As *Bruen* makes clear, however— and as many federal courts have held post-*Bruen*—the correct question is whether assault weapons are "in common *use* today for *self-defense*." 142 S. Ct. at 2134

INTERVENOR-DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 2:23-cv-00112-MKD - 5

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

(emphasis added) (cleaned up); *see, e.g.*, *OFF I*, 2022 WL 17454829, at *11 (plaintiffs failed to show that large-capacity magazines are "in common use for lawful purposes like self-defense" where "large-capacity magazines are rarely used by civilians for self-defense" but "are disproportionately used in crimes involving mass shootings"); *United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *4 (S.D. Cal. Aug. 30, 2022) (noting that *Bruen* asks "if the type of weapon at issue, handguns, was in 'common use' today for self-defense"); *Hanson v. District of Columbia*, No. CV 22-2256 (RC), 2023 WL 3019777, at *7 (D.D.C. Apr. 20, 2023) (same); *Ocean State Tactical, LLC v. Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *15 (D.R.I. Dec. 14, 2022) (same). As State Defendants persuasively show, assault weapons fail this "common use" test, so Plaintiffs fail to carry their burden as to *Bruen*'s text prong. ECF 30 at 11-16.

Even if assault weapons were "presumptively protected" as a textual matter (and they are not), *Bruen* leaves no doubt as to the next step: to determine whether SHB 1240 is "consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2117, 2130. The Court should decline Plaintiffs' invitation to bypass the history prong altogether, just as other courts have refused to do. *See, e.g.*, *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety and Homeland Sec.*, No. 22-951-RGA, 2023 WL 2655150 at *8 ("Plaintiffs argue that, once a weapon is found to be 'in common use' within the meaning of the Second Amendment, it cannot be regulated, and no historical analysis is necessary. I disagree.") (cleaned up); *OFF II*, 2023 WL 3687404, at *3 ("This Court agrees with the court's analysis in *Delaware State Sportsmen's Ass'n, Inc.* and concludes that whether a weapon is in common

INTERVENOR-DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 2:23-cv-00112-MKD - 6

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

use for lawful purposes such as self-defense today is the first question—not the only question—that a court must consider under *Bruen*.").

### 2. Assault weapons involve dramatic technological changes

As the Supreme Court explained in *Bruen*, the historical inquiry will be "fairly straightforward" in some cases, such as when a challenged law addresses a "general societal problem that has persisted since the 18th century." *Id*. at 2131. But where the law addresses "unprecedented societal concerns or dramatic technological changes," the historical analysis requires a "nuanced approach." *Id*. at 2132. In such cases, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. at 2133. Thus, a modern-day regulation need not be a "dead ringer for historical precursors" to "pass constitutional muster." *Id*. Instead, in evaluating whether a "historical regulation is a proper analogue for a distinctly modern firearm regulation," *Bruen* directs courts to determine whether the two regulations are " 'relevantly similar.'" *Id*. at 2132 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). At least two metrics are pertinent to this determination: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132-33. Accordingly, a regulation restricting protected conduct is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors that is "comparably justified." *Id*. at 2133.

Here, as State Defendants have demonstrated even at this preliminary stage, states have long regulated weapons used for lawless violence, including firearms

INTERVENOR-DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 2:23-cv-00112-MKD - 7

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

capable of automatic and semiautomatic fire, bowie knives, clubs and other blunt weapons, pistols, and trap guns. ECF No. 30 at 18-21.

Furthermore, contrary to Plaintiffs' contention that repeating firearms were widespread around the time that the Second and Fourteenth Amendments were ratified, assault weapons represent a "dramatic technological change" from the firearms of the eighteenth and mid-nineteenth centuries. *Id*. 2132; *see* ECF No. 16 at 19. During the 1700s, most gun owners in the American colonies and in the newly independent republic of the United States possessed and used single shot, muzzle-loading, flintlock firearms, or muskets. Expert Report of Professor Kevin Sweeney ("Sweeney Report") ¶¶ 4, 8.[1] Eighteenth-century muskets had two serious setbacks. *Id*. ¶ 9. First, their accuracy and range were limited. *Id*. And second, loading and reloading these muskets was a complicated and relatively slow process. *Id*. ¶ 10.

While inventive gunsmiths had been trying to design reliable, effective firearms capable of shooting multiple rounds without reloading since at least the sixteenth century, these weapons were flawed, experimental curiosities prior to the founding of the United States. Expert Report of Professor Brian DeLay ("DeLay Report") ¶ 6.[2] Most of these weapons never advanced beyond proof of concept. *Id*. Moreover, these weapons were usually more suited to admire than to shoot. *Id*. ¶ 11; *see also* Sweeney Report ¶ 6. Only a small minority of large-capacity firearm

---

[1] The Sweeney Report is attached as Exhibit A to the Declaration of Zachary J. Pekelis (Pekelis Declaration).

[2] The DeLay Report is attached as Exhibit B to the Pekelis Declaration.

INTERVENOR-DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 2:23-cv-00112-MKD - 8

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

inventions ever moved past the design or prototype stage, and none achieved commercial significance or military relevance prior to 1791, when the Second Amendment was ratified. Delay Report ¶ 6.

For example, the Girardoni rifle one of the only large-capacity weapons from the period that enjoyed limited, experimental military use in a European army was not even a true firearm, but rather an *air* gun. *Id*. ¶ 20-21; *see also* Sweeney Report ¶ 38. But air-guns had major drawbacks that consigned them to the status of military oddities and niche consumer items. DeLay Report ¶ 22. These drawbacks included difficulty achieving air pressures commensurate with black powder, requiring 1,500 pumps to fully pressurize one reservoir. *Id*. They also demanded high levels of skill to build and significant manufacturing costs. *Id*. All these factors consigned the Girardoni air gun to the status of a novelty for people of sufficient wealth to spend on unusual (if impractical) curios. *Id*. ¶¶ 22–23; *see also* Sweeney Report ¶ 38 ("[O]nce again a repeater was being featured as a novelty in a show put on for paying customers.").

Plaintiffs contend that "[t]here were no restrictions on firing capacity, reloading mechanisms, or the kinds of attachments the state has singled out *at all* when . . . the Second . . . Amendment was ratified." ECF No. 16 at 19. But as shown above, these firearms were a rarity and remained "flawed curiosities." Delay Report ¶ 43. "The simplest and most accurate explanation for the absence of regulation, therefore, is that high-capacity firearms were much too rare to attract regulatory attention in 1791." *Id*.

INTERVENOR-DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 2:23-cv-00112-MKD - 9

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

Firearms technology underwent dramatic evolution after 1791. *Id*. ¶ 45. The period from the 1820s through the 1860s became one of the most productive and dynamic in the history of firearms technology. *Id*. An example of a new innovation was the percussion cap ignition, which led the way to two types of repeating pistols entering the market by the 1830s: one manufactured by Samuel Colt and the other by Ethan Allen. *Id*. ¶ 49. Also referred to as revolvers, these arms eventually came to be known as "pepperboxes." *Id*. But these repeating pistols had two important limitations: The vast majority of revolvers or pepperboxes produced in the nineteenth century held seven or fewer rounds and they took a significant amount of time to reload. *Id*. ¶¶ 51–52. Thus, in terms of the damage that a single person could inflict with a firearm, limited shot capacity and lengthy reload times sharply distinguished these early pistols from today's semi-automatic handguns. Id. ¶ 53.

Unlike the repeat-fire curiosities in the eighteenth century, these new firearms had actual social consequences. *Id*. ¶ 50. And these social consequences generated legislation. *Id*. Responding to rising public safety concerns over the increase in gun violence and the proliferation of concealable weapons, including repeating pistols and percussion-cap pistols, lawmakers sought to regulate conceal-carry. *Id*. More than thirty such laws were enacted around the country between the ratifications of

INTERVENOR-DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 2:23-cv-00112-MKD - 10

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

the Second and Fourteenth Amendments. *Id*.[3] Further, many states started to regulate firing capacity in various ways, including by regulating weapons defined "by the number of rounds that could be fired without reloading or by the ability to receive bullet feeding devices." *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 Law & Contemp. Probs. 231, 237-38 (2020).

The technological and manufacturing advances that made repeat-fire pistols practical weapons for the first time also enabled new breakthroughs in long arms. DeLay Report ¶ 54. Innovations included metallic cartridges and breech-loading firearm designs, which made loading the firearms easier. *Id*. ¶¶ 54–55. This line of innovation culminated in 1860 with the world's first reliable firearm with a greater than ten-shot capacity. *Id*. ¶¶ 56. But these high-capacity firearms went almost exclusively to military buyers through the early 1870s with very few to private

---

[3] *Bruen* surveyed numerous statutes and cases from the antebellum and postbellum periods in assessing the scope of the Second Amendment, while reserving judgment on whether courts should "primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868." 142 S. Ct. at 2138. However, multiple courts of appeals have held that, when a Second Amendment challenge is directed at a state law, the pertinent point in time [for assessing original public meaning] would be 1868 (when the Fourteenth Amendment was ratified), not 1791. *See, e.g.*, *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323–24 (11th Cir. 2023); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).

INTERVENOR-DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 2:23-cv-00112-MKD - 11

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

persons. *Id.* ¶ 57. And in totality, high-capacity firearms constituted less than 0.002% of all firearms in the United States even a few years after the ratification of the Fourteenth Amendment. *Id.* ¶ 58.

The late nineteenth century was the era of slow-load, high-capacity firearms. *Id.* ¶ 61. For example, Winchester lever-action rifles and their high-capacity competitors had fixed magazines. *Id.* ¶ 61. Once the internal magazine was empty, the shooter had to reload, each round one by one, which put a ceiling on the damage a single shooter could inflict—a ceiling that had not risen much since the 1830s. *Id.*

These inventions did not provoke fundamentally different social problems than those that had been accelerating in the United States since the proliferation of the revolvers and pepperboxes earlier in the century. *Id.* ¶ 62. State lawmakers continued to regulate firearms in the name of public safety, as they had since the colonial era. *Id.* At least forty-eight new laws were passed in the United States between 1868 and 1903 restricting firearm carry, for example. *Id.* By the turn of the century, most Americans living in the nation's most populous urban area were subject to some form of restrictive carry regulations. *Id.*

Automatic and semi-automatic firearms first started coming on the market in the 1890s. *Id.* ¶ 67. American firms helped lead the way in the production of semi-automatic rifles. *Id.* ¶ 71. And light, fully automatic guns, called "sub-machine guns" migrated from the battlefield to the U.S. civilian market. *Id.* The most notorious was the Thompson submachine gun, also known as the "Tommy Gun," which entered the U.S. market in the 1920s. *Id.* This fast-load, high-capacity firearm became much sought-after by criminals and law enforcement alike. *Id.* But despite the great variety

INTERVENOR-DEFENDANT'S RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION
Case No. 2:23-cv-00112-MKD - 12

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON 98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

of models produced, prior to the 1930s very few of the new firearms came with magazines that held more than ten rounds. *Id*. ¶ 73.

Nevertheless, state lawmakers did pass laws restricting semi-automatic weapons, some of which incorporated capacity ceilings into the law. *Id*. ¶ 74. And it is clear that the lawmakers did respond to the novel public safety implications of semi-automatic firearms by regulating them. *Id*.

In sum, even at this early stage of the case, the foregoing historical survey demonstrates that firearms underwent dramatic technological change from the Founding and Reconstruction eras to the beginning of the twentieth century, when semi-automatic firearms came on the market. Further, this history demonstrates a long tradition of regulating arms like today's assault weapons that pose significant risks to public safety. SHB 1240 fully aligns with this tradition.

### IV.   CONCLUSION

The Alliance respectfully requests that the Court deny Plaintiffs' Motion for Preliminary Injunction.

DATED this 1st day of June, 2023.

PACIFICA LAW GROUP LLP

By: */s/ Zachary J. Pekelis*
ZACHARY J. PEKELIS, WSBA #44557
KAI A. SMITH, WSBA #54749
1191 2nd Avenue, Suite 2000
Seattle, WA  98101-3404 | (206) 245-1700
Zach.Pekelis@PacificaLawGroup.com
Kai.Smith@PacificaLawGroup.com

*Attorneys for Proposed Intervenor-Defendant Alliance for Gun Responsibility*

INTERVENOR-DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 2:23-cv-00112-MKD - 13

PACIFICA LAW GROUP  LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750