Steven W. Fogg, WSBA No. 23528
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104-1001
Ph: (206) 625-8600

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| AMANDA BANTA, SHARP SHOOTING INDOOR RANGE & GUN SHOP, INC., THE RANGE, LLC, AERO PRECISION, LLC, and NATIONAL SHOOTING SPORTS FOUNDATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT W. FERGUSON, ATTORNEY GENERAL OF THE STATE OF WASHINGTON; and JOHN R. BATISTE, CHIEF OF THE WASHINGTON STATE PATROL, <br><br> Defendants. | No. 2:23-cv-00112-MKD <br><br> PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

Under *Bruen* and *Heller*, the irreducible minimum of the Second Amendment is this: States may not ban arms that millions of law-abiding Americans possess for lawful purposes such as self-defense. That most basic of principles dooms HB 1240.

## I. Plaintiffs Are Likely To Succeed On The Merits.

The Second Amendment secures "the right of the people to keep and bear Arms." U.S. Const. amend. II. Accordingly, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022). The first question after *Bruen* thus is whether the firearms HB 1240 bans satisfy "the Second Amendment's definition of 'arms.'" *Id*. at 2132. If the answer is yes, then the next question is whether the state's effort to ban them is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126, 2132. Here, the Supreme Court has already supplied all the tools necessary to answer both questions. Whatever else may be said of the firearms HB 1240 bans, they plainly satisfy *Bruen*'s broad definition of "arms," so the right to keep and bear them is presumptively protected by the Second Amendment. And the historical inquiry here is equally straightforward. *Bruen* teaches that our nation's historical tradition is to protect the right to keep and bear arms that are "in common use today," *id*. at 2143 (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 627 (2008)), which the firearms HB 1240 bans plainly—indeed, indisputably—are. That is the end of the analysis, for a state may not flatly ban what the Constitution protects. Washington resists that conclusion only by distorting *Bruen* beyond recognition.

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 1

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1. Washington first insists that the myriad rifles, pistols, and shotguns it has banned do not qualify as "Arms" covered by the Second Amendment at all because (it says) they are not "commonly used for self-defense." ECF No. 30 ("Resp.Br.") at 8–9. That argument is wrong on its own terms. *See infra* pp. 3–8. It confuses *Bruen*'s threshold textual inquiry with *Bruen*'s historical tradition test. Whether a weapon qualifies as an "arm" that the people are *presumptively* entitled to keep and bear depends simply and solely on whether it falls within the "plain text" meaning of the term "arms." *Bruen*, 142 S.Ct. at 2126. And the Supreme Court has already—twice—instructed what that meaning is: "'[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Heller*, 554 U.S. at 581. "[T]he Second Amendment's definition of 'arms'" thus presumptively covers all "modern instruments that facilitate armed self-defense," "'even those that were not in existence at the time of the founding.'" *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582). Rifles, pistols, and shotguns plainly fit that bill, no matter what kind of grip, stock, or feeding device they may have.

To be sure, the fact that arms are *presumptively* protected does not necessarily mean a state may not ban their keeping or carrying. But whether a state may do so depends on whether its ban is consistent with "this Nation's historical tradition of firearm regulation," *id.* at 2126, 2132, not on some convoluted effort to declare that firearms somehow cease to be "arms" at all if they have features that a state thinks makes them too dangerous to entrust to citizens. That is clear from *Bruen*, which made explicit that the principle "that the Second Amendment protects only the

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 2

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large,'" was "[d]rawn from th[e] *historical tradition*" regarding "dangerous and unusual weapons," not from some silent restriction lurking in the Second Amendment's text. *Id.* at 2143 (emphasis added).[1]

Under *Bruen*, then, the threshold inquiry here is simple. Not even the state disputes that the myriad rifles, pistols, and shotguns HB 1240 bans "facilitate armed self-defense," *id.* at 2132, or are "thing[s] that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," *Heller*, 554 U.S. at 581. Nor could it. The firearms HB 1240 bans satisfy the textual definition of "arms."

2. Because the firearms HB 1240 bans easily fit "the Second Amendment's definition of 'arms,'" the state bears the burden of proving that its sweeping ban is nonetheless "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126, 2132. The state cannot meet that burden. The Supreme Court has already decided what "arms" a state may ban consistent with our nation's "historical tradition" of firearms regulation: arms that are "highly unusual in society at large," *not* "in common use today." *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627).

---

[1] A recent Ninth Circuit case contains dicta locating the common-use inquiry as part of the textual inquiry. *United States v. Alaniz*, 2023 WL 3961124, at *3 (9th Cir. June 13, 2023). That dicta is wrong, for the reasons just explained. It also makes no difference here where one puts the common-use inquiry, because the arms HB 1240 bans are plainly in common use for lawful purposes, including self-defense.

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 3

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

The question, then, is whether the arms HB 1240 bans are in common use for lawful purposes. *Id.* And, once again, the answer is easy, as the arms HB 1240 bans are the furthest thing from "highly unusual" in modern America.

For instance, HB 1240 bans all AR-platform rifles by name and/or feature. §2(a)(i), (iv). The Supreme Court has long described "AR-15 rifle[s]" and other similar semiautomatic firearms as "widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 603, 612 (1994). And that wide acceptance has only grown over the past few decades. Roughly one million Americans lawfully owned AR-style rifles in 1994; since then, the number has *at least* sextupled. *See* NSSF, *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), bit.ly/45Sj7lT (relying on federal government and industry data to show that Americans today own over 24 million AR-platform rifles); NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* 12 (July 14, 2022), bit.ly/3oXjavU (finding that the average American who owns an AR-platform rifle owns 3 or 4 of them).

The state briefly complains that it lacks certainty as to whether the number of AR-platform owners is 6 million or 8 million. *See* Resp.Br. at 13 (criticizing methodology of one of the many studies finding that Americans lawfully own over 24 million AR-platform rifles). But even the state seems to recognize that this is (at most) a difference in degree, not kind, as it quickly pivots to its principal argument: According to the state, whether firearms "are commonly *possessed* is irrelevant." *Id.* at 14. All that matters, says the state, is how frequently people "use"—by which the state seems to mean *fire*—them in self-defense situations. That is a remarkable claim

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 4

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

given that *the Supreme Court* has declared that the frequency of *possession*, not of firing (let alone firing in an actual confrontation), dictates whether a firearm is "in common use." Indeed, *Heller* held explicitly that the only arms that may be banned consistent with historical tradition are those "not typically *possessed* by law-abiding citizens for lawful purposes." 554 U.S. at 625 (emphasis added); *accord Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) ("[T]he pertinent Second Amendment inquiry is whether [arms] are commonly *possessed* by law-abiding citizens for lawful purposes today." (emphases altered)).

To be sure, *Bruen* used a slightly different formulation—that tradition protects arms "'in common use at the time [of the challenged law],' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 142 S.Ct. at 2143. But, in doing so, the Court hardly cast aside *Heller*. To the contrary, the "in-common-use-at-the-time" language *comes directly from Heller*. *See Heller*, 554 U.S. at 627 (explaining that the "weapons protected" by the Second Amendment "[a]re those 'in common use at the time'"). Moreover, the juxtaposition of the phrase "weapons that are those 'in common use at the time'" with the phrase "those that 'are highly unusual in society at large,'" *Bruen*, 142 S.Ct. at 2143, makes plain that the focus is on *possession*, as the latter phrase is nonsensical vis-à-vis a frequency-of-*firing* inquiry.

Lest there be any lingering doubt, *Bruen* concluded that the people have a right to carry handguns outside the home for self-defense without ever even asking how frequently they fire them in actual self-defense situations. It was enough for the Court in *Bruen*, just as it was for the Court in *Heller*, that "handguns are the most

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 5

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629; *see also Bruen*, 142 S.Ct. at 2143. And rightly so, as the Second Amendment protects the right "to keep and bear Arms," U.S. Const. amend. II, not just to fire them at would-be attackers. Individuals "keep" arms by "'keep[ing]' firearms in their home, *at the ready* for self-defense." *Bruen*, 142 S.Ct. at 2134 (emphasis added). And they "bear arms" by "carry[ing]" them "for the purpose … of *being armed and ready* for offensive or defensive action." *Id.* (ellipsis in original) (emphasis added). How frequently law-abiding citizens keep versus carry handguns, or fire them at ranges versus at attackers, is therefore legally irrelevant, as an individual lawfully "uses" her firearm every time she does *any* of those things. The state's contrary argument is not so much an effort to apply *Bruen* as to rewrite it.[2]

      What that means here is simple: Given that 6 to 8 million Americans lawfully possess at least one AR-platform rifle, the state bears the burden of showing that the typical member of this enormous population does *not*, in fact, keep such arms inside their home or carry it outside their home for lawful purposes like self-defense, but instead typically keeps and carries such arms for *unlawful* ends. The state has not even tried to do so. It briefly claims that, of the millions of Americans who own what

---

[2] Indeed, it is notable that the state seems to prefer to talk about an out-of-circuit case that predates *Bruen* by the better part of a decade and applied a two-part test that plainly does not survive it. *See, e.g.*, Resp.Br. at 2, 10, 14 (citing *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)).

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 6

it now dubs "assault weapons," "only a fraction cite self-defense as a reason." Resp.Br. at 13. Setting aside the problem that the state does not and cannot claim that anyone who cites a different reason must be a criminal, that is just plain false. In reality (and unsurprisingly), most people who own (for instance) an AR-style rifle cite self-defense as *one of the key reasons* they bought such a rifle, and just about *all* owners of such rifles cite self-defense as *a* reason. *See, e.g.*, NSSF, *Comprehensive Consumer Report*, *supra*, at 18. The state has thus supplied no evidence from which this Court could conclude that the overwhelming majority of the millions of Americans who lawfully keep and bear these common arms do so for anything other than lawful purposes, including self-defense. *See DSSA v. Del. Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *6 (D. Del. Mar. 27, 2023) ("owners seek such rifles for a variety of lawful uses, including … self-defense [and] hunting").

Of course, none of that is to deny that some people have put these arms to unlawful—indeed, awful—ends.But the fact that handguns are the overwhelming choice of criminals did not alter *Heller*'s conclusion that handguns are protected because the *typical* owner of such arms *typically* possesses them for lawful purposes, including self-defense.[3] So too here: The state's emphasis on the horrific crimes that

---

[3] Indeed, the state's own statistics belie any claim that the arms it has banned are *commonly* used to perpetrate mass shootings. According to one of its own declarations, between 1982 and 2022, there were 36 mass shooting incidents involving what it deems an "assault weapon." *See* Allen Decl. (ECF No. 31) at 41.

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 7

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

a small number of perpetrators have committed using firearms it now labels "assault weapons" does not change who the *typical* owner of such an arm is or how they are *typically* used. Just as in *Heller*, the state's flat ban is flatly unconstitutional, as such bans violate the foundational principle that "a free society prefers to punish the few who abuse [their] rights … after they break the law than to throttle them and all others beforehand." *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546,559 (1975).

       3.   The Court can and should end its analysis there. *Bruen* makes clear that "dangerous and unusual" is a conjunctive test, as the Court explicitly stated that firearms must be "'highly unusual in society at large'" to fall within the "historical tradition" of restrictions on "dangerous and unusual weapons." *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627); *see also Caetano*, 577 U.S. at 417 (Alito, J., concurring) ("A weapon may not be banned unless it is *both* dangerous *and* unusual."). And *Bruen* makes clear beyond cavil that "even if [past] laws prohibited the carrying of [certain arms] because they were considered 'dangerous and unusual

---

Thus, by the state's own telling, over a 40-year period, only 36 people—out of the 6-8 million who own at least one AR-platform rifle—used one of these arms for such a heinous purpose. Of course, even one such shooting is one too many. But for present purposes, the key point is that the state's own evidence confirms that 99.999995% of owners are not using their firearms to commit mass murder—and the state has no evidence showing that any significant portion are using them for other unlawful ends.

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 8

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

weapons' in the [past]," such laws would "provide no justification for laws restricting [arms] that are unquestionably in common use today." 142 S.Ct. at 2143.

But even if the Court thought some further historical inquiry were necessary, the result would remain the same, as Washington has not come close to meeting its burden of demonstrating any historical tradition that would support banning arms just because they possess commonplace features like a pistol grip, a thumbhole stock, or a detachable magazine with a particular capacity. To the contrary, the historical record reveals a long tradition of welcoming technological advancements aimed at improving the speed, firing capacity, accuracy, and functionality of firearms kept and born by civilians. In the end, all the state succeeds in is demonstrating why the arms it has banned are so common among law-abiding citizens: They make it easier and safer to fire more rounds quickly without sacrificing accuracy, functionality, or reliability. Whatever may be said of the desirability of such features for military or tactical uses, they are precisely the kinds of features that law-abiding citizens have long concluded make arms not just suited, but *better* suited, to self-defense. *See Barnett v. Raoul*, 2023 WL 3160285, *9 (S.D. Ill. Apr. 28, 2023). And in all events, banning arms because the state finds them undesirable is exactly the sort of interest balancing *Bruen* explicitly foreclosed. *See Bruen*, 142 S.Ct. at 2129.

The lack of any tradition supporting bans on the kinds of features the state has singled out is certainly not owing to any "dramatic technological changes." *Bruen*, 142 S.Ct. at 2132. People have been making and using firearms that allow them to shoot faster and more accurately for years now. But there was never any regulation

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 9

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

imposed to slow the advancement. And that is decidedly *not* because the firearms HB 1240 bans are novel. All of the firearms HB 1240 bans are semiautomatics; the semiautomatic action was invented *in 1885*; the first semi-automatic pistols date back *to 1896*; many of the *early-20th-century* semiautomatics had features the state now singles out for opprobrium; and features like pistol grips on repeating firearms *predate the Civil War*. *Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020). What is more, far from being sold "primarily" to the military, *cf.* Resp.Br. at 17, semiautomatics were marketed as civilian arms from the start. Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 463, 519 (2d ed. 2018). The claim that the technology HB 1240 bans, *which predates both airplanes and automobiles*, constitutes a "dramatic technological change," ECF No. 36 at 7–13, is not serious.

The state's effort to equate *semi*automatic and *fully* automatic firearms is equally ahistorical. Fully automatic weapons developed as specialized military arms around the turn of the 20th century; bearable "sub-machinegun" variants like the "Tommy gun" were not marketed to civilians until the 1920s; and they were banned by the majority of states and heavily regulated by the federal government within a few years of coming onto the market, at which point Americans had purchased fewer than 4,000 of them and they had found virtually no legitimate civilian use. ECF No. 35 ¶¶70, 80; National Firearms Act, ch. 757, 48 Stat. 1236 (1934). Semiautomatic firearms are quite different. They were marketed as civilian arms from the start, yet in stark contrast to the immediate groundswell of bans on the *fully* automatic arms that hit the market several decades later, very few states imposed *any* restrictions on

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 10

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

semiautomatic firearms, and *no* states banned them entirely. To the contrary, semiautomatics have been chosen by millions of Americans precisely because they facilitate self-defense and other lawful ends, and they were not subject to *any* bans until nearly a century after coming on the market—which explains why the Supreme Court had no trouble recognizing that they "traditionally have been widely accepted as lawful possessions" in this country. *Staples*, 511 U.S. at 612.

The state's attempt to equate the weapons banned by HB 1240 with historical regulation of "weapons associated with interpersonal violence," Resp.Br. at 18, likewise fails. To begin, most of the laws Washington cites regulated only certain *uses* of particular weapons; they did not prohibit their possession or sale. For instance, while the state claims that some states "all but banned … Bowie knives" in the mid-1800s, *id.* at 20, most states actually just prohibited carrying them concealed or using them in crimes, and "no state prohibited possession of Bowie knives" by the end of the 19th century, David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com, bit.ly/3RNRpQD. A restriction on one manner of carrying an arm is obviously not analogous to a law that prohibits *acquiring* an arm altogether. A concealed-carry restriction still allows individuals to acquire (and thus keep) arms for self-defense in the home; a flat ban on acquisition does not. Historical concealed-carry laws are therefore not analogous, because they impose a substantially lesser "burden [on] a law-abiding citizen's right to armed self-defense" than a flat ban like HB 1240. *Bruen*, 142 S. Ct. at 2132–33. The state's reliance on "trap gun" laws, Resp.Br. at 19, is even less helpful to its cause. "Trap guns" were designed "to fire

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 11

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

when the owner need not be present." *Id.* at 19 (quoting Spitzer Decl. (ECF No. 35) at 19). A weapon that goes off when the owner is not even there is not an arm used for self-defense, or even a "bearable arm" at all. The state has thus put forward no evidence of an American tradition of prohibiting the general public from acquiring common arms that a state deems too "dangerous"—because no such tradition existed.

Finally, the state cannot save HB 1240 by pointing to "unprecedented societal concerns." *See Bruen*, 142 S.Ct. at 2132. Even accepting the dubious claim that there is some causal link between the recent rise in mass shootings and arms that have been lawfully possessed by civilians for the better part of a century, *see* Resp.Br. at 7–8, the unfortunate reality is that mass murder long predates semiautomatic firearms. *See* Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 105-06 (2008). Yet before "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds." *Miller v. Bonta*, 542 F.Supp.3d 1009, 1024 (S.D. Cal. 2021). More important, there has never been any tradition in this country of banning arms that *law-abiding* citizens typically keep and bear for *lawful* purposes based on the damage they could inflict in the hands of someone bent on misusing them. To the contrary, a primary animating principle of the Second Amendment is the tradition of protecting the rights of law-abiding citizens to defend themselves and others against those who seek to do them harm.

## II.   The Remaining Factors Favor Injunctive Relief.

Allowing HB 1240 to take effect would cause Plaintiffs imminent irreparable

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 12

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

constitutional injury. *See Renna v. Bonta*, 2023 WL 2846937, at *14 (S.D. Cal. Apr. 3, 2023). The state cites no contrary authority, because none exists. The state instead just argues that Plaintiffs are not *really* injured because (it says) they can use other weapons for self-defense. Resp.Br. at 23. But as *Heller* made clear, "[i]t is no answer to say … that it is permissible to ban the possession of [one type of protected firearm] so long as the possession of other firearms … is allowed." 554 U.S. at 629. The state's contrary position is fundamentally inconsistent with the notion that the Second Amendment secures a fundamental right. After all, "[w]e would never say the police may seize and keep printing presses so long as newspapers may replace them, or that they may seize and keep synagogues so long as worshippers may pray elsewhere." *Frein v. Penn. State Police*, 47 F.4th 247, 256 (3d Cir. 2022).

The state's apparent desire to relitigate *Heller* is no basis to decline to enjoin an unconstitutional statute. And its failure to answer the black-letter law that enforcing unconstitutional laws is never in the public interest, and enjoining them causes no cognizable harm, confirms the need for injunctive relief.[4]

## CONCLUSION

The Court should grant Plaintiffs' motion for preliminary injunction.

---

[4] The state does not deny that economic harm is irreparable here given the Eleventh Amendment; it just claims that HB-1240-derived losses may be recouped elsewhere. That is fanciful. It is also non-responsive; HB 1240 has *already* caused some to lose out on *irrecoverable* opportunities. *E.g.*, Ball Decl. (ECF No. 18) ¶¶11–15.

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 13

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1     DATED this 15th day of June, 2023.

                              CORR CRONIN LLP

                              *s/ Steven W. Fogg*
                              Steven W. Fogg, WSBA No. 23528
                              CORR CRONIN LLP
                              1015 Second Avenue, Floor 10
                              Seattle, Washington  98104-1001
                              Ph: (206) 625-8600 | Fax: (206) 625-0900
                              sfogg@corrcronin.com

                              Paul D. Clement, admitted *pro hac vice*
                              Erin E. Murphy, admitted *pro hac vice*
                              Matthew D. Rowen, admitted *pro hac vice*
                              Mariel A. Brookins, admitted *pro hac vice*
                              CLEMENT & MURPHY, PLLC
                              706 Duke Street
                              Alexandria, VA 22314
                              Ph: (202) 742-8900
                              paul.clement@clementmurphy.com
                              erin.murphy@clementmurphy.com
                              matthew.rowen@clementmurphy.com
                              mariel.brookins@clementmurphy.com

                              *Attorneys for Plaintiffs*

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 14

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

# CERTIFICATE OF SERVICE

I hereby certify that on (Date), I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice. I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

DATED at Seattle, Washington on 15th day of June, 2023.

*s/ Megan Johnston*
Megan Johnston, Legal Assistant
Corr Cronin LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Phone: (206) 625-8600
Email: mjohnston@corrcronin.com

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION - 15

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900