# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NATIONAL ASSOCIATION FOR GUN RIGHTS and
TONI FLANIGAN

     *Plaintiffs*,

     *v.*

EDWARD M. LAMONT, JR., in his official capacity,
*et al.*,

     *Defendants.*

Civil No. 3:22-1118 (JBA)

August 3, 2023

**DECISION ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**I.**   **Summary of Decision** ........................................................................... **4**

**II.**  **Background** ........................................................................................ **5**

  **A.**   **Parties to the Lawsuit** ................................................................... **5**

  **B.**   **Challenged Statutes** ....................................................................... **6**

  **C.**   **Assault Weapons** ........................................................................... **9**

    **1.**   **Firearms** ................................................................................... **9**

    **2.**   **Firearm Parts and Accessories** ............................................. **10**

  **D.**   **Procedural Background** ................................................................ **11**

**III.** **Legal Standard** ................................................................................. **11**

  **A.**   **Preliminary Injunctions** .............................................................. **11**

  **B.**   **Facial vs. As-Applied Challenge** ................................................ **13**

  **C.**   **Second Amendment Jurisprudence** ........................................... **16**

    **1.**   ***District of Columbia v. Heller*** .............................................. **16**

      **a)**   **Scope of the Right** .............................................................. **16**

      **b)**   **Constitutionality of the Handgun Prohibition** ................ **18**

    **2.**   ***McDonald v. City of Chicago, Ill.*** ......................................... **19**

    **3.**   ***New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*** .............. **20**

    **4.**   ***New York State Rifle & Pistol Association, Inc. v. Bruen*** ....... **23**

1

IV.  Discussion ........................................................................................................26

A.   Analytical Framework for Second Amendment Challenges...................................26

B.   Likelihood of Success on the Merits ....................................................................36

1.   Whether Plaintiffs' Proposed Conduct Falls Within the Scope of the Second Amendment..................................................................................................36

a)   Whether LCMs are Bearable Arms .................................................38

b)   Determining the Purpose for Which Assault Weapons and LCMs are Commonly Purchased and how they are Commonly Used ...........................41

(1)   Ownership for and Use in Self-Defense ...............................41

(2)   Possession for Use in and Actual Use of Assault Weapons and LCMs in Non-Mass Shooting Crimes ....................................................44

(3)   Possession for Use in and Actual Use of Assault Weapons and LCMs in Mass Shootings...............................................................47

(4)   Possession and Use of Assault Weapons and LCMs for their Military Characteristics ...........................................................48

c)   Overall Conclusion on Plaintiffs' Burden....................................52

2.   Whether the Firearm Regulations are Consistent with the Nation's Historical Tradition of Firearm Regulation ..................................................................52

a)   Whether Violence Perpetrated through Use of Assault Weapons is an Unprecedented Societal Concern.......................................................54

(1)   History of Firearm-Related Homicides in America ...........54

(2)   Modern Mass Shootings .........................................................55

b)   Methodology for Evaluating Historical Sources .......................59

c)   Whether the Burden imposed by the Statutes is a Comparable Burden to that of Historically Analogous Regulations and is Comparably Justified ...............61

(1)   New and Dangerous Weapon Technology .........................61

(2)   Concealed Weapon Regulations.........................................63

(3)   Overall Conclusion on Whether Defendant's Historical Analogues are Relevantly Similar to the Challenged Statutes..........................................65

**V.   Conclusion**................................................................................................................**67**

## I.    Summary of Decision

On December 14, 2012, at Sandy Hook Elementary school, a shooter armed with an AR-15 and two semiautomatic pistols fired 154 shots in less than five minutes and killed 26 people. In response, the Connecticut State Legislature passed "An Act Concerning Gun Violence Prevention and Children's Safety" in 2013. Two provisions of that law are Conn. Gen. Stat. § 53-202c(a) and Conn. Gen. Stat. § 53-202w(b) and (c) (the "Challenged Statutes"), which restrict the ability of individuals in the state of Connecticut to own, purchase, and use specific types of firearms and accessories, collectively defined as "assault weapons", as well as large capacity magazines ("LCMs"), which are magazines with the capacity to hold more than ten rounds of ammunition.

Plaintiffs National Association for Gun Rights ("NAGR") and Toni Theresa Spera Flanigan believe that by prohibiting them from purchasing the banned assault weapons and LCMs, the Challenged Statutes violate their Second Amendment right to keep and bear arms. Their view is grounded in the Supreme Court's decision in *District of Columbia v. Heller,* 554 U.S. 570 (2008), that a complete ban on handguns violates the individual Second Amendment right to keep and bear arms, as well as the Supreme Court's more recent holding in *New York State Rifle & Pistol Association, Inc. v. Bruen,* 142 S. Ct. 2111 (Jun. 23, 2022) that any law restricting the right to keep and bear arms under the Second Amendment is only justified if the government can demonstrate that it is consistent with this Nation's history and tradition of firearm regulation. Plaintiffs' suit against Defendants Connecticut Governor Ned Lamont, Chief State's Attorney Patrick Griffin, and Sharmese Walcott, State's Attorney for the Hartford Judicial District seeks to have enforcement of the Challenged Statutes permanently enjoined as unconstitutional. Currently before the Court is Plaintiffs' motion for a preliminary injunction [Doc. # 28] seeking to temporarily enjoin enforcement of the Challenged Statutes until final disposition of this case.

For the reasons discussed below, the Court denies Plaintiffs' motion for a preliminary injunction because they have failed to meet their burden to demonstrate a likelihood of success on their claim that the challenged statutes unconstitutionally burden their Second Amendment right to keep and bear arms. Plaintiffs' proposed ownership of assault weapons and LCMs is not protected by the Second Amendment because they have not demonstrated that the specific assault weapons and LCMs in the Challenged Statutes are commonly sought out, purchased, and used for self-defense. Although this failure alone would have been fatal to Plaintiffs' claim, Defendants have submitted persuasive evidence that assault weapons and LCMs are more often sought out for their militaristic characteristics than for self-defense, that these characteristics make the weapons disproportionately dangerous to the public based on their increased capacity for lethality, and that assault weapons and LCMs are more often used in crimes and mass shootings than in self-defense. Defendants also show through the submission of historically analogous statutes and expert declarations that when a modern innovation in firearm technology results in a particular type of weapon or method of carrying being utilized for unlawful purposes to terrorize and endanger the public, the Nation has a longstanding history and tradition of regulating those aspects of the weapons or manners of carry that correlate with rising firearm violence. The record shows that the Challenged Statutes are consistent with that purpose and impose a comparable level of burden to the relevantly similar historical analogues Defendants submitted.

## II.     Background

### A.     Parties to the Lawsuit

Plaintiff NAGR is a nonprofit organization that "seeks to defend the right of all law-abiding individuals to keep and bear arms." (Third Amended Complaint [Doc. # 69] ¶ 10). Plaintiff Toni Flanigan is a Connecticut resident, a US citizen, and member of NAGR who "is

affected by State's prohibition of commonly possessed arms." (*Id.* ¶ 9.) She claims "a present intention of exercising her constitutionally protected right to acquire, keep and bear commonly possessed arms, and specifically commonly possessed firearms and magazines that fall with the definition of Banned Firearms and the Banned Magazines, without being subjected to criminal prosecution," and "is presently ready, willing, able and eligible to acquire such arms and, but for her reasonable fear of criminal prosecution, would do so." (*Id.*) "Specifically, she would acquire and keep an AR-15 or similar rifle and magazines that hold more than 10 rounds." (*Id.*) Defendants are Ned Lamont, in his official capacity as the Governor of the State of Connecticut; Patrick Griffin, in his official capacity as the Chief State's Attorney of the State of Connecticut; and Sharmese Walcott, in her official capacity as the State's Attorney, Hartford Judicial District.

## B. Challenged Statutes

The challenged statutes regulate certain—but not all—types of both fully automatic and semiautomatic firearms. Semiautomatic firearms fire "one round for each squeeze of the trigger." (Defs.' Ex. A, Decl. of Detective Brindiana Warenda[1] [Doc. # 37-10] ¶ 20.) After each discharge, another round is automatically loaded into the chamber for the next shot, permitting a faster rate of fire than a manually operated gun. (*Id.* ¶ 20.) Automatic weapons fire continuously as long as the trigger is held down. (*Id.* ¶ 21.) Selective fire weapons allow the operator "to choose between semiautomatic and fully automatic." (*Id.* ¶ 22.) Prior to the passage of the Challenged Statutes, the Connecticut General Assembly passed an assault weapon ban in 1993, which prohibited firearms "'capable of fully automatic, semiautomatic or burst fire at the option of the user,' including 67 specifically enumerated semiautomatic firearms." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 248 (2d Cir. 2015) (quoting 1993 Conn. Pub. Acts 93–306, § 1(a)). In 2001, the Connecticut State Legislature passed Public Act 01-130, which expanded the definition of assault weapon to include

6

semiautomatic rifles, pistols, and shotguns with certain features, and to include particular parts that could be used to convert a firearm into an assault weapon. (Warenda Decl. ¶ 12.) In 2013, Public Act 13-3, which includes Conn. Gen. Stat. §§ 53-202a-c and 53-202w, was passed as part of a "An Act Concerning Gun Violence Prevention and Children's Safety" after "the 2012 massacre at Sandy Hook Elementary School." (Defs.' Mem. at 4.)

Conn. Gen. Stat. § 53-202a (a)(1) defines an "assault weapon" as:

(A) (i) "Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user or any of the following specified semiautomatic firearms: . . .", [enumerating several dozen specific fully automatic, semiautomatic or burst fire selective-fire firearms];

(ii) "A part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in subparagraph (A)(i) of this subdivision, or any combination of parts from which an assault weapon, as defined in subparagraph (A)(i) of this subdivision, may be rapidly assembled if those parts are in the possession or under the control of the same person";

(B) "Any of the following specified semiautomatic centerfire rifles, or copies or duplicates thereof with the capability of any such rifles, that were in production prior to or on April 4, 2013: . . .", [enumerating a list of several dozen specified semiautomatic centerfire rifles, including the AK-47 and the AR-15];

(C) "Any of the following specified semiautomatic pistols, or copies or duplicates thereof with the capability of any such pistols, that were in production prior to or on April 4, 2013: . . ." [enumerating a list of several dozen specified semiautomatic pistols];

(D) "Any of the following semiautomatic shotguns, or copies or duplicates thereof with the capability of any such shotguns, that were in production prior to or on April 4, 2013: All IZHMASH Saiga 12 Shotguns;"

(E) Any semiautomatic firearm regardless of whether such firearm is listed in subparagraphs (A) to (D), inclusive, of this subdivision, and regardless of the date such firearm was produced, that meets the following criteria: . . .", [enumerating further criteria for centerfire rifles, semiautomatic, centerfire rifles, semiautomatic pistols, semiautomatic shotguns, shotguns with revolving cylinders, or semiautomatic firearms generally that would qualify them as "assault weapons"]; or

7

(F) "A part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in any provision of subparagraphs (B) to (E), inclusive, of this subdivision, or any combination of parts from which an assault weapon, as defined in any provision of subparagraphs (B) to (E), inclusive, of this subdivision, may be assembled if those parts are in the possession or under the control of the same person."[2]

A centerfire rifle is designed for "centerfire cartridges which are more powerful projectiles" because "they have a larger bullet, higher velocity, greater range, and more 'foot pounds of energy' or stopping power, than other cartridges such as rimfire or pistol ammunition." (Warenda Decl. ¶ 29.) One example of a centerfire cartridge is the .223 round often used in an AR-15 type rifle. (*Id.*) A pistol is "any firearm that has a barrel under twelve inches in length" under Connecticut General Statute § 29-27. (*Id.* ¶ 30.)

Under Conn. Gen. Stat. § 53-202c (a), except as provided by statute, "any person who, within this state, possesses an assault weapon, except as provided in sections 53-202a to 53-202k, inclusive, and 53-202o, shall be guilty of a class D felony and shall be sentenced to a term of imprisonment. . . ." Some of the carveouts include provisions allowing various law enforcement agencies to possess assault weapons and a process by which persons who lawfully possessed assault weapons prior to the enactment of Connecticut's assault weapon bans could apply for a certificate of possession to retain the firearm. Conn. Gen. Stat. § 53-202c (b)-(c). As of January 30, 2023, 81,982 Certificates of Possession had been issued to individuals lawfully permitted to possess assault weapons. (Warenda Decl. ¶ 18-19.)

Under Conn. Gen. Stat. § 53-202w(b), except as provided by statute, "any person who, within this state, distributes, imports into this state, keeps for sale, offers or exposes for sale, or purchases a large capacity magazine shall be guilty of a class D felony." Section 53-202w(a)(1) defines a "large capacity magazine" as "any firearm magazine, belt, drum, feed strip or similar device that has the capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition, but does not include: (A) A feeding device

8

that has been permanently altered so that it cannot accommodate more than ten rounds of ammunition, (B) a .22 caliber tube ammunition feeding device, (C) a tubular magazine that is contained in a lever-action firearm, or (D) a magazine that is permanently inoperable."

## C. Assault Weapons

### 1. Firearms

The AR-15 originated in response to the U.S. military's request for an improved infantry weapon in the 1950s and was initially manufactured as a selective-fire machine gun by ArmaLite Corporation. (Warenda Decl. ¶ 24.) The ArmaLite AR-15, which was the predecessor of the modern AR-15, went into mass production in June 1959; it was adopted as the M-16 machine gun during the Vietnam War. (*Id.*) Colt Manufacturing Company obtained the trademark for the AR-15 semiautomatic version, without the fully automatic fire option, and began selling to the civilian market in the early 1960s. (*Id.* ¶ 25.) The AK-47 was created by Mikhail Kalashnikov with the intent that it would replace rifles and submachine guns carried by Soviet forces at the end of World War II, was officially adopted by the Soviet Army in 1949, and has been used by countries "throughout the world." (*Id.* ¶ 26.)

Based on her firearms expertise, Warenda's opinion is that "the majority of the firearms specifically named in the statutes are semiautomatic versions of the original selective-fire AR-15/M-16, the AK-47, or variants of these weapon platforms in an assortment of calibers." (*Id.* ¶ 23.) Specifically, of the 49 assault rifles listed by name in Conn. Gen. Stat. § 53-202a, nineteen are AK-47 variants, thirteen are AR-15 or M-16 variants, and three are HK 91 or FN type variants. (*Id.* ¶ 27.) The remaining rifles are "unique" rather than falling into a "type". (*Id.* ¶ 28.) The rifles are all semiautomatic centerfire rifles except for the Remington Tactical 7615, a "pump action" rifle using detachable magazines that "can accept more than ten rounds of ammunition." (*Id.* ¶ 29, 32.)

9

The Second Circuit declared the ban on the Remington Tactical 7615 was unconstitutional in *Cuomo*, 804 F.3d 242, because it was a non-automatic or semi-automatic firearm. Conn. Gen. Stat. § 53-202a also bans certain semiautomatic pistols; six are AK-47 variants and seven are M-16/AR-15 variants, with the remaining nine not falling into "a type." (Warenda Decl. ¶ 30.) The one shotgun specifically listed in Public Act 13-3 is the IZHMASH SAIGA 12, which is "based on an AK-47 platform." (*Id.* ¶ 31.)

### 2. Firearm Parts and Accessories

A magazine is a "container that holds ammunition for a firearm," typically by holding bullets and feeding the ammunition into the firearm, but does not contain a firing mechanism. (*Id.* ¶¶ 39, 40.) A detachable magazine may be removed and replaced with another fully loaded magazine; fixed magazines are typically reloaded by reloading bullets into the magazine attached to the firearm. (*Id.* ¶ 39.) Ordinary ammunition magazines "extend perpendicularly from the frame of the firearm and are fed with one round on top of the other," while tubular magazines are generally "fixed magazines that run horizontally along the length of the barrel and are fed with cartridges end to end" and are typically only for "lever action rifles, rimfire rifles and shotguns." (*Id.* ¶ 41.) Large capacity magazines have been manufactured for a variety of firearms, and most firearms that accept large capacity magazines "can also function using a magazine that has a capacity of under ten rounds." (*Id.* ¶¶ 42, 43.)

Other accessories to firearms banned by Conn. Gen. Stat. § 53-202a include telescoping stocks, flash suppressors, and forward pistol grips. A telescoping stock, also known as a collapsible stock, is "a stock that can retract into and shorten itself to make a firearm more compact." (*Id.* ¶ 15.) A flash suppressor is "a device attached to the muzzle of a firearm that reduces its visible signature while firing." (*Id.* ¶ 16.) A forward pistol grip,

also known as a second pistol grip, is a "grip on the front of the firearm or simply a second grip on a firearm." (*Id.* ¶ 17.)

### D.    Procedural Background

Plaintiffs filed suit in September 2022 under 42 U.S.C. § 1983 claiming violations of their Second Amendment rights. An amended complaint was filed on September 13, 2022, and a second amended complaint was filed on October 25, 2022; Plaintiffs filed their motion for a preliminary injunction on November 3, 2022, and Defendants filed their motion to dismiss the complaint on November 18, 2022. After new standing arguments were raised in Defendants' reply brief, Defendants' motion to dismiss was denied without prejudice and Plaintiffs were granted leave to file a third amended complaint to address the arguments, which they filed on March 7, 2023. Defendants filed an answer, rather than moving again to dismiss. The Court granted leave to file three amici briefs by Everytown for Gun Safety [Doc. # 78], the Brady and March for Our Lives groups [Doc. # 80], and the Giffords Law Center to Prevent Gun Violence [Doc. # 75].

## III.    Legal Standard

### A.    Preliminary Injunctions

To obtain a preliminary injunction against the Defendant, "the movant has to demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction. The movant also must show that the balance of equities tips in his or her favor." *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).[3] When "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction will only be granted if both irreparable harm and a likelihood of success on the merits are shown. *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir. 1989).

If the injunction is prohibitory in nature, seeking only to maintain the status quo, the likelihood of success standard requires a demonstration of a "better than fifty percent" probability of success. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, n.2 (1987). The status quo is measured as "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam). However, if the injunction seeks to "alter the status quo by commanding some positive act," *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, n.4 (2d Cir. 2010) then a preliminary injunction is "mandatory" in nature and "the standard is [more] exacting: a district court may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a clear or substantial likelihood of success on the merits." *Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 176-77 (2d Cir. 2020). This heightened standard also applies if the requested injunction "(1) would provide the plaintiff with all the relief that is sought and (2) could not be undone by a judgment favorable to defendants on the merits at trial." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006).

Defendants submit that this is a mandatory injunction, and that Plaintiffs must "carry the burden of persuasion by a clear showing for each factor," but submit nothing demonstrating that positive action by them would be required. *Bergamaschi v. Cuomo*, No. 20 CIV. 2817 (CM), 2020 WL 1910754, at *6 (S.D.N.Y. Apr. 20, 2020) (citations omitted). Plaintiffs maintain that they need show only a likelihood of success on the merits, which they characterize as a "probable" success on the merits. District courts in this circuit have split on whether injunctions enjoining enforcement of gun regulations are mandatory or prohibitive. *Compare Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631, at *5

12

(W.D.N.Y. Nov. 22, 2022) (currently on appeal) (finding that injunction enjoining enforcement of a regulation prohibiting firearms on private property without permission was prohibitory because it would "restore the status that existed before implementation of the private property exclusion") *with Frey v. Nigrelli*, No. 21 CV 05334 (NSR), 2023 WL 2473375, at *1, (S.D.N.Y. Mar. 13, 2023) (currently on appeal) (injunction enjoining enforcement of several New York City gun laws would require "altering, rather than maintaining, the status quo."). However, *Mastrovincenzo v. City of New York*, 435 F.3d. 78, 90 (2d Cir. 2006) held that an injunction which "enjoined" the defendants "from enforcing" a city code provision "clearly prohibits, rather than compels, government action by enjoining the future enforcement of § 20–453 against plaintiffs" and that it "clearly" did not command defendants "to perform any specific tasks." The language of the requested injunction here is similarly prohibitory, and nearly indistinguishable from *Mastrovincenzo*; the status quo that the injunction of the statute would return the state to would be the status quo pre-1993, before semiautomatic and automatic firearms were subject to the 1993, 2001, and 2013 restrictions enacted through the statutory sections now being challenged. Thus, the lower standard for likelihood of success on the merits applies.

### B. Facial vs. As-Applied Challenge

Although Plaintiff Flanigan submits that she would seek to own an LCM and AR-15-type firearm, Plaintiffs nevertheless seek an injunction that will enjoin enforcement of *all* provisions of each of the statutes, including provisions that apply to non-AR-15-type firearms; as such, this challenge is a facial one. The Supreme Court has held that "[a] facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Because "[t]he fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is

insufficient to render it wholly invalid," litigants bringing facial challenges must meet a "heavy burden." *Id.*

Defendant views the distinction between facial and as-applied challenges as important because "the challenged statutes restrict ownership and possession of a range of weapons and features," and that Plaintiffs must show "that the statute is [un]constitutional in all aspects, which means here that every weapon and feature merits Second Amendment protection and that the challenged restrictions fail to meet the *Bruen* test," to succeed. (Defs.' Opp'n Mem. [Doc. # 37] at 10.) Defendants point to the fact that some of the restricted weapons in Conn. Gen. Stat. § 53-202(a) are grenade launchers, Uzis, and certain shotguns, all of which have been found dangerous or unusual by other courts and which do not fall within the Second Amendment's protection. (*Id.* at 11.) Because Plaintiffs do not contend that these particular firearms are constitutionally protected, Defendants aver that Plaintiffs fail to carry their "unconstitutional in all" applications burden required for a facial challenge. (*Id.*)

Plaintiffs claim that *Bruen* created an exception to the Second Circuit's "no set of circumstances" standard. (Pls.' Reply [Doc. # 64] at 44.) In Plaintiffs' view, "if the Second Amendment covers the Plaintiffs' conduct, and the government cannot 'demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation,' then the regulation is invalid" because *Bruen's* standard would be meaningless if a statute "inconsistent with history and tradition" could be "saved by the one possible application that may be constitutional." (*Id.* at 44-45.) *Bruen* aside, Plaintiffs also argue that *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992), *abrogated on other grounds, Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, (2022), and *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016), *abrogated on other grounds in Dobbs*, established a "large fraction" exception to the general "no set of circumstances" rule by allowing a facial

14

challenge to a statute when the statute would unconstitutionally impact a "large fraction" of the cases to which it would be applied. (*Id.*)[4]

District courts have taken a variety of approaches to resolving the issue of facial challenges; while one court held that "[o]utside of the First Amendment context, a facial challenge generally must show that 'no set of circumstances exists under which the [law] would be valid,'" *Copeland v. Vance*, 230 F. Supp. 3d 232, 248 (S.D.N.Y. 2017), another court used the less demanding "plainly legitimate sweep" portion of the facial challenge test for a Second Amendment claim. *See Christian,* 2022 WL 17100631, at *11. Yet another court found that, as Plaintiff maintains, *Bruen* essentially created a binary in which either the regulation itself is or is not inconsistent with the nation's tradition of firearm regulation, and so necessarily requires permitting facial challenges that invalidate statutes as unconstitutional even if there might theoretically be certain constitutional applications of them. *See Antonyuk v. Hochul,* No. 122CV0986GTSCFH, 2022 WL 16744700, at *47 (N.D.N.Y. Nov. 7, 2022), *reconsideration denied sub nom. Antonyuk v. Nigrelli,* No. 122CV0986GTSCFH, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022).

Nothing in *Bruen* suggests that plaintiffs now may challenge a statute implicating Second Amendment rights without being held to the higher facial challenge standard, and the Second Circuit's most recent holding on the issue of the standard for facial challenges in *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023) (petition for certiorari filed) settles the question in this Circuit. There, the Second Circuit rejected arguments by a group of landlords challenging a statute under the 14th Amendment that the stricter *Salerno* standard no longer applied, holding instead that while "a different, more challenge-friendly standard has developed in the context of statutes affecting First Amendment rights," "*Salerno* provides the prevailing standard for facial challenges to statutes outside the context of the First Amendment." *Id.* at 549. However,

Plaintiffs fail to meet their burden under either standard because they cannot show even that a "large fraction" of the regulated firearms and accoutrements are unconstitutionally restricted.

### C. Second Amendment Jurisprudence

Under the Second Amendment, "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Both the Second Circuit and the Supreme Court have issued cases over the last two decades interpreting that right that are critical to the Court's analysis, beginning with *District of Columbia v. Heller*, 554 U.S. 570 (2008).

#### 1. *District of Columbia v. Heller*

Until *Heller*, the scope of the Second Amendment was largely unexplored territory, last addressed by the Supreme Court in *United States v. Miller*, 307 U.S. 174, 179 (1939). As *Heller* noted, the matter went "judicially unresolved" for so long because "for most of our history," the question of whether the Second Amendment could invalidate firearms regulations "did not present itself." *Heller,* 552 U.S. at 625-26. When the issue of the Second Amendment's protections came before the Supreme Court in *Heller*, the litigants posed two questions: whether "the Second Amendment protects an individual right to possess firearms," and whether a "total ban on handguns" violated the Second Amendment. *Id.* at 576.

##### a) Scope of the Right

Given the "very different interpretations" by the parties of the right conferred by the Second Amendment, the *Heller* court embarked on a comprehensive analysis of the Second Amendment's meaning, beginning with its textual analysis of the prefatory and operative clauses. *See id.* at 577-79. *Heller* divided the operative clause into two parts: the holder ("the people") and the substance ("to keep and bear arms.") *Id.* at 579. When interpreting

the latter, *Heller* relied on dictionaries from the Founding era defining "arms" as "[w]eapons of offence, or armour of defence," or as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581. Although it adopted these definitions, *Heller* cautioned that the scope of the right is not limited to only the embodiments of that definition that might have existed in the 1700s: "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582.

After reviewing additional Founding era sources and documents to determine both the textual definition of and the contextual use of the phrase "keep" and "bear" arms, the Supreme Court concluded that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation," as "confirmed by the historical background of the Second Amendment." *Id.* at 592; *see also* 601-03 (discussing state constitutions codifying Second Amendment analogues that secured "an individual right to bear arms for defensive purposes"). This history demonstrated that the Second Amendment did not *create* a right, but codified a pre-existing right to "protect[] against both public and private violence," including "to keep arms for their own defense." *Id.* at 593-94. While the fear that the citizens' militias would be disarmed by the government might have been the primary reason for the Second Amendment's codification, as evidenced by the prefatory clause, *Heller* stressed that self-defense is the "*central component* of the right." *Id.* at 599 (emphasis in original). A review of relevant history and case law, *Heller* found, confirmed that its interpretation of the Second Amendment was consistent with public understanding and interpretation of the right from "immediately after its ratification through the end of the 19th century." *Id.* at 605-06, 606-19.

Constitutional rights, *Heller* explained, are "enshrined with the scope they were understood to have when the people adopted them," including the historical limitations that were part of that understanding, *id.* at 634. The Second Amendment is subject to those same limitations and has never been understood as conferring the right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. One of the most explicitly recognized limitations came from *Miller,* which held that "'the **type of weapon at issue**," a short-barreled shotgun, was "not eligible for Second Amendment protection" *id.* at 622 (emphasis in the original), because it did not "have some reasonable relationship to the preservation or efficiency of a well-regulated militia." *Id.* (quoting *Miller,* 307 U.S. at 178.) *Heller* characterized *Miller* as standing for the proposition that the Second Amendment "extends only to certain types of weapons," *id.* at 622-23; weapons "used in defense of person and home" are constitutionally protected, but "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barred shotguns," are not. *Id.* at 624-25. The historical tradition of "prohibiting the carrying of 'dangerous and unusual weapons'" as discussed in 18th and 19th century treatises, *Heller* held, supported *Miller's* restriction on the scope of the Second Amendment, which *Heller* described as an "important limitation on the right." *Id.* at 627.[5] Despite the fact that developments in warfare like the invention of modern-day bombers and tanks, may render militias without "highly unusual" and "sophisticated arms" less than effective against a standing army, *Heller* nevertheless held that "weapons that are most useful in military service—M-16 rifles and the like—may be banned." *Id.* at 627-28.

### b)        Constitutionality of the Handgun Prohibition

Once the scope of the right had been determined, *Heller* reached the challenged statute at issue, and held that the "prohibition of an entire class of 'arms'" such as handguns that were "overwhelmingly chosen by American society" for the lawful purpose of self-

18

defense" and were "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," where "the need . . . is most acute," would "fail constitutional muster" under "any of the standards of scrutiny." *Id.* at 628-29. *Heller* explained that it was not "permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed" because the handgun was the "quintessential self-defense weapon," "possessing characteristics making it well-suited for self-defense." *Id.* at 629. "Whatever the reason," *Heller* found, "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.* at 629.

In rejecting the idea that a complete ban on a category of commonly used firearms was constitutional, *Heller* cited to other cases[6] that had reached similar conclusions regarding laws that impermissibly burdened the right to self-defense. *Heller* also distinguished laws that the government had argued were comparable, like gunpowder storage laws and a 1783 law that permitted seizure of any loaded firearm found in a house, stable, shop, or other similar building. *Id.* at 631-32. *Heller* found that the purpose of these laws was to limit danger to firefighters, not to prevent loading a gun or accessing gunpowder for self-defense, and neither did the laws "remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.* Similarly, laws punishing the discharge of a gun at certain times or in certain areas were meant to prevent "indiscreet" firing of guns, not their use for self-defense, and came with only minor fines or penalties as opposed to a significant prison sentence. *Id.* at 632-33. Because none of these regulations "c[a]me close" to the level of restriction imposed by the challenged statute, *Heller* concluded that there was no historical evidence contradicting its holding that such a prohibition was constitutionally impermissible.

     **2.**     ***McDonald v. City of Chicago, Ill.***

Two years later, the Supreme Court in *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 749 (2010) held that the Second Amendment right is fully applicable to the states because it was incorporated through the Fourteenth Amendment. *Id.* at 750. The Supreme Court explained that the right to self-defense by bearing arms was "deeply rooted in this Nation's history and tradition," dating back centuries, and was considered fundamental by those who drafted and ratified the Bill of Rights. *Id.* at 767-69. *McDonald* reaffirmed, however, the ability of the states to continue devising "solutions to social problems that suit local needs and values," including to limit firearm violence, so long as they were "reasonable" firearms regulations that complied with the limits of the Second Amendment. *Id.* at 784-85. It further reiterated language from *Heller* that there were "longstanding regulatory measures" that remained valid, and that "incorporation does not imperil every law regulating firearms." *Id.* at 786.

### 3.    *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*

Like *Heller, McDonald* cast doubt on the idea of interest-balancing as a method of evaluating firearm regulations but offered no alternative method or test for determining whether a regulation "infringed" on Second Amendment rights. As a result, circuit courts differed as to what the exact scope of the Second Amendment right to bear arms was, and how to evaluate regulations that applied to conduct within the scope of the Second Amendment. *See, e.g.*, *Kachalsky v. County of Westchester*, 701 F.3d 81, 101 (2d Cir. 2012). A number of circuits eventually coalesced around a "two step" where courts asked (1) whether the regulated activity fell inside or outside the scope of the right as originally understood, and if it fell within that scope, (2) applied either strict or intermediate scrutiny depending on how close the law came to the "core" of the Second Amendment right, and how severe the burden was on that right. *See id.*

20

In 2015, the Second Circuit used this same two-step analysis to reject a challenge to the same statutes at issue in this case, as well as analogous statutes passed in New York, in *Cuomo*, 804 F.3d 242. The Second Circuit acknowledged that *Heller* established the Second Amendment right as an individual one to possess and carry weapons for self-defense, at least in the home, but found that it stopped "well short" of extending its rationale to other firearms restrictions beyond handgun bans by endorsing "the historical tradition of prohibiting the carrying of dangerous and unusual weapons," *id.* at 253. However, the Second Circuit lamented that "[n]either *Heller* nor *McDonald* [] delineated the precise scope of the Second Amendment or the standards by which lower courts should assess the constitutionality of firearm restrictions," leaving unresolved which tier of scrutiny might apply. *Id.* at 254.

In the absence of "more detailed guidance" from the Supreme Court, the Second Circuit followed the two-step test adopted in *Kachalsky,* asking at the first step "whether the challenged legislation impinges on conduct protected by the Second Amendment." *Id.* at 254. The Second Circuit explicitly divided the step one inquiry into two questions: whether the weapons were in "common use", and whether they were "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 254-55. *Cuomo* defined "common use" as being an inquiry into whether the weapons were "commonly owned" by "law-abiding Americans," and considered arguments from both sides about what the statistics showed regarding the ownership of the challenged firearms. *Id.* at 255. Without identifying a specific metric that would satisfy the threshold for common use, *Cuomo* found that "Americans own millions of the firearms that the challenged legislation prohibits," as well as LCMs, meaning that they were "in common use" as that term was used in *Heller. Id.* While *Cuomo* viewed the "common use" requirement as meaning "the weapons must actually be used lawfully," it determined that the court "need not consider" any evidence related to

21

lawful use because the mere possession of assault weapons was the proscribed conduct under the statute. *Id.* at n. 52.

While the Second Circuit viewed common use as an "objective and largely statistical inquiry," it found that typical possession by law-abiding citizens for a lawful purpose required looking into "both broad patterns of use and the subjective motives of gun owners." *Id.* at 256. *Cuomo* rejected the idea that use in crime, as opposed to lawful purposes, could deprive the firearms of constitutional protection because the handguns in *Heller* were also often used in violent crime, and the "evidence of disproportionate criminal use did not prevent the Supreme Court from holding that handguns merited constitutional protection." *Id*. Instead of considering only a weapon's association with crime, the Second Circuit also decided it must consider "more broadly whether the weapon is 'dangerous and unusual' in the hands of law-abiding civilians," distinguishing "weapons that are most useful in military service" from civilian weapons. *Id. Cuomo* candidly acknowledged that the analysis is "difficult to manage in practice" because the fact that an AR-15 is "the civilian version of the military's M-16 rifle" could either mean it should be treated as equally dangerous and unusual as an M-16, or that its role as the civilian alternative made it constitutionally protected where the M-16 was not. *Id.* at 256-57.

The Second Circuit concluded that "neither the Supreme Court's categories nor the evidence in the record cleanly resolves the question of whether semiautomatic assault weapons and large-capacity magazines are 'typically possessed by law-abiding citizens for lawful purposes.'" *Id.* Because there was a "dearth of evidence" that "law-abiding citizens typically use these weapons for self-defense," *id.* at 263, the Second Circuit decided in lieu of ruling on the typical possession question that "[i]n the absence of clearer guidance from the Supreme Court or stronger evidence in the record," it would "proceed on the assumption that these laws ban weapons protected by the Second Amendment" because

22

"the statutes at issue nonetheless largely pass constitutional muster" under step two of the analysis—tiers of scrutiny. *Id.* at 260.

*Cuomo* noted that the "instant bans are dissimilar from D.C.'s unconstitutional prohibition of 'an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose' of self-defense" because "New York and Connecticut ban only a limited subset of semiautomatic firearms, which contain one or more enumerated military-style features," and "[a]s *Heller* makes plain, the fact that the statutes at issue do not ban 'an entire class of 'arms'" makes the restrictions substantially less burdensome." *Id.* at 260. Based on this distinction and because "numerous 'alternatives remain for law-abiding citizens to acquire a firearm for self-defense'", *Cuomo* found that the bans did not "effectively disarm individuals or substantially affect their ability to defend themselves" and so imposed a burden that was "real" but not "severe." *Id.* In evaluating the purpose of the statutes, *Cuomo* also held that the legislation was "tailored" to address "particularly hazardous weapons" and the dangers that many of the "military-style features" posed. *Id.* at 262. The legislation, the Second Circuit found, was "specifically targeted to prevent mass shootings like that in Newtown," and to reduce "circulation of assault weapons among criminals." *Id.*

### 4. *New York State Rifle & Pistol Association, Inc. v. Bruen*

In *Bruen,* the Supreme Court invalidated the majority of circuit court decisions addressing the Second Amendment post-*Heller* by definitively rejecting the tiers-of-scrutiny "two-step" approach to Second Amendment claims and introducing a new test:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

142 S. Ct. at 2129-30. While "[s]tep one" of the previous "two-step" framework was "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history," the Supreme Court held that the second step was "one step too many," and that "[i]nstead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. *Heller's* methodological approach, *Bruen* explained, began with textual analysis and a review of the historical background of the Second Amendment, followed by a review of the public understanding of the right based on post-enactment sources, to confirm whether the right was an individual one to self-defense and to "demark the limits on the exercise of that right" such as the "historical tradition" of prohibiting dangerous and unusual weapons, and protecting only weapons that were "in common use." *Id.* at 2128. This methodology, centered on "constitutional text and history," *id.*, did not allow for balancing the interest protected by the statute with other government interests under traditional means-end scrutiny—instead, courts should respect the fact that the Second Amendment "is the very *product* of an interest balancing by the people" and look to the balance "struck by the traditions of the American people" in evaluating the legitimacy of any regulation of firearms. *Id.* at 2130-31.

New York's licensing scheme prohibited the possession of any firearm without a license and required applicants to show a "special need for self-protection distinguishable from the general community" in order to obtain a general carry license. *Id.* at 2123. Neither side contested that petitioners had demonstrated that they were part of "the people" protected by the Second Amendment, and that handguns were "'in common use' today for self-defense," and so the only preliminary question under the first question of *Bruen's* newly enunciated test was "whether the "plain text of the Second Amendment" protected "carrying handguns publicly for self-defense." *Id.* at 2134. *Bruen* had "little difficulty

24

concluding that it does" because the "textual elements" of the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation," which "naturally encompasses public carry" based on the definition of "keep" and "bear." *Id.*

Because petitioners had met their burden, *Bruen* next turned to determining whether the regulation had a proper historical analogue such that it was consistent with the Nation's traditions of firearm regulation. *Bruen* embarked once more on a journey through history, reviewing sources from "the late 1200s to the early 1900s" submitted by the respondents and concluding that "apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 2135-2136, 2138. *Bruen* distinguished a number of pre-19th century regulations directed to the carry of firearms as inapposite, *see, e.g., id.* at 2141-45 (discussing how the Statute of Northampton and successor statutes' prohibition on riding "armed by night nor by day" only prohibited bearing arms in a way that spread "fear" or "terror" rather than representing a broad prohibition on all forms of public carry) or outliers, *see, e.g., id.* at 2143-44 (finding that a regulation preventing a farmer or plantation owner who settled new territory from carrying any kind of pistol, and more broadly prohibited the concealed carry of pocket pistols or unusual or unlawful weapons, was not meaningful because it only appeared to have been in effect for 8 years). Regarding the latter, *Bruen* held that even if there had been a statute prohibiting handguns as "dangerous and unusual" during the colonial period, handguns are "indisputably in 'common use' for self-defense today," and so could provide no justification for restricting "the public carry of weapons that are unquestionably in common use today." *Id.* at 2143.

*Bruen* found after a review of the historical record that the government could regulate "the intent for which one could carry arms," (such as prohibiting carrying of a

firearm in a way that would cause fear and terror,) "the manner by which one carried arms" (such as prohibiting either open or concealed carry so long as the other form of carry remained open) or the "exceptional circumstances under which one could not carry arms" (such as in the case of dangerous or unusual weapons), but it could not broadly prohibit the public carry of commonly used firearms for personal defense by requiring individuals to demonstrate a need for a handgun beyond the generalized desire to possess it for self-defense. *Id.* at 2156. Thus, *Bruen* held that New York's licensing scheme violated the Second and Fourteenth Amendments. *Id.*

## IV.   Discussion

### A.   Analytical Framework for Second Amendment Challenges

Ruling on the merits of the parties' arguments first requires determining what framework for analyzing Second Amendment claims the Supreme Court has left lower courts with post-*Bruen,* including what the various terms of art used by the Supreme Court mean for purposes of their application, and whose burden it is to produce evidence on each point.

At oral argument, both sides agreed that because there is a degree of overlap between the analyses for 'common use,' 'typical possession,' and 'dangerous and unusual' in the context of the Second Amendment, the structural organization of how the Court addresses each phrase is less important than what the core of the inquiry is. However, the parties' positions diverge sharply on what that core might be. Plaintiffs' position is that whether a weapon is "common use," whether the firearms are "typically possessed by law-abiding citizens for lawful purposes," and whether the firearms are "dangerous or unusual weapons" are the "flip side of one another." (June 5, 2023 Oral Argument Tr. [Doc. # 83] at 39). In their view, common use is an inquiry focused on "the choices commonly made by contemporary law-abiding citizens" to purchase and possess certain weapons and is meant

26

only to distinguish commonly used civilian weapons from "specialized weapons employed by a standing army." (Pls.' Mem. at 10.) Broadly, Defendants view the three different phrases as ultimately getting at whether the firearms at issue are suitable and used for self-defense, or for some other purpose—lawful or unlawful—unprotected by the Second Amendment. Defendants maintain that after *Bruen,* Plaintiffs must show not only that the weapons and accoutrements are commonly owned, but that they are commonly possessed and used *for self-defense* based on *Bruen's* repeated use of the phrase "'common use' for self-defense." (Defs.' Mem. at 24.) Amici Brady, March for Our Lives, and Giffords Law Center join that position, highlighting that both *Heller* and *Bruen* heavily emphasize that "individual self-defense" is the central component of the Second Amendment, not mere possession of firearms for lawful purposes generally. (Brief for Brady as Amicus Curie, supporting Defendants ("Brady Amicus") [Doc. # 80] at 4-5); (Brief for Giffords Law Center as Amicus Curie, supporting Defendants ("Giffords Amicus") [Doc. # 75] at 8, 10.)[7] Defendants interpret the phrase "typical possession by law-abiding citizens for lawful purposes" to require the Court to determine what the weapon is "useful" for and how it is "used" in practice. (Defs.' Mem. at 20.)

The first step requires deciding whether *Cuomo's* holding on these two questions is still binding post-*Bruen. Cuomo* interpreted the "common use" analysis as a purely statistical inquiry into ownership, and the "typical possession" analysis as a more qualitative examination "into both broad patterns of use and the subjective motives of gun owners." *Cuomo,* 804 F.3d at 256. *Cuomo* held that because "Americans own millions of the firearms that the challenged legislation prohibits," they should be considered "in common use" as that term was used in *Heller and* assumed without deciding that the plaintiffs would succeed on the issue of typical possession*. Cuomo,* 804 F.3d at 255-57. If *Cuomo's* holding on common use remains good law, then the Court's task is merely to apply it. However,

because *Cuomo* preceded *Bruen,* the Court must determine to what extent *Cuomo* has been abrogated; while the parties agree that the "two-step" and the means-end scrutiny analyses used in *Cuomo* are no longer applicable law[8], their positions diverge on whether discrete portions of *Cuomo's* "step one" analysis on common use and typical possession remain binding.

Plaintiffs' arguments as to *Cuomo's* applicability are built upon ever-shifting sands, making their precise position difficult to pin down. Plaintiffs devote an entire section of their opening brief, titled "[t]he Second Circuit's decision in *Cuomo* is no longer good law," (capitalization omitted), to arguing that both the "mode of review" *and* "holding" were overturned by *Bruen*, (Pls.' Mem. at 11-13). This position is consistent with their argument that common use and typical possession are part of the same overlapping inquiry, and that no inquiry into whether the weapons are used for self-defense is required. However, it is fundamentally *inconsistent* with their assertion at oral argument that *Cuomo* is binding on this Court to the extent it held that assault weapons are commonly used, because the method of analysis with which *Cuomo* reached that conclusion divided common use and typical possession into two questions. (*See* Oral Argument Tr. at 11.) Plaintiffs cannot have it both ways—either *Cuomo's* common use analysis survived *Bruen* and is thus binding, or common use and typical possession are terms meant to be interchangeably used as part of one analysis, in which case that portion of *Cuomo's* holding giving the terms distinct meanings is inconsistent with *Bruen* and it is no longer good law.

The Court views the latter option interpretation as the better one. *Cuomo* openly acknowledged that *Heller* provided lower courts with little guidance on what phrases like "common use" or "typically possessed by law-abiding citizens for lawful purposes" meant and how they should be applied; while *Cuomo* strove to faithfully apply the analysis as *Heller* appeared to set it out, continued analysis of the question in other circuits revealed

that defining the "common use" factor articulated in *Cuomo* leads to a problem of application:

> [R]elying on how common a weapon is at the time of litigation would be circular to boot. Machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal. Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.

*Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015).

*Bruen,* perhaps recognizing the shortcomings of a purely statistical inquiry into possession, avoided that pitfall by framing the relevant inquiry as being whether the weapons are "'in common use' today *for self-defense*." *Bruen,* 142 S. Ct. at 2134 (emphasis added); *see also Heller,* 554 U.S. at 594 (discussing the origins of the pre-existing right codified by the Second Amendment as the "right of self-preservation" permitting a citizen to "repel force by force" when "the intervention of society in his behalf, may be too late to prevent an injury.") While only a handful of district courts post-*Bruen* have had the occasion to grapple with the question of what common use means, at least one has reached the conclusion that *Bruen* requires that common use to be specifically for self-defense. *See Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-CV-01815-IM, 2022 WL 17454829, at *10 (D. Or. Dec. 6, 2022), *appeal dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022) (noting that the relevant inquiry was whether the weapons were in common use "for lawful purposes *like self-defense*") (quoting with emphasis *Heller,* 554 U.S. at 624). As such, this Court reads *Bruen* to abrogate *Cuomo* to the extent it treated common use as a solely statistical question.

Plaintiffs next insist that because the Second Amendment guarantees an "individual right to *possess* and carry weapons *in case of confrontation,*" that necessarily means

firearms need not be commonly "used" for self-defense—only possessed. (Pls.' Reply at 36) (quoting with emphasis *Bruen,* 142 S. Ct. at 2134.) The reason for which the firearms are possessed is certainly part of the analysis; however, *Bruen* recognized that the "limitation" on "the sorts of weapons protected" by the Second Amendment to those in common use stems from "the historical tradition of prohibiting the *carrying*" of dangerous and unusual weapons, intrinsically linking the contours of constitutionally protected weapons to how those weapons are used, rather than merely possessed. *Heller,* 554 U.S. at 627 (emphasis added). Further, to adopt Plaintiffs' proposal would mean allowing the analysis to be driven by nebulous subjective intentions such that if enough individuals filled out a survey stating that they owned high powered shotguns or niche sniper rifles for the purpose of self-defense, that would satisfy the common use test regardless of how the weapons were actually used, a result that the Supreme Court does not indicate in the slightest that it intended.

The Supreme Court's holding in *Miller* that "the sorts of weapons protected" by the Second Amendment are those that were "in common use at the time," *Miller,* 307 U.S. at 179, was interpreted in *Heller* to mean that the weapons protected by the Second Amendment were "the sorts of lawful weapons" that are typically "possessed at home," and not "dangerous and unusual" weapons. *Heller,* 554 U.S. at 627. *Caetano v. Massachusetts,* 577 U.S. 411, 411 (2016) explicitly rejected the idea that a firearm is dangerous and unusual merely because it did not exist at the time of the Founding, and *Bruen* further explained that the tradition of prohibiting "dangerous and unusual" weapons is not meant to prohibit guns that might have been dangerous and unusual during the colonial period if they are now "the quintessential self-defense weapon," *id.* at 2143. All three precedents point towards the inquiry into whether the Second Amendment protects a particular firearm focusing not on whether it was commonly kept and used or would have been

considered dangerous and unusual at the time of the Founding, but instead on both the characteristics of the firearm and how the firearm is used by everyday citizens. *See also id.* at 2128 (characterizing the limitation on dangerous and unusual weapons as part of the "the historical understanding of the Amendment to demark the *limits on the exercise* of [the Second Amendment] right.") (emphasis added).

The Court views the three phrases—common use, typical possession, and dangerous and unusual—as meant to get at both the "how" and the "why" of how a particular weapon is used. Thus, the Court proceeds by seeking to answer two questions: Do law-abiding citizens buy the weapons at issue for the purpose of defending themselves, or because the weapons' characteristics are well-suited for some unlawful purpose? And once those firearms are purchased, are they actually used for self-defense, or are they more often utilized to achieve unlawful ends? In order to prevail, the answer to both must be that the weapons are obtained and used for self-defense.

Having settled that *Bruen* requires the Court to determine both how and why the firearms are commonly used and possessed, whether it be for self-defense or for some unlawful end that makes the weapons dangerous and unusual, the Court must now decide whose burden it is to provide evidence as to each element. Plaintiffs argue "the Second Amendment's plain text covers Plaintiffs' conduct in seeking to acquire bearable arms" and that as such, Plaintiffs' conduct "is **presumptively** protected by the Second Amendment"; based on the language in *Bruen* stating that "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms," Plaintiffs maintain that no more is required from them. (Pls.' Mem. at 4-5) (emphasis in original); (Pls.' Reply at 5.)

Defendants view Plaintiffs' burden in both *Heller* and *Bruen* to require threshold showings that (1) Plaintiffs are members of "the people", (2) the regulated instrument is a "bearable arm" under the Second Amendment, (3) the arms are not "dangerous or

unusual," (4) such arms are in "common use" for "lawful purposes like self-defense" and that (5) the weapons are "typically owned by 'law-abiding citizens for lawful purposes." (Defs.' Mem. at 11-12.) They acknowledge that if Plaintiffs meet their burden, the burden to justify their regulation by demonstrating that it is relevantly similar to historical analogues in the nation's history and tradition of firearm regulation lies with them. (*Id.*)

*Bruen's* mandate provides that *if* the Second Amendment's plain text creates the presumption, "*then*" the government must justify its regulation. *Bruen,* 142 S. Ct. at 2130 (emphasis added). Similarly, the section of *Bruen* in which the Supreme Court applied its newly enunciated test considered whether handguns were arms that were "'in common use' today for self-defense" and whether the "plain text" of the Second Amendment covered the petitioner's "proposed course of conduct" of carrying handguns publicly for "self-defense" *before* shifting the burden to respondents to justify the regulation. *Id.* at 2134. Thus, *Bruen* and *Heller* make clear that Plaintiffs have the burden of making the initial showing that they are seeking to possess or carry firearms that are "'in common use' today for self-defense" and are typically possessed by law-abiding citizens for that purpose. *Id. Heller* may have discussed the common use test as part of the "historical tradition" of prohibiting dangerous and unusual arms, rather than the "plain text" of the Second Amendment, but *Heller* stressed that text and history are inextricably intertwined; the constitutional right is defined by the text used to immortalize it, but *Heller* also teaches that the text itself is defined by its original meaning, including the history and tradition behind it. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1459-51 (2009). In short, *Heller* made extensive use of history to define *both* the scope of the right and the types of regulations that, despite burdening the right, are constitutionally permissible; the

requirement that the arms be in common use for self-defense falls into the former category, not the latter.

Plaintiffs strenuously contest this interpretation of *Heller* and *Bruen,* maintaining at oral argument that neither case imposes any obligation on plaintiffs to offer empirical evidence on how the arms are used and for what purpose.[9] In support, they rely on *Bruen's* acknowledgment that the First Amendment was "repeatedly compared" to the Second Amendment in *Heller* for the purpose of analyzing whether the Supreme Court's holding was consistent with its treatment of other constitutional rights, and *Bruen's* subsequent comparison of the government's burden in a Second Amendment challenge to First Amendment cases where the government "bears the burden of proving the constitutionality of its actions" when it restricts speech. *Bruen,* 142 S. Ct. at 2130.[10] However, the quoted language stands only for the well-established principle that when Plaintiffs bring any constitutional challenge, whether in the context of the First or the Second Amendment, the burden shifts to the government to justify its actions once the plaintiffs have satisfied their *own* preliminary burden. *See, e.g., Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2421 (2022) (explaining that "a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses," and it was only "*[i]f* the plaintiff carries these burdens" that the burden "*then* shifts to the defendant to [justify] … its actions[.]") (emphasis added).

Nothing in *Bruen* or any of the other cases that Plaintiffs cite grants them an automatic presumption that their conduct is constitutionally protected which Defendants are then required to affirmatively rebut. Plaintiffs must bear the burden of producing evidence that the specific firearms they seek to use and possess are in common use for self-defense, that the people possessing them are typically law-abiding citizens, and that the purposes for which the firearms are typically possessed are lawful ones.

To the extent that Defendants seek to demonstrate that the regulated firearms are instead dangerous and unusual weapons that are not protected by the Second Amendment, Defendants must demonstrate either that the weapons are unusually dangerous, or that they are not commonly used or possessed for self-defense. Plaintiffs protest, urging that Defendants be required to show both that the assault weapons and LCMs are not commonly used *and* that they are unusually dangerous, because the "dangerous and unusual" test is a conjunctive one. However, it cannot be the case that a grenade launcher or a flamethrower becomes constitutionally protected even if it becomes "common[ly] used" for self-defense if it is also commonly used by military combatants. Further, all firearms are "dangerous" in the sense that they are lethal, and so the Court reads the term "unusual" as implying that there must be some level of lethality or capacity for injury beyond societally accepted norms that makes it especially dangerous. *Heller's* use of the phrase "dangerous and unusual" does not state that it must be conjunctive, but instead cites to several sources—including 4 Blackstone 148–49 (1769), *State v. Lanier*, 71 N.C. 288, 289 (1874), and *Eng. v. State*, 35 Tex. 473, 476 (1871)—all of which use the phrase "dangerous *or* unusual weapons" (emphasis added). *See also* Volokh, *supra*, 1481 (noting that some of the sources *Heller* cites to use the phrase "dangerous and unusual" while others use "dangerous or unusual".) At least one district court has made the same observation and rejected a conjunctive interpretation. *See United States v. Reyna, No.* 3:21-CR-41 RLM-MGG, 2022 WL 17714376, at *3 (N.D. Ind. Dec. 15, 2022) (finding that a weapon can be banned if it is "uncommon or unusually dangerous").[11]

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.,* No. CV 22-951-RGA, 2023 WL 2655150, at *7 (D. Del. Mar. 27, 2023) held to the contrary, finding that even if "dangerous or unusual" was more accurate as a matter of history, the "great weight" of precedent required it to interpret the "dangerous and unusual" test to

require the checking of "both boxes." *Id.* For this "great weight" of authority, however, the court cited to only two cases in support: *Bruen,* and Justice Alito's concurrence in *Caetano.* *Id.* However, the section of *Bruen* that *Delaware State Sportsmen's Ass'n* cites to immediately follows the phrase "dangerous and unusual" with a citation to the Blackstone commentaries that uses "dangerous *or* unusual," (emphasis added) and providing such disproportionate weight to the concurrence in *Caetano* is unwarranted given that the majority opinion in *Caetano* holds only that the lower court erred in finding that whether a firearm is in common use or is dangerous and unusual turned on whether the firearm existed during the time of the Founding and was useful in warfare. *Id.* at 412. Justice Alito's concurrence was joined only by Justice Thomas, and no citation to his concurrence appears in the majority opinion in *Bruen.* The Court declines to follow the analysis of *Delaware State Sportsmen's Ass'n.*

Thus, the Court finds that the purpose of the "dangerous and unusual" exception to the Second Amendment is to determine whether the firearm's character is such that it is commonly used and typically possessed for self-defense, or instead for the purpose of causing unlawful or excessive harm or fatalities. This interpretation of the test is also consistent with the interplay between common use, typical possession, and dangerous and unusual; a weapon must be both possessed for the purpose of and actually used for self-defense in order to fall within the Second Amendment's protection, meaning that if it is either unusual for it to be possessed for self-defense or if it is used in a way that makes it particularly dangerous, the weapon does not fall within the Second Amendment's purview.

Finally, Plaintiffs must also show that the conduct they seek to engage in is covered by the right to "keep and bear arms," which includes "the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Bruen,*

142 S. Ct. at 2134. To prevail on this question, Plaintiffs must show that carrying both a firearm defined as an "assault weapon" and that possessing and using an LCM in conjunction with an assault weapon are part of keeping and bearing arms. If Plaintiffs establish each of those elements, the burden shifts to Defendants to justify their regulation based on *Bruen's* requirements for establishing relevant similarity to history and tradition.

> **B.      Likelihood of Success on the Merits**
>
> > **1.      Whether Plaintiffs' Proposed Conduct Falls Within the Scope of the Second Amendment**

It is undisputed that Plaintiff Flanigan is a "law-abiding citizen of the United States," and that she has a valid permit to carry a pistol or revolver. (Third Amend. Compl. ¶¶ 4, 6.) Defendants also do not contest that the firearms defined in Conn. Gen. Stat. § 53-202a(1) are "arms," or that Plaintiff Flanigan seeks to "keep and bear" those arms. The remaining disputes are (1) whether LCMs and firearm accessories are bearable arms, (2) whether assault weapons and LCMs are in common use for self-defense, and (3) whether they instead are dangerous and unusual weapons not typically possessed by law-abiding citizens for lawful purposes.

Before delving into the specifics of each prong of the *Bruen* test, the Court notes that many of Plaintiffs' arguments as to the applicability of the Supreme Court's precedent employ the logic that if a broader category of something is constitutional, then the smaller parts within it must also be constitutional. The problem with such a logical fallacy, however, is that even if such generalizations are true of the whole, they cannot account for circumstances that distinguish the individual parts. Plaintiffs attempt to apply this logic at multiple turns, beginning with their interpretation of *Staples v. United States*, 511 U.S. 600, 610 (1994), in which the Supreme Court sought to determine whether guns *generally* should be considered "highly dangerous devices that should alert their owners to the

probability of regulation" such that owning an unregistered rifle with prohibited characteristics could be classified as a public welfare offense. The Supreme Court explained that while it might classify categories of guns including "the machineguns, sawed-off shotguns, and artillery pieces" as having a "quasi-suspect character", other guns "traditionally have been widely accepted as lawful possessions" and so did not put gun owners sufficiently on notice of the likelihood of regulation" simply based on the fact that guns are dangerous possessions. *Id.* at 611-12.[1] Thus, because *Staples* characterized guns other than machine guns, sawed off-shotguns, and artillery pieces as generally lawful possessions, and the assault weapons in the challenged statutes here are guns that do not fall into one of those categories, Plaintiffs conclude that assault weapons must be generally lawful possessions. However, this generalization ignores the broader context of *Staples,* such as the fact that the phrase "traditionally have been widely accepted as lawful possessions" was written decades before *Bruen* in 1994, without exhaustive historical analysis, and to answer an entirely different question. *Id.* at 612.

Plaintiffs employ similar logic in their arguments regarding whether use in crimes, military characteristics, or use in mass shootings makes firearms dangerous and unusual, *infra,* Sections IV(B)(1)(b)(2)-(4). However, nothing so clearly illustrates the flaw in Plaintiffs' logic as *Bruen* itself which acknowledged that traditionally, governments have been permitted to "lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." *Bruen,* 142 S. Ct. at 2150. In other words, the government cannot ban individuals from carrying firearms, but it can ban different types of carry so long as others are left available. The same principle applies here. The Challenged Statutes do not ban handguns, or all semiautomatic rifles, or even all semiautomatic handguns, but *specific* firearms of enumerated models and features. Because the statutes are not complete bans of the "quintessential self-defense" weapon, Plaintiffs' arguments

directed to general common use of firearms broadly or of similar firearms made throughout their briefing will not suffice, nor will evidence regarding common use of firearms generally satisfy Plaintiffs' burden to present evidence regarding the *specific* assault weapons enumerated in the Challenged Statutes.

### a) Whether LCMs are Bearable Arms

*Bruen* and *Heller* held that "arms" is not limited to only those arms existing in the 18th century, but that the "general definition" of arms fixed according to the historical understanding of it in the 18th century "covers modern instruments that facilitate armed self-defense." *Bruen,* 142 S. Ct. at 2132. Defendants insist that the LCMs as defined in Conn. Gen. Stat. § 53-202w(a)(1) do not fall within the historical definition of "arms" but are instead analogous to "Founding-era cartridge boxes" that would have been considered "accoutrements" beyond the scope of the Second Amendment's definition.[12] (Defs.' Mem. at 12-13.) Defendants rely on an expert declaration maintaining that because ammunition was manually fed into weapons, and kept in cartridge boxes, "magazine" at the time of the Founding would mean "a building designated for storing gunpowder," and the use of "magazine" as a "bullet storage container" only first appeared in the late 1880s. (Defs.' Ex. E, Decl. of Prof. Dennis E. Baron[13] [Doc. # 37-5] ¶ 24.) Linguistically, Baron argues that the cartridge boxes that held the ammunition, which would have been the closest analogue to modern day magazines, were described as "accoutrements" and were considered separate from "arms" by those in the Founding Era. (Baron Decl. ¶¶ 24, 38, 78).[14] Thus, Defendants contend that LCMs are not ammunition but an "ammunition feeding device" that would qualify as an accoutrement.

Plaintiffs maintain that magazines are covered by the Second Amendment because they are essential to the operation of semi-automatic firearms, and thus are an integral part of the firearm itself. (Pls.' Reply at 19.) In Plaintiffs' view, whether LCMs can be banned

even if magazines generally are constitutionally protected is a separate question that should be considered under the second step—the historical analysis—rather than the first. If magazines generally are necessary to make semi-automatic rifles effective, then Plaintiffs maintain that magazines generally constitute bearable arms "that are prima facia protected by the Second Amendment." (*Id.* at 25.)

Plaintiffs rely on the declaration of Mark Passamaneck[15] to support their proposition that without detachable magazines, "semi-automatic firearms are inoperable" because the "feed angle, magazine spring pressure, and feed ramps" are all features that are meant to ensure the magazine and firearm function together as intended, making the magazine a "dynamic component" necessary to the firearm's operation. (Pls.' Reply Ex. 2, Decl. of Mark Passamaneck [Doc. #64-2] ¶¶ 6-7). Without the magazine, there "is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger," which is the "defining characteristic of a semi-automatic weapon." (*Id.* ¶ 7.) Even if it is "technically possible" to fire a semi-automatic weapon without a magazine by "manually opening the action each time the weapon is fired and manually inserting a single round into the chamber," to do so would make the firearm "unreliable, unsafe, and subject to being damaged." (Pls.' Reply at 24.)[16]

*Heller* noted that the "18th-century meaning" of arms "is no different from the meaning today," and extends to "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller,* 554 U.S. at 581-82. Several courts have found that components of firearms that are necessary to their operation, such as ammunition, are covered by the Second Amendment. *See Miller*, 307 U.S. at 179-80 (citing seventeenth-century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless.")

Plaintiffs point to Passamaneck's declaration as evidence that magazines are similarly necessary to the operation of semiautomatic firearms and are thus entitled to Second Amendment protection as a form of "arms," and note that the Ninth Circuit has reached the same conclusion. *See Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("to the extent that certain firearms capable of use with a magazine . . . are commonly possessed by law-abiding citizens for lawful purposes, our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable".)

Defendants' position is that even if there may be some right to magazines under the Second Amendment, the question is whether an LCM *specifically* is integral to a firearm, because a "firearm can be used for self-defense without a large capacity magazine—any ammunition feeding device of lesser capacity will do the job." (Defs.' Mem. at 14.) They point to cases like *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *12 (D.R.I. Dec. 14, 2022)[17] and *Oregon Firearms*, 2022 WL 17454829, at *9 in support, but these cases ignore that under *Bruen,* a "modern instrument[] that facilitate[s] armed self-defense" is an arm entitled to the "prima facie" protection of the Second Amendment. 142 S. Ct. at 2132.

The fact that magazines as a general category constitute bearable arms does not automatically render them protected by the Second Amendment; it means, however, that whether an LCM specifically is necessary for self-defense is better addressed in the section of the inquiry focused on the "common use" of LCMs. The Court concludes that LCMs are "arms" for purposes of the Second Amendment as defined in *Bruen* and *Heller.* Plaintiffs have met their burden in this part of the analysis.

> b) **Determining the Purpose for Which Assault Weapons and LCMs are Commonly Purchased and how they are Commonly Used**

> (1) **Ownership for and Use in Self-Defense**

Plaintiffs maintain that the metric used to determine common use should be the percentage of "gun owners" who have an assault weapon and LCM, rather than a percentage of the general population, (Pls.' Reply at 37), as measured by manufacturing data. They submit that semiautomatic rifles are in common use because the AR-15 is the "best-selling rifle type in the United States" and semiautomatic rifles and semiautomatic handguns are the two most popular types of firearms that are sold. (Pls.' Reply at 29).[18] According to Plaintiffs, about thirty-five percent of all newly manufactured guns sold in America as of 2018 were modern semiautomatic rifles[19], and 24.6 million Americans have owned AR-15 or similar rifles.[20] As for LCMs, Plaintiffs' expert reports that "[a]t least 150 million magazines with a capacity greater than ten rounds" are owned by law-abiding American citizens, (Pls.' Mot. Ex. 3, Decl. of James Curcuruto[21] [Doc. # 28-4] ¶ 7), and many handguns, including the Glock 17 pistol (the most popular handgun in America, and legal to own under the Challenged Statutes) come standard with magazines greater than 10 rounds. (Pls.' Mem. at 21).

Plaintiffs also rely on the 2021 National Firearms Survey, which reported that recreational target shooting, home defense, and hunting were the primary reasons for possessing a firearm among the survey participants; specifically, 61.9% of the survey participants reported that they possessed an AR-style firearm for home defense. *See* 2021 National Firearms Survey at 33-34, 23. The same survey found that "[o]f the 25.3 million Americans who have defended themselves with a firearm, 13.1% (3.3 million) have used a rifle." (*Id.*) For LCMs, the survey reported that out of 16,708 gun owners, 48% (which the

survey estimates represents 39 million people when measuring 48% of gun owners as a whole) "have owned magazines that hold over 10 rounds," including the "most popular semi-automatic rifles" which are "manufactured with standard magazines holding more than ten rounds." (Pls.' Reply at 29.)[22] According to the survey, of those who owned LCMs, 41% reported owning them for the purpose of defense outside the home, and 62.4% reported owning them for the purpose of home defense. *See* 2021 National Firearms Survey at 23.

Defendants argue that manufacturing or ownership statistics alone shed only limited light on the question of how assault weapons and LCMs are used. *See, e.g.*, *Heller v. District of Columbia* (*"Heller II")*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (holding that although 4.7 million LCMs had been imported into the United States between 1995 and 2000, statistics alone did not reveal whether they were "commonly used or are useful" for self-defense.) Professor Donahue[23] reflects that "gun ownership is becoming more concentrated in a declining portion of the population," and that "ownership of private firearms is highly concentrated among a small percentage of gun owners." (Defs.' Ex. B, Decl. of Prof. John Donahue [Doc. # 37-2] ¶ 131.) The average "assault weapons owner" has "three or more of the guns", meaning that far more assault weapons are sold than there are individual owners of such guns. (*Id.* ¶ 92); (*see also* Defs.' Ex. C, Decl. of Prof. Louis Klarevas[24] [Doc. # 37-3] ¶ 27); (Defs.' Mem. at 24.)[25] Donahue also reports that "the vast majority of the time that an individual in the United States is confronted by violent crime, they do *not* use a gun for self-defense," and that between 2007-2011, 99.2 percent of victims of violent crimes did not defend with a gun. (*Id.* ¶ 150.)[26]

Defendants, supported by Amici Brady and March for our Lives, contend that "the overwhelming body of case law and empirical data demonstrate that LCMs are not needed for 'armed self-defense,'" nor are assault weapons commonly used in self-defense. (Brady

Amicus at 2.)[27] Defendant's expert Lucy Allen's[28] research on incidents documented by The Heritage Foundation's database, which is meant to "highlight" stories of successful self-defense, shows only 51 of the 2714 incidents, or 2%, involving any kind of rifle, with no further breakdown indicating whether those rifles were "assault weapons." (Defs.' Ex. D, Decl. of Lucy Allen [Doc. # 37-4] ¶¶ 21-23.)[29] In reported instances of self-defense involving firearm use from 2011-2017, Allen submits evidence that only 2.34 shots are fired in self-defense on average, with individuals firing 5 shots or fewer in 97.3% of all incidents nationally, and in Connecticut specifically, no individual fired more than 10 rounds in self-defense in reported incidents between 2011-2017. (Allen Decl. ¶¶ 10, 16-17.)[30] Donahue concludes that in light of those statistics, the fact that "[a]ll firearms that can accept high-capacity magazines can also accept magazines that hold fewer rounds" and the firing rate of a semi-automatic firearm would be irrelevant if only brandishing it was necessary to deter threats, it "cannot be seriously maintained that assault weapons and high-capacity magazines play any important role in furtherance of the Second Amendment goal of self-defense." (Donahue Decl. ¶ 153.)

"[W]hether a weapon is in common use depends a lot on how generally one defines the weapon; for instance, as a handgun generally, or as a Glock 17 in particular." *See* Volokh, *supra,* at 1481. Because *Heller* focused on handguns being "the most popular weapon chosen by Americans for self-defense in the home," the Court views the correct inquiry to be how many Americans actually own and use assault weapons for self-defense. *Heller*, 554 U.S. at 629. The data relied on by both sides, unfortunately, is unhelpfully general in nature to the extent that it divides the statistics only by categories such as handgun or rifle, rather than semiautomatic or non-semiautomatic. Given those limitations, this Court cannot determine whether assault weapons are in "common use" because, importantly, the challenged statute does not ban *all* rifles, pistols, or shotguns; statistics

that do not differentiate between assault weapons and other firearms within those categories are thus of limited assistance. Even if the Court were to credit Plaintiffs' statistics on the common use of rifles, the fact that 13.1% of self-defense incidents involve a rifle of some kind does not assist this Court in determining whether the specific semiautomatic rifles covered by this statute are used commonly for self-defense. As for semiautomatic handguns and the banned shotguns, Plaintiffs offer no evidence regarding the possession or use statistics of either.

Plaintiff's single survey on the reason for which the survey respondents reportedly bought their assault weapons does not demonstrate that assault weapons and LCMs possess characteristics that make them well-suited for self-defense. To the contrary, Donahue explains that because "[b]ullets fired by assault weapons or a modern weapon with an LCM will easily penetrate walls," their use threatens family members or occupants of occupied dwellings, as illustrated by one instance in which a concealed carry permit holder accidentally fired his gun in a gun safety class, and the bullet passed through a wall to kill the gun store owner in the next room. (Donahue Decl. ¶ 154.) Donahue notes that experts "consider handguns clearly more suitable than assault weapons for self-defense." (*Id.* ¶ 158.)[31] *Cf. Heller,* 552 U.S. at 629 (noting that handguns have particular features that make them preferable as a home defense tool).

In the absence of persuasive evidence that the assault weapons or LCMs listed in the statutes are commonly used or are particularly suitable for self-defense, Plaintiffs have failed to carry their burden.

### (2) Possession for Use in and Actual Use of Assault Weapons and LCMs in Non-Mass Shooting Crimes

The Second Circuit recognized that after *Heller,* handguns cannot be constitutionally banned despite being disproportionately used in murders and violent crimes as compared

to other firearms. *Cuomo,* 804 F.3d at 256. Plaintiffs reason therefore that use in crime alone cannot be enough to find that the assault weapons and LCMs are not protected by the Second Amendment. They also dispute the premise that assault rifles are often used in crime, asserting that "evidence indicates" that under 1% of guns used in crimes were "assault rifles" as of 1997.[32] Plaintiffs claim that more recent FBI statistics demonstrate that rifles (with no breakdown between semiautomatic rifles and non-semiautomatic rifles) were used in only 315 murders per year between 2015 and 2019, whereas 669 murders are committed by hands, fists, and feet in that time period.[33]

Defendants maintain that assault weapons and LCMs are often used to perpetrate "unlawful violence" and are "particularly popular weapons for drug traffickers and gang members both in the U.S. and Mexico," citing to Donahue's assertion that "lost or stolen" guns are "one of the most important sources of weapons for criminals in the United States." (Donahue Decl. ¶ 115.)[34] Donahue concludes that the 364 killings with rifles is likely an undercount as there were also 3281 murders with "firearms, type not stated" where no information about the type of firearm was available, and the data reported by the FBI does not capture whether any of those murders were committed with semiautomatic pistols— some of which are also defined as assault weapons. (Donahue Decl. ¶¶ 178-79.) Donahue also points out that police departments are not required to report data to the FBI on firearm homicides, and that the figures do not account for shootings committed with assault rifles that did not result in death. (*Id.* ¶ 179.) Because these statistics do not track what types of firearms are used with enough precision to determine whether they are assault weapons as defined by the Challenged Statutes, this data provides limited relevant insight.

Donahue further posits that "[a]ssault weapons pose particular dangers and problems to law enforcement" beyond those of an average handgun because "the types of

rounds typically fired by assault weapons as well as the muzzle velocities they tend to have" make them "'capable of penetrating the soft body armor customarily worn by law enforcement.'"[35] Additionally, the "ability to fire rapidly allows criminals to more effectively engage with responding police officers, even from a significant distance," and despite the "relative rarity" of assault weapons used in crime generally, "'one in five law enforcement officers slain in the line of duty was killed with an assault weapon'" and assault weapons "'accounted for 13.2% of the firearms used in [police murders]'" from 2009-2013.[36] (*See also* Defs.' Ex. F, Decl. of Prof. Randolph Roth [Doc. # 37-6] ¶ 51) (assault weapons "maintain parity with law enforcement in a standoff, which is why many police and sheriff departments across the United States have purchased semiautomatic rifles and armored vehicles to defend themselves and decrease the likelihood that officers are killed or wounded.")[37]

Plaintiffs do not rebut the point that assault weapons and LCMs are substantially more lethal and prone to causing injury when utilized in crime than a non-semi-automatic handgun or rifle, and the Second Circuit has observed that assault weapons are "disproportionately used in crime . . . [and] to kill law enforcement officers: one study shows that between 1998 and 2001, assault weapons were used to gun down at least twenty percent of officers killed in the line of duty." *Cuomo*, 804 F.3d at 262. As a result, law enforcement officers and agencies require additional time and resources preparing for encounters with individuals wielding assault weapons, and the consequences when law enforcement are—either as a matter of perception or reality—not timely equipped to confront an individual with an assault weapon may play out tragically. (Donahue Decl. ¶ 44.)

The semi-automatic nature of the assault weapons banned by the Challenged Statutes and the increased danger to law enforcement have led to their increased use in

crime, and the evidence as to the suitability of these weapons for crime outweighs the limited evidence Plaintiffs presented on the use of these weapons for self-defense. However, mindful of the fact that the commonality of a particular firearm or weapon's use in crime was not enough to find in either *Heller* or *Cuomo* that the firearms at issue were not typically used for law-abiding purposes, the Court additionally considers the Defendants' other rebuttal evidence regarding the typical use of such weapons.

### (3)     Possession for Use in and Actual Use of Assault Weapons and LCMs in Mass Shootings

Assault weapons have been used to perpetuate approximately one-third of the high fatality mass shootings in the past 32 years, and between 2014 and the end of 2022, that number has increased to approximately half. (Klarevas Decl. ¶ 23).[38] When assault weapons and LCMs were used in active shooter incidents, "deaths and injuries were substantially higher for the 61 active shooter incidents using a semiautomatic rifle versus the 187 episodes using some other firearm," and the average number killed or wounded with a semiautomatic rifle was 9.72, higher than the average 5.47 killed or wounded when some other firearm was used. (Donahue Decl. ¶ 48.)[39] The ten deadliest mass shootings in American history were all carried out using either an assault weapon or a firearm equipped with an LCM. (*Id.* ¶ 49, Table 1.) The trend of increased use of assault weapons and LCMs in mass shootings also shows "a growing preference for using assault weapons and LCMs" to perpetrate attacks, particularly in high-fatality mass shootings. (Klarevas Decl. ¶ 12-13.)

Plaintiffs offer no evidence that assault weapons and LCMs are not disproportionately used in mass shootings[40], and the Court finds the evidence weighs in favor of Defendants' arguments that the use of such weapons in mass shootings demonstrates that the weapons are commonly used for reasons other than lawful self-defense.

### (4) Possession and Use of Assault Weapons and LCMs for their Military Characteristics

Defendants submit that the challenged firearms and LCMs are military style weapons that are "built for killing large numbers of people rapidly in open spaces[;]" "more shots fired, more victims wounded, and more wounds per victim" translates to "more injuries, more lethal injuries, and higher rates of death than incidents involving more conventional firearms. (Defs.' Mem. at 16.) Detective Warenda's opinion is that the assault weapons in the challenged statutes are essentially civilian versions of "the most prolific military firearms in the world": the M-16/AR-15 and the AK-47. (Warenda Decl. ¶ 22.) The injuries caused by AR-15s are also particularly severe; the designers have stated that the AR-15 was engineered to generate "maximum wound effect." Doctor Peter Rhee, a trauma surgeon who saved the life of Congresswoman Gabby Giffords after she was shot in the head with a handgun, said that "[a] handgun [wound] is simply a stabbing with a bullet. It goes in like a nail. [But with the AR-15,] it's as if you shot somebody with a Coke can." (Donahue Decl. ¶ 109.)

Defendants also argue that LCMs are uniquely dangerous and deadly because they "allow a shooter to fire more than ten rounds without having to pause to reload." *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017), *abrogated by Bruen*. The Fourth Circuit found that this was a "uniquely military feature" intended to "enable a shooter to hit multiple human targets very rapidly." *Id.* at 137. LCMs were originally designed for military use in World War I and did not become widely available for civilian use until the 1980s. (Roth Decl. ¶¶ 49-51.) The other accessories that are banned in conjunction with certain firearms are also meant to enhance the effectiveness of the weapons and ultimately "enhance the death toll" in mass shooting events; "pistol grips and thumbhole stocks enable easier spray-firing; a collapsible or folding stock allows the weapon to be shortened and more easily

48

concealed; and barrel shrouds are essential for mass shooters to continuously fire their weapons without suffering discomfort from an overheated barrel." (Donahue Decl. ¶ 65.)

The U.S. Army chose to adopt the M-16 as a military rifle due to its "phenomenal lethality" and reliability, as well as its increased ability to penetrate helmets and body armor. (*Id.* ¶¶ 103-06.) Although its progeny, the AR-15, is semiautomatic rather than fully automatic, Donahue notes that the civilian AR-15 "retains all other aspects that made it such a valuable lethal weapon for deadly combat," and that the Army's own field manual states that semi-automatic fire is "the most important firing technique during fast-moving, modern combat" given how "devastatingly accurate rapid semi-automatic fire can be." (*Id.* ¶ 107.) According to Retired Army Maj. Gen. Paul D. Eaton, "[f]or all intents and purposes, the AR-15 and rifles like it are weapons of war….It is a very deadly weapon with the same basic functionality that our troops use to kill the enemy." (*Id.* ¶ 170.)

The marketing of assault weapons reflects these military roots. Smith & Wesson sells a "Military & Police" (M&P) AR model, which was used in the Aurora, Colorado movie theater shooting. (*Id.* ¶ 111.) A 2016 shooting in Baton Rouge, Louisiana, involved a TAVOR assault rifle, described by the manufacturer as "the ultimate weapon of the 21st century," and described on the page for Israel Weapon Industries as having been developed in co-operation with the Israeli Defense Forces in response to "dynamic changes in the modern battlefield, the threats of global terrorism and the demands of ever-changing combat situations." (*Id.* ¶ 112.) Assault weapons have been advertised using phrases such as "[t]he closest you can get without having to enlist," or as being "for the 'warrior' in you." (*Id.* ¶¶ 91, 101.) The Bushmaster assault rifle used in the Newtown massacre was advertised with the slogan "Forces of opposition, bow down," and another advertisement depicted the Bushmaster rifle with the phrase "consider your man card reissued," stating that "[i]f it's

good enough for the professional, it's good enough for you." (*Id.* ¶¶ 93, 97.) The firearms industry itself sometimes referred to AR-style rifles as "assault rifles." (*Id.* ¶ 96.)

Plaintiffs assert that *Heller* forecloses any argument that a firearm's relationship to use in the military bears on its constitutionality based on its conclusion that *Miller's* use of the phrase "part of ordinary military equipment" meant only that the Second Amendment was supposed to protect arms in common use at the time for self-defense, such as firearms that would have been brought to militia service when men were called up for it, rather than weapons "not typically possessed by law-abiding citizens for lawful purposes." *Heller,* 554 U.S. at 624-25. Plaintiffs read *Heller* and *Miller* to mean that because "[w]eapons in common use brought to militia service by members of the militia" are protected by the Second Amendment, and militia members "fight wars," then states cannot ban "all weapons useful for fighting wars." (Pls.' Reply at 32.) They reason that only machineguns, bombers, and tanks, aka specialized weapons used by a standing army, can be constitutionally banned. (*Id.* at 33.)

In short, Plaintiffs divide weapons into two categories: "the type of weapons that a nation-state uses in its armed forces," which are unprotected by the Second Amendment, and "weapons in common use," which are protected by the Second Amendment regardless of the "relative dangerousness" of the firearm, which Plaintiffs view as "irrelevant." (Oral Argument Tr. at 19-20.) Plaintiffs openly acknowledge that under this logic, even if a gun manufacturer began producing and selling the most dangerous weapon on earth for the military, "if the legislatures of the American people decided to deregulate a particular weapon and over the centuries that weapon became owned by tens of millions of people, it would not be dangerous and unusual[.]" (*Id.* at 21.) The Court rejects this logic; while constitutional protections adapt to the constant evolution of societal norms and technology, no other constitutional right waxes and wanes based solely on what

manufacturers choose to sell and how Congress chooses to regulate what is sold, and the Second Amendment should be no exception.

In addition to being built upon flawed logic, Plaintiffs' argument is also contradicted by history. During the time of the Founding, there *was* a distinction between the guns people typically owned at home and those that were most useful in fighting the Revolutionary War. "Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys, and a pair of polished dueling pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men." (Defs. Ex. G, Decl. of Prof. Saul Cornell[41] [Doc. # 37-7] ¶ 19.) Instead, "the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets." (*Id.*) It was because of this discrepancy between militia weapons and weapons typically kept and used at home that it was difficult to equip militias with weapons such as working, battle-suited muskets, and laws "requiring" people to be armed with particular kinds of weapons were passed as a result. (*Id.*) Thus, the Second Amendment's meaning cannot be read to equate the weapons people had at home with weapons useful for fighting war, because weapons useful for fighting war were not those that men were likely to have lying around the house. (*Id.* ¶)

Finally, Plaintiffs' cherry-picked quotations of *Heller* disregard the portion of the opinion stating that in banning "dangerous and unusual" weapons, "[i]t may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large," but that nevertheless, "weapons of war" such as M-16 rifles "and the like" may be banned. 552 U.S. at 627-28. Plaintiffs claim that the distinction between the fully automatic M-16 and semi-automatic weapons such as the AR-15 is legally significant based on *Staples,* but *Staples* does not

51

mention the AR-15, nor does it opine on whether the distinction between an M-16 and AR-15 is significant for the purpose of the Second Amendment.

In sum, the fact that a modern American citizen might want to possess a military-grade weapon that would be effective in warfare is irrelevant given *Heller*'s acknowledgment that "modern developments have limited the degree of fit between the prefatory clause and the protected right" in the Second Amendment; whether a weapon would be useful or necessary for an effective militia is a concern now "completely detached" from the actual right itself. *Heller,* 554 U.S. at 627. Plaintiffs offer no rebuttal for the substantive point that assault weapons and LCMs are more suitable for military use than civilian self-defense. Thus, the Court finds this record to support the conclusion that the militaristic character of assault weapons weighs in favor of finding that they are not typically possessed by the average citizen for self-defense.

### c) Overall Conclusion on Plaintiffs' Burden

The foregoing analyses of the record and case law demonstrate Plaintiffs' failure to meet their burden to show that the statutorily defined assault weapons and LCMs are protected by the Second Amendment, and there is thus no likelihood Plaintiffs can succeed on the merits.

### 2. Whether the Firearm Regulations are Consistent with the Nation's Historical Tradition of Firearm Regulation

Even if Plaintiffs had met their burden under the first part of the test, there is another independent reason for denying the preliminary injunction: Defendants have demonstrated under step two of the *Bruen* analysis that the Challenged Statutes pose a comparable burden to relevantly similar historical analogues for comparably justified reasons.

When evaluating Defendants' justifications under the second part of the *Bruen* analysis, courts "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen,* 142 S. Ct. at 2131. Some inquiries, *Bruen* said, would be "straightforward":

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* However, *Bruen* also recognized that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. *Bruen* explained that "history guide[s] our consideration of modern regulations that were unimaginable at the founding," and that the "historical inquiry . . . will often involve reasoning by analogy." *Id. Bruen* pointed to *Heller* as an example of how "fixed" meanings of terms based on the "understandings of those who ratified it" could be applied to new circumstances, referring to its finding that "arms" applied to more than those arms existing in the 18th century because its "general definition" also covers "modern instruments." *Id.*

Recognizing the need for some guidance on "which similarities are important and which are not" for purposes of identifying relevantly similar historical analogues, *Bruen* provided two metrics: (1) "how" and (2) "why" the regulations burden a law-abiding

53

citizen's right to armed self-defense," with the central inquiry being "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33. *Bruen* noted that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check," cautioning courts against upholding any law that only "remotely resembles" an analogue or striking laws down which do not have a historical "twin." *Id.* at 2133.

### a) Whether Violence Perpetrated through Use of Assault Weapons is an Unprecedented Societal Concern

Defendants submit that the Challenged Statutes address an unprecedented societal concern and dramatic technological change that requires a more nuanced analogical inquiry to determine if the regulation is consistent with firearms regulation in America. Amici Brady and March for Our Lives support Defendants' position that because semi-automatic firearms were not introduced until "more than half a century after ratification of the Fourteenth Amendment," the lack of a historical tradition of regulating them dating back to the Second and Fourteenth Amendments' enactments is "meaningless," and the Court should instead take a broader view of what may be a comparable analogue. (Brady Amicus at 17.) Plaintiffs rejoin that because lawmakers in the Founding era were familiar with mass casualty and mass murder, mass shootings are instead a "general societal problem that has persisted since the 18th century."[42] (Pls. Reply at 7) (quoting *Bruen*, 142 S. Ct. at 2132.)

### (1) History of Firearm-Related Homicides in America

To determine whether Defendants are correct that mass shootings are a modern societal development, the Court will examine the history of firearm violence in America, and the modern rise of mass shootings in America. Cornell submits that "there was no

comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment," primarily because of "the nature of firearms technology and the realities of living life in small face to face and mostly homogenous rural communities that typified many parts of early America." (Cornell Decl. ¶ 18.) Roth explains that the reason for rare regulation of possession of firearms by colonists of European ancestry, in contrast to heavy regulation of firearm usage and ownership by Native Americans and African Americans between 1688 and 1763, was primarily because Native Americans and African Americans were feared, and because there was a "surge in patriotic fellow feeling" between European-originating colonists as well as "greater trust in government." (Roth Decl. ¶ 14.)

Around the time of the Founding, fifty to sixty percent of households owned a working firearm, usually a musket or another muzzle-loading gun designed to hunt birds or control vermin. (Roth Decl. ¶ 15.) Firearm use in homicides was "generally rare" because muzzle-loading firearms were "lethal and accurate enough at short range, but they were liable to misfire," most often could not fire multiple shots without reloading and could not be used impulsively unless they were already loaded for some purpose. (*Id.* ¶ 16). Guns were "not the weapons of choice in homicides that grew out of the tensions of daily life," but firearm use became more common during times of "anticipated violence or during times of political instability," when American colonists anticipated armed hostile encounters with Native Americans, or when slave catchers were searching out runaway slaves. (*Id.* ¶¶ 17-18.)

### (2)    Modern Mass Shootings

As Roth explains, while "[m]ass murder has been a fact of life in the United States since the mid-nineteenth century," it was "a group activity through the nineteenth century because of the limits of existing technologies." (*Id.* ¶ 41.) "The only way to kill a large

number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own." (*Id.*)

It was only in the late nineteenth and early twentieth century "with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time" that the "character of mass murder began to change." (*Id.* ¶ 44.) According to Klarevas, "there is no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1766 and 1948," with the first shooting that resulted in 10 or more deaths occurring in 1949. (Klarevas Decl. ¶ 18.) Further, Donahue states that mass shootings first came into public consciousness almost two decades later in 1966, when Charles Whitman used "scoped hunting rifles" from the top of the University of Texas memorial tower to kill 14 and wound 32; he was an "expert Marine marksman perched in a very protected space," and carried out his assault over 90 minutes. (Donahue Decl. ¶ 84.) Donahue notes that this incident stands in contrast to the November 5, 2009 shooting at Fort Hood, where an inexperienced shooter "was able to fire 214 times" in less than ten minutes to kill nine people and wound 17 others. (*Id.*)

According to Donahue, Americans did not move towards the "pervasive possession of modern weaponry" until the 1980s, during which time the Glock 9 mm semiautomatic pistol was introduced to the market and assault rifles were being advertised more heavily. (*Id.* ¶ 85.) The early 1980s was also when the distribution of double-digit-fatality mass shootings began to increase sharply and was the period during which "assault weapons were used to perpetrate mass shootings resulting in 10 or more deaths" for the first time. (Klarevas Decl. ¶ 20.) In 1994, Congress passed the Public Safety and Recreational Firearms

Use Protection Act, 18 U.S.C. § 921(a)(30), otherwise known as the Federal Assault Weapons Ban, to "address the problem" of mass shootings and "restrict[] mass shootings" by curtailing the purchase and sale of new assault weapons and high-capacity magazines. The legislation had a sunset provision which took effect in 2004 and Congress did not renew the legislation, at which point gun massacre incidents and fatalities began to increase substantially. (Donahue Decl. ¶¶ 85-89; Klarevas Decl. ¶¶ 20-21.)

High-fatality mass shooting violence is "on the rise" and poses a "significant—and growing—threat to American public safety." (Klarevas Decl. ¶ 11.) Donahue states that mass shootings, which are typically measured by whether at least four individuals are killed excluding the shooter, occurred at an average rate of 2.7 public mass shootings per year in the 1980s, rising to 4.5 events per year from 2010 to 2013, and continuing to rise with 30 mass shootings in 2017 alone, and 61 mass shootings in 2021. (Donahue Decl. ¶¶ 36, 40 n. 13 and Figure 1.)[43]

Donahue takes the position that the lethality of assault weapons and their use in mass shootings is a unique and modern problem separate from the general issue of gun violence. To illustrate, he points to the attempted assassination of President Ronald Reagan, in which the assassin fired six shots with a .22 caliber revolver before his gun was emptied and he was tackled. (*Id.* ¶ 56.) All four shooting victims survived. However, a semiautomatic pistol with 15 or more bullets "would have enabled the assassin to fire off many more rounds, hitting many more victims" and both the typical caliber of a pistol round used in semi-automatic pistols and the use of an LCM to inflict wounds would have increased the chances of lethality. (*Id.* ¶ 57.) Defendants document the increase in the lethality of firearms; a Founding-era flintlock muzzleloader could kill 43 people per hour, and a Civil War-era rifle could kill 102 people per hour; a 1903 bolt-action rifle with a

magazine, however, could kill 495. Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022).

The psychological impact of mass shootings on the psyche of law-abiding Americans is also new and unique. Mass shootings cause "significant emotional and mental health harms" to survivors, but also cause "broad social damage" such as increased stress in the surrounding community and general population at large.[44] (Donahue Decl. ¶¶ 58-63.) Donahue notes that "[r]estrictions on weaponry have historically followed growing criminal abuse and social harm, rather than at the time these weapons are first introduced" because "it is not always clear at the outset which inventions will lead to adverse impacts on public safety. Frequently, the dangers of products and practices fly below the radar until their proliferation generates sufficient social damage to enable the public and the scientific community to become aware of the full extent of their social harm." (*Id.* ¶ 136.)

"Connecticut's assault weapons ban was not primarily enacted to address gun crime generally, but rather was adopted in response to the growing mass shooting problem in the United States" and specifically, the Sandy Hook Elementary school shooting. (*Id.* ¶¶ 145-46).[45] Thus, the record supports the conclusion that mass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal problem; the development of semiautomatic fire has led to a level of casualties and injuries from firearm violence previously unseen in American history and has been spurred by factors and advances in technology that would have been unimaginable to the Founding Fathers. While this conclusion does not automatically dictate that Defendants' regulation will be upheld, it does mean that the absence of regulations of semiautomatic firearms at the time of the Founding is not dispositive evidence against Defendants' position, and that a more "nuanced" view is required considering whether particular statutes and traditions of regulation are analogous to the challenged statutes at issue using the guiding principles

that both *Heller* and *Bruen* set out for how to evaluate specific time periods and types of historical sources.

### b) Methodology for Evaluating Historical Sources

In *Heller*, the Supreme Court looked to "analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment" to support the proposition that the right was understood as "an individual right to use arms for self-defense," but cautioned that it was "dubious to rely on" the "drafting history of the Second Amendment" such as the "various proposals in the state conventions and the debates in Congress" to interpret the Second Amendment's meaning. *Heller,* 554 U.S. at 603. To interpret public understanding of the right "from immediately after its ratification through the end of the 19th century," the Supreme Court considered writings from "important founding-era legal scholars," state and federal court cases during that period, and records of public discussion of the right by antislavery advocates. *Id.* at 605-10. While *Heller* cautioned that the "outpouring of discussion of the Second Amendment in Congress and in public discourse" in the aftermath of the Civil War does "not provide as much insight into [the] original meaning [of the right] as earlier sources," the Supreme Court nevertheless determined that the public's "understanding of the origins and continuing significance of the Amendment" during that period is "instructive." *Id.* at 614. It also noted that it "would not stake our interpretation of the Second Amendment upon a single law, in effect in a single city, that contradicts the overwhelming weight of other evidence." *Id.* at 632.

*Bruen* also provided several general principles to guide lower courts in evaluating the historical record. Historical evidence that "long predates" either 1791 when the Second Amendment was adopted or in 1868 when the Fourteenth Amendment was adopted "may not illuminate the scope of the right if linguistic or legal conventions changed in the

59

intervening years", and courts should take caution in evaluating English practices and common law to determine whether they "prevailed up to the period immediately before and after the framing of the Constitution" or whether they had become "obsolete in England at the time of the adoption of the Constitution" and were never "acted on or accepted in the colonies." *Bruen,* 142 S. Ct. at 2136. Evidence of the public understanding of the Second Amendment from immediately after its ratification through the end of the 19th century can provide clarity on whether a court's interpretations of earlier history are consistent with how the right was understood; "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision", but "to the extent later history contradicts what the text says, the text controls." *Id.* at 2136-37.[46] "Post-Civil War discussions of the right to keep and bear arms" can be relevant to a limited extent, but do "not provide as much insight into its original meaning as earlier sources," and are "secondary" to the text of the Second Amendment and state constitutions. *Id.* at 2137.

*Bruen* also cautioned against giving disproportionate weight to isolated examples or historical outliers; for example, statutes applying only to territories, as opposed to states, deserve "little weight" because they were "consistent with the transitory nature of territorial government" and "short lived"; and a "single state statute", "pair of state-court decisions", or statute that "governed less than 1% of the American population" could not be used to uphold a challenged statute if the "overwhelming weight" of the other evidence suggested that the statutes were outliers. *Id.* at 2153-55.

With these principles of interpretation in mind, the Court turns to the historical evidence submitted by Plaintiffs and Defendants.

c)      **Whether the Burden imposed by the Statutes is a Comparable Burden to that of Historically Analogous Regulations and is Comparably Justified**

Defendants submit that there are three relevant categories of restrictions analogous to the challenged statutes: regulations on new and dangerous weapon technology, concealed weapon regulations, and gunpowder regulations.

(1)      **New and Dangerous Weapon Technology**

Regardless of whether the guns are "dangerous and unusual" as that term was used in *Heller*, Defendants maintain that there is a longstanding tradition of governments "using their police powers to regulate new weapons that posed an unprecedented risk to public safety," such as folding knives, dirk knives, Bowie knives, and percussion-cap pistols (which could be carried loaded for longer periods of time due to advancements in firearm manufacturing) being banned or taxed prohibitively after being used in an "alarming proportion of the [post-Revolutionary War] era's murders and serious assaults." (Defs.' Mem. at 33.) Roth explains that the first prohibitions against many of these "certain concealable weapons" were passed in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838, meaning that several were enacted "during the lifetimes of Jefferson, Adams, Marshall, and Madison."[47] (Roth Decl. ¶¶ 26-27.) For example, Georgia's 1837 law[48] passed banned Bowie knives as well as pistols "as arms of offense or defence" in response to a rise in those weapons "being used in crime by people who carried them concealed on their persons." (Roth Decl. ¶¶ 26-27).[49]

The need for further regulation once more became apparent from surging homicide rates and the invention of firearms like the Colt revolver and the Smith and Wesson rimfire revolver in the 1840s and 1850s, as well as the Colt double-action commercial revolver in 1889. (*Id.* ¶¶ 28-33.) Colt's cap-and-ball revolver, invented in 1836, quickly gained

61

popularity; it still had to be loaded one chamber at a time, and could not be loaded quickly or indefinitely, but the two rotating cylinders allowed a person to fire five or six shots in rapid succession and reload quickly with the second cylinder. (*Id.* ¶ 31.) States responded by passing various restrictions, like the time-place-manner restriction in Texas passed in 1870, and the pocket pistol and revolver bans by Tennessee and Arkansas in 1871 and 1881. (*Id.* ¶ 36.)[50] When dynamite was invented in 1866, and the Thompson submachine gun in 1918, legislatures responded with ammunition magazine restrictions in 1927 and 1934, the National Firearms Act of 1934 and 1938 restricting ownership of machine guns and submachine guns, and the Organized Crime Control Act of 1970s restricting ownership of explosives by building on the Federal Explosives Act passed in 1917. (*Id.* ¶¶ 44-47.)[51]

Defendants maintain that this pattern demonstrates a tradition of governmental regulation of weapons "that posed a new danger or concern" as behaviors and technologies changed beginning shortly after the founding and continuing through the Reconstruction era and then modern eras. (Defs.' Mem. at 34.) Thus, in Defendants' view, regulations on assault weapons are consistent with the kind of laws that states have passed "to address new and evolving societal concerns presented by technologically advanced weapons throughout history." (*Id.*) Plaintiffs challenge this conclusion, referencing some firearms that could fire more than 10 rounds without reloading that have been available for centuries without being regulated. (Pls. Mot. at 23, 25). However, amici Brady and March for Our Lives point out that many of those weapons were often malfunctioning, were relatively uncommon, and were not widely used by civilians; for example, the Girandoni air rifle, which Plaintiffs refer to as an example of a multi-shot gun in existence at the time of the Second Amendment, required a "wagon-mounted pump filled with water to sustain the pressure needed to operate" or "1500 manual hand pumps."[52] There was no need to regulate many of these firearms because they were neither commonly used nor widely

accessible; however, the firearms that *did* pose new dangers to the public based on their use of advanced technology *were* regulated.

Plaintiffs also insist that Defendant's "handful of isolated examples and outliers" are not relevantly similar historical regulations that impose a comparable burden but are instead "localized restrictions" that do not show a tradition of regulation like the statutes at issue. (Pls.' Reply at 9; *see also* Pls.' Reply Ex. 1.) However, beyond objecting to the relevance of each analogue based on their same strained readings of *Heller* and *Bruen's* holdings and methodology the Court has previously rejected, Plaintiffs produce no evidence or data to undermine Defendants' core premise, which is that governments have been passing regulations targeting specific types or characteristics of weapons that have proved problematic or dangerous since the time of the Founding, demonstrating that there is a longstanding tradition of the government exercising its power to regulate new and dangerous weapon technology. *See Bevis v. City of Naperville, Illinois,* No. 22 C 4775, 2023 WL 2077392, at *14 (N.D. Ill. Feb. 17, 2023) (holding that "governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories)" and that "assault weapons and large-capacity magazines fall under this category.")

### (2) Concealed Weapon Regulations

Defendants also contend that restrictions on concealed carry, which have been enacted by American legislatures for over two centuries, are evidence of a nationwide tradition of regulating the dangers posed by specific weapons and firearms. (Defs.' Mem. at 35.) After the Revolution, Roth submits that there was "little interest in public officials in the North" for restricting the use of firearms during the period after ratification of the Second Amendment because "[p]olitical stability returned, as did faith in government and a strong sense of patriotic [comraderie]." (Roth Decl. ¶¶ 21-22.) However, in the South, discord remained as poor and middle-class whites were frustrated by their inability to rise

in society, and tensions grew between enslaved African-Americans and whites. (*Id.* ¶ 23.) Homicide rose, and public officials in the South recognized that concealable weapons like pistols and certain knives were being used disproportionately in murders and serious assaults. (*Id.* ¶ 24.) As a result, laws banning or restricting the carrying of concealed weapons were enacted in Kentucky, Louisiana, Indiana, Arkansas, and Virginia between 1813 and 1838. (*Id.* ¶ 26.)

After homicide rates continued to rise during the period from the Mexican War through Reconstruction, and weapons like the Smith and Wesson rimfire revolver "superseded knives and black powder handguns as the primary weapons used in interpersonal assaults" because they were increasingly lethal and "[e]asily concealed," states responded with increasing degrees of firearm regulation, including time-place-manner restrictions, prohibitions of open or concealed carry of particular firearms, and the sale of particular firearms such as easily concealable pistols. (*Id.* ¶¶ 32-36.) By the early twentieth century, "every state either banned concealed firearms or placed severe restrictions on their possession" in response to the surge in homicide rates and the invention of new firearms. (*Id.* ¶ 21.) Several courts upheld these concealed carry restrictions as constitutional because they restricted only a "particular mode" of bearing arms, rather than infringing on a person's Second Amendment right. *State v. Jumel*, 13 La. Ann. 399, 399–400 (1858).[53]

Plaintiffs contend that concealed weapon regulations are not analogous because they prohibit a method of carry, not a type of weapon, and that *Heller* found them non-analogous to D.C.'s ban on "commonly held arms." (Pls.' Reply at 13.) However, *Heller* and *Bruen* were not considering a modern and unprecedented societal problem, which warrants a more nuanced analysis; both cases also found only that a prohibition on concealed weapons did not impose the same level of burden as a complete ban or proper-

64

cause requirement for the "quintessential self-defense weapon," not that concealed weapon prohibitions may never be an analogue for other types of restrictions imposing only comparable burdens. *See Heller,* 554 U.S. at 629; *Bruen,* 142 S. Ct. at 2143-44, 2150. Defendants have produced sufficient evidence demonstrating that concealed carry statutes were part of a broader tradition of targeting specific dangers posed by the characteristics and unlawful use of particular weapons, and that those regulations were considered constitutional because they left available sufficient avenues of carrying firearms for self-defense. The Challenged Statutes do the same; they are tailored to address problems of mass shootings and mass casualties that employ the firearms at issue with increasing frequency, and still leave open alternative avenues for exercise the Second Amendment right to self-defense, including through possession of the "quintessential" self-defense weapon: a handgun or revolver.

### (3) Overall Conclusion on Whether Defendant's Historical Analogues are Relevantly Similar to the Challenged Statutes

Plaintiffs insist that the Founders would never have tolerated a ban of a particular kind of gun because free, white male citizens were required to have firearms and ammunition, indicating that early Founding-era regulations were meant to require gun ownership rather than restrict it. (Pls.' Reply at 15.) Mass killings, Plaintiffs maintain, were a problem that existed at the time of the Founding, and the Founding generation's solution was for law-abiding citizens to engage in self-help by defending themselves and their neighbors, rather than broadly disarming the populace of particular weapons to prevent the unlawful from utilizing them. (*Id.* at 16).

Defendants respond that the Founders saw the right to self-defense as existing in harmony with and being further enabled by reasonable regulation of the right to keep and

bear arms in order to maintain peace. (Cornell Decl. ¶¶ 7-9, 52-53.) In Defendants' view, the Challenged Statutes "do not prohibit or impact an entire class of firearms," or even "all semiautomatic firearms, long guns, rifles, or fully automatic firearms," but instead "a small subset of unusually dangerous military-style weapons, features, and magazines" that "are not actually useful or used for any such lawful self-defense purposes in practice." (Defs.' Mem. at 20-21.) The rationale behind the Defendants' submitted historical regulations is the same one that drove the enactment of the Challenged Statutes: to respond to growing rates of violence and lethality caused by modern innovations in technology and changing patterns of human behavior by regulating the particular kinds of weapons or modes of carry that were being most often employed by those causing the violence, while leaving open alternative avenues for lawful possession of firearms for purposes of self-defense.

As for the level of burden imposed, *Heller* did not foreclose any kind of restriction on the types of firearms that can be possessed and carried, or even restrictions on firearms that are commonly owned by lawful citizens—only a ban on firearms that are so pervasively used for self-defense that to ban them would "infringe," or destroy, the right to self-defense.[54] Unlike the broader category of handguns at issue in *Heller* and *Bruen*, the record developed here demonstrates that assault weapons and LCMs are suboptimal for self-defense. A set of statutes that bans only a subset of each category of firearms that possess new and dangerous characteristics that make them susceptible to abuse by non-law abiding citizens wielding them for unlawful purposes imposes a comparable burden to the regulations on Bowie knives, percussion cap pistols, and other dangerous or concealed weapons, particularly when "there remain more than one thousand firearms that Connecticut residents can purchase for responsible and lawful uses like self-defense, home defense, and other lawful purposes such as hunting and sport shooting." (Warenda Decl. ¶ 33.)[55]

## V.    Conclusion

Plaintiffs have failed to show their likelihood of success on the merits, and so the Court need not reach the remaining preliminary injunction factors. The motion for preliminary injunction is DENIED.

IT IS SO ORDERED.



Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 3rd day of August, 2023

---

[1] Brindiana Warenda, a trooper with the Connecticut State Police and the primary detective serving in the Firearms Vault, was submitted as an expert in firearms by Defendants.

[2] On June 6, 2023, 2023 Conn. Legis. Serv. P.A. 23-53 (H.B. 6667) further expanded the definition of what constitutes an assault weapon by adding several new subsections; however, the sections of each statute challenged by Plaintiffs are not substantively changed, and no motion to amend has since been filed to include a challenge to the new subsections.

[3] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

[4] Plaintiffs argue further that the "no set of circumstances" rule does not apply to cases involving the loss of "fundamental rights" because the "rules are different" for fundamental rights, such as the general rule disfavoring facial vagueness challenges outside the First Amendment context. (Pls.' Reply at 45) (quoting *Farrell v. Burke*, 449 F.3d 470, 496 (2d Cir. 2006)). However, *Farrell* does not stand for the sweeping proposition that the rules go out the window for fundamental rights, and instead recognizes that "that the Supreme Court ha[s] not spoken clearly as to whether a facial challenge outside the First Amendment context had to show that a statute was impermissibly vague in all applications, or merely that the statute was 'permeated' with vagueness" declining to adopt or express a preference for either analysis, and that at best, prior Second Circuit precedent "arguably suggests" that "at least some facial vagueness challenges may be brought outside the First Amendment context" despite other "suggestion to the contrary." *Id.* at n. 11.

[5] *Heller* also pointed to 19th century case law and Founding era commentary such as Blackstone as defining several ("although not an 'exhaustive' list") of further limitations on the "scope of the Second Amendment," including "prohibitions on carrying concealed weapons," "longstanding prohibitions on the possession of firearms by felons and the mentally ill," laws "forbidding the

carrying of firearms in sensitive places such as schools and government buildings," and "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. In a footnote, Justice Scalia cautioned that its list of "presumptively lawful regulatory measures" was meant "only as examples" and that the "list does not purport to be exhaustive." *Id.* at n. 26.

[6] These cases included *Nunn v. State,* 1 Ga. 243, 251 (1846), which struck down a prohibition on open carry of pistols while upholding a prohibition on concealed carry prohibitions; *Andrews v. State,* 50 Tenn. 165, 183-84 (1871), which struck down a prohibition on open carry of pistols that was "without regard to time, place, or circumstances"; and *State v. Reid,* 1 Ala. 612, 616–17 (1840), which held that "[a] statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."

[7] Giffords Law Center further argues that the Second Circuit's discussion of common use and typical possession in *Cuomo* has limited weight given that the court recognized "that reliable empirical evidence of lawful possession for lawful purposes was 'elusive,'" and primarily relied on its analysis under means-end scrutiny to come to the holding. (Giffords Amicus at 10.)

[8] While the Second Circuit's findings regarding means-end scrutiny may no longer constitute a binding holding, its findings as to the level of burden imposed by the Challenged Statutes provides useful guidance to this Court in determining whether the Challenged Statutes impose a similar level of burden to a historical analogue under the *Bruen* test.

[9] Both *Heller* and *Bruen* also dealt with a type of firearm that neither side disputed was commonly used for self-defense by average citizens, and thus no conclusions can be drawn from the fact that plaintiffs in those cases were not required to provide empirical support for their arguments.

[10] Plaintiffs seize on language from *Bruen* in which the Supreme Court justifies its burden-shifting framework by reference to First Amendment cases where the government bears the burden of "showing whether the expressive conduct falls outside the category of protected speech." *Bruen,* 142 S. Ct. at 2130. However, the cases *Bruen* cites in support make clear that the Supreme Court is referring to situations where the government seeks to justify its regulation by demonstrating that certain types of speech fall into a new categorically unprotected category akin to fighting words or libel. *See, e.g., United States v. Stevens*, 559 U.S. 460 (2010). Such a burden might be applicable in, for example, a case in which the government seeks to establish a new category of sensitive place in which firearms can be banned, but has no applicability here.

[11] Other courts have reached the same conclusion—that unusually dangerous weapons may be banned by the government—but have done so under the history and tradition prong of the *Bruen* test. *See Herrera v. Raoul,* No. 23 CV 532, 2023 WL 3074799, at *4 (N.D. Ill. Apr. 25, 2023); *Bevis v. City of Naperville, Illinois,* No. 22 C 4775, 2023 WL 2077392, at *13 (N.D. Ill. Feb. 17, 2023). As addressed *infra,* p. 64-65, even if a weapon must be dangerous *and* unusual to fall under the already enumerated Second Amendment exception from *Heller,* the Court also finds that it is consistent with the nation's tradition and history of firearm regulation to regulate narrow and specific categories of unusually dangerous weapons resulting from developments in firearm technology.

---

[12] Defendants make the same argument as to the firearm accessories in Conn. Gen. Stat. § 53-202a(1). However, because the accessories or features enumerated are banned only in conjunction with use as part of a banned firearm, rather than in isolation, there is no need to conduct a separate analysis of whether the accessories warrant Second Amendment protection; whether the underlying firearm itself is constitutionally protected will resolve both questions.

[13] Dennis Baron is the Professor Emeritus and Research Professor at the University of Illinois and has served as a member of both the English and Linguistics departments; he has a Ph.D. in English language and literature, and publishes widely on "matters of historical use, in addition to topics related to language and law." (Baron Decl. ¶ 5.)

[14] As corroborating evidence that two separate terms were used for each category, Defendants submit a resolution passed by the 1778 Continental Congress, *Congress Undertakes to Raise a Cavalry Corps.,* in 2 Public Papers of George Clinton, First Governor Of New York 827, 828 (Wynkoop Hallenbeck Crawford Co. ed., 1900); Connecticut militia regulations during the Founding, 1799 Conn Acts 511, *An Act For The Militia,* § 4; and *Miller,* 307 U.S. at 182 (1939) (citing militia regulations passed by the General Assembly of Virginia in October 1785), all of which use "accoutrements" in addition to the word "arms".

[15] While Plaintiffs did not provide any details on Passamaneck's credentials beyond his declaration, which states that he has designed magazines, barrels, muzzle devices, gas blocks, and complete firearms for manufacturers, and that he has been admitted in court cases as a firearms expert, Defendants did not challenge his qualifications, and it appears from Westlaw that he was accepted as a firearms expert in *Rocky Mountain Gun Owners v. Hickenlooper,* No. 2013CV33879, 2017 WL 4169712, at *4 (Colo. Dist. Ct. July 28, 2017). The Court is thus satisfied that it may consider his testimony as expert testimony.

[16] Plaintiffs also find support in a case from the Southern District of California that held that magazines were arms; however, given the procedural posture of that case, which was vacated and remanded repeatedly and most recently for further proceedings consistent with *Bruen,* the case has minimal usefulness. *See Duncan v. Becerra,* 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019), *aff'd,* 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated,* 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta,* 19 F.4th 1087 (9th Cir. 2021)*, cert. granted, judgment vacated,* 213 L. Ed. 2d 1109, 142 S. Ct. 2895 (2022), *and vacated and remanded,* 49 F.4th 1228 (9th Cir. 2022).

[17] In *Oregon Firearms*, 2022 WL 17454829 at *9, the district court found that LCMs are not "arms" within the Second Amendment's protection because they "are neither weapons themselves nor necessary to the use of weapons." *Id.* at *8. Defendants' evidence was that "all firearms that can accept a detachable large-capacity magazine can also accept a magazine that holds 10 or fewer rounds and function precisely as intended." *Id. Ocean State Tactical,* 2022 WL 17721175 at *12 reached a similar conclusion, noting that the plaintiffs could not carry their burden by "simply assert[ing]" that magazines are "arms" without supporting expert opinion, historical or textual sources.

---

[18] Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009) and National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report*, 9, available at https://bit.ly/3gWhI8E (last visited Jan. 30, 2023)).

[19] Bloomberg, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, FORTUNE (June 20, 2018), available at https://bit.ly/3R2kZ3s,

[20] *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* ("2021 National Firearms Survey") at 1 (May 13, 2022), available at https://bit.ly/3yPfoHw.

[21] James Curcuruto was the Director of Research and Market Development at the National Shooting Sports Foundation from 2009-2021 and was responsible for both internal and external research on industry topics and trends including firearms, ammunition, target shooting, and hunting. Curcuruto has also published and contributed to articles in trade magazines on the subject. (Curcuruto Decl. ¶¶ 2-5.)

[22] The 2021 National Firearms Survey simply asks if the participants have *ever* owned a large capacity magazine without specifying the time period, not whether they currently own one.

[23] Professor John Donahue is the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School, and teaches a course on empirical law and economics issues involving crime and criminal justice that evaluates the nature of gun regulation in the United States and its impact on crime, a topic on which he is also published. He has served as an expert in several gun regulation-related and Second Amendment cases. (Donahue Decl. ¶¶ 3-20.)

[24] Professor Louis Klarevas is a security policy analyst and current Research Professor at Teachers College, Columbia University. He authored the book *Rampage Nation* as a study of gun massacres in America, and his current research is on the nexus between American public safety and gun violence; he is published on the topic of gun regulation and gun violence, and has served as an expert in court cases on the topic as well. (Klarevas Decl. ¶¶ 2-8.)

[25] Defendants cite to a 2015 survey finding that 8% of individual gun owners "collectively account[] for 39% of the American gun stock," and that 20% of gun owners possessed about 60% of the nation's guns. (Donahue Decl. ¶ 132.) AR-15 rifles "make up approximately 5% of privately owned guns, compared to 50% for handguns," and most Americans who do own guns do not own assault weapons." (Klarevas Decl. ¶ 27)

[26] Assault weapons are also rarely used defensively in mass shootings; of the 406 active shooter incidents since 2000 documented by the FBI, only one involved an armed civilian intervention with an assault weapon. (Klarevas Decl. ¶ 25.)

[27] While Defendants claim there are 3.8 million LCMs lawfully owned in Connecticut by only 41,000 individuals, i.e., about 1% of the state's population, that statistic has limited relevance given the fact that LCMs are largely illegal under the Challenged Statutes in Connecticut, and thus few individuals are likely to own them. (Defs.' Mem. at 24.)

---

[28] Lucy Allen is Managing Director of the National Economic Research Associates Economic Consulting ("NERA"), a member of NERA's Securities and Finance Practice, and Chair of NERA's Product Liability and Mass Torts Practice. She has previously been qualified as an expert and testified in both federal and state courts on economic and statistical issues relating to the flow of guns into the criminal market. (Allen Decl. ¶¶ 1-3.)

[29] That statistic remained consistent when excluding incidents in states that restrict assault weapons. (*Id.* ¶ 24.)

[30] Donahue notes that "NRA-affiliated and pro-gun experts" have repeatedly argued that "about 98 percent" of defensive gun uses "involve people brandishing a gun and not using them." (Donahue Decl. ¶ 151) (quoting John R. Lott testifying on behalf of the NRA in the State of Nebraska's Committee on Judiciary.) Amici Brady and March for our Lives also point to studies of the NRA's database of "armed citizen" accounts demonstrating that use of more than ten rounds of ammunition for self-defense is "extremely rare" and the average shots fired by civilians in self-defense was only about two. (Brady Amicus at 6.)

[31] For example, Maryland Police Superintendent Marcus Brown submitted a declaration in *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014) stating that "in many home defense situations assault weapons are likely to be less effective than handguns because they are less maneuverable in confined areas." (Donahue Decl. ¶ 158.)

[32] Gary Kleck, *Targeting Guns: Firearms And Their Control* 112 (1997).

[33] U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States, 2019,* FBI, available at https://bit.ly/31WmQ1V. Donahue also argues that Plaintiffs' claims are of limited helpfulness because they inaccurately cite the statistics from the FBI; for example, he states that, there were actually 16,425 murders reported by the FBI in 2019, rather than 13,927 as claimed by Plaintiff. (Donahue Decl. ¶¶ 177-79.)

[34] According to Donahue, roughly 400,000 guns move "into the hands of criminals" through theft or lost guns every year, making it "orders of magnitudes more likely that a criminal will steal a gun of a law-abiding citizen than a law-abiding citizen will fire an assault weapon in lawful self-defense." (*Id.*)

[35] (Donahue Decl. ¶ 44) (quoting the declaration of Colonel Marcus Brown, then-Superintendent of the Maryland State Police, submitted in *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014)).

[36] (Donahue Decl. ¶ 44) (quoting Violence Policy Center, *Officer Down: Assault Weapons and the War on Law Enforcement*, May 2003, available at http://www.vpc.org/studies/officer%20down.pdf (last visited Oct. 12, 2018) at 5) and (Christopher S. Koper et al. 2017, Finding at 317).

[37] Professor Randolph Roth is the Arts and Sciences Distinguished Professor of History at The Ohio State University, and is the author of American Homicide, a comparative study of homicide in the United States from colonial times to the present. He has published on the topic of violence and the

use of firearms in the United States and has served as an expert witness in at least eight cases concerning the constitutionality of state and municipal gun laws. (Roth Decl. ¶¶ 1-9.)

[38] For assault weapons, examples include the 2021 Atlanta spa shooting; the 2022 Buffalo, New York supermarket shooting; the 2022 Robb Elementary school shooting in Uvalde, Texas shooting; and the 2022 Highland Park, Illinois' Fourth of July parade shooting. (Donahue Decl. ¶¶ 42-43); *see also* (Allen Decl. ¶ 36) (LCMs have been used in 73 out of 115, or 63%, of mass shootings). For LCMs, examples include the 12 people killed in May 2019, at Virginia Beach by a shooter using LCMs; the 23 people killed on August 2019, in El Paso, Texas by a shooter using LCMs, and the nine people killed and 27 wounded just hours later in Dayton, Ohio by another shooter using LCMs; later in August 2019, 7 were killed and 25 were wounded by a shooter using LCMs in Odessa, Texas. (Donahue Decl. ¶ 37.) Defendants' opposition was filed on January 31, 2023, and so the reports of both sides' experts make no reference to mass shootings that occurred after that date.

[39] The study Donahue relies on excluded the Las Vegas shooting in which 50 were killed and 500 were wounded with semiautomatic rifles, as an extreme outlier.

[40] Plaintiffs argue that "the fact that a weapon can be used in mass shootings does not disqualify it from Second Amendment protection." (Pls.' Reply at 3.) In support, Plaintiffs point to the fact that briefs filed in both *Heller* and *Bruen* drew attention to the fact that the Virginia Tech shooting, "the worst mass shooting in U.S. history" at the time of *Heller,* had been committed with semiautomatic handguns, and *Heller* nevertheless found that handgun bans are unconstitutional. These arguments rehash Plaintiffs' prior misreading of *Heller* and warrant no further discussion. *See supra*, p. 35-37.

[41] Professor Saul Cornell is the Paul and Diane Guenther Chair in American History at Fordham University, where he teaches constitutional history to undergraduate and graduate students; he also teaches constitutional law at Fordham Law School. He has written on the topic of the Second Amendment and gun regulation both in the context of his scholarship and has provided expert declarations and portions of joint briefs in notable Second Amendment cases. (Cornell Decl. ¶¶ 2-4.)

[42] Plaintiffs also argue that *Heller* and *Bruen* characterized handgun violence as a problem persisting since the Founding, rather than an unprecedented societal concern; because mass shootings are a form of handgun violence, Plaintiffs interpret *Bruen* and *Heller* to thus hold that mass shootings are a not a new societal development because modern handguns are "the product of exactly the same sort of technological innovation" as assault weapons, producing "the same societal problem identified by the State" of mass shootings. (Pls.' Reply at 5, 8.) Neither *Heller* nor *Bruen* held mass shootings are not a modern societal phenomenon that could justify a complete ban of a category of gun, and in fact, neither *Heller* nor *Bruen* even used the words "mass shooting" in the majority opinions.

[43] Four gun massacres resulting in double-digit fatalities occurred between October 2017 and May 2018: 60 people were killed at a concert in Las Vegas; 26 at a church in Sutherland Springs, Texas; 17 at a high school in Parkland, Florida; and 10 people at a high school in Santa Fe, Texas. (*Id.* ¶ 37.) Mass school shootings have resulted in more deaths or injuries so far in the 21st century than in the entire 20th century. (*Id.* ¶ 50.)

---

[44] Plaintiffs argue that the "availability heuristic," or the psychological phenomenon where dramatic incidents influence judgments in such a way that even when rare, people tend to overestimate the likelihood of events like mass shootings and feel less safe as a result, cannot be used to justify a burden on constitutional rights. (Pls.' Reply at 42.) However, Defendants are instead arguing that the newness of this phenomenon and the lack of such fears at the time of the Founding suggest that mass shootings committed by assault weapons are a new societal phenomenon.

[45] (*See also* Klarevas Decl. ¶ 38) ("The legislative intent of Connecticut . . . [in banning] assault weapons and LCMs is to reduce the frequency and lethality of mass shootings . . . associated with the increased kill potential of such firearm technologies.")

[46] However, the Supreme Court noted that it had "generally assumed" that the scope of the protection applicable to both the Federal Government and States was "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," but that there "is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Id.* at 2138. It declined to resolve that debate because for the purposes of the law at issue, the public understanding of the right in 1791 and 1868 was "for all relevant purposes, the same[.]" As discussed *infra*, p. 59-64, the same applies here; the conclusion remains unchanged regardless of which period the Court views as more determinative.

[47] Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836. (*Id.* n. 54.)

[48] The law was overturned in part by *Nunn v. State*, 1 Ga. 243 (1846), which allowed for the ban of concealed carry of certain weapons but held that it could not simultaneously ban open carry.

[49] *See also* Defs.' Mem. at 33, citing similar statutes from Alabama, Tennessee, Florida, Virginia, Alabama, North Carolina, and Massachusetts in effect from the 1830s to the 1870s.

[50] *See also Andrews v. State*, 50 Tenn. 165, 171, 186, 188-89 (1871) (upholding the constitutionality of a statute making it unlawful for any person to publicly or privately carry a dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver" because ""[a]dmitting the right of self-defense in its broadest sense, still on sound principle every good citizen is bound to yield his preference as to the means to be used, to the demands of the public good.")

[51] Plaintiffs argue that any laws from the late 19th century after the Civil War have only minimal relevance, and that laws from the 20th century are irrelevant under *Bruen*. However, Defendants do not submit 19th and 20th century regulations in a vacuum, but as part of their broader purported explanation of why this regulation is part of a "governmental practice" that has been "open, widespread, and unchallenged since the early days of the Republic," which *Bruen* explicitly permitted; it chose not to address the 20th century evidence submitted because it "contradicts earlier evidence," not because 20th century evidence is *per se* irrelevant. *See Bruen,* 142 S. Ct. at 2137, 2154 n. 28. Nowhere does *Bruen* forbid consideration of any regulations or history after the end of the 19th century, and the Court will consider evidence from this period as it relates to, either confirming or contradicting, earlier Founding, antebellum, and Reconstruction-era evidence.

---

[52] *See* Brady Amicus at 13-14, also discussing the rarity, unreliability, and lack of popularity of the 16-round wheel lock shooter, the Jennings Flintlock, the Pepperbox-style pistol, and the Winchester repeating rifles, all of which were invented between 1580 and 1873.

[53] *See also State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833) (rejecting a Second Amendment challenge to a state concealed carry law); *State v. Reid*, 1 Ala. 612, 614, 621 (1840) (upholding a concealed carry conviction under a state right to bear arms because "[t]here was no evidence . . . that the defendant could not have defended himself as successfully, by carrying the pistol openly, as by secreting it about his person.") *Bruen* itself recognized that "States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." *Bruen,* 142 S. Ct. at 2150.

[54] (*See* Cornell Decl. ¶ 14) (explaining that "infringe" during the time of the Founding era meant to "violate" or "destroy", as opposed to phrases like "abridge" as used in the First Amendment, which mean to "reduce.")

[55] Because Defendants have already identified two historical analogues and given the *Bruen* and *Heller* courts' skepticism of the applicability of gunpowder regulations to firearm regulation, the Court declines to address the parties' arguments regarding whether gunpowder regulations are relevantly similar analogues.