1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
 2
    AMANDA BANTA, et al.,        ) Case No. 2:23-cv-00112-MKD
 3                 Plaintiffs,   )
                                 ) August 18, 2023
 4  vs.                          ) Spokane, Washington
                                 )
 5  ROBERT W. FERGUSON, Attorney ) Motion Hearing
    General of the State of      )
 6  Washington, et al.,          ) Pages 1 - 68
                   Defendants,   )
 7                               )
    and                          )
 8                               )
    ALLIANCE FOR GUN RESPONSIBILITY, )
 9          Intervenor-Defendant. )

10
                    BEFORE THE HONORABLE MARY K. DIMKE
11                  UNITED STATES DISTRICT COURT JUDGE

12

13  APPEARANCES:

14  For the Plaintiffs:          MATTHEW D. ROWEN
                                 Attorney at Law
15                               706 Duke Street
                                 Alexandria, Virginia 22314
16
                                 STEVEN W. FOGG
17                               Attorney at Law
                                 1015 Second Ave., 10th Floor
18                               Seattle, Washington 98104

19  For the Defendants:          ANDREW W. HUGHES
                                 Assistant Attorney General
20                               800 Fifth Ave., Ste. 2000
                                 Seattle, Washington 98104
21
    For the Intervenor-          ZACHARY J. PEKELIS
22  Defendant:                   MEHA GOYAL
                                 Attorneys at Law
23                               1191 Second Ave., Ste. 2000
                                 Seattle, Washington 98101

24

25
```

2

1   Official Court Reporter:          Allison R. Anderson, RMR, CRR, CCR
2                                     United States District Courthouse
                                      P.O. Box 700
3                                     Spokane, Washington 99210
                                      (509) 458-3465
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Proceedings reported by mechanical stenography; transcript
    produced by computer-aided transcription.

1       (Court convened on August 18, 2023, at 10:02 a.m.)

2           THE COURTROOM DEPUTY:  The matters before the Court

3   are *Amanda Banta, et al., versus Robert W. Ferguson, et al.*,

4   Case No. 2:23-cv-0112-MKD; and *National Shooting Sports*

5   *Foundation, Inc. versus Robert Ferguson*, Case No. 2:23-cv-0113-

6   MKD.

7       Counsel, please state your presence for the Court and

8   record, beginning with the *Banta* case and plaintiffs.

9           MR. FOGG:  Good morning, Your Honor.  Steve Fogg from

10  the Corr Cronin firm in Seattle, and I'm here on behalf of the

11  plaintiffs.

12          THE COURT:  Good morning.

13          MR. ROWEN:  Good morning, Your Honor.  Matthew Rowen

14  from Clement Murphy, PLLC, and I'm also here for plaintiffs.

15          THE COURT:  Good morning.

16          MR. HUGHES:  Good morning, Your Honor.  I'm Assistant

17  Attorney General Andrew Hughes.  I'm here on behalf of the state

18  defendants.  With me is my colleague, Amy Hand.

19          THE COURT:  Good morning.

20          MR. PEKELIS:  Good morning, Your Honor.  Zachary

21  Pekelis on behalf of Intervenor-Defendant, The Alliance For Gun

22  Responsibility.  With me today is my co-counsel, Meha Goyal.

23          THE COURT:  Good morning.

24      All right.  And my understanding is we also have counsel

25  for the National Shooting Sports Foundation sitting in the

1  gallery as well.  It's my intention to take that case second

2  today, but I just put it on the record because I'm going to make

3  some preliminary comments that we will take your case second

4  after I hear the *Banta* case.  In terms of agenda for this

5  morning, it's my intent to hear the *Banta* case first with the

6  motion for preliminary injunction.  Then we will take up the

7  second case after that.  I intend to start with the motion to

8  dismiss, then the motion for a preliminary injunction.

9       One initial comment I wanted to make is about supplemental

10  authority because there may have been some confusion in some of

11  the filings.  I realize it's not clear in our local rules.

12  Folks are always welcome to submit notices of supplemental

13  authority of cases that have been decided since briefing closed.

14  I find it very helpful.  That way, I have had an opportunity to

15  make sure I'm aware of and have read the cases that you intend

16  to talk about at argument.  However, briefing or any argument

17  related to the cases is not permitted without filing a motion

18  because I consider that additional briefing.  Under the local

19  rules, there needs to be permission for that.

20       It's helpful to have access to the cases to make sure that

21  we're all on the same page, have read the same materials.

22  Multiple mini-briefs becomes a bit unwieldy.  So I generally,

23  unless there's a very good reason, will not authorize additional

24  briefing, but the case law is very, very helpful.  So I'll put

25  notice on the website going forward that that's my expectation

1  because I realize it's not clear in our local rules.  So I just

2  offer that for moving forward.

3      All right.  With respect to the *Banta* motion for

4  preliminary injunction, who is handling argument on that issue

5  today?

6          MR. ROWEN:  I will be on behalf of the plaintiffs,

7  Your Honor.

8          THE COURT:  All right.

9          MR. ROWEN:  May I?

10          THE COURT:  You may.

11          MR. ROWEN:  Thank you.  Good morning, Your Honor.

12  Matthew Rowen on behalf of the plaintiffs.

13      Millions of law-abiding Americans possess the semiautomatic

14  rifles, pistols, and shotguns that Washington now bans under

15  House Bill 1240.  These are not 21st century innovations.

16  Semiautomatic firearms are more than a hundred years old, as

17  evidenced by the fact that one of the firearms on the list of

18  banned rifles first came on the market in 1927.  The features

19  that Washington has newly singled out for opprobrium, which are

20  designed to make it easier for law-abiding citizens to hit their

21  targets, have been around for generations.

22              (Reporter interruption.)

23          MR. ROWAN:  Is that better?

24          THE COURT:  Actually, if you lift it up, pull it a

25  little bit closer to you and lift it up, it will pick up your

1  voice a little better.

2          MR. ROWEN:  Great.

3      The types of arms that Washington now prohibits have

4  traditionally been widely accepted as lawful possessions in this

5  country, according to no less in authority than the Supreme

6  Court of the United States.  Under *Bruen*, all of that forecloses

7  the state's effort to prohibit these common arms as *Bruen*

8  teaches that our nation's historical tradition of firearm

9  regulation is one of protecting arms in common use for lawful

10 purposes today.

11         THE COURT:  One of the questions I have -- and I think

12 this was raised by Judge Bryan in his order in the *Hartford* case

13 -- is the lack of evidentiary record related to exactly what

14 you're talking about now, the scope of the regulation, what

15 types of firearms and accessories and things of the like that

16 are regulated, and a lack of information in the record about

17 statistics that would demonstrate that those things are commonly

18 used and for self-defense.  When a party is asking for an

19 extraordinary remedy such as a preliminary injunction, doesn't

20 the Court need a more robust record with respect to those facts?

21         MR. ROWEN:  Not in these circumstances, Your Honor,

22 and there are three reasons why.  So the first is as *Heller*,

23 *Bruen,* and *Teter* last week make very clear, the -- what my

24 friends on the other side call the common use inquiry, the

25 relevant question there is whether the arms that a state has

1  sought to ban are commonly owned for lawful purposes.  So in

2  *Teter*, the Ninth Circuit upheld granting summary judgment to the

3  challengers because Hawaii didn't come forward with evidence

4  disproving that the arms were commonly owned for lawful

5  purposes.  And here, Plaintiffs have put in -- cited to a number

6  of statistics showing that -- just to take one example, which is

7  an AR-platform rifle, that there are conservatively 24 million

8  of them that have lawfully been sold in the United States.

9        THE COURT:  But there's no evidence of that in the

10 record.  I have two declarations.  A complaint citing statistics

11 is not evidence.  I have two declarations in the record.

12 Neither of those declarations are support for the statistics

13 that you've offered.  Where's the evidence?

14       MR. ROWEN:  So sure.  I mean, the evidence is what we

15 have cited to in our complaint, which at the preliminary

16 injunction stage, things cited to in a complaint are -- under my

17 understanding of the Ninth Circuit's treatment of preliminary

18 injunctions is the federal rules of evidence are relaxed; and

19 while we'd be happy to go, you know, submit supplemental

20 authority with leave of Your Honor pointing to lots of

21 statistics that are out there, you know, the way we understand

22 -- because this is a preliminary injunction motion, it's not --

23 it's not sort of the whole ball game.  We sort of understand

24 that that's -- that's how this works.  But to the extent Your

25 Honor thinks, no, you need more to see, you know, we're happy to

1   do that.

2       What I will say, though, is *Teter* couldn't be clearer that

3   the burden is on the state to show that the arms that it has

4   banned -- and I want to talk about that these are arms -- but to

5   show that the arms that a state has banned are dangerous and

6   unusual, which is the flip side of saying they're not commonly

7   owned for lawful purposes, and they have zero evidence to

8   dispute the numbers that we have cited and the statistics that

9   we have cited.  I realize we didn't append the various sources

10  to our motion, and, again, we're happy to do that.  But even

11  though, obviously, we're the moving party and it's our burden to

12  demonstrate a likelihood of success on the merits, the

13  substantive law on this question is common ownership for lawful

14  purposes.

15      I don't think there can be a dispute that a product that is

16  owned by millions and millions of Americans that the Supreme

17  Court in 1994 in *Staples* said traditionally has been widely

18  accepted as lawful possessions in this country -- they were

19  talking about the AR-15 specifically -- that those are commonly

20  possessed for lawful purposes.  Now, to be sure, the state

21  points out that a small number of bad actors have committed

22  horrible crimes using similar firearms, and that's, of course,

23  true, and it's awful.  But respectfully, the same point was made

24  by the dissenters in *Heller*; and with respect to handguns, of

25  course, the point is almost -- because, of course, there is much

1   more handgun crime in this country than crime committed with an

2   AR-platform rifle or a similar type of firearm that falls under

3   the list of banned firearms under HB 1240.

4       And the majority, notably, didn't dispute the statistics

5   that Justice Breyer cited in his dissenting opinion in *Heller.*

6   They said that's not how constitutional rights work.  You don't

7   look at what a small number of people who don't follow the law

8   -- which is sort of the definition of a criminal -- do in

9   criminal acts.  You look at, as we now know from *Bruen*, the

10  tradition of this country; and the tradition of this country is

11  that these types of arms, as the Supreme Court made very clear,

12  have been widely acceptable as lawful possessions, and they're

13  commonly owned for lawful purposes, including self-defense, also

14  for hunting and sports-shooting and a number of other lawful

15  purposes.

16      So while, again, we're happy to update the record to the

17  extent Your Honor thinks that's necessary, but as we read both

18  our burden and the state's burden under the cases, there's just

19  no dispute that the types of firearms that the state has banned

20  are commonly owned for lawful purposes, and we -- we take that

21  to essentially end the inquiry.  And in saying that, I don't --

22  and I will get to the arms question, but, you know, in saying

23  that, we don't mean to suggest that there's some sort of carve-

24  out for arms that aren't dangerous and unusual.  Our argument is

25  actually much more straightforward than that.

1     It's because the ultimate question under *Bruen* is:  Is the

2  state's regulation of firearms consistent with our nation's

3  tradition?  The fact that an arm today is commonly possessed for

4  lawful purposes is extremely strong evidence that there is no

5  tradition in this country of banning that type of arm.  So

6  whether you think of it as, well, it just sort of obviates the

7  need to look at the regulations or it sort of tells you in

8  advance what you're going to find once you look at all the

9  regulations, it's sort of two sides of the same coin.  But I'm

10  getting ahead of myself a little bit.

11     And while I'm happy to sort of stay on this line, the state

12  and intervenors, to a lesser extent, have made the argument that

13  the various rifles, pistols, and shotguns that HB 1240 bans are

14  not even arms, and, respectfully, I just don't quite know how to

15  think about that argument after *Bruen*.  So, you know, *Bruen* and

16  *Heller* and *Teter* from last week are all very clear that the

17  definition of "arms" is the same today as it was in the 1790s.

18     In the 1790s, as *Heller* made very clear, all firearms were

19  considered arms.  The reason that -- it's a quote straight from

20  *Teter* quoting *Heller*.  The reason that that was true is that the

21  definition then, as now, was that it includes all bearable

22  instruments that a man can take in his hands and use either

23  offensively or defensively in wrath to strike another or, as

24  *Bruen* put it, can facilitate armed self-defense, which, of

25  course, something that is even designed to be offensive can, of

1    course, facilitate armed self-defense.

2        And I just don't think there can be any dispute that

3    rifles, pistols, and shotguns are bearable instruments that

4    facilitate armed self-defense or that can be taken in one's hand

5    and used in wrath to strike another, and I don't think that that

6    changes just because the rifle in question has a certain type of

7    stock or a certain type of grip or feeding mechanism.

8        And, you know, I think it's important to note -- to note

9    that *Bruen* said very clearly there's one step to this inquiry;

10   and, yes, the Court, you know, said there is this threshold

11   textual inquiry, but that's what it is.  It's a threshold

12   textual.  It's the same type of inquiry that we do in the First

13   Amendment, but we almost never talk about it because it's always

14   obvious that the thing in question is speech.

15       So, you know, a good example is liable.  You know, liable,

16   if you do the analysis the same way in the First Amendment

17   context, of course liable -- libelous speech is speech.  But our

18   nation's historical tradition of speech regulation is such that

19   we've said, no, it actually can be regulated or banned.  And we

20   normally just jump through the hoop of, oh, okay, of course

21   that's speech, but there isn't sort of this long -- this long

22   sort of inquiry that goes at the first step; and, you know, even

23   there I just sort of goofed and said first step, but we do think

24   that it's just sort of a threshold inquiry where you're looking

25   at, okay, are you among the people whose rights the Second

1  Amendment secures?

2      Here, there's no dispute that Ms. Banta and the rest of my

3  clients are among, you know, law-abiding citizens that the

4  Second Amendment is designed to protect, and I just don't see

5  how rifles, shotguns, and pistols aren't arms given what the

6  Supreme Court has itself said is the definition of that term in

7  the Second Amendment.  Now, my friends on the other side make --

8  you know, offer an array of alternative theories about what they

9  think the term "arms" means, and I think *Bruen* and *Teter* and, to

10 some extent, *Heller* sort of foreclose all of them.

11     So the first thing they argue is relying on the Fourth

12 Circuit's decision in *Kolbe*, the en banc decision from 2017.

13 They say, well, what the state has called assault weapons are

14 like machine guns, and therefore they're outside the Second

15 Amendment.  And while the status of that case in the Fourth

16 Circuit is up for grabs -- they recently had oral argument on

17 whether that's still the law of the Fourth Circuit after *Bruen*

18 -- it just couldn't be clearer that in this circuit, that is not

19 the law.  I mean, as *Teter* made explicit, the question for

20 whether something is arms is just whether it fits the definition

21 the Supreme Court gave in *Heller* and *Bruen*; and, as I have

22 mentioned at length, rifles, pistols, and shotguns clearly are,

23 regardless of what types of features they may have.

24     The state next makes a similar argument that -- excuse me,

25 the state's sort of main argument on arms seems to be that we

1    haven't proven that these firearms are commonly used in self-

2    defense, and this gets back to the colloquy that you and I were

3    having earlier, which is *Teter* just couldn't be clearer that, as

4    we've argued throughout this case, that misunderstands the

5    burden.

6         So *Teter* says, "We reject Hawaii's argument that the

7    purported 'dangerous and unusual' nature of butterfly knives

8    means that they are not 'arms' as that term is used in the

9    Second Amendment."  Then it goes on.  "*Heller* did not say that

10   dangerous and unusual weapons are not arms.  Thus, whether

11   butterfly knives are 'dangerous and unusual' is a contention as

12   to which Hawaii bears the burden in the second prong in the

13   *Bruen* analysis."  And while I recognize that butterfly knives

14   are different than the types of firearms that HB 1240 bans, they

15   are no less arms.  Indeed, you'd have to jump through more hoops

16   to figure out that a butterfly knife is an arm than you would

17   for firearms, particularly given *Heller*'s statement that in the

18   1790s, all firearms were arms.

19        So the state, you know, in addition to sort of trying to

20   place the burden where it does not belong under the analysis,

21   also, you know, sort of misunderstands what the common use

22   inquiry is all about; and again, as we've argued and as *Teter*

23   confirms, the common use inquiry looks to are the arms in

24   question typically possessed by law-abiding citizens for lawful

25   purposes today?  And as to that question, again, to go to the

1  colloquy that you and I had in the beginning, I mean, I just

2  don't see how the uncontested statistics that there are millions

3  and millions of Americans who own tens of millions of these

4  firearms doesn't establish that these are typically possessed by

5  law-abiding citizens for lawful purposes.

6      And so, you know, that's all a long way of saying what I

7  would've thought would be sort of the easy part after *Bruen*,

8  which is that the rifles, pistols, and shotguns that HB 1240

9  bans are arms and therefore that the burden is on the state to

10  come forward and show that its categorical ban on the

11  acquisition of these arms is consistent with our nation's

12  history and tradition of firearm regulation; and on that score,

13  the state just cannot overcome the presumptive protection that

14  the Second Amendment provides for keeping and bearing these

15  common arms.

16      And so, you know, as I mentioned at the outset, the way

17  that we have briefed this case is to say essentially the

18  historical inquiry is answered by the fact that the state cannot

19  prove at the second step that these arms are dangerous and

20  unusual; so *Heller*, as quoted in *Teter,* makes very clear that

21  "dangerous and unusual" is part of the historical tradition

22  because there was a historical tradition of banning the carry of

23  dangerous and unusual arms.  But when it comes to arms that are

24  not dangerous and unusual, or, as *Bruen* put it, arms that are

25  not highly uncommon in society at large today, it sort of just

1  by logic would be impossible for there to be a widespread

2  tradition in this country of banning those arms because then how

3  would it be that millions and millions of Americans own tens of

4  millions of these firearms lawfully today?

5       But we don't want to shy away from the historical

6  regulations because we think that the record -- the historical

7  record on this is very clear, and my friends on the other side

8  point to a number of what they call regulations.  If you look at

9  their briefs, they use the term "regulations" dozens of times in

10  both the intervenor's brief and the state's brief.  And, of

11  course, there are lots of firearms regulations, lots of knife

12  regulations in this country's history.  What there aren't a lot

13  of are bans on types of arms.

14       Now, there are -- you know, they cite a number of concealed

15  carry statutes from the 19th century.  They cite various gun

16  powder storage laws from the 19th century.  They cite all manner

17  of laws that regulated arms in certain ways but didn't ban them.

18  And, you know, I imagine my friend on the other side is going to

19  say, well, you know, this isn't a dispossession statute, and so

20  someone who currently possesses, you know -- you know, a

21  Browning semiautomatic 1927 doesn't have to give it to the

22  government, and that's true; so as to that person, this doesn't

23  prevent them from keeping or bearing that arm.  But as to

24  someone who wants to buy a new one, it certainly does, just in

25  the same way that the law in Hawaii did in *Teter*.

1          And, you know, at that level, we know from *Teter* that the

2    how and why are the two main, sort of, pillars of the analogical

3    reasoning at the second step when we're looking at historical

4    analogs for a ban, and we know from *Teter* that the how of a

5    concealed carry statute is just fundamentally different from the

6    how of a ban.  A concealed carry statute takes away one-half of

7    one-half of an individual citizen's right under the Second

8    Amendment with respect to a particular type of arm.  You can

9    still keep it, and you can still carry it openly.

10          A ban on acquisition takes away all of your -- all of your

11    rights with respect to the type of arms that are banned, and

12    that's why *Teter* didn't even get to the why because, you know,

13    again, the how and the why are the two pillars of analogical

14    reasoning.  How does it burden the rights that the Second

15    Amendment protects and why was it enacted?  And the state has to

16    show that it fits both.

17          And *Teter* didn't even get to the why because it said, look,

18    all these concealed carry laws, the gun powder storage laws that

19    Hawaii wants to rely on, they just burdened the right that the

20    Second Amendment protects in a fundamentally different and less

21    way -- lesser way.  And the laws that Hawaii relied upon are the

22    same laws that the state relies upon, which isn't surprising

23    because they're the laws that exist in this country's history

24    and tradition.

25          So while I'm sort of happy to keep going on all of this,

1  you know, I think the last thing that I want to say on this is

2  just to briefly address Judge Bryan's reason in the *Hartford*

3  case.  So Judge Bryan assumed, without deciding, that the

4  firearms this covers are arms.  I'll note that Judge Bryan

5  incorrectly put the burden on the plaintiffs to show that the

6  arms were typically possessed by law-abiding citizens for lawful

7  purposes rather than on the state to show that it's not

8  dangerous and unusual.  Now, of course, he ultimately assumed

9  that the first step was satisfied so that was sort of neither

10 here nor there.

11      But at the second step, the analogical reasoning step, the

12 "how" part of the inquiry makes no appearance in his opinion;

13 and whatever sort of confusion there was about how to do

14 analogical reasoning after *Bruen*, *Teter* makes it perfectly

15 clear.  When it comes to a ban, laws that took away one quarter

16 of the right to self-defense or laws that regulated how you

17 store ammunition or other things just are not analogous to a law

18 that actually bans law-abiding citizens' ability to acquire arms

19 that are in common use for lawful purposes today.  Thank you,

20 Your Honor.

21          THE COURT:  Are you aware of any preliminary

22 injunction that has been granted with respect to a similar

23 statute that is still standing?  In our review of the case law,

24 the few that have been granted have been either reversed or

25 stayed by the appellate courts; so *Miller* in the Ninth Circuit,

1   the -- I think it's the Southern -- Southern District of

2   Illinois has been stayed by the Seventh Circuit.  Are you aware

3   of any preliminary injunction that has been granted that is

4   currently in effect?

5           MR. ROWEN:  I don't believe there are any.  I believe

6   that there are five of these cases that are currently being

7   litigated; so two in Washington and, as Your Honor mentioned,

8   the Southern District of Illinois.  There were -- there were

9   three in Illinois, and they all were consolidated up, and the

10  Seventh Circuit has yet to rule.  The Seventh Circuit did stay

11  the injunction that Judge McGlynn entered in the *Barnett* case in

12  the Southern District.  And then there's the Delaware case, and

13  that's currently up on appeal in the Third Circuit.  So no.

14      But what I will say is we're in a very different posture

15  here in light of *Teter* because a lot of the arguments that, for

16  instance, the judge -- the judges in the Northern District of

17  Illinois cases, *Herrera* and *Bevis*, relied upon are very similar

18  to what Judge Bryan did in *Ferguson* when looking at analogical

19  reasoning to say, well, there have been lots of regulations on

20  firearms, especially firearms that, you know, bad guys use for

21  bad purposes, and that's good enough.  And respectfully, our

22  read of *Bruen*, but particularly after *Teter*, we know that at

23  least in this circuit that can't be enough when it comes to a

24  ban.

25      So while there are, you know, lots of things that, you

1  know, we think are sort of incorrect on their own terms in those

2  other opinions, you know, we think those other opinions just

3  wouldn't hold up today in this circuit under the circuit's law.

4          THE COURT:  Thank you.

5      Mr. Hughes, are you handling argument on behalf of the

6  state?

7          MR. HUGHES:  I am, Your Honor.  Thank you.  Just get

8  myself situated.  Whenever you're ready, Your Honor.

9          THE COURT:  You may proceed.

10          MR. HUGHES:  Good morning, and may it please the

11  Court.  Again, I'm Andrew Hughes on behalf of the state

12  defendants.  As Your Honor knows, this case is about our state's

13  efforts to protect its people from mass shootings and other

14  horrific crimes by ensuring that anyone who would want to can't

15  just walk into a gun store and buy the same military-style

16  weapon that the shooters in El Paso and Uvalde and Sandy Hook

17  and Orlando and Las Vegas and Mukilteo and too many more places

18  to even name, to even remember, use to murder innocent

19  Americans.

20      SHB 1240 is a common sense safety measure that will save

21  lives while protecting individuals' Second Amendment rights to

22  self-defense.  In asking this Court to upend the will of

23  Washington's people, Plaintiffs ask this Court to read *Bruen* as

24  categorically barring states from restricting the sale of any

25  weapon, no matter how dangerous, as long as enough people own

1  that weapon, but *Bruen* does no such thing.  It concerns one type

2  of carry restriction applying to handguns, which the Supreme

3  Court has repeatedly characterized as the quintessential self-

4  defense weapon.  *Bruen* does not mandate a free-for-all in which

5  common sense gun restrictions, the type of laws our country has

6  adopted since before its founding, are now --

7          THE COURT:  But doesn't Washington's current

8  regulation essentially leave handguns, and only handguns, as the

9  only method left for self-defense?

10          MR. HUGHES:  I don't think that's true, Your Honor.

11          THE COURT:  What else is left?  With the scope of

12  Washington's new regulation, what is left?

13          MR. HUGHES:  So a couple points on that, Your Honor.

14  First, as *Bevis* in particular highlights, handguns and shotguns

15  are both, sort of, the type of weapons that are most appropriate

16  for self-defense.

17      The second point I'd like to make on this is -- part of the

18  reason why I don't have, like, a fully delineated answer for you

19  is that the burden to show that a particular arm is protected --

20  and I'll get to this a little more later -- is on the

21  plaintiffs.  So Plaintiffs haven't put forward any evidence

22  about any other arms.  They've talked about the AR-15 and tried

23  to make an argument as to why that is commonly used in self-

24  defense, but it's simply -- as I'll get to that, they simply

25  haven't proven that.

1    But Washington statute -- I guess this is the third point.

2  Washington statute doesn't touch most commonly-owned, commonly-

3  used weapons.  So it doesn't touch hunting rifles in the main.

4  It doesn't touch shotguns in the main.  It doesn't touch, you

5  know, most semiautomatic handguns.  And then, of course, that's

6  just talking about firearms.  It certainly doesn't touch the --

7  sort of what we -- you know, I think some of the most effective

8  self-defensive weapons; you know, mace, bear spray, stun guns,

9  knives.  So Washington residents have a full panel of arms.

10          THE COURT:  Your position is the most effective self-

11  defense for homes are mace and bear spray and knives?

12          MR. HUGHES:  I -- I said that.  I realize that.  But I

13  assume -- that was -- maybe I overstated that.

14          THE COURT:  I think maybe.

15          MR. HUGHES:  As *Bruen*, I think, tells us, handguns are

16  the -- or *Heller*, rather, handguns are the quintessential self-

17  defense weapon.  And I'd like to sort of point to right where

18  you ended with -- with Mr. Rowen, which is that since *Bruen,*

19  Plaintiffs have made these same arguments all across the

20  country, and they've lost time and time again, in *Bevis*,

21  *Herrera*, and *Delaware State Sportsmen's Association*.  Earlier

22  this month in *NAGR versus Lamont*, the Connecticut District Court

23  issued a 70-page opinion comprehensively dismantling the

24  arguments Plaintiffs make here.  And, of course, in *Hartford,*

25  Judge Bryan of the Western District denied a PI motion against

1  SHB 1240 that raised essentially the same arguments Plaintiffs

2  make here.

3          THE COURT:  And how do you respond to the fact that

4  given the intervening decision in *Teter* by the Ninth Circuit in

5  the analysis that the Court undertook in that case undermines

6  Judge Bryan's position?

7          MR. HUGHES:  So I have a few responses to that, Your

8  Honor.  First of all on the common use portion of *Teter*, two

9  things to say.  One is that *Teter* doesn't affect the standard

10 for common use at all.  It uses the common ownership language

11 that you also see, I think, once in *Heller*; but overwhelmingly,

12 it is not used in *Heller* and *Bruen*.  And I realize I left my

13 notes on *Teter* at my -- at my table.

14         THE COURT:  You're welcome to go grab them.  I saw you

15 looking over there, and I was wondering what was happening.

16         MR. HUGHES:  So it does use that language, Your Honor,

17 but if you look at the court's reasoning in *Teter*, the panel

18 highlighted here, I'm quoting, "Hawaii's own witness conceding

19 that butterfly knives may be used for self-defense."  The panel

20 further emphasized that, again quoting, "butterfly knives are an

21 integral part of the Filipino martial art called Escrima," so

22 clearly looking at how the weapons are actually used, point one.

23     Point two, Plaintiffs point to the "dangerous and unusual"

24 analysis that the Court undertakes in *Teter*, but whether a

25 weapon is dangerous and unusual is a separate, albeit related,

1  analysis to *Bruen*'s threshold question of whether arms are in

2  common use for self-defense.  And I can -- I think the other

3  distinction between *Teter* is really a historical one.  I can

4  address it now, or I was planning to touch that --

5          THE COURT:  That's fine.  You can address it where it

6  fits into your argument.

7          MR. HUGHES:  I appreciate that, Your Honor.  So under

8  step one of the *Bruen* test, the Supreme Court has set out clear

9  guideposts for determining whether a particular weapon is

10  covered by the plain text of the Second Amendment as understood

11  by its framers, and at least two of those are independently

12  fatal to Plaintiffs here.

13      First, we know, because the Supreme Court told us

14  explicitly in *Heller*, that M16s and the like are not covered by

15  the Second Amendment, and Mr. Rowen said this -- this argument

16  comes from *Kolbe*; false.  It comes directly from the language of

17  *Heller*.  And this is a fundamental problem for Plaintiffs, Your

18  Honor, because they have to come up with a principal

19  constitutionally-significant distinction between M16s and the

20  AR-15 to which they develop the vast majority of their argument,

21  and they just can't, Your Honor.

22      AR-15s aren't just like M16s.  They're practically

23  indistinguishable.  The lone difference is that instead of

24  taking only two seconds to fire 30 rounds, they take five or six

25  seconds; and that's before we get to things like bump stocks,

1  trigger cranks, or, of course, the rubber band that comes on

2  cauliflower at the grocery store, all of which can be used to

3  convert an AR-15 to a fully automatic rifle.

4      And Plaintiffs' response is to say, well, semiautomatic

5  weapons have been around for a long time.  But, again,

6  Washington's law doesn't restrict all semiautomatic weapons.  It

7  doesn't touch hunting rifles or common handguns.  It singles out

8  the types of weapons that were developed for the military and

9  adopted because of their superior ability to kill as many humans

10 as possible on the battlefield and all too often the play field

11 as well.

12     So then Plaintiffs respond, well, but a lot of people own

13 AR-15s, right?  But this doesn't cut it, and it gets to the

14 second fatal stumbling block.  As the court said in *Heller* and

15 reiterated in *Bruen*, the Second Amendment does not guarantee

16 civilians the right to keep and carry any weapon whatsoever.

17 Instead, the Court held the Second Amendment only covers weapons

18 that are in common use today for self-defense, and this really

19 gets to the core of Plaintiffs' argument.

20     If you had to summarize their argument in a single

21 sentence, it would go something like the Second Amendment

22 categorically prohibits Washington from limiting the sales of

23 assault weapons because AR-15s are popular, but Plaintiffs are

24 wrong on the law, and this gets back to the *Teter* point that

25 they were raising because as the Court made clear in both *Bruen*

1  and *Heller,* the question is not whether a particular weapon is

2  commonly owned but whether it is commonly used for self-defense.

3  And in their reply on Page 5, Plaintiffs admit that this is

4  exactly what *Bruen* says, but they try to sweep it away, saying,

5  well, the Court didn't really mean that because it's not

6  consistent with *Heller*, but that's just not so, Your Honor.

7      *Heller* makes clear that the Second Amendment covers -- and

8  here I'm quoting -- "arms in common use at the time for lawful

9  purposes like self-defense."  That's at 624.  Further on in

10  *Heller*, the Court, "recognizes another important limitation on

11  the right to keep and carry arms, namely that the sort of

12  weapons protected were those in common use at the time."

13      And as numerous courts have pointed out, a test focused

14  solely on whether arms are commonly possessed at the time of

15  litigation is illogical, and it's circular.  To take just one

16  example, as Judge Easterbrook put it in *Friedman*, Tommy guns

17  were "all too common" during Prohibition, but that "popularity

18  doesn't give" dangerous military weapons "constitutional

19  immunity."  Indeed, as with assault weapons, their increasing

20  prevalence is precisely why machine guns were restricted.

21      Now, *Bruen* avoids the obvious pitfalls of Plaintiffs'

22  argument by framing the inquiry not simply as whether a

23  particular weapon is commonly owned but whether it is in common

24  use today for self-defense, or, as Plaintiffs put it, whether it

25  facilitates armed self-defense for those with ordinary self-

1  defense needs.  In light of *Bruen*'s clear focus on common use

2  for self-defense, courts that have addressed this particular

3  question post-*Bruen* have repeatedly confirmed that the Second

4  Amendment only covers those weapons that are actually used

5  commonly for self-defense, and I point Your Honor here to the

6  *NAGR versus Lamont* case and *Ocean State Tactical* in particular.

7       So, then, to succeed on the merits, Plaintiffs have to show

8  that assault weapons are commonly used for self-defense, and it

9  is Plaintiffs who bear the burden on this point.  In *Bruen*, the

10 Supreme Court considered, however briefly, whether handguns were

11 arms that were in common use today for self-defense as part of

12 the step one plain text analysis of the Second Amendment before

13 shifting the burden to respondents to justify the regulation

14 with historical analogs.

15      And I realize that it may seem a little jarring to think of

16 the plain text as including this analysis of whether they're

17 commonly used for self-defense, but that's a function of

18 originalist reading of the Constitution, Your Honor.  If we want

19 to know what the plain text of the Constitution means, we have

20 to know what it meant to those who drafted the Second Amendment.

21 And the Supreme Court did this work in *Bruen* and concluded that

22 the plain text of the Second Amendment, as understood by its

23 founders, covered arms in common use for self-defense.  And as I

24 said, this follows directly from *Heller* in which the Supreme

25 Court held that the arms covered by the text of the Second

1  Amendment, as understood by its framers, are those in common use
2  for self-defense.

3      And lest there be any doubt as to who bears the burden, the
4  Ninth Circuit eliminated that doubt in *United States versus*
5  *Alaniz* in which the Court said that in alignment with *Heller*,
6  *Bruen* step one requires a textual analysis, determining, among
7  other things, whether the weapon at issue is in common use today
8  for self-defense.  Plaintiffs fail to carry that burden, Your
9  Honor, and the failure is both quantitative and qualitative.

10      Quantitatively, the data confirms that assault weapons are
11  not commonly used for self-defense.  Expert Lucy Allen shows
12  that rifles of all types, not just assault rifles, are used in
13  only about 4 percent of reported instances of armed self-defense
14  nationwide; and this includes, by the way, incidents in which no
15  shots were fired, contrary to what Plaintiffs assert in their
16  reply.

17      And qualitatively, the evidence shows that assault weapons
18  are not designed or well-suited for self-defense, and I don't
19  want to belabor the design point.  At this point, I think even
20  -- even Plaintiffs would have to concede that assault weapons
21  are merely variations and in many cases very, very slight
22  variations of weapons designed for military use.

23      But I do want to touch briefly on the suitability point.
24  Because assault weapons are designed for the unique context of
25  the battlefield, they are not well-suited for typical self-

1  defense scenarios.  An AR-15's ability to pierce a military

2  helmet from 50 yards away on a battlefield is unhelpful and

3  indeed counterproductive when there's an intruder in your

4  bedroom and your kids or your neighbor might be sleeping on just

5  the other side of the wall.  Expert Ryan Busse, a former gun

6  industry executive, goes through the features that qualify guns

7  as assault weapons and explains how things like barrel shrouds

8  and pistol grips are all useful when you're spraying 30 rounds

9  on a battlefield but don't offer any benefit when you're trying

10  to scare away an attacker in a parking garage.

11      And to the extent Plaintiffs would suggest there's some

12  deterrent effect, they have not shown that an assault weapon is

13  any more of a deterrent than any of the many, many, many guns

14  that remain lawful to purchase or, more accurately, lawful to

15  sell under SHB 1240.  And the court in *Bevis*, as I noted

16  earlier, highlights this point, noting that the type of close

17  range encounters which are most likely to need self-defense,

18  handguns and shotguns are most useful.  That's at 2023 Westlaw

19  2077392, Page 16.  And Plaintiffs offer nothing to rebut this.

20      I want to take a brief detour and just talk about *Staples*

21  because Mr. Rowen really heavily emphasized that, but *Staples*

22  absolutely cannot bear the weight that Plaintiffs place on it.

23  The question in *Staples* was whether an individual would have

24  reason to believe that the machine gun -- sorry, that a weapon

25  that he owned bore features that qualified it as a machine gun

1  under the National Firearms Act.  It did not in any sense

2  address the constitutionally of any firearm restriction.  And in

3  any event, the language that Plaintiffs take out of context in

4  *Staples* was merely the court saying that guns in general,

5  outside of a few narrow categories, were widely regarded as

6  lawful possessions, not assault weapons in particular.  And this

7  is a point that Judge Arterton makes, I think, effectively in

8  rejecting the same argument in *NAGR versus Lamont*.

9       More fundamentally, *Staples* was decided on May 23rd, 1994.

10 Less than four months later in September of 1994, Congress

11 banned all assault weapons, and then they were illegal for ten

12 years until a Republican-controlled Congress allowed that ban to

13 sunset.  So the notion that *Staples* somehow stands for the

14 proposition that assault weapons are and always have been and

15 always must be widely accepted as lawful possessions is simply

16 nonsense.

17      Ultimately, Your Honor, Plaintiffs' exclusive focus on how

18 many assault weapons are possessed opens up a bunch of obvious

19 questions that they can't answer.  They can't say, for example,

20 how many people must own a weapon.  They can't even approximate

21 where the line is between what is constitutional and what is

22 not; why 6 million people in a nation of over 330 million, less

23 than 2 percent of all Americans, is enough; or why that

24 2 percent matters more than the one in three Americans who have

25 decided through their legislatures that assault weapons are not

1  appropriate self-defense weapons.

2      Plaintiffs can't tell you why their proposed rule wouldn't

3  sweep away machine gun bans when something like 400,000

4  Americans lawfully own machine guns.  Plaintiffs can't explain

5  how it makes sense that a law could be constitutional in 1959

6  when the AR-15 was first invented but before anyone bought one

7  or in 1994 when Congress passed the assault weapons ban before

8  the gun industry began aggressively marketing assault weapons,

9  but the identical law is somehow unconstitutional today.

10      Plaintiffs' argument is constitutional law untethered from

11  any principle.  The Supreme Court has made clear that the core

12  principle underlining the Second Amendment is the right to self-

13  defense.  Military-style assault weapons are not commonly used

14  in self-defense and thus are not the types of weapons covered by

15  the Second Amendment.  Plaintiffs thus cannot carry their burden

16  of *Bruen* step one; and because of that, this Court need go no

17  further.

18      But even if this Court were to disagree and conclude that

19  Plaintiffs have met their burden at step one, that would just

20  get us to the *Bruen* second historical step; and here, too, the

21  evidence overwhelmingly undermines Plaintiffs.  Under *Bruen* step

22  two, the Supreme Court has made clear that the historical

23  analysis is not a straightjacket.  While cases like *Teter* and,

24  for that matter, *Bruen* itself, cases that are dealing with

25  technology and social issues of long standing would require the

1  state to identify close historical parallels -- distinctly

2  similar historical analogs, in the language of *Bruen*.  *Bruen*

3  made clear that a more nuanced analysis applies in cases like

4  this one because here we're dealing with a novel problem.

5       Mass shootings really only became a national concern just

6  in my lifetime.  And we're dealing with a novel technology,

7  assault weapons, which didn't emerge in anything like their

8  modern form until the 1950s and didn't begin to proliferate

9  among civilians until the 2000s.  Accordingly, *Bruen* instructs

10  the court to engage in a more nuanced analysis focused on how

11  modern regulations burdens self-defense compared to historical

12  regulations and how modern regulations are justified compared to

13  historical ones.  And again, to emphasize, this is not the test

14  the court was applying in *Teter* because under *Bruen*, this was

15  not the appropriate test for a case about the ancient problem of

16  knife violence caused by a simple and ancient technology of

17  pocket knives.

18       And as we show in our brief, Your Honor, the history of the

19  United States is replete with examples of governments responding

20  to new threats of violence by restricting access to the new

21  weapons disproportionately used in that violence, and this

22  pattern repeats over and over again with Bowie knives and other

23  fighting knives, slung shots, pistols, trap guns, machine guns,

24  clubs, and now assault weapons.  Plaintiffs' response is to try

25  to nitpick these examples.

1    For instance, in response to testimony from Professor
2  Robert Spitzer that 15 states all but banned Bowie knives by
3  banning both concealed and open carry, Plaintiffs respond, as
4  they did here today, that this isn't analogous to Washington's
5  law because people could still keep Bowie knives in their homes;
6  but this is actually much more restrictive than Washington's
7  law, which enables those who already own assault weapons to
8  continue using them for all lawful purposes, whether in their
9  home or outside, but merely prohibits folks from adding to their
10  arsenal, which, of course, the carry restrictions discussed by
11  Professor Spitzer also do since there's no way to sell or buy a
12  Bowie knife without the buyer, seller, or both carrying the
13  weapon at some point.

14    Also, Plaintiffs' efforts distinguish some states' methods
15  of regulation, ignores that other states did outright ban the
16  sale of Bowie knives, just as Washington now does with assault
17  weapons.  And in any event, the *Hartford* plaintiffs tried this
18  exact same move, and Judge Bryan correctly rejected it because
19  the analogical reasoning called for by *Bruen* requires the state
20  to "identify a well-established and representative historical
21  analog, not a historical twin."  Other examples cited by
22  Defendants Plaintiffs simply ignore, presumably because they
23  don't have any response.

24    Shortly after the Civil War, multiple states banned pocket
25  pistols, either outright or through prohibitive taxation.  Once

1  machine guns emerged as a threat, dozens of states enacted bans,

2  many of which covered any semiautomatic rifle that could fire

3  more than a certain number of rounds.  Indeed, Congress passed

4  just such a ban for the District of Columbia.  Eventually, the

5  federal government stepped in and effectively banned machine

6  guns.  Certainly, these are analogs that this Court can and

7  should look to and would show that Washington's assault weapons

8  restrictions fit comfortably within a robust national tradition

9  of restricting arms associated with unlawful violence.

10      Again, this is exactly what the courts held in *Bevis*,

11  *Herrera*, *Delaware State Sportsmen's Association*, *NAGR versus*

12  *Lamont*, and *Hartford*.  Accordingly, if this Court does reach

13  *Bruen* step two, the evidence plainly shows that Plaintiffs are

14  unlikely to succeed on the merits of their claims because SHB

15  1240 is entirely consistent with historical arms regulations.

16      I'd like to move just briefly, Your Honor, to discuss

17  remaining factors.  So turning first to irreparable harm,

18  Plaintiffs' argument fails most obviously because the primary

19  harm they allege is a constitutional one, but SHB 1240 does not

20  violate their constitutional rights to bear arms in self-

21  defense.  And as we explained at length in our brief, even if

22  they could arguably show a constitutional violation, that

23  standing alone would be insufficient to entitle them to a PI.

24      Lastly, Plaintiffs' irreparable harm argument fails because

25  nothing in SHB 1240 prohibits them from using the weapons they

Banta, et al. v. Ferguson, et al.
Case No. 2:23-cv-00112-MKD
Motion Hearing

34

1  already have, including assault weapons.  All it does is

2  prohibit them adding to their collections.  Plaintiffs have a

3  constitutional right, undoubtedly, to bear arms to defend

4  themselves, and there are plenty of firearms lawfully for sale

5  in the state that they could use for that purpose.  No plaintiff

6  has shown that they are currently insufficiently armed for self-

7  defense as a result of SHB 1240.  Their claim of irreparable

8  harm thus fails.

9       And finally, Your Honor, turning to the public interest,

10  even if, contrary to everything I just said, Plaintiffs could

11  show a clear violation of their right to buy more assault

12  weapons and even if Plaintiffs could show they were irreparably

13  injured, the public interest weighs resoundingly against

14  overturning a literally lifesaving measure like SHB 1240 on a

15  preliminary basis without a fully developed factual record.

16  Again, Plaintiffs' only interest is in being able to buy more

17  assault weapons than they already have while this litigation is

18  pending.

19       By contrast, Your Honor, in the first 11 days after

20  Governor Inslee signed SHB 1240 into law, there were two mass

21  murders committed with assault weapons, both in Texas where

22  assault weapons remain unrestricted.  In those two mass murders

23  in just 11 days, 13 people -- mothers, fathers, children, best

24  friends, crushes, coworkers -- were killed and seven more

25  injured by lone individuals with assault weapons.  Your Honor,

1    this doesn't have to happen.  Nothing in our constitution

2    requires this to keep happening, and so we would respectfully

3    request that the Court deny Plaintiffs' motion to preliminarily

4    enjoin this lifesaving measure.

5        Unless there are any questions, that's all I have, Your

6    Honor.

7            THE COURT:  I do not at this time.  Thank you.

8            MR. HUGHES:  Thank you.

9            THE COURT:  Mr. -- is it Pekelis?

10           MR. PEKELIS:  Pekelis.

11           THE COURT:  Pekelis.  Thank you.

12           MR. PEKELIS:  It rhymes with Chehalis, Your Honor.

13           THE COURT:  All right.  Thank you.

14           MR. PEKELIS:  Zach Pekelis for Intervenor-Defendant,

15   The Alliance For Gun Responsibility.

16       Washington's restrictions on assault weapons are not only

17   common sense lifesaving measures to reduce gun violence and

18   address the scourge of mass shooting in our society, but they

19   are perfectly constitutional under the Second Amendment,

20   consistent with the *Bruen* framework.  The Alliance agrees with

21   the points made by counsel for state defendants today.  My

22   presentation focuses on three specific points that, in our view,

23   bear special emphasis.

24       First, I'll address the common use test, explaining why it

25   is part of the *Bruen*'s -- *Bruen* standard's text prong, not its

1   history prong; why it is not simply a question of assault

2   weapons' proliferation or production or even ownership in

3   society at large, but rather whether they are commonly used in

4   self-defense today, and why the evidence shows that they are

5   not.

6        Second, I'll address the history prong, highlighting the

7   dichotomy *Bruen* sets out between, on the one hand, laws that

8   address a general societal problem that has persisted since the

9   founding, which demands a tighter analogical fit between the

10  modern law and the historical predecessors and which is a

11  straightforward analysis, is the way they term that in *Bruen*;

12  and on the other hand, laws that address dramatic technological

13  developments or unprecedented societal concerns, which require a

14  more nuanced and flexible analysis.  Because this case falls in

15  the latter category, the historical antecedents clearly show

16  that assault weapon restrictions are consistent with the

17  nation's historical tradition of firearm regulation.

18       And the final point I'll address concerns irreparable harm

19  and why Plaintiffs have failed to demonstrate it.

20       So beginning with the common use test, the question under

21  *Bruen* is whether a particular firearm or accessory is in common

22  use today for self-defense.  That's the exact language.  So as

23  Your Honor knows, *Bruen* has set forth essentially a two-part

24  test.  The first part asks does the plain text cover Plaintiffs'

25  conduct, and second question asks whether the law is consistent

1  with the nation's historical tradition of firearm regulation.

2      So why does the common use inquiry fit into the text

3  element?  First, circuit precedent requires that.  In *United*

4  *States versus Alaniz*, not spelled like the singer but

5  A-L-A-N-I-Z --

6          THE COURT:  I'm familiar with the case.

7          MR. PEKELIS:  I was doing it for the court reporter's

8  benefit, Your honor, although I love an Alanis Morissette

9  reference whenever I can make one.

10     *Bruen* step one involves threshold inquiry.  This is quoting

11  from *Alaniz*.  "In alignment with *Heller*, it requires a textual

12  analysis, determining whether the challenger is part of the

13  people whom the Second Amendment protects, whether the weapon at

14  issue is in common use today for self-defense, and whether the

15  proposed course of conduct falls within the Second Amendment."

16  It could not be clearer.  Plaintiffs try to dismiss *Alaniz* as

17  dicta, but you can't say it's dicta when it's literally setting

18  forth the requisite standard that district courts within the

19  circuit are to apply.

20     So Mr. Rowen suggests that *Teter* couldn't be clearer.  I

21  disagree, but it certainly doesn't overrule *Alaniz*.  And for the

22  reasons Mr. Hughes explained, *Teter* doesn't address the common

23  use question at all.  It only addresses the "dangerous and

24  unusual" prong, as I'll address a bit later.

25     So numerous courts have rejected Plaintiffs' argument,

1  including put forward by National Shooting Sports Foundation and

2  including Mr. Rowen, that the common use question is part of the

3  historical prong and that it's essentially the be-all/end-all of

4  the analysis.  Specifically, the *Hartford* court rejected that.

5  The *Oregon Firearms Federation* court addressed that in a lengthy

6  122-page findings of fact.  That was NSSF.  That was Mr. Rowen's

7  firm making those exact same arguments, and they rejected it.

8  *Ocean State Tactical* rejected it.  *Hanson* rejected it.  *Lamont*

9  rejected it.  I could go on.

10       So what is the standard?  You've seen it as part of the

11  text prong.  Well, the question is -- again, using the *Bruen*

12  language itself -- is whether they are in common use today for

13  self-defense.  It doesn't say anything about common ownership or

14  possession or sales or marketing or popularity.  It's about

15  common use for self-defense.

16       And *Bruen* says specifically that handguns are in common use

17  today for self-defense.  That wasn't disputed in that case.  And

18  Mr. Rowen actually pointed out that some of the language that

19  *Bruen* uses to describe what arms are, the question of whether

20  they facilitate armed self-defense, again, shows that there is a

21  textual hook to arms being linked to self-defense at all.  So it

22  makes sense.  If arms are only those weapons used to strike in

23  wrath at one another that facilitate armed self-defense, that

24  means that, well, a machine gun could be used to strike at

25  someone else; but because it's not used today, in common use

1  today for self-defense, it does not facilitate self-defense and

2  is therefore not an arm.  Otherwise, that distinction simply

3  collapses.

4      Even Justice Alito's concurring opinion in *Caetano*, which

5  Plaintiffs rely on at length -- and, of course, it's not

6  binding, but it does shed light on the same question -- it

7  rejected the proposition that the Second Amendment doesn't

8  protect stun guns because they weren't around in the 18th

9  century, saying the same is true for the weapons most commonly

10 used today for self-defense, mainly revolvers and semiautomatic

11 pistol, again, Justice Alito focusing correctly on how the

12 weapon at issue is actually used today for self-defense.

13     As I mentioned, numerous district courts have rejected not

14 only the concept that the common use inquiry fits into the

15 history prong and that it's the be-all/end-all, but also that

16 it's simply a popularity contest or a popularity question.  In

17 *Oregon Firearms Federation*, Judge Immergut wrote, "This Court

18 notes that firearm manufacturers and dealers make decisions that

19 both limit consumer choice and magnify the commonalty of LCMs.

20 This Court declines to adopt an interpretation of the Second

21 Amendment that solely allows those with the greatest economic

22 interest in the sale of LCMs to define the boundaries of a

23 constitutional right."

24     You know, in picking up on that kind of idea that the

25 Second Amendment can't just depend on decisions of the most

1  economically interested firearm industry professionals, the *NAGR*

2  *v. Lamont* court in Connecticut, Judge Arterton, wrote, "No other

3  constitutional right waxes and wanes based solely on what

4  manufacturers choose to sell and how Congress chooses to

5  regulate what is sold, and the Second Amendment should be no

6  exception."

7       And finally, I direct the Court's attention to the *Duncan*

8  decision of the Ninth Circuit en banc decision.  Of course, it

9  was vacated after *Bruen*, but in Justice Berzon's concurrence,

10 which was joined by five other judges -- so it's a six-judge

11 concurrence -- she correctly pointed out that *Heller* focused not

12 just on the prevalence of a weapon but on the primary use or

13 purpose of that weapon, and I think that's of continuing

14 validity because it's looking at the common use question, which

15 is -- derives, of course, from *Heller* originally, even if the

16 two-step test that *Duncan* relied on is no longer valid after --

17 after *Bruen*.

18      So finally to turn to *Teter*, which Plaintiffs rely on

19 extensively here, it's very clear from the opinion -- and this

20 is on Page 21 of the slip opinion at Docket 42 in our case.  The

21 question is not defined as whether -- is this the common use

22 question.  The Court says whether butterfly knives are dangerous

23 and unusual is a contention as to which Hawaii bears the burden

24 of proof and the second prong of the *Bruen* analysis.  And the

25 "dangerous or unusual" question, I agree with Mr. Hughes.  It's

1  related to common use, but it's a separate distinct question.

2  And the Ninth Circuit in *Teter* places it within the -- within

3  the second prong, within the history prong.  But in just as --

4  quite exactly as clearly, *Alaniz* places the common use question

5  in the first prong, in the textual prong.

6      And what's interesting is that *Teter* relies on pre-*Bruen*

7  precedent from the Ninth Circuit, the *Fyock v. Sunnyvale*

8  decision, in elucidating what the "dangerous or unusual"

9  question is.  And citing *Fyock*, the "dangerous and unusual"

10  question is phrased as follows:  "We consider whether the weapon

11  has uniquely dangerous propensities and whether the weapon is

12  commonly possessed by law-abiding citizens for lawful purposes."

13      So whether or not, you know, *Fyock* really survived *Bruen* is

14  -- I guess is an open question, but the *Teter* court's clearly

15  relying on the pre-*Bruen Fyock* precedent to articulate how they

16  should examine the "dangerous or unusual" question.  It doesn't

17  say anything about common use and the textual inquiry that so

18  many other courts, including the Ninth Circuit, have said is

19  located in the text prong.

20      And Your Honor, I would point out that *Teter* -- although

21  the mandate hasn't issued under Ninth Circuit law, it is

22  precedential, despite the mandate not having issued.  So I think

23  it is fair for them to raise it, but it just doesn't stand for

24  the proposition that Plaintiffs think it does.

25      So why don't -- why don't they establish?  Why can't they

1  establish?  How do they establish on this record that assault

2  weapons are in common use today for self-defense?  The first

3  part I want to point out is that this is a facial challenge, and

4  the *Hartford* court picked up on this and the *NAGR versus Lamont*

5  court addressed the facial question extensively.  So they're not

6  saying that Washington's assault weapons restrictions can't be

7  applied to some species of assault weapons like AR-15s or

8  AK-47s.  They're saying that every single firearm covered under

9  the assault weapons law is -- it must be constitutionally

10 required to purchase in Washington.

11      All right.  So because it's a facial challenge, Plaintiffs

12 bear the burden of showing that the law is unconstitutional in

13 all its applications.  That means it's their burden to show that

14 each and every firearm covered under the restrictions are in

15 common use for self-defense today.  They haven't come close to

16 showing that.  At most, they've come forward with statistics --

17 statistics put forward by the plaintiff itself, by NSFF, relying

18 on their own data, which, obviously, does not have indicia of

19 reliability.

20      But even if we accept them, all they show are how many

21 firearms are -- how many assault weapons generally are actually

22 in possession, and it's not even that large a number.  It ends

23 up being about 5 percent of all firearms total and about

24 2 percent of Americans actually own an assault weapon, based on

25 Dr. Klarevas's calculations.  Very few people with a passing

1  familiarity with the English language would say that something

2  owned by 2 percent of the population is commonly owned, and

3  certainly they do nothing to establish that assault weapons are

4  in common use today for self-defense because, as the Allen

5  declaration shows, they're almost never used in self-defense

6  incidents because they're simply not very helpful for self-

7  defense.  Shotguns and handguns are much more commonly used,

8  much more useful for Americans for self-defense.

9        I also want to point out that there is a considerable

10 number of rifles that remain lawful to possess and purchase in

11 Washington.  The Court asked Mr. Hughes this question so I want

12 to go to the -- first of all, to the definition of assault

13 weapons in the statute.  There's the list of 50 or so

14 specifically identified weapons, including AR-15s and AK-47s.

15       But then beyond that, it regulates -- it's a features test,

16 as it's commonly known, so it regulates semiautomatic centerfire

17 rifles that have another feature, such as pistol grip or a

18 grenade launcher.  So there are numerous non-centerfire

19 rifles -- for example, rimfire semiautomatic rifles -- that

20 aren't touched by that definition at all, it would seem.  In

21 addition, as long as it's a centerfire rifle that doesn't have

22 one of those features -- pistol grip, et cetera -- that would

23 not be regulated under the definition as long as it's not

24 specifically enumerated in the initial list of 50.

25       So, you know, California has done this.  It's had an

1   assault weapons ban in place for much longer; and, you know,

2   I'll just point out you can go to the online, you know,

3   guns.com, the numerous online sites and look for California-

4   compliant rifles, and what you'll find are thousands of rifles

5   listed that are California-compliant that -- you know, because

6   of the similarity between the statutes, I'm not saying they're

7   exactly the same, but presumably a very high number are also

8   going to be lawful in Washington.  And if even if you narrow

9   that down to just semiautomatic rifles, there are hundreds of

10  California-compliant semiautomatic rifles for sale on any of the

11  online sellers.  So it's simply false that even if rifles were

12  used or in common use for self-defense that Washingtonians are

13  no longer going to be able to purchase them for that purpose.

14      On the historical tradition, as I mentioned in my opening

15  remarks, *Bruen* clearly sets forth a dichotomy or at least a

16  sliding scale in how the historical analysis is to proceed.  So

17  -- and that is between a straightforward approach and a nuanced

18  approach.  So here's the straightforward approach that *Bruen*

19  sets forth.

20      In some cases, that historical inquiry will be fairly

21  straightforward.  For instance, when a challenged regulation

22  addresses a general societal problem that has persisted since

23  the 18th century, the lack of a distinctly similar historical

24  regulation addressing that problem is relevant evidence that the

25  challenged regulation is inconsistent with the Second Amendment.

1  Okay.  So that's the straightforward approach.  It looks for a

2  distinctly similar historical analog.

3      Here's the nuanced approach.  Other cases implicating

4  unprecedented societal concerns or dramatic technological

5  changes may require a more nuanced approach.  In such cases,

6  analogical reasoning requires only that the government identify

7  a well-established and representative historical analog, not a

8  historical twin.  So even if a modern day regulation is not a

9  dead ringer for historical precursors, it still may be analogous

10  enough to pass constitutional muster.

11      So we have these two different approaches set forth.

12  *Heller* is an example, *Bruen* tells us, of the first.  It's a

13  straightforward approach.  Here's what -- again, quoting from

14  *Bruen*, "*Heller* itself exemplifies this kind of straightforward

15  historical inquiry....  The District in *Heller* addressed a

16  perceived societal problem -- firearm violence in densely

17  populated communities -- and it employed a regulation -- a flat

18  ban on the possession of handguns in the home -- that the

19  Founders themselves could have adopted to confront the problem."

20  Because they did not, *Heller* concluded that the handgun ban was

21  unconstitutional.

22      *Bruen* also is an example of the straightforward approach.

23  Again, here's what *Bruen* says.  "New York's proper-cause

24  requirement concerns the same alleged societal problem addressed

25  in *Heller*, 'handgun violence,' primarily in 'urban areas.'"  "We

1  find no such tradition in the historical materials" of imposing

2  a proper cause requirement.

3       *Teter*, again, an example of the straightforward approach,

4  quoting from the Ninth Circuit's decision, "The problem of

5  people using easily concealable, foldable knives in violent

6  crimes predates 1999 by hundreds of years."  It goes on.  "This

7  historical background makes our analysis relatively

8  'straightforward.'"  And then it quotes the *Bruen* passage at

9  length on -- just on that historical -- on the straightforward

10 approach to the history analysis.  So because historical laws

11 regulating knives were not -- were not sufficiently tightly

12 analogous to Hawaii's ban on butterfly knives, the *Teter* court

13 said that they -- it doesn't pass constitutional muster, and

14 that was because historical laws regulated different kinds of

15 knives and because they regulated them in different kinds of

16 ways; so it didn't have that really tight fit that the

17 straightforward analysis requires.

18      So what about the nuanced approach?  So assault weapons --

19 Mr. Rowen is correct that semiautomatic weapons technology has

20 existed for over a hundred years, but assault weapons like

21 large-capacity magazines did not become popular and widespread

22 until the 1980s, and that's, I think, uncontested.  So the

23 relevant question is when it became a societal concern, when the

24 technology actually became something that might provoke

25 regulation.  Otherwise, the -- looking at historical regulations

1  is useless because if a legislature historically had no reason

2  to regulate something, the absence of regulation would shed very

3  little light on whether such regulation passes constitutional

4  muster.

5        So in this case, assault weapons require a nuanced approach

6  for both reasons, both because it's a new -- it's a dramatic new

7  technology and because it causes a new societal concern, an

8  unprecedented societal concern, and all courts that have

9  adjudicated large-capacity magazine and assault weapons cases

10 have reached that conclusion, that they're -- it's a dramatic

11 new technology and it's an unprecedented societal concern; so a

12 nuanced approach is appropriate.  And, you know -- and that's --

13 it's not just five cases, Your Honor; it's eight cases because I

14 think the large-capacity magazine cases are perfectly compatible

15 and require a very similar analysis.

16       So, you know, if you look at 1240 -- HB 1240, the

17 legislature -- the purpose of regulating assault weapons is the

18 exact same as the purpose of regulating large-capacity

19 magazines.  It's because they allow shooters to fire large

20 numbers of rounds very quickly.  That's from the first section,

21 introduction of the bill.

22       Second, large capacity magazines and assault weapons,

23 they're used together is precisely what is so dangerous, what

24 enables mass shooting, because not only does the assault weapon

25 allow rapid controlled fire, but with large-capacity magazines,

1  you can go on and on and on without reloading.

2      Third, they kind of share a similar historical development.

3  They were invented in the late 19th century but did not become

4  popular until the 1980s; so they kind of have the same

5  historical pedigree.

6      And then finally, the historical analogs that show that

7  these regulations are comparably justified are the exact same,

8  regulations on dangerous weapons once they become popular and

9  present a societal problem, from trap guns to Bowie knives to

10 blunt objects through semiautomatic weapons in the early 20th

11 century and automatic weapons in the early 20th century.

12     So, you know, in some of these cases, of course, the courts

13 are actually adjudicating large-capacity magazine and assault

14 weapons bans together; so the analysis really does dovetail.  So

15 in our view, it's really eight to one; and as Your Honor

16 suggested, the one was the Southern District of Illinois.  It

17 was stayed by Judge Easterbrook.  Argument has been heard in

18 that case.  Judge Easterbrook is on the panel, along with Judge

19 Wood.  I forget the third, but, you know, that's a case to watch

20 certainly.

21     And I think Mr. Hughes set out exactly why the nuanced

22 approach here clearly leads to the conclusion that assault

23 weapons bans are constitutional and are consistent with that

24 long history of regulating the dangerous components of dangerous

25 weapons once they become a societal concern.

1      So finally turning to the irreparable harm question,

2   Plaintiffs have set forth two different theories of irreparable

3   harm, as I understand it.  The first is sort of a per se or an

4   automatic theory where they establish a constitutional violation

5   that automatically means irreparable harm.  As Mr. Hughes

6   pointed out for all the reasons we've explained today and in the

7   briefing, they haven't established a likelihood of success on

8   their constitutional claims; so that argument just kind of

9   fails, along with the merits.

10      But even if they had, Plaintiffs are incorrect that a

11  likelihood of success on its Second Amendment claim, or really

12  any other, requires a finding of irreparable harm.  The cases

13  they cite all come from the First Amendment context, and note

14  the Ninth Circuit has never recognized a per se theory or even a

15  presumption of irreparable harm for any other type of

16  constitutional violation outside the First Amendment context,

17  and I think that's explained really nicely in a District of

18  Oregon decision, *Coba*, cited in the briefs, *Great Northern v.*

19  *Coba*; and *Hartford* also confirms that there's no automatic

20  irreparable harm for a Second Amendment violation.

21      And it's not that this means that the Second Amendment is a

22  second-class right or that First Amendment violations are

23  somehow magical or special.  It's just logical.  It stems from

24  the kind of equitable considerations that this Court has to

25  consider when adjudicating this type of motion for extraordinary

1   equitable relief.

2       It's -- you know, when you think about it, being unable to

3   engage in protected expressive conduct or religious conduct, for

4   that matter, to worship in a way that your religion commands,

5   that's obviously irremediable with later relief.  That's why

6   First Amendment violations often carry with them a presumption

7   of irreparable harm.  It's a rebuttable presumption, as the

8   Ninth Circuit has made very clear in the *Cuviello v. City of*

9   *Vallejo* case, 944 F.3d 816, where it says even in the First

10  Amendment context, the court must still independently evaluate

11  irreparable harm.

12      So a Second Amendment violation certainly -- certainly

13  could carry with it an irreparable harm, right?  If there were

14  an argument that a plaintiff was unable to engage in a protected

15  -- in protected self-defense because of a particular law, that

16  certainly could create a colorable case for irreparable harm,

17  but that's not what Plaintiffs are arguing here.  That's not

18  part of their irreparable harm theory, that any Plaintiff is

19  unable to engage in self-defense because of the assault weapons

20  restriction.

21      The only individual plaintiff here, Amanda Banta -- Banta,

22  says absolutely nothing about what weapons she has or -- or

23  self-defense needs.  There's no declaration from her saying that

24  she needs an assault weapon to engage in self-defense; and as I

25  explained earlier, she, of course, has the quintessential self-

1  defense weapon at her disposal in handguns.  She can purchase

2  any number of shotguns or non-assault weapon rifles, of which

3  there are hundreds, if not thousands, available in Washington.

4       So their second irreparable harm theory is not based on

5  inability to engage in self-defense.  It's based on an economic

6  harm to the plaintiff gun sellers and NSFF's clients.  So their

7  theory is that they will lose revenue if 1240 remains in effect,

8  but the declarations that they've provided in support of that

9  proposition are totally inadequate to establish that they're

10  going to lose any revenue.  All they do is they provide very

11  generalized sales estimates from past years, 2021 and 2022, and

12  they say that weapons classified as assault weapons represent a

13  certain percentage; I think it's 30 percent of those sales.

14       There's no information from 2023 to -- that would shed

15  light on whether their prediction is actually true, whether

16  their current sales have actually overall gone down, let alone

17  that they would show that they've gone down because of the

18  assault weapons restrictions, and it's interesting why they

19  didn't provide that evidence.  Of course, the assault weapons

20  restrictions have been in place since April.  So four months

21  later, obviously, they should have data to show whether there's

22  been an impact.

23       And I think logically we would say, well, if someone were

24  going into a gun shop to purchase a weapon for self-defense and

25  they find out, oh, the weapon you came in for, an AR-15 -- said

1  we can't sell that anymore in Washington, the average reasonable

2  consumer would probably say, "Oh, well, I still need a firearm

3  for self-defense; I'll purchase a handgun or I'll purchase a

4  rimfire automatic rifle," if they, you know, are bent on getting

5  a rifle.  So there's a substitution effect that Dr. Klarevas

6  references in his declaration that would logically mean that the

7  gun sellers aren't going to lose any revenue as a result of the

8  ban, but they don't provide any data for us to determine whether

9  that logical inference is actually true.

10      And in fact, what they also ignore is -- there's no

11 evidence of this in the record, but I think the Court can take

12 judicial notice of news reports of a spike in assault weapon

13 sales that occurred just before the law was signed by the

14 governor and went into effect.  So it's highly possible that not

15 only have sellers not been economically harmed from the assault

16 weapons restrictions, they've actually benefitted from it by

17 getting an early surge of -- you know, early preview of the

18 demand that would've gone on over the rest of the year that they

19 got all at once in April.

20      Again, they don't provide any data from 2023 for us to

21 measure whether their sales of assault weapons and other weapons

22 have actually gone down, gone up, or stayed the same; so they've

23 not -- even assuming that economic harm could constitute an

24 irreparable harm, which is not the usual rule, they haven't

25 demonstrated it here under the evidence.

1    Unless the Court has further questions, we ask that the

2    Court deny the motion for preliminary injunction.

3            THE COURT:  I do not.  Thank you.

4    Mr. Rowen.

5            MR. ROWEN:  Thank you, Your Honor.  And in the

6    interest of time, I will try to be as brief as I can responding

7    to two separate sets of arguments.

8        So my friends on the other side, Mr. Pekelis pointed out

9    that this is a facial challenge and will talk probably a lot

10   about that in the second set of arguments, but in one sense with

11   respect to this case, he is correct, but I just don't think he

12   quite understands what that means for Your Honor.  So if Your

13   Honor thought that we had satisfied our burden under the

14   preliminary injunction factors with respect to AR-platform

15   rifles but not with respect to any of the other firearms that

16   HB 1240 covers, for instance, the scope of the injunction would

17   be limited to what we had established, and that doesn't sort of

18   transmute our claim.

19       It just shows, as the Ninth Circuit and the Supreme Court

20   have said over and over again, the difference between facial and

21   as-applied in terms of those terms go to the scope of relief

22   that a court ultimately enters, not to what a plaintiff must

23   prove.  And, of course, if we establish that, for instance, all

24   of the AR-platform rifles that HB 1240 bans are arms and

25   therefore that they're presumptively protected; and if Your

1  Honor found that the state hadn't rebutted that presumptive

2  protection, then as to those, at the very least, an injunction

3  should enter.  So, you know, on that point, I mean, it just -- I

4  think that's enough on the facial versus as-applied for this

5  argument.

6      On the common ownership point, Mr. Pekelis pointed out that

7  we don't have -- we don't have a line.  Well, I mean, I know

8  200,000 is enough because if 200,000 weren't enough, then the

9  Supreme Court would have had to do a lot more work in *Caetano*.

10 As Justice Alito pointed out in his concurrence, 200,000

11 Americans own stun guns, and that was enough to make them not

12 unusual; and as he pointed out in his concurrence, the

13 "dangerous and unusual" language is a conjunctive requirement.

14 For a state to be able to ban a class of arms, they have to be

15 -- they have to show that those arms are both dangerous and

16 unusual.

17      THE COURT:  Mr. Rowen, if I were to find that under

18 *Bruen* it is the challenger, the Plaintiffs' obligation to

19 establish something is -- that the arm at issue is commonly used

20 for the purpose of self-defense, what evidence is there in the

21 existing record that would meet that?

22      MR. ROWEN:  So I'll answer your question in a second,

23 I promise, but the first thing I would say is you would -- if

24 that were to be your finding, it would be inconsistent with

25 Ninth Circuit law.  I'll get to that in a second.  So to --

*Banta, et al. v. Ferguson, et al.*                                    55
*Case No. 2:23-cv-00112-MKD*
*Motion Hearing*

1        THE COURT:  I realize that's your position.

2        MR. ROWEN:  Yes.

3        THE COURT:  Say that I disagree with you.

4        MR. ROWEN:  Sure.

5        THE COURT:  I'm asking where's the evidence in the

6    record?

7        MR. ROWEN:  Sure.  I mean, so I think the evidence in

8    the record is it goes -- it's what we have cited as to the

9    numbers of people that own these firearms.  And, you know, the

10   point that the other side makes --

11       THE COURT:  But ownership is different than commonly

12   used for self-defense.  What evidence is there in the record

13   that the arms at issue are commonly used for self-defense?  What

14   evidence?  Point me to it.

15       MR. ROWEN:  So the evidence is on -- that they are

16   commonly possessed, and I will explain why we think that that is

17   more than sufficient.  So the text of the Second Amendment tells

18   us which uses are constitutionally privileged, keeping and

19   bearing.  Every time a person purchases a lawful firearm and

20   keeps it in their home at the ready for self-defense, every time

21   a person exercises their right to carry a firearm, which, as the

22   Supreme Court has defined in *Bruen*, is to -- the "bear" as

23   carrying to be ready in case of confrontation -- that person

24   uses their firearm in self-defense, and we know that that has to

25   be right for two reasons.

1      One, in *Bruen*, the court didn't ask how often do people

2  fire these things when they leave their homes.  It was enough

3  that the type of weapon in question was not dangerous and

4  unusual.

5      And second, we know that common use is the flip -- that

6  something being highly unusual is the flip side of common use

7  because *Bruen* says so.  So my friends on the other side like to

8  quote the one sentence from the first paragraph of *Bruen*'s

9  analysis where it says first there's no dispute that the

10  plaintiffs are among the people nor is there any dispute that

11  handguns are in common use for self-defense.  Then it moves on

12  to the second step.

13      And then at Page 2143 of *Bruen*, it makes very clear, just

14  as *Heller* had done and just as *Teter* does, that the "dangerous

15  and unusual" question is part of the historical tradition

16  question and that the fact that a certain set of arms, like

17  handguns, may have been considered dangerous and unusual in the

18  past is insufficient to allow a state to ban them now, and it

19  makes very clear that the common use flip side is whether an arm

20  is "highly unusual in society at large today."

21      Now, that language makes no sense if you think "use" means

22  firing or doing anything other than keeping and bearing, because

23  they didn't say "are highly unusually shot."  And, of course,

24  that makes sense because the language comes from *Heller*.  The

25  common use language, as my friends on the other side pointed

1  out, comes from *Heller*; and in explaining what "common use"

2  meant, *Heller* makes clear more than once that the question is

3  typically possessed by law-abiding citizens for lawful purposes.

4  And the reason that makes sense, again, is because the

5  constitutional uses that are privileged are not just firing at

6  people.  They're keeping and bearing at the ready in case of

7  confrontation, whether inside or outside the home.

8        My friends on the other side pointed out that in *Teter,* the

9  state had conceded that butterfly knives may be used in self-

10  defense.  Well, so have they with respect to what they term

11  assault weapons.  If you look at their expert, Ms. Allen, she's

12  found that at least in some cases, AR-platform rifles and some

13  of the other types of weapons have actually been fired at people

14  in self-defense situations so there's no -- nor could they

15  really dispute that they may be used if you think that "use"

16  means actually fire.  Of course, a firearm that's a rifle or a

17  semiautomatic shotgun that has -- you know, that can have more

18  than five rounds, of course it may be used in self-defense.  And

19  so, you know, on the --

20        THE COURT:  But Mr. Rowen, there certainly, I think,

21  is an argument to be made that the possession of firearms,

22  although -- I'm sorry, I should say it this way, that commonly

23  used in self-defense is not exclusively defined by when an

24  incident occurs, any firearm is then used.  I think there's

25  plenty of instances where people possess firearms for the

1  purposes of self-defense and never have to use them, but there's

2  no evidence of that in the record.  I think that's the concern I

3  have is you are, in your argument, relying on what you believe

4  is common sense and your belief what statistics that you offer

5  me, and there's no evidence of that, of those particular points.

6  You want to rely on what you believe is common sense as opposed

7  to evidence in the record.

8         MR. ROWEN:  So again, what I'll say is while we're

9  happy to cite government data showing the number of sales that

10 have been made of the types of weapons that are now banned, I

11 mean, again, what we would argue and have argued and do argue is

12 that possession has to be the relevant metric because otherwise

13 *Heller* and *Bruen* make no sense.

14        So my friends on the other side love to point out that the

15 Supreme Court said that handguns are the quintessential self-

16 defense weapon; and with respect, if you go on to read what it

17 says two sentences later makes clear that that's not a

18 suitability -- according to the Justices or the District of

19 Columbia -- argument.  They say whatever the reason, the

20 American people have overwhelmingly chosen handguns for this

21 purpose; and that's because, as *Bruen* later elucidated, the way

22 to understand the Second Amendment is to look at the traditions

23 of the American people.

24        And so, again, we don't ask how often do people take out an

25 AR-15 to the range for one purpose or another.  We ask whatever

1  the reason, 20 million of these have been sold; whatever the

2  reason that upwards of 8 million Americans own them for lawful

3  purposes.  The tradition in this country is allowing that lawful

4  possession.

5       And so just to go to the standard for a second, so the

6  state intervenors, I think, argue that *Teter* is wrongly decided,

7  and they're free to argue that.  And I know Your Honor will

8  decide how to read this, but Mr. Pekelis said that I can't just

9  say *Alaniz* is dicta.  I actually can because it is.  So *Alaniz,*

10  "assumed, without deciding, that step one was met."

11       So everything it said about what's in step one is, by

12  definition, dicta; and if it weren't dicta, then *Teter* couldn't

13  have decided the way it did because, again, it was decided after

14  *Alaniz* came out, and it granted summary judgment to the

15  challengers because Hawaii hadn't disproven the common ownership

16  of balisongs.  So while I know that this will ultimately be, you

17  know, Your Honor's province, I just think as the law stands now

18  in the Ninth Circuit, there just can't really be a dispute about

19  how the analysis under *Bruen* works.

20       So my friends said -- you know, they said over and over

21  again that, you know, these types of firearms, in their view,

22  are not most suitable for self-defense; and while I know that

23  they and many others share that view, that's not how

24  constitutional rights work.  Again, I mean, I mentioned this

25  earlier, that what *Heller* said is it's whatever the reason, the

1  American people are overwhelmingly choosing this, and that's

2  because constitutional rights belong to the people, and that's

3  particularly true in the Second Amendment context.

4      I mean, the point of the Second Amendment is to allow the

5  people to defend themselves, yes, against their fellow citizens

6  and attackers, but also they needed to be ready to muster for

7  the militia.  And, you know, the passage that they're relying on

8  goes on to then explain that the types of weapons that we want

9  people to be able to have are those that the American people are

10 overwhelmingly choosing for their own defense and also for that

11 sort of core militia purpose.  But if the government can come in

12 and say, "No, no, no, we don't think that's good enough for you,

13 we don't think you need that," then the basic purpose that the

14 Second Amendment is designed to protect would be eviscerated.

15     And I think it's telling that they said many times, well,

16 people don't need these sorts of things.  Mr. Pekelis suggested

17 people can just go buy rimfire rifles, and the state's attorney

18 suggested that maybe knives and other things are great for self-

19 defense; and they sure might be, but, you know, the rimfire

20 rifles got overtaken in large part because they're less

21 accurate.  I mean, the way a rimfire rifle works instead of a

22 centerfire rifle is the suppression cap is on the -- on the rim,

23 and so it leads to less likely for the average shooter to be

24 able to hit their target.

25     And the features that HB 1240 singles out for prohibition

1  like a stabilizing brace or a flash suppresser to make sure you

2  don't get blinded in real light situations, as Judge McGlynn

3  found and as the state has never contested, are all things that

4  make it easier for you to hit your target, and the state doesn't

5  dispute any of that.  But what the state says is, yes, but they

6  make it easier for bad guys to hit their target, too.  Of

7  course, that's true, but that's not how constitutional rights

8  work.

9      We don't, sort of, do a lowest common denominator standard.

10  We don't ask in the Fifth Amendment context, well, we know that

11  this mob boss is going to be able to hide behind the privilege,

12  behind self-incrimination.  We know that he's a really, really

13  bad guy so we're going to compel him to testify, and then we're

14  going to compel everyone else to testify, too.  That's not how

15  constitutional rights work.  Constitutional rights, however, do

16  work by looking to what the American people actually do.

17      I mean, the attorney for the state said, you know, this is

18  some sort of novel understanding of constitutional rights.  With

19  respect, the Fourth Amendment question that I know Your Honor is

20  highly familiar with, the reasonable expectation of privacy,

21  depends on what the American people's expectation is, and that

22  depends on actually looking at what the American people do and

23  expect.

24      If the government the day after the iPhone came out had

25  said, "We're putting a policy in place where everything on the

1  iPhone -- you know, we're going to be able to search this before

2  it's password-protected," people's expectations would be a lot

3  different today ten years later than they are.  And, you know,

4  lots of people have said, oh, well, that's sort of circular.

5  It's like, well, no, the way the constitutional rights work in

6  large part depends on what the people whose rights the

7  constitution secures sort of actually do in this country and in

8  the world.

9      And I think the final point that I want to make on this is,

10  you know, the state relies heavily on the machine gun bans, and,

11  you know, they say, you know, we have no -- no way to account

12  for that, and I think they just couldn't be further from the

13  truth.  So as Professor Spitzer has pointed out, by the time the

14  state started banning Tommy guns, 3,000 of them had been

15  purchased in the United States; well, to Judge Easterbrook in

16  the *City of Highland Park* opinion said, oh, no, they were super

17  popular, and he said it again at oral argument a month ago in

18  the Seventh Circuit.  He's just wrong.  And if Your Honor wants

19  to look at the evidence -- the evidence in this case, one of the

20  declarations says fewer than 3,000 of them were sold.  These

21  were the furthest thing from common in the United States when

22  states started banning them.

23      Whereas with respect to semiautomatic rifles, pistols, and

24  shotguns, which predated bearable fully-automatic arms by almost

25  50 years, they've been in circulation in the United States for

1    more than a century.  And with respect to the types of firearms

2    that are banned specifically under HB 1240, they've been in

3    circulation in the United States for almost 70 years.  I mean,

4    some of the firearms that the United States Civilian

5    Marksmanship Program sold at a discount after the Korean War to

6    civilians would be banned under this statute.  The United States

7    government sold 200,000 semiautomatic rifles that would fit

8    within the definition of the statute in the '60s and '70s.

9          So while 200,000 is certainly less than 24 million and we

10   don't dispute that the, you know, sort of true rise in sales

11   numbers happened in the 1980s -- I don't want to, you know, be

12   heard that I'm contesting that; it's just reality -- the idea

13   that these things weren't sort of out there in large numbers is

14   just counterfactual.  And again, you know, this isn't -- they

15   like to say that this is sort of circular, but, with respect,

16   when it comes to types of arms that have been on the market for

17   more than a century -- or, you know, if you want to look at the

18   very specific times, for at least 50, 60, 70 years -- when the

19   ultimate question under the constitutional standard is what's

20   the tradition of the American people in terms of regulating

21   those arms, of course it matters what the American people have

22   done.

23         And while the inquiry might be, you know, somewhat differ

24   -- somewhat different to think through when it comes to

25   something that's truly a dramatic technological change,

1  something that's truly just different in kind from the types of

2  weapons that are available, when it comes to something that's

3  been around for decades and decades and decades, how the United

4  States has and has not regulated them has to be dispositive

5  because *Bruen* tells us that's what's dispositive.

6          And with respect to these types of firearms, they were not

7  banned, period, until the 1990s.  The federal government's

8  assault weapons ban, as the state pointed out, did lapse within

9  ten years; so there is a very short tradition.  And although,

10  you know, Mr. Pekelis, I believe, pointed out that Dr. Spitzer

11  had said, you know, more than a few states actually effectively

12  banned semiautomatic firearms, I mean, we're happy to run

13  through each and all of the laws.  He and I had a nice colloquy

14  at the Oregon trial that Mr. Pekelis -- Mr. Pekelis mentioned.

15  And if you go through and you drill down on all of them, at most

16  four states ever banned any type of semiautomatic weapon, and

17  all four of those states repealed those laws within a few

18  decades.  So there's just no -- and because -- and we sort of

19  know that that has to be right because otherwise what *Staples*

20  said would've made no sense.

21          And sure, the assault weapons ban came in a few months

22  after *Staples*, but it's important to note that in 1994, the

23  Supreme Court hadn't recognized an individual right under the

24  Second Amendment; so it's sort of hard to really understand how

25  that ten-year law that was allowed to lapse could sort of be

1  treated now as, you know, overwhelming the tradition where these

2  arms have been in common use for self-defense and all other --

3  you know, many other lawful purposes for decades without being

4  regulated at all, let alone banned.

5      And the last thing that I should say is on irreparable

6  injury.  And so, I mean, to start with the economic injury

7  because that's the easiest, I mean, to be sure, economic

8  injuries are usually not irreparable because you usually can get

9  your money back.  You can't get your money back from the

10 governor or the attorney general under the 11th Amendment.  So

11 even if only $0.01 were lost, that's irreparable injury; and

12 while you might think, "Oh, well, $0.01's not enough for an

13 injunction because I've got to do balancing," I don't mean to

14 suggest that $0.01 means we win, but it's irreparable by

15 definition here, every sort of dollar that my clients aren't

16 able to recoup because of this.

17     And, you know, Mr. Pekelis pointed out, you know, newspaper

18 articles that aren't in the record that, you know, show that

19 sales went up before; and if we want to talk about sales numbers

20 that aren't in the record that I'm happy to put in the record,

21 my clients currently have in their inventory rifles and shotguns

22 and handguns that their customers bought that their customers

23 can't receive because of this law; so they're just sitting

24 there.  And the Ninth Circuit's *Teixeira* decision makes very

25 clear that the derivative inquiry works in the Second Amendment

1  context; so a dealer there had standing to assert the rights of

2  his customers.

3       So if you're worried about irreparable injury, you know,

4  and if you think that it really matters who those people are,

5  the customers whose firearms that they've paid for but they

6  don't have them, we can get you that information.  But the idea

7  that this isn't irreparably injuring people right now, I mean, I

8  just think is just fundamentally inconsistent with reality.

9       And on Mr. Pekelis's point that we don't have 2023 sales

10  figures, we can get -- I mean, we're happy to get those, too,

11  but the reason that we don't have them is we filed this lawsuit

12  a few months ago.  Most businesses sort of don't know their

13  sales figures for the future.  Most businesses tend not to sort

14  of know the past year's everything until, you know, later in the

15  year.  But to the extent, you know, those types of facts and

16  figures are what the Court thinks it needs to decide this, we're

17  happy to provide any of that or any other evidence the Court

18  feels is necessary.

19       So for these reasons and those in our briefs, we'd ask that

20  the Court enter a preliminary injunction.

21            THE COURT:  Thank you.

22       All right, Counsel.  I'm going to ask you.  Would you like

23  to take a lunch break now and pick up with the next case in,

24  say, about an hour, hour and fifteen minutes; or do you want to

25  get started on the next case and then take a lunch break?

1          MR. ROWEN:  I think I'd prefer to just stand back up

2    there.

3          THE COURT:  All right.  Well, let's --

4          MR. ROWEN:  I don't know what my friends on the other

5    side think.

6          MS. GRUNBERG:  That's fine with us.  Could we possibly

7    take a break?

8          THE COURT:  Yes.  Why don't we take about 15 minutes.

9    We'll start at noon on the motion to dismiss.  But I'm certain

10   that the court reporter probably wants a break as well.  We've

11   gone over what I'm supposed to go.  All right.  So we'll pick

12   back up around noon, and we'll go for, I would say, about an

13   hour, and then we'll probably take lunch before we go into the

14   motion for preliminary injunction.

15          (Court adjourned on August 18, 2023, at 11:44 a.m.)

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3      I, ALLISON R. ANDERSON, do hereby certify:

4      That I am an Official Court Reporter for the United States

5   District Court for the Eastern District of Washington in

6   Spokane, Washington;

7      That the foregoing proceedings were taken on the date and

8   place as shown on the first page hereto; and

9      That the foregoing proceedings are a full, true, and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12      I do further certify that I am not a relative of, employee

13  of, or counsel for any of said parties, or otherwise interested

14  in the event of said proceedings;

15      DATED this 19th day of September, 2023.

16

17  _____
    ALLISON R. ANDERSON, RMR, CRR
18  Washington CCR No. 2006
    Official Court Reporter
19  Spokane, Washington

20

21

22

23

24

25