FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 26, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| AMANDA BANTA, et al., | No. 2:23-CV-00112-MKD |
| Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF |
| v. | |
| ROBERT W. FERGUSON, Attorney General of the State of Washington, et al., | **ECF No. 16** |
| Defendants, | |
| ALLIANCE FOR GUN RESPONSIBILITY, | |
| Defendant-Intervenor. | |

Before the Court is Plaintiffs' Motion for Preliminary Injunction, ECF No. 16. On August 18, 2023, the Court held a hearing on the motion. ECF No. 47. Matthew D. Rowen and Steven Fogg appeared on behalf of Plaintiffs Amanda Banta, Sharp Shooting Indoor Range & Gun Shop, Inc. ("Sharp Shooting"), The Range, LLC ("The Range"), Aero Precision, LLC ("Aero"), and the National Shooting Sports Foundation, Inc. ("NSSF"). Andrew W. Hughes appeared on

ORDER - 1

behalf of Defendants Robert W. Ferguson, Washington's Attorney General, and John R. Batiste, Chief of the Washington State Patrol. Zachary Pekelis and Meha Goyal appeared on behalf of Defendant-Intervenor Alliance for Gun Responsibility.

Plaintiffs challenge the constitutionality of Substitute House Bill 1240 ("SHB 1240"), 2023 Wash. Sess. Laws, ch. 162. ECF No. 1. The instant motion seeks a preliminary injunction to enjoin enforcement of SHB 1240 while the litigation in this case is ongoing. ECF No. 16. For the reasons stated below, the motion is denied.

## BACKGROUND

Amanda Banta is a law-abiding citizen and a shooting-sports Olympian. ECF No. 1 at 4 ¶ 11. Sharp Shooting and The Range are federally licensed retail firearms businesses. *Id.* at 4-5 ¶¶ 12-13. Aero is a firearms and firearm-parts manufacturer. *Id.* at 5 ¶ 14. NSSF is "the trade association for the firearm, ammunition, and hunting and shooting sports industry." *Id.* at 5-6 ¶ 15. NSSF "has a membership of more than 10,000 throughout the United States (including Washington), including manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members." *Id.*

On April 25, 2023, Washington Governor Jay Inslee signed SHB 1240 into law. 2023 Wash. Sess. Laws, ch. 162. SHB 1240 amends RCW ch. 9.41,

ORDER - 2

pertaining to crimes and punishments for firearms and dangerous weapons.  *Id.*  In relevant part, Section 3 of SHB 1240 criminalizes the manufacture, import, distribution, or sale of any "assault weapon," as defined in Section 2(2) of SHB 1240.  A violation is a gross misdemeanor, *id.* at § 3(4), and may also constitute a civil violation of Washington's Consumer Protection Act,[1] *id.* at § 4.  Limited exceptions are provided for assault weapons manufactured, sold, etc., to the armed forces, law enforcement, or out-of-state individuals, and where an assault weapon is received by operation of law upon the death of the owner.  *Id.* at § 3(2).

SHB 1240 identifies sixty-two specific categories of firearms as "assault weapons," including the AR-15, AK-47, and Springfield Armory M1A.  *Id.* at § 2(a)(i).  In addition, SHB 1240 defines "assault weapon" to include any of the following:

> (ii) A semiautomatic rifle that has an overall length of less than 30 inches;
>
> (iii) A conversion kit, part, or combination of parts, from which an assault weapon can be assembled or from which a firearm can be converted into an assault weapon if those parts are in the possession or under the control of the same person; or
>
> (iv) A semiautomatic, center fire rifle that has the capacity to accept a detachable magazine and has one or more of the following:

---

[1] Plaintiffs do not raise any challenge to the provisions of SHB 1240 concerning civil liability in the instant motion.  *See* ECF No. 16.

ORDER - 3

(A)    A grip that is independent or detached from the stock that protrudes conspicuously beneath the action of the weapon.    The addition of a fin attaching the grip to the stock does not exempt the grip if it otherwise resembles the grip found on a pistol;

(B) Thumbhole stock;

(C) Folding or telescoping stock;

(D) Forward pistol, vertical, angled, or other grip designed for use by the nonfiring hand to improve control;

(E) Flash suppressor, flash guard, flash eliminator, flash hider, sound suppressor, silencer, or any item designed to reduce the visual or audio signature of the firearm;

(F) Muzzle brake, recoil compensator, or any item designed to be affixed to the barrel to reduce recoil or muzzle rise;

(G) Threaded barrel designed to attach a flash suppressor, sound suppressor, muzzle break, or similar item;

(H) Grenade launcher or flare launcher; or

(I) A shroud that encircles either all or part of the barrel designed to shield the bearer's hand from heat, except a solid forearm of a stock that covers only the bottom of the barrel;

(v) A semiautomatic, center fire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;

(vi) A semiautomatic pistol that has the capacity to accept a detachable magazine and has one or more of the following:

(A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer;

(B) A second hand grip;

ORDER - 4

(C) A shroud that encircles either all or part of the barrel designed to shield the bearer's hand from heat, except a solid forearm of a stock that covers only the bottom of the barrel; or

(D) The capacity to accept a detachable magazine at some location outside of the pistol grip;

(vii) A semiautomatic shotgun that has any of the following:

(A) A folding or telescoping stock;

(B) A grip that is independent or detached from the stock that protrudes conspicuously beneath the action of the weapon. The addition of a fin attaching the grip to the stock does not exempt the grip if it otherwise resembles the grip found on a pistol;

(C) A thumbhole stock;

(D) A forward pistol, vertical, angled, or other grip designed for use by the nonfiring hand to improve control;

(E) A fixed magazine in excess of seven rounds; or

(F) A revolving cylinder shotgun.

*Id.* at § 2(2)(a).

Ms. Banta states that "[b]ut for [SHB 1240], she would be in the market for one or more new firearms that fall within the scope of what is banned under [S]HB 1240." ECF No. 1 at 4 ¶ 11. NSSF states that its members include "manufacturers, distributors, and retailers of firearms, ammunition, and related products, as well as other industry members" across the United States and including Washington, who have been injured by SHB 1240. *Id.* at 5-6 ¶ 15.

ORDER - 5

Before SHB 1240 became law, Sharp Shooting, The Range, and Aero (collectively, the "Industry Plaintiffs") sold or manufactured firearms falling within SHB 1240's definition of assault weapons in Washington and state they would have continued to do so but for SHB 1240.  ECF No. 1 at 4-5 ¶¶ 12-14.

## LEGAL STANDARD

Fed. R. Civ. P. 65(a) provides for preliminary injunctions.  "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  To obtain a preliminary injunction, a movant must establish "that (1) [s]he is likely to succeed on the merits of [her] claim, (2) [s]he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in [her] favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Winter*, 555 U.S. at 20).  "When . . . the nonmovant is the government, the last two *Winter* factors 'merge.'" *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  The first factor is considered "a threshold inquiry" and "the most important factor." *Id.* (quoting *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)) (quotation marks omitted).  "As a general matter, district courts must consider all four *Winter* factors," although "a court need not consider the other factors if a movant fails to show a likelihood of success on the merits." *Id.* (quotation marks, alterations, and citations omitted).  Further, the

Ninth Circuit applies a "sliding scale" approach to these factors, whereby "a stronger showing of one element may offset a weaker showing of another." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (citation and quotation marks omitted).  If a plaintiff demonstrates that the "balance of equities 'tips sharply in [her] favor,' the plaintiff must raise only 'serious questions' on the merits—a lesser showing than likelihood of success."  *Id.* (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

Where a plaintiff alleges a constitutional injury, "the first factor is especially important."  *Baird*, 81 F.4th at 1040.  The likelihood of success on the merits for such a plaintiff is usually sufficient to establish the other factors.  *Id.* (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022)) (other citations omitted).  However, a district court should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (citation and quotation marks omitted).

## DISCUSSION

### A. Likelihood of Success on the Merits

Plaintiffs' Complaint seeks a declaratory judgment that SHB 1240 is unconstitutional and an injunction to prevent its enforcement.  ECF No. 1 at 23. Plaintiffs argue that a preliminary injunction is warranted because they are likely to

ORDER - 7

establish that SHB 1240 violates the Second Amendment of the United States

Constitution.  ECF No. 16 at 8-9.

The Second Amendment states: "A well regulated Militia, being necessary

to the security of a free State, the right of the people to keep and bear Arms, shall

not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*

(*Heller I*), the Supreme Court clarified that the Second Amendment right is "an

individual right to keep and bear arms" and that self-defense is "the central

component of the right itself."  554 U.S. 570, 595, 599 (2008) (emphasis omitted).

In *McDonald v. City of Chicago*, the Court held that "the Second Amendment right

is fully applicable to the States."  561 U.S. 742, 750 (2010).  In *N.Y. State Rifle &*

*Pistol Ass'n, Inc. v. Bruen*, the Court articulated a test for Second Amendment

challenges to firearm regulations.  597 U.S. 1, 17 (2022).  The Ninth Circuit has

explained this test as follows:

> We first consider whether the Second Amendment's plain
> text covers an individual's proposed course of conduct. . . .
> If so, the Second Amendment presumptively protects that
> conduct. . . .  The Government then bears the burden of
> justifying the challenged regulation by showing that it is
> consistent with our nation's 'historical tradition of firearm
> regulation.' . . .  Only then may we conclude that the
> regulation is constitutional.

*United States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024) (quoting *Bruen*,

597 U.S. at 24); *see also United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir.

2023) (citation omitted).

ORDER - 8

1      The "burdens at the preliminary injunction stage track the burdens at trial."

2    *Baird*, 81 F.4th at 1044 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao*

3    *do Vegetal*, 546 U.S. 418, 429 (2006)) (quotation marks omitted).  Here, it is

4    Plaintiffs' burden to first demonstrate that the Second Amendment protects their

5    proposed course of conduct.  *See Perez-Garcia*, 96 F.4th at 1178; *Baird*, 81 F.4th

6    at 1046.  If Plaintiffs succeed, the burden shifts to the State Defendants to

7    demonstrate that SHB 1240 is "part of the historical tradition that delimits the outer

8    bounds of the right to keep and bear arms."  *See Baird*, 81 F.4th at 1043 (quoting

9    *Bruen*, 597 U.S. at 19) (quotation marks omitted).

10        *1.  Plain Text of the Second Amendment*

11        The plain text of the Second Amendment has three components: (1) the right

12   of the people (2) to keep and bear (3) Arms.  *See* U.S. Const. amend. II; *Heller I*,

13   554 U.S. at 579-92.  Although the meaning of the Second Amendment is

14   "historically fixed," its protections "appl[y] to new circumstances."  *Bruen*, 597

15   U.S. at 28 (citing *Heller I*, 554 U.S. at 582).  Below, the Court looks to post-*Bruen*

16   authority to apply the Second Amendment's plain text, and pre-*Bruen* authority

17   that is not incongruent with *Bruen*.

18        a.  "The People" & "Keep and Bear"

19        The parties do not dispute that SHB 1240 implicates the Second Amendment

20   right to the extent it regulates "the people" and conduct amounting to "keep[ing]

ORDER - 9

and bear[ing]." *See generally* ECF Nos. 16, 30, 36.  "[O]rdinary, law-abiding, adult citizens . . . are part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31-32 (citing *Heller I*, 554 U.S. at 580); *see also Perez-Garcia*, 96 F.4th at 1178-79, 1179 n.9.  Further, the Second Amendment right "'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).  "[T]he right to keep and bear arms includes the right to purchase them.  And thus laws that burden the ability to purchase arms burden Second Amendment rights." *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022), *vacated and remanded*, 47 F.4th 1124 (9th Cir. 2022) (citation omitted); *see also Luis v. United States*, 578 U.S. 5, 26 (2016) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise.") (Thomas, J., concurring).  However, "the Second Amendment does not independently protect a proprietor's right to sell firearms." *Teixeira*, 873 F.3d at 690.

Ms. Banta is an ordinary, law-abiding adult citizen.  ECF No. 1 at 4 ¶ 11.  In contrast, the Industry Plaintiffs are businesses, and NSSF represents 10,000 unnamed industry members. *Id.* at 4-6 ¶¶ 12-15.  The Second Amendment's plain text concerns firearm makers and sellers only to the extent that the individual citizen relies upon makers and sellers to exercise their individual Second Amendment right. *See Teixeira*, 873 F.3d at 689-90.  In short, the below

ORDER - 10

1  discussion should not be construed to include the Industry Plaintiffs under "the

2  people," or commercial activities under "keep and bear," separate and apart from

3  the individual's right to keep and bear arms.

4          b.  "Arms"

5          The parties disagree sharply as to whether SHB 1240's "assault weapons"

6  are "arms" for the purposes of the Second Amendment's plain text.  ECF No. 16 at

7  15-25; ECF No. 30 at 11-18; ECF No. 36 at 8-11.

8          "Arms" are "weapons of offence, or armour of defence," or "any thing that a

9  man wears for his defense, or takes into his hands, or useth in wrath to cast at or

10 strike another."  *Heller I*, 544 U.S. at 581 (quoting 1773 and 1771 dictionaries)

11 (alterations and quotation marks omitted).  At the time of the founding, it was

12 understood that "all firearms constituted 'arms.'"  *Id.* (citing a 1794 thesaurus).

13 "The Court has held that 'the Second Amendment extends, prima facie, to all

14 instruments that constitute bearable arms, even those that were not in existence at

15 the time of the founding[.]'"  *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016)

16 (per curiam) (quoting *Heller I*, 554 U.S. at 582).  In *Bruen*, the Court explained

17 "that general definition covers modern instruments that facilitate armed self-

18 defense."  597 U.S. at 28 (citing *Caetano*, 577 U.S. at 411-12).

19         It is well established that modern handguns are protected.  *Perez-Garcia*, 96

20 F.4th at 1180 (citing *Bruen*, 597 U.S. at 9-10); *Alaniz*, 69 F.4th at 1127 (quoting

ORDER - 11

*McDonald*, 561 U.S. at 767-68).  Beyond handguns, the Court is without binding authority as to what other weapons the Second Amendment protects as "arms." Justice Thomas recently noted that the Supreme Court has not "squarely addressed what types of weapons are 'Arms' protected by the Second Amendment." *Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (2024) (statement respecting a denial of certiorari). He further noted that the state of the authority on this issue "leaves open essential questions such as what makes a weapon 'bearable,' 'dangerous,' or "unusual." *Id.*

At this stage of the analysis, Plaintiffs bear the burden to demonstrate they are likely to succeed in establishing the conduct at issue is covered by the text of the Second Amendment.  *See Baird*, 81 F.4th at 1044.  To evaluate that proposition, the Court reviews the existing authority, then considers Plaintiffs' evidentiary showing in light of that authority.

                i.   State of the Authority

There is no post-*Bruen* Ninth Circuit authority offering guidance on the Second Amendment's definition of "arms" or which arms do or do not fall under its protections.[2]

---

[2] *Teter v. Lopez*, a panel decision involving butterfly knives, was vacated pending rehearing en banc.  No. 20-15948, 2024 WL 719051 (9th Cir. Feb. 22, 2024). *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), an en banc decision involving

1       The circuit courts that have applied *Bruen* to category-of-weapon restrictions

2   have found that the Second Amendment's definition of "arms" does not include

3   certain weapons.  The Fourth Circuit has excluded arms "not reasonably related or

4   proportional to the end of self-defense" and "better suited for offensive criminal or

5   military purposes."  *Bianchi v. Brown*, 111 F.4th 438, 450 (4th Cir. 2024) (en

6   banc), *petition for cert. filed sub nom., Snope v. Brown*, No. 24-203 (2024).  The

7   Seventh Circuit has excluded "weapons that may be reserved for military use."

8   *Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023).  A concurring

9   judge of the Third Circuit would have excluded "dangerous and unusual weapons."

10  *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108

11  F.4th 194, 209 (3rd Cir. 2024) (Roth, J., concurring).

12      District courts in this circuit, while not unanimously, have largely reached

13  the same conclusion as these circuit courts.  A court in the Central District of

14  
    _____

15  large-capacity magazines, was vacated and remanded, 49 F.4th 1228 (9th Cir.

16  2022), and is now awaiting en banc decision, *see* Notice, No. 23-55805 (9th Cir.

17  Mar. 19, 2024), ECF No. 82.  *Miller v. Bonta* (*Miller II*), 699 F. Supp. 3d 956

18  (S.D. Cal. 2023), a case involving assault weapons, is awaiting a panel decision

19  and has been stayed pending *Duncan*.  No. 23-2979, 2024 WL 1929016 (9th Cir.

20  Jan. 26, 2024).

ORDER - 13

California excluded "dangerous and unusual" weapons from the definition of "arms." *See, Rupp v. Bonta*, No. 17-cv-746, 2024 WL 1142061, at *7-9 (C.D. Cal. Mar. 15, 2024). A court in the Western District of Washington has explained that "*Heller* [*I*] does not hold that access to all weapons 'in common use' are automatically entitled to Second Amendment protection without limitation." *Hartford v. Ferguson*, 676 F. Supp. 3d 897, 903 (W.D. Wash. 2023). A court in the District of Oregon has noted that regulations of dangerous and unusual weapons were presumptively lawful, and considered the dangerousness of the weapon at issue to determine that they were not "in common use for lawful purposes like self-defense." *Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 798, 801 (D. Or. 2022) (citations, alteration, and quotation marks omitted). In contrast, a court in the Southern District of California applied a "dangerous and unusual" analysis only to determine whether historical regulations were analogous to the regulation at issue at *Bruen* step two. *Miller II*, 699 F. Supp. 3d at 969-70, 977, 985, 1007.

The majority of the existing authority favors a Second Amendment test requiring Plaintiffs to demonstrate that the weapons at issue are not only in common use for self-defense but also tailored to that end, or that the weapons at issue are otherwise not too dangerous or unusual.

ii.  Assault Weapons Subject to SHB 1240

SHB 1240's definition of "assault weapons" is wide in scope.  It encompasses a long list of specific and general categories of firearms with various features, capabilities, calibers, attachments, shapes, and sizes.  *See* 2023 Wash. Sess. Laws, ch. 162, at § 2(2)(a).  The law explains that "[a]ssault weapons are civilian versions of weapons created for the military and are designed to kill humans quickly and efficiently" and that the state legislature has found assault weapons to be "most useful in military service."  *Id.* at § 1.

Plaintiffs protest that this "sweeping definition captures nearly any modern rifle," ECF No. 16 at 11, although Plaintiffs seek to enjoin SHB 1240 with regard to more than just rifles, *id.* at 9.  Plaintiffs argue that the Second Amendment's plain text "obviously includes the rifles, pistols, and shotguns that SHB 1240 bans, regardless of whether they possess the various features that SHB 1240 singles out as supposedly problematic." *Id.* at 15-16.  The Court disagrees that the current state of authority provides an "obvious" answer on what types of weapons are or are not included in the Second Amendment right.  *See Heller I*, 554 U.S. at 623 ("the Second Amendment right, whatever its nature, extends only to certain types of weapons"); *Harrel*, 144 S. Ct. at 2492.

Plaintiffs repeatedly assert, without supporting evidence, that many of the firearms and features that SHB 1240 bans are not highly unusual and are common,

ubiquitous, and used for lawful purposes.  ECF No. 16 at 20-21; ECF No. 39 at 5, 10.  In contrast, Plaintiffs acknowledge they are not challenging SHB 1240's ban on the sale of grenade launcher attachments, noting without evidentiary support that "'[g]renade launchers' are very rare . . . as are grenades themselves."  ECF No. 16 at 11 n.1.  The Court will not deem a firearm in common use today for self-defense without a proffer of evidence explaining what the firearm is, how commonly Americans use it, and for what purpose(s) it is used.[3]  Plaintiffs have failed to meet their burden to demonstrate that the bulk of the arms that SHB 1240 identifies are covered by the Second Amendment.

　　　　There is one type of firearm for which Plaintiffs present sufficient evidence

---

[3] Plaintiffs briefly suggest that "pistol braces" are "unquestionably common in modern America," citing a news article that describes pistol braces as "a commonly owned and used accessory" and estimating there are 10 to 40 million privately owned pistol braces.  ECF No. 16 at 20 (citing Ben Johnson, *ATF Announces Pistol Brace Ban Affecting Millions of Gun Owners*, The Salem News Online (Jan. 31, 2023)).  The article cites to the Congressional Research Service for the conclusion.  It is not clear whether SHB 1240 covers pistol braces, and Plaintiffs do not otherwise explain how these statistics bear on the analysis for firearms that are clearly covered by SHB 1240.

ORDER - 16

and data to enable a *Bruen* inquiry—the AR-15 rifle.  Plaintiffs offer information relating to the commonality and lawful uses of AR-15 rifles.  ECF No. 16 at 18-23.  The State Defendants' experts also provide information on these points.  *See, e.g.,* ECF No. 32 at 10-13, 14-16, 19-20 (Busse Declaration); ECF No. 33 at 33-41 (Klaveras Declaration).  Moreover, the commonality and use of the AR-15 has been analyzed by other courts.  *See Rupp*, 2024 WL 1142061, at *9-19; *Miller II*, 699 F. Supp. 3d at 965-68; *see also Staples v. United States*, 511 U.S. 600, 603 (1994).

Plaintiffs cite NSSF data indicating that, from 1990 to 2018, 19.79 million modern sporting rifles have been produced in or imported into the United States.  NSSF, *Firearm Production in the United States* 7 (2020), available at https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf.  In 2018, 1.72 million modern sporting rifles, which are mostly AR-15s and AK-style rifles, were produced in the United States, constituting 48% of all rifles produced that year.[4]  *Id*. at 7, 18; *see also* ATF, *National Firearms*

_____

[4] For comparison, 3.8 million pistols were manufactured in the United States in 2018.  NSSF, *Firearm Production in the United States*, *supra*, at 2; *see also* ATF, *Firearms Commerce in the United States: Annual Statistical Update* 3 (2021), available at https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-

ORDER - 17

*Commerce and Trafficking Assessment: Firearms in Commerce* 149 (May 5, 2022), available at https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume (noting that AR-type rifles "are now commonly referred to as 'modern sporting rifles'").  In 2022, NSSF estimated that 24.44 million modern sporting rifles had been produced in or imported into the United States since 1990.  NSSF, *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), available at https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/.  97% of modern sporting rifle owners own an AR-platform rifle.  NSSF, *Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles* 12 (July 14, 2022), available at https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf.

The State Defendants offer an expert opinion from Louis Klarevas, a security policy analyst and research professor in the field of gun massacres.  ECF No. 33 at 1-3.  Klarevas opines that "only 6.4 million gun owners—out of an estimated 81 million Americans who own at least one personal firearm—own modern sporting rifles."  ECF No. 33 at 34 ¶ 26.  Klarevas opines that this

---

report/download.

ORDER - 18

represents "less than 8% of all civilian gun owners in the United States" and "less than 2% of all Americans."  *Id.* at 34-35 ¶ 26; *see also* ECF No. 33-9 at 2 (Philip J. Cook & John J. Donohue, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 JAMA 1191, 1191 (2022) ("Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.")).

Plaintiffs also cite a 2021 paper that indicates "82.7% of gun owners report owning a handgun" and 30.2% reported having owned an AR-15.  ECF No. 16 at 19 (citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 20, (Georgetown McDonough School of Business Research Paper No. 4109494, May 2022), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494).[5]

---

[5] Klarevas challenges the English paper on the grounds that "it fails to identify the source of sponsorship funding and it fails to fully disclose the measurement tools." ECF No. 33 at 38 ¶ 27 n.26.  The Court "is not strictly bound by all rules of evidence" when considering a preliminary injunction.  *See Ticketmaster LLC v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1103 n.2 (C.D. Cal. 2007) (citing *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).  Evidentiary

In a 2021 survey of firearms retailers, 86.9% of respondents indicated they offer new handguns for sale, and 82.1% offer new "AR-style/modern sporting rifles."  NSSF, *Firearms Retailer Survey Report* 7 (2021), available at https://www3.nssf.org/share/PDF/pubs/Firearms-Retailer-Survey-Report-2021.pdf. Retailers were asked to approximate 2020 sales by firearm type: the largest category of reported sales was semiautomatic pistols (44.2%), and the second largest was AR/modern sporting rifles (20.3%).  *Id.* at 12.

The figures cited are broadly consistent with the findings by other courts.  A

standards are relaxed to accommodate "[t]he urgency of obtaining a preliminary injunction [which] necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial."  *Harvey*, 734 F.2d at 1394.  "The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."  *Id.* (citations omitted); *see also Republic of Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction.").  The English study is broadly consistent with the other information presented.  However, this Order should not be construed as an evidentiary ruling on the admissibility of the English study in future proceedings.

ORDER - 20

court in the Southern District of California found in 2021 that "[o]ver the last three decades, 19,797,000 modern rifles have been manufactured or imported into the United States . . . ." *Miller v. Bonta* (*Miller I*), 542 F. Supp. 3d 1009, 1020 (S.D. Cal. 2021), *vacated and remanded*, No. 21-55608, 2022 WL 3095986 (9th Cir. Aug. 1, 2022) (citations omitted). That same court also found that "[a]lmost one-half of all rifles (48%) produced in 2018 were modern rifles." ECF No. 16 at 18 (citation omitted); *see also Miller II*, 699 F. Supp. 3d at 1009 ("Today, the AR-15 is the best-selling rifle in the United States, industry figures indicate. About 1 in 20 United States adults—or roughly 16 million people—own at least one AR-15, according to polling data from The Washington Post and Ipsos." (quoting Todd C. Frankel et al., *The Gun That Divides a Nation*, Washington Post, Mar. 27, 2023)) (quotation marks omitted). In March 2024, a court in the Central District of California found that "the number of AR-type-rifle owners" is "about 10.31 million—about 4% of the adult population." *Rupp*, 2024 WL 1142061, at *16; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market.").

As to *why* Americans own AR-15s, NSSF consumer survey data shows that "[h]ome/self-defense" is the second-highest reason cited for modern sporting rifle

ownership, behind "[r]ecreational target shooting."  NSSF, *Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles*, *supra* at 18.

In sum, the data presented suggests that AR-15s are commonly owned, and some who own them do so for self-defense.  However, as explained above, most courts analyzing this issue have found commonality is not enough.  In fact, most courts that have considered whether the AR-15 falls under the Second Amendment's plain text have concluded that it does not.

The Fourth Circuit found that the AR-15 "lies outside the scope of the Second Amendment" because "the Second Amendment protects only those weapons that are typically possessed by average Americans for the purpose of self-preservation and are not ill-suited and disproportionate to achieving that end." *Bianchi*, 111 F.4th at 461.  The court reasoned that the AR-15 was intended for offensive combat rather than individual self-defense.  *Id.* at 454 (citation omitted). The court noted the AR-15's likeness to the M16, a rifle with "phenomenal lethality and reliability"; features that "make[] the AR-15 'uniquely dangerous' compared to other high-powered rifles"; disproportionate use in mass shootings, and the increased death toll that results; and factors that make "AR-15s and similar assault rifles . . . 'uniquely dangerous to law enforcement.'"  *Id.* at 451, 456-57 (citations omitted).  The court explained that it had "described the AR-15's capacities in abundant detail to demonstrate just how far outside the animating

ORDER - 22

purposes of the Second Amendment this weapon lies." *Id.* at 458.

In *Bevis*, a consolidated appeal, the Seventh Circuit held that challengers to Illinois's assault weapons ban had failed to demonstrate a likelihood of success in showing that the AR-15 is protected by the Second Amendment. 85 F.4th at 1197. The court affirmed the district courts' denials of a preliminary injunction, finding that "the Arms protected by the Second Amendment do not include weapons that may be reserved for military use." *Id.* at 1194. The court explained that "the AR-15 is almost the same gun as the M16 machinegun," *id.* at 1195, and that "*Heller* [*I*] informs us that the latter weapon is not protected by the Second Amendment," such that both M16s and AR-15s "may be regulated or banned . . . without offending the Second Amendment," *id.* at 1197. But the court "stress[ed] that this is just a preliminary look at the subject" and "d[id] not rule out the possibility that the plaintiffs will find other evidence that shows a sharper distinction between AR-15s and M16s (and each one's relatives) than the present record reveals." *Id.*

District courts in this circuit have analyzed the constitutionality of AR-15 bans. No challenge to such a ban has succeeded in obtaining an injunction that currently remains in force. In *Rupp*, a court in the Central District of California found that the challengers failed to meet their burden at *Bruen* step one, at the summary judgment stage. 2024 WL 1142061, at *19. In *Hartford*, a court in the Western District of Washington found that the challengers failed to meet their

1    burden at *Bruen* step one, in seeking a preliminary injunction against SHB 1240,

2    the same statute at issue here.  676 F. Supp. 3d at 904.  In *Miller II*, the district

3    court in the Southern District of California granted a permanent injunction, 699 F.

4    Supp. 3d at 1011, which the Ninth Circuit administratively stayed, 2023 WL

5    11229998.

6          These cases are stayed pending an en banc decision in *Duncan v. Bonta*.  In

7    *Duncan*, the plaintiffs brought a Second Amendment challenge to a California law

8    banning the manufacture of firearm magazines accepting more than 10 rounds as

9    inconsistent with the Second Amendment.  *See* 83 F.4th 803, 805 (9th Cir. 2023).

10   The district court issued a preliminary injunction, *Duncan v. Becerra*, 265 F. Supp.

11   3d 1106, 1139 (S.D. Cal. 2017), and a permanent injunction at summary judgment,

12   366 F. Supp. 3d 1131, 1185-86 (S.D. Cal. 2019).  After a Ninth Circuit panel

13   affirmed, 970 F.3d 1133, 1169 (9th Cir. 2020), an en banc panel reversed and

14   remanded for entry of judgment in favor of the government defendant, *Duncan v.*

15   *Bonta*, 19 F.4th 1087, 1113 (9th Cir. 2021).  After *Bruen* was decided, the

16   Supreme Court vacated the *Duncan* en banc decision.  142 S. Ct. 2895 (2022).

17   Upon remand, the district court issued another injunction.  695 F. Supp. 3d 1206,

18   1254-55 (S.D. Cal. 2023).  On appeal, the Ninth Circuit stayed the injunction, 83

19   F.4th at 807, and heard the case en banc on March 19, 2024, *see* Notice, No. 23-

20   55805 (9th Cir. Mar. 19, 2024), ECF No. 82.

ORDER - 24

*Duncan* is likely to be instructive on the question of what "arms" are included under the Second Amendment's plain text.  However, the Court must rely on the scant authority that exists.  And, as summarized above, that authority weighs against Plaintiffs' claim.  The most relevant authority available, although not directly on point, is the *Duncan* court's stay of the injunction issued in that case.  *See* 83 F.4th at 805-06.  The court found that the government defendant was likely to succeed on the merits, i.e., by demonstrating that California's large-capacity magazine ban is constitutional.  *Id.*

Finally, the operative legal standard here is the standard for a preliminary injunction, "an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 24.  Plaintiffs cannot point to an injunction that has been upheld on appeal akin to the one they seek.  Plaintiffs fail to meet the high standard required for issuance of a preliminary injunction.  However, because the relief currently sought is preliminary and extraordinary, this analysis does not control a later determination of the merits, either on summary judgment or following a trial.  *See Bevis*, 85 F.4th at 1197.

### 2. *Historical Tradition of Firearms Regulation*

Should the Court assume that the Second Amendment's plain text covers AR-15s, the State Defendants must then demonstrate that SHB 1240 comports with "the Nation's historical tradition of firearm regulation."  *See Bruen*, 597 U.S. at 24.

The Supreme Court has stated that the historical analysis is "fairly straightforward" in cases involving a firearms regulation that "addresses a general societal problem that has persisted since the 18th century." *See id.* at 26.  In such a case, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.*  Conversely, if "earlier generations addressed the societal problem . . . through materially different means," that may also signify that the "modern regulation is unconstitutional." *Id.* at 26-27.  But "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27.  "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy[.]" *Id.* at 28.  Under *Heller II* and *McDonald*, a court should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense," relative to past regulations. *Id.* at 29.

Similar to the above discussion of *Bruen* step one, there is little authority to guide the Court's analysis at *Bruen* step two.  However, what authority exists tends to weigh against Plaintiffs' challenge.  SHB 1240 is a prohibition on the manufacture, import, distribution, or sale of a weapon the legislature deemed dangerous.  *See* 2023 Wash. Sess. Laws, ch. 162, §§ 1, 3.  While no Ninth Circuit case to date has reviewed a similar law, other circuit courts and other district courts

in this circuit have done so.

In *Bianchi*, the Fourth Circuit likened Maryland's assault weapons ban to historical restrictions on carry and possession, observing that "over the course of the 19th century and into the early 20th century, nearly every single state would either regulate the carry of certain firearms or place severe restrictions on their possession." 111 F.4th at 466. The court highlighted regulations targeting "excessively dangerous weapons such as Bowie knives, dirks, sword canes, metal knuckles, slungshots, and sand clubs," which were weapons "particularly suitable for fighting and 'popular with street criminals.'" *Id.* at 466-67 (footnotes, alteration, and citations omitted). The court also found regulations banning the possession of explosives and automatic or semiautomatic weapons in the early 20th century to be persuasive. *Id.* at 470.

The Seventh Circuit found convincing parallels between Illinois's assault weapons ban and 18th- and 19th-century regulations banning the discharge of weapons in city limits, banning the sale of various bladed weapons and pistols, and restricting carry of certain "dangerous and concealable" weapons, as well as more recent federal gun control laws. *Bevis*, 85 F.4th at 1201-02 (citations omitted).

The First Circuit found convincing parallels between Rhode Island's large-capacity magazine ban and historical regulations of sawed-off shotguns and Bowie knives, in addition to a broader tradition of restricting access to certain dangerous

weapons in response to "growing societal concern[s] about violent crime." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46-50 (1st Cir. 2024).

Finally, the district courts in *Rupp*, 2024 WL 1142061, at *35-36; *Hartford*, 676 F. Supp. 3d at 904-07; and *Or. Firearms Fed'n*, 644 F. Supp. 3d at 802-04, each found a sufficient historical analogy to the category-of-weapons regulations at issue in the cases before them.

Here, the State Defendants offer a number of proposed analogues to demonstrate that SHB 1240 is within this Nation's historical tradition of gun regulations. *See* ECF No. 30 at 20-24; ECF No. 34 at 3-33; ECF No. 35 at 3-107. These analogues include restrictions on the sale, carrying, concealment, brandishing, possession, and certain types of uses of certain weapons, in the form of taxes, fines, and criminal penalties. These analogues include some that circuit courts of appeal have found persuasive in comparable cases, such as regulations of Bowie knives and other dangerous weapons. *See* ECF No. 34 at 22-26 (citing 19th century laws and court decisions from a variety of states).

Therefore, even if the Court were to continue to *Bruen* step two, it appears that the State Defendants are likely to meet their burden, under the currently available authority.

**B. Remaining Winter Factors**

The remaining *Winter* factors inquire whether Plaintiffs are likely to suffer

ORDER - 28

irreparable harm and whether the merged balance of equities and public interest analysis weighs in Plaintiffs' favor. *See Baird*, 81 F.4th at 1040. Plaintiffs have failed to demonstrate a likelihood of success on the merits—the most important *Winter* factor. *See id.* Therefore, the Court need not consider the other factors. *See id.*

Accordingly, **IT IS HEREBY ORDERED:**

**1.** Plaintiffs' Motion for Preliminary Injunction, **ECF No. 16**, is **DENIED.**

**2.** The parties are directed to confer and file a joint status report with a proposed schedule for further proceedings in this matter **by October 10, 2024,** including their positions on whether this case should be stayed pending the Ninth Circuit's decision in *Duncan*, No. 23-55805 (9th Cir. argued Mar. 19, 2024). *See, e.g., Miller v. Bonta*, No. 23-2979 (9th Cir. stayed Jan. 26, 2024).

**IT IS SO ORDERED.** The District Court Executive is directed to file this order and provide copies to the parties.

DATED September 26, 2024.

*s/Mary K. Dimke*
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE